**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| THE NIELSEN COMPANY (US), LLC, | ) |
| Plaintiff, | ) ) ) C.A. No. _____ |
| v. | ) ) ) **JURY TRIAL DEMANDED** |
| TVISION INSIGHTS, INC., | ) ) |
| Defendant. | ) |

**COMPLAINT FOR PATENT INFRINGEMENT**

The Nielsen Company (US), LLC ("Nielsen" or "Plaintiff"), for its Complaint against Defendant TVision Insights, Inc. ("TVision" or "Defendant"), alleges as follows:

**NATURE OF THE ACTION**

1. This is an action for patent infringement brought against Defendant for infringement of United States Patent No. 12,047,642 ("the '642 Patent").

**PARTIES**

2. Plaintiff The Nielsen Company (US), LLC is organized and exists under the laws of the State of Delaware.

3. According to public records, Defendant TVision Insights, Inc. is organized and exists under the laws of the State of Delaware.

**JURISDICTION AND VENUE**

4. This is an action for patent infringement arising under the Patent Act, 35 U.S.C. §§ 1 *et seq.* This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

5. This Court has personal jurisdiction over Defendant because Defendant is a Delaware corporation and on information and belief, regularly transacts business in Delaware.

Defendant has a registered agent in Delaware: The Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801.

6. Venue is proper pursuant to 28 U.S.C. § 1400(b) because Defendant resides in this District.

## FACTUAL BACKGROUND

7. Founded in 1923 by Arthur C. Nielsen, Nielsen is the media industry's leading data and analytics company. As people watch and listen to media content, Nielsen fuels the industry by providing an accurate understanding of audience metrics.

8. Measuring across all channels and platforms – from traditional linear television to streaming TV to social media and on-line video/audio platforms – Nielsen helps its clients and partners optimize the value of their marketing investments and growth strategies. Nielsen offers measurement and analytics services in nearly 50 countries.

9. Nielsen is a leading innovator in the field of audience measurement and has been awarded numerous patents for its inventions in the field, including the '642 Patent. Nielsen's audience measurement innovations have been a key to enabling its industry-leading measurement and analytics products and services. Nielsen has invested millions of dollars in its audience measurement inventions.

10. One of the unique features of Nielsen's product and service offerings is its leveraging of panel measurement technologies. Media panels consist of people who have allowed Nielsen into their homes to enable first-hand measurement, via audience measurement devices, of their media consumption activities on an ongoing basis. More specifically, a cornerstone of Nielsen's media data and analytics business has been its investment in media panels and the related technology to measure panelists' media consumption and to analyze the

data collected from those panelists. These media panels allow for a true understanding of not just who is consuming media, but when, why, where, and how much – a truth set.

11. TVision also maintains a media panel. TVision uses data obtained from its panel both to compete with Nielsen and to fuel other companies to compete with Nielsen. In other words, TVision uses Nielsen's patented technology to enable Nielsen's competition.

## THE ASSERTED PATENT

12. The '642 Patent, entitled "Methods and Apparatus to Identify Media Presentations by Analyzing Network Traffic" was duly and legally issued on July 23, 2024, from Application 18/522,843. A true and correct copy of the '642 Patent is attached hereto as Exhibit 1.

13. The '642 Patent descends through a series of continuations whose ultimate parent is U.S. Patent Application No. 16/209,897, filed on December 4, 2018, which issued as U.S. Patent No. 10,805,690. Accordingly, the '642 Patent's priority date is at least as early as December 4, 2018.

14. Nielsen is the assignee and owner of all right, title, and interest in the '642 Patents.

15. The '642 Patent is valid and enforceable.

16. The declaration of Virginia Lee ("Lee Decl."), attached hereto as Exhibit 2, is hereby incorporated by reference into this Complaint.

17. The '642 Patent relates to, among other things, methods and apparatuses for media monitoring, and, more particularly, to methods and apparatus to identify active streaming applications by analyzing network traffic and querying streaming devices. *See* Ex. 1, '642 Patent, 1:20-22; 7:23-27. The '642 patent improves media monitoring technology by analyzing network traffic such that when it determines a streaming device is providing Internet content to a

viewer, it queries the streaming device for the identity of the streaming application running on that streaming device. It then stores an identification of that streaming application.

18. In the prior art, "media monitoring services would monitor the media streamed to desktop and laptop computers by monitoring the media presentation devices to which the media was being sent. This was fairly simple because there existed direct connectivity between the monitoring device and the media presentation devices. For example, a network meter monitored a router in a household and the media streaming through the router. This allowed for a relatively simple method of monitoring the media streaming to the laptop or desktop computer because the media monitoring service needed only monitor the network traffic data, such as the uniform resource locator (URL) for the media being presented or the Internet Protocol (IP) address for the media presentation device to which the media was sent." Ex. 1, '642 Patent, 3:46-59.

19. As media delivery and network technology evolved, new problems arose in monitoring media streaming. Networks started encrypting traffic, which prevented the prior art techniques from providing robust monitoring. "With the advent of new methods of streaming (e.g. Roku, Amazon Fire TV Stick, Google Chromecast, Amazon Fire TV Cube, etc.), such network traffic data may not clearly represent the media that is streaming. For example, the network traffic data that is accessible by a network meter is generally encrypted with only a few metrics that are not encrypted. These unencrypted metrics do not accurately represent what data is being transferred over the network. For example, a streaming service, such as Netflix may use content delivery networks, such as Akamai® or Level 3®. In such an example, a streaming device may request media to stream to a media presentation device. The media that is sent to the streaming device may not be clearly represented by unencrypted metrics of the network traffic data. Because of this unclarity, the network traffic data that is collected by the network meter

cannot be used to determine if media is streaming on a media presentation device connected to the network. When the streaming device receives the streaming media from a network device such as a router, and sends it to a media presentation device, it may be unclear whether the media is being presented at all." Ex. 1, '642 Patent, 3:63-4:16.

20. As the '642 patent explains, "[t]hese new methods of accessing media on media presentation devices present a problem for media monitoring services. Because the media is sent to streaming devices via network communications that are mostly encrypted, network meters cannot determine the streaming media without the addition of a supplemental meter. Traditionally, a media presentation device meter is used to supplement the network meter in order to identify the media streaming to the media presentation device. With the multiple sources of data, it is possible to identify the streaming media being presented on the media presentation device." Ex. 1, '642 Patent, 4:58-5:1. In this context, "a media presentation device meter" identifies content as it is presented on the television or other presentation device. Ex. 2, Lee Decl. ¶11.

21. According to the '642 patent, prior attempts to solve these problems did not result in acceptable metering data. "Prior methods of identifying streaming media being presented on a media presentation device using a network meter required the use of multiple meters to identify the streaming media. In situations where only a network meter is present, prior methods cannot determine the streaming media being presented on the media presentation device because the collected network traffic data does not provide enough information to identify the media. The collected network traffic data alone could represent a number of different tasks being done on a network." Ex. 1, '642 Patent, 5:5-14; Ex. 2, Lee Decl. ¶12.

22. The '642 patent solves these problems with an innovative network-based technological solution. In the invention, "the network meter may identify, from the notification from the media presentation device 108, the identity of the streaming device 112. After identifying the streaming device 112, the network meter 106 may query the streaming device 112 to determine the active application running on the streaming device 112." Ex. 1, '642 Patent, 10:25-30; *also* 7:23-29 ("The network meter 106 may also be configured to query devices in the media exposure measurement location 102 to determine information on active processes running on the other devices in the media exposure measurement location 102. For example, the example network meter 106 of FIG. 1 queries the streaming device 112 to determine the active application running on the streaming device 112."). Querying the streaming device allows the meter to determine "that the active application is, for example, the Netflix application." Ex. 1, '642 Patent, 16:20-21; *also* 19:4-18 ("The program 600 continues at block 604 where the network meter 106 monitors a network (e.g. the network 114) for a notification of an identity of a streaming device (e.g. streaming device 112). If the notification is not received and/or obtained, the program 600 continues to block 602. However, if the notification is received and/or obtained, the program 600 continues to block 606 where the network meter 106 initiates a device discovery process. The example device discovery process of block 606 causes the network meter 106 to query devices in the media exposure measurement location 102 to determine information on active processes running on the other devices in the media exposure measurement location 102. For example, the network meter 106 queries the streaming device 112 to determine the active application running on the streaming device 112."); Ex. 2, Lee Decl. ¶13.

23. The priority date of the '642 Patent is at least as early as December 4, 2018, which is the filing date of the ultimate parent application from which the '642 Patent is a continuation. *See* Ex. 1, '642 Patent; Ex. 2, Lee Decl. ¶14.

24. As of that date, it was not well-understood, routine, or conventional among those of skill in the art to monitor streaming media and active applications on a streaming device by querying a streaming device. Ex. 2, Lee Decl., ¶15. In particular, it was not well-understood, routine, or conventional to query a streaming device for information about the application active and running on the device. *Id.* At that time, those of skill in the art were focused on analyzing data either from the presentation device/television or from the network to obtain information about media consumption and active, running applications. *Id.*

25. As of the priority date, the state of the art attempted to determine the application executing on a streaming device by network traffic analysis, by using a monitor running on the device itself, or by monitoring content as the television or other presentation device played it. Ex. 2, Lee Decl., ¶16. As explained in the '642 patent, network traffic analysis does not provide identifying information about the running application because, *inter alia*, the use of content delivery networks such as Level 3 or Akamai may hide the source of the media. *See* Ex. 1, '642 patent, 4:2-13; Ex. 2, Lee Decl., ¶16. In addition, network traffic analysis has trouble determining media identity and the running application because such traffic is generally encrypted. *See* Ex. 1, '642 patent, 3:63-4:13 ("Because of this unclarity, the network traffic data that is collected by the network meter cannot be used to determine if media is streaming on a media presentation device connected to the network."); Ex. 2, Lee Decl., ¶16.

26. In addition to a network-based solution, monitoring could occur on the device itself, *i.e.*, a device-based solution. But such a solution requires cooperation with device

manufacturers to obtain such data. Ex. 2, Lee Decl., ¶17. Moreover, such manufacturers may not wish to share data and may prefer to monetize it themselves, resulting in a balkanized media measurement landscape. *Id.*

27.     Monitoring could also occur at the television or other presentation device. Ex. 2, Lee Decl., ¶18. This technology, however, will not identify the active application on a streaming device unless the detected content is available only on a single streaming service. *Id.* Such monitoring does not identify the application presenting the media content; rather, it monitors only the content itself. Some media content, for example, is available on streaming services and is also available in syndication on linear television stations, such as those available over the air or on cable television. For such content, monitoring the presentation device will not identify either that the content is being streamed or the active application. *Id.*

28.     The invention provides a technical improvement in the technology of media measurement by identifying a solution to these problems: monitoring the network for a streaming device accessing internet-based media, querying the streaming device for the executing application, and then recording that data for later analysis. Ex. 2, Lee Decl., ¶19.

29.     The '642 patent claims are directed to using a specific, technical technique to determine the active, running application—querying the streaming device after determining that such a device is accessing media from the Internet and providing the media to a television. Ex. 2, Lee Decl., ¶20.

30.     Other ways of determining the active, running application would have been known to one of skill in the art. Ex. 2, Lee Decl., ¶21. For example, a network meter could require streaming devices to operate only in a non-encrypted environment where it could track the destination of the received and sent packets and thereby determine the running application.

*Id.* For example, packets sent to and received from an IP address associated with Netflix would indicate that the Netflix application is running on the streaming device. *Id.* Alternatively, a network monitor could try to obtain clues from encrypted data to make an educated guess as to the running application, such as by analyzing patterns in the sent and received packets. *Id.* Or the running application could be monitored on the device itself. *Id.* Consequently, the claims do not preempt all ways of identifying an application active on a streaming device. *Id.*

31. These technical alternatives have disadvantages compared to the invention. Ex. 2, Lee Decl., ¶22. Many devices will not operate in an unencrypted environment for security reasons, and device manufacturers may be unwilling to create unencrypted and thus unsecure products or modes. *Id.* In any event, communications between a streaming device and a content delivery network will obscure the application running on the streaming device even if the communications are unencrypted. *Id.* And while some information might be gleaned from encrypted data, encryption seeks to obscure the encrypted content, making it hard to obtain useful data from encrypted data streams. *Id.* Trying to glean useful information from patterns in the transmission and reception of data might also not work in the long or medium term if the streaming device's send/receive protocols change or are not predictable. *Id.* And monitoring on the device leaves monitoring in the hands of the device manufacturers who might not be willing to share data with a media measurement entity and who are not a neutral party with respect to the usage of their own devices. *Id.*

32. The invention avoids these problems by monitoring the network and when it determines that the streaming device is accessing Internet media, querying the streaming device for the active streaming application running on the device. Ex. 2, Lee Decl., ¶23. This technical

9

improvement in the art of media measurement and networking solves the problems previously described with these alternatives. *Id.*

33. The '642 Patent reflects the invention's improvements in the technical area of audience measurement by claiming specific improvements to computer-based systems used by an audience measurement entity to obtain information about streaming device usage. Ex. 2, Lee Decl., ¶24. The claims' focus is to improve computer functionality in audience measurement technology itself, not on economic or other tasks for which a computer is used in its ordinary capacity or as a mere tool. *Id.* The claims therefore recite a computer system and method for producing a certain result in a certain way—querying a streaming device after monitoring the network to identify the streaming device and determining it is accessing internet-based media—and not solely the result or effect produced. *Id.*

34. The '642 patent claims are not directed to using a computer as a tool—that is, automating a conventional idea on a computer. Ex. 2, Lee Decl., ¶25. Rather, the claims improve the technical functioning of the computer and computer networks by making a specific improvement to computer functionality by reciting a specific technique for improving media measurement. *Id.* Specifically, the '642 patent claims recite, *inter alia*, monitoring a network to identify a streaming device on the network and querying the streaming device over the network to obtain the running, active application on that streaming device. Nor do the claims recite a fundamental economic or longstanding commercial practice. *Id.* Rather, the claims solve a technical problem with respect to monitoring media consumption on a network. *Id.* The claimed solution is rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks. *Id.*

## **THE INFRINGING APPARATUS AND METHOD**

35. Defendant TVision is a data and analytics company that measures how people watch TV. TVision "started out by measuring attention on linear TV" (*see* Ex. 8, Allison Schiff, *TVision Insights: 'Ratings Only Tell Part of the Story'*, https://www.adexchanger.com/tv-and-video/tvision-insights-ratings-only-tell-part-of-the-story/ ("AdExchanger Article") but has since become the "go-to-choice" for Nielsen's measurement rivals, as reported by AdAge, by providing panel measurement data to them to compete directly with Nielsen's products and service offerings by providing panel measurement data for them to compete directly with Nielsen's products and service offerings. *See* Ex. 9, *TVision is the go-to-choice for Several Nielsen Rivals*, https://www.tvisioninsights.com/resources/adage-mrc-panel-data ("AdAge Article").

36. TVision asserts that its "cutting-edge computer vision technology gathers second-by-second data from a nationally representative panel of households. Our person-level insights are critical components driving innovation at the major providers of alternative currency for TV measurement. Measurement leaders like iSpot, VideoAmp, and Oracle all trust TVision data." Ex. 10, https://www.tvisioninsights.com/about.

37. TVision collects data from TV viewers who opt-in to be part of a panel. *See* Ex. 15, Join the TVision Panel, https://vimeo.com/295447727/3506f24b2b (at 00:50-03:16). Defendant's former President and COO, Luke McGuinness, has stated that "[w]e are like Nielsen in that we use a panel methodology." *See* Ex. 8, AdExchanger Article. According to its website, TVision "gathers second-by-second data from a nationally representative panel of households who have signed on to help our industry understand how, what, and when they watch TV." Ex. 10, https://www.tvisioninsights.com/about. As of a few years ago, Defendant's panel included at

11

least 5,000 homes (approximately 15,000 persons) in the United States. *Id.*; Ex. 11, Alison Weissbrot, *4 Challenges the Industry will Face as it Breaks Away from Nielsen*, https://www.campaignlive.com/article/4-challenges-industry-will-face-breaks-away-nielsen/1726140?DCMP=EMC-CONTheCampaignFix&bulletin=the-campaign-fix ("CampaignLive Article"). TVision's webpage indicates that TVision's panel of households includes 5,000 homes covering 13,000 people. *See* Ex. 12, https://www.tvisioninsights.com/our-panel.

38. The TVision system contains meters and webcams that are located at the panelists' homes and a back-end computing system that receives viewing data and attention data from the panelists' homes. The back-end computing system aggregates the viewing and attention data, generates reports, and provides the reports to TVision's customers.

39. Each panelist household receives a TVision meter that monitors media content presented in the household. *See* Ex. 13, https://www.tvisioninsights.com/resources/tvision-methodology-overview; Ex. 14, https://www.mytvpanel.com/about. The TVision meter is a "mini-computer" having a housing, processor circuitry, memory, and software. *See* Ex. 15, TVision, "Join the TVision Panel" at 1:02-1:17, https://vimeo.com/295447727/3506f24b2b. The household TVision meter transmits viewing and attention data to a remote measurement engine, the TVision remote back-end computing system. *See* Ex. 4, https://www.tvisioninsights.com/our-technology; Ex. 15, TVision, "Join the TVision Panel" at 1:39, available at https://vimeo.com/295447727/3506f24b2b.

40. The TVision meter within a panelist's household is connected to the household's internet network using an Ethernet cable or WiFi. *See* Ex. 14, https://www.mytvpanel.com/about. The TVision meter transmits viewing data to the TVision

back-end computing system using the household's internet network. *See* Ex. 15, TVision, "Join the TVision Panel" at 1:39, available at https://vimeo.com/295447727/3506f24b2b.

41. TVision has proclaimed itself to be "the industry's most comprehensive view of linear and CTV." *See* Ex. 6, https://www.tvisioninsights.com/total-view. TVision's in-home technology "detect[s] which network, app, and/or streaming device is in use. Basically, if the content plays through the TV or a device connected to the TV, we capture it in our reporting." *See* Ex. 6, https://www.tvisioninsights.com/total-view. For streaming content, the TVision meter "uses network traffic analysis to detect if a digital device is connected and identifies if any streaming apps are in use." *See* Ex. 4, https://www.tvisioninsights.com/our-technology. TVision's meter "will determine if there are any streaming devices running on your network and will ask them what content they're currently playing." *See* Ex. 14, https://www.mytvpanel.com/about; *also* Ex. 18, https://www.nttdocomo-v.com/en/news/f8tj1l7s1f/ ("TVision's solution a) identifies who is watching CTV programming and ads, b) on which devices and apps, c) on a second-by-second level across hundreds of apps, and thousands of programs."). TVision then uses this data to "combine network, app, program, and device data with computer vision observations of our panel to report on viewer engagement across the entire TV landscape." *See* Ex. 6, https://www.tvisioninsights.com/total-view. TVision generates streaming reports, such as a report of streaming apps per household (e.g.,Netflix, YouTube, Hulu, etc.). *See* Ex. 7, https://www.tvisioninsights.com/signal/june-2-2024.

42. The TVision back-end computing system includes a remote measurement engine that "remotely manages and supports thousands of in-home devices." *See* Ex. 4, https://www.tvisioninsights.com/our-technology. TVision describes its platform as "a SaaS

13

platform … powered by proprietary hardware, software, and advanced data models. … The end result is our industry's only single-source platform for understanding how people really watch both linear and CTV.  Our SaaS reporting allows marketers and media sellers to leverage the powerful data our technology collects."  *See* Ex. 4, https://www.tvisioninsights.com/our-technology.  TVision "gathers second-by-second data from a nationally representative panel of households who have signed on to help our industry understand how, what, and when they watch TV."  *See* Ex. 5, https://www.tvisioninsights.com/.  TVision captures and reports on "[w]hat program or ad is playing on the TV," "[w]hich individuals are in the room," and "[i]f they're paying attention to the TV."  *See* Ex. 5, https://www.tvisioninsights.com/.

43.     TVision licenses and offers to license data that it collects and analyzes.  TVision has been and is licensing its data to several Nielsen competitors.  *See* Ex. 11, CampaignLive Article.  The press has made known that Defendant has licensed its data to VideoAmp, iSpot, Xandr, and 605.  *See* Ex. 9, AdAge Article.  AdAge reported that Defendant is "the go-to-choice for several Nielsen rivals."  Ex. 9, AdAge Article.

44.     Defendant uses an apparatus ("the Infringing Apparatus") and employs a method ("the Infringing Method") as components of its audience measurement products and services.

45.     The Infringing Apparatus includes TVision's meters, their associated software and hardware, and TVision's remote, backend computing systems that allow it to collect, to aggregate and to report data about its panelists' TV watching, including streaming device application usage.  The Infringing Method includes the steps of collecting, compiling, and analyzing the collected data (including streaming device application usage) using TVision's meters and associated hardware and software and its remote, backend computing systems and other computer systems and apparatuses.

46. By making, using, offering to sell, and selling the Infringing Apparatus and performing the Infringing Method, and by inducing others to infringe, Defendant is infringing the '642 Patent as further described below, including in the claim charts attached hereto as Exhibit 3, which is hereby incorporated by reference into this Complaint.

47. By this lawsuit, Nielsen seeks to enjoin TVision from any further unauthorized use of Nielsen's patented technology, and it seeks to recover damages, including lost profits, increased damages, reasonable attorneys' fees, and other such relief as the Court deems just and proper for TVision's violation of federal law.

## COUNT I
## INFRINGEMENT OF THE '642 PATENT

48. Nielsen repeats and re-alleges paragraphs 1-47 as if fully set forth herein.

49. TVision has infringed and continues to infringe, literally or under the doctrine of equivalents, at least claims 1-6, 11, 12-16, 17-20, and 21 of the '642 Patent ("the Asserted '642 Claims") under 35 U.S.C. § 271(a) by making, using, selling and/or offering to sell in the United States, and/or importing into the United States, the Infringing Apparatus and by performing the Infringing Method in the United States.

50. TVision's activities are without license or permission from Nielsen.

51. The Infringing Apparatus and the Infringing Method include all elements of the Asserted '642 Claims, either literally or equivalently, as shown in the claim charts incorporated by reference in this Complaint and attached hereto as Exhibit 3.

52. TVision has knowledge of the '642 Patent as of the service date of the Complaint, and TVision is willfully and deliberately infringing the '642 Patent at least as of the service date of this Complaint.

53. Alternatively, and in addition to its liability for direct infringement of the above-identified claims of the '642 Patent, TVision is liable for indirectly infringing the above-identified claims of the '642 Patent in this judicial district and elsewhere in the United States by inducing infringement in violation of 35 U.S.C. § 271(b).

54. TVision induces direct infringement by at least its panelists and/or others using the Infringing Apparatus in the United States, and its panelists and/or others performing the Infringing Method in the United States.

55. TVision encourages continued direct infringement of the above-identified claims of the '642 Patent by at least distributing or otherwise providing the Infringing Apparatus to its panelists and/or others, by instructing its panelists and/or others to use the Infringing Apparatus and to perform the Infringing Method, and by providing those panelists and/or others with (1) instructions, technical support, and services, and (2) detailed explanations and information as to how to use the Infringing Apparatus and perform the Infringing Method in a way that promotes use of the Infringing Apparatus and performance of the Infringing Method.

56. TVision specifically intended to induce infringement by its panelists and/or others by at least the acts set forth above in paragraph 55, knowing that such acts would cause infringement and/or were willfully blind to the possibility that its inducing acts would cause infringement. TVision's panelists have infringed and are continuing to infringe the '642 Patent.

57. TVision's actions of direct infringement and inducing its panelists and/or others to infringe the '642 Patent were deliberate and intentional with no reasonable non-infringement or invalidity defense. TVision had knowledge of the '642 patent and its Infringing Apparatus and Infringing Method's infringement no later than the date of service of this Complaint.

58. Through the conduct alleged above, TVision has caused and will, in the absence of an injunction, continue to cause Nielsen to suffer damages, which in no event are less than a reasonable royalty, and which include, but are not limited to, lost sales and sales opportunities.

59. TVision has also irreparably harmed Nielsen. Unless and until TVision is enjoined by this Court from further infringement of the '642 Patent, Nielsen will continue to suffer irreparable injury for which it has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Nielsen prays for judgment against TVision as follows:

A. A judgment that Defendant has directly infringed and/or induced infringement of the '642 Patent;

B. A judgment that Defendant's infringement of the '642 Patent is willful;

C. An order permanently enjoining Defendant and its officers, directors, agents, servants, employees, affiliates, and all others acting in privity or in concert with them, and their parents, subsidiaries, divisions, successors, and assigns, from further acts of infringement of the '642 Patent;

D. An award of damages adequate to compensate Nielsen for Defendant's infringement of the '642 Patent, including increased damages up to three times the amount found or assessed, together with pre-judgment and post-judgment interest and costs, under 35 U.S.C. §§ 154(d) and 284.

E. A judgment that this case is exceptional and an award of Nielsen's reasonable attorneys' fees, costs, and expenses under 35 U.S.C. § 285; and

F. An award of such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues so triable.

|  |  |
|---|---|
| | Respectfully submitted, |
| | POTTER ANDERSON & CORROON LLP |
| OF COUNSEL: | By: */s/ David E. Moore* |
| | David E. Moore (#3983) |
| Steven Yovits | Bindu A. Palapura (#5370) |
| Douglas Lewis | Andrew M. Moshos (#6685) |
| Jason Greenhut | Malisa C. Dang (#7187) |
| KELLEY DRYE & WARREN LLP | Hercules Plaza, 6th Floor |
| 333 West Wacker Drive | 1313 N. Market Street |
| Chicago, IL 60606 | Wilmington, DE 19801 |
| Tel: (312) 857-7070 | Tel: (302) 984-6000 |
| | dmoore@potteranderson.com |
| Dated: May 9, 2025 | bpalapura@potteranderson.com |
| 12217071 / 14944.00011 | amoshos@potteranderson.com |
| | mdang@potteranderson.com |
| | |
| | *Attorneys for Plaintiff The Nielsen Company (US), LLC* |