**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| THE NIELSEN COMPANY (US), LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 25-575-RGA |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| TVISION INSIGHTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

<u>**NIELSEN'S OPPOSITION TO TVISION INSIGHTS, INC.'S MOTION TO DISMISS**</u>

OF COUNSEL:

Steven Yovits
Douglas Lewis
Jason Greenhut
KELLEY DRYE & WARREN LLP
333 West Wacker Drive
Chicago, IL 60606
Tel: (312) 857-7070

Dated: August 15, 2025
12421304 / 14944.00011

David E. Moore (#3983)
Bindu A. Palapura (#5370)
Andrew M. Moshos (#6685)
Malisa C. Dang (#7187)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
Tel:  (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
amoshos@potteranderson.com
mdang@potteranderson.com

*Attorneys for Plaintiff The Nielsen Company*
*(US), LLC*

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ................................................................................................. 1

II.    BACKGROUND .................................................................................................. 2

III.   APPLICABLE LAW............................................................................................ 4

IV.    ARGUMENT ....................................................................................................... 5

    A.     The Asserted Claims Are Not Directed to an Abstract Idea under *Alice*
        Step One ...................................................................................................... 5

        1.     The asserted claims improve the functioning of computer network
            technology by solving the Masked Source Problem and the
            Multiple Meter Problem.......................................................................... 5

        2.     A recent case in this District found patent-eligible a claim similar
            to Claim 17 of the '642 Patent .................................................................. 8

        3.     Analogous Federal Circuit cases have found claims similar to the
            asserted claims patent-eligible ................................................................ 11

            a.     *Packet Intelligence LLC v. NetScout Systems* ............................. 11

            b.     *SRI Int'l, Inc. v. Cisco Sys.* ......................................................... 12

         4.     TVision has failed to posit an appropriate abstract idea ......................... 14

         5.     TVision cites inapposite cases in its *Alice* Step One analysis................. 17

    B.     The Asserted Claims Are Patent-Eligible under *Alice* Step Two ........................ 18

        1.     The Complaint and the Declaration of Virginia Lee establish an
            inventive concept ................................................................................... 18

         2.     The asserted claims do not preempt the field.......................................... 20

V.     CONCLUSION................................................................................................... 20

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

*3G Licensing*, *S.A. v. HTC Corp.*,
 C.A. No. 17-83-LPS, 2019 WL 2904670 (D. Del. July 5, 2019) ........................................5, 14

*Alice Corp. v. CLS Bank Int'l*,
 573 U.S. 208 (2014)................................................................................................................5, 19, 20

*Ancora Tech., Inc. v. HTC America, Inc.*,
 908 F.3d 1343 (Fed. Cir. 2018)...................................................................................................7

*Berkheimer v. HP Inc.*,
 881 F.3d 1360 (Fed. Cir. 2018)................................................................................2, 5, 18, 19

*Buck v. Hampton Tp. School Dist.*,
 442 F.3d 256 (3d Cir. 2006)......................................................................................................18

*Electric Power Group, LLC v. Alstom S.A.*,
 830 F.3d 1350 (Fed. Cir. 2016)............................................................................................13, 14

*Enfish, LLC v. Microsoft Corp.*,
 822 F.3d 1327 (Fed. Cir. 2016)............................................................................................5, 6, 19

*Gracenote, Inc. v. Free Stream Media Corp.*,
 C.A. No. 18-1608-RGA, 2019 WL 5684491 (D. Del. Nov. 1, 2019).....................................19

*Gracenote, Inc. v. Free Stream Media Corp.*,
 C.A. No. 18-1608-RGA, 2019 WL 6728450 (D. Del. Dec. 11, 2019).........................2, 15, 19

*In re Kotzab*,
 217 F.3d 1365 (Fed.Cir. 2000)...................................................................................................4

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
 837 F.3d 1299 (Fed. Cir. 2016)........................................................................................ *passim*

*Mobile Acuity Ltd. v. Blippar Ltd.*,
 110 F.4th 1280 (Fed. Cir. 2024) .............................................................................................17

*Packet Intelligence LLC v. NetScout Systems, Inc.*,
 965 F.3d 1299 (Fed Cir. 2020).............................................................................................11, 12

*Peloton Interactive, Inc. v. Echelon Fitness, LLC*,
 C.A. No. 19-1903-RGA, 2020 WL 3640064 (D. Del. Jul. 6, 2020)................................. 18-19

*Sanderling Management Ltd. v. Snap Inc.*,
    65 F.4th 698 (Fed. Cir. 2023). ................................................................................17

*Sapphire Crossing LLC v. Quotient Tech. Inc.*,
    C.A. No. 18-1717-MN-CJB, 2020 WL 1550786 (D. Del. Apr. 1, 2020) ....................5, 18, 19

*SRI Int'l, Inc. v. Cisco Sys.*,
    930 F.3d 1295 (Fed. Cir. 2019)........................................................................ *passim*

*Sunoco Partners Marketing & Terminals L.P. v. Powder Springs Logistics, LLC*,
    C.A. No. 17-1390-LPS-CJB, 2019 WL 4466766 (D. Del. Sep. 18, 2019)...............................2

*Thales Visionix Inc. v. US*,
    850 F.3d 1343 (Fed. Cir. 2017)................................................................................19

*The Nielsen Company (US), LLC v. Hyphametrics, Inc.*,
    C.A. No. 23-136-GBW, 2025 WL 2051443 (D. Del. July 22, 2025).............................8, 9, 10

*The Nielsen Company (US), LLC v. VideoAmp, Inc.*,
    C.A. No. 24-123-RGA, 2025 WL 961421 (D. Del. Mar. 31, 2025)........................................18

*Trident Holdings, Inc. v. HubSpot, Inc.*,
    C.A. No. 21-401-CFC, 2022 WL 823514 (D. Del. Mar. 18, 2022)........................................14

*Two-Way Media Ltd v. Comcast Cable Communications, LLC*,
    874 F.3d 1329 (Fed. Cir. 2017)................................................................................17

## I.      INTRODUCTION

Nielsen has been measuring media audiences for over 100 years, beginning with radio audiences in the 1920s and then moving to television and eventually streaming and other digital media. At each step of the way, Nielsen has innovated to keep up with advancements in media technology so that it could measure audiences in all common modes of media consumption.

One of Nielsen's more recent audience measurement innovations includes the invention recited in the claims of U.S. Patent No. 12,047,642 ("the '642 Patent"). This invention provides a specific technological approach to determining what application is running on a streaming device by using a single network meter—*i.e.,* without the need for separate meters to monitor all streaming devices in a computer network. (D.I. 1-1, Ex. 1 ('642 Patent) at 4:58-5:12, 10:63-11:8.) Eliminating the need for separate meters to monitor all streaming devices increases efficiency and reduces network resource costs. (*Id.* at 24:43-54 ("[T]he disclosed methods, apparatus, and articles of manufacture disclosed herein reduce the computational and processing burden of media presentation device meters by eliminating the need for media presentation device meters.").) Moreover, it eliminates the need to secure the cooperation of the streaming device manufacturers (in the form of making certain data available to the meters). (D.I. 1 (Complaint) ¶ 26; D.I. 1-1, Ex. 2 (Declaration of Virginia Lee ("Lee Decl.")) ¶ 17.) Accordingly, the invention recited in the asserted claims, far from merely using a computer network as a tool, solves long-standing problems in computer network technology. (D.I. 1-1, Ex. 1 at 3:63-4:28, 4:58-5:12, 10:63-11:8, 24:43-54; D.I. 1 ¶ 34; D.I. 1-1, Ex. 2 at ¶ 25.)

TVision argues that the asserted claims of the '642 Patent are directed to the abstract idea of "analyzing network data to locate and store the identity of an application on a device." (D.I. 12 (TVision's Brief) at 7.) But this posited abstract idea is so broad that it improperly covers systems that suffer from the prior art problems that the invention solves. For this reason alone,

1

the Court should deny TVision's Motion to Dismiss. *See Gracenote, Inc. v. Free Stream Media Corp.*, C.A. No. 18-1608-RGA, 2019 WL 6728450, at *3 (D. Del. Dec. 11, 2019); *Sunoco Partners Marketing & Terminals L.P. v. Powder Springs Logistics, LLC*, C.A. No. 17-1390-LPS-CJB, 2019 WL 4466766, at *10 (D. Del. Sep. 18, 2019).

Finally, even if the asserted claims were directed to an abstract idea, they would pass muster under Step Two of the *Alice* analysis because they contain elements that were not well-known, routine, or conventional at the time of the invention. *See Berkheimer v. HP Inc.,* 881 F.3d 1360, 1367 (Fed. Cir. 2018).

## II.    BACKGROUND

Before the advent of streaming devices and services, the source of streamed content could be easily monitored by a meter at the network level by determining the uniform resource locator (URL) of the sender of the media being presented. (D.I. 1-1, Ex. 1 at 3:53-59.) Such URLs straightforwardly identified the source of the data because the originator of the data was the same entity that sent the data over the Internet to the user. (*See id*.)

More recently, streaming devices such as the Amazon Fire TV Stick and Roku, and streaming services such as Netflix and Hulu, have allowed access to Internet media in ways that were previously unavailable. (D.I. 1-1, Ex. 1 at 1:29-33, 3:35-38.) Accordingly, audience measurement entities have begun assigning ratings to various streaming applications. (*Id.* at 2:29-37.) To do so, it is necessary to have computer networks capable of determining, for example, when and for how long users run those applications. (*See id*.) To that end, one method of determining which application is running on a streaming device is to determine the source of the data being streamed. (*See id.* at 3:35-42, 4:4-28; D.I. 1 ¶ 30; D.I. 1-1, Ex. 2 ¶ 21.) For example, if the source of data being streamed is Netflix, then it is understood that the Netflix application is running. (*See id*.)

2

However, in the modern streaming environment, it is generally not possible to determine the source of the media (and thus, the currently-running streaming application) through the prior art method of monitoring the source URL. (*See* D.I. 1-1, Ex. 1 at 3:53-4:28.) This is because streaming services, such as Netflix and others, typically do not send data to their users from their own URLs. (*Id.*) Instead, they use a content delivery network (*e.g.*, Akamai or Level 3) that delivers streaming data to users from a variety of sources (*e.g.,* Netflix, Hulu, etc.). (*Id.*) Thus, when streaming data originates with a service like Netflix, there is no indication in the URL from which the data is sent to the user (*i.e.,* the URL of the content delivery network) that the ultimate source is Netflix. (*See id.*) Additionally, because content delivery networks encrypt the data they send, it is not possible to examine that data to determine its ultimate source (*e.g.*, Netflix), and thus, the identity of the active application that is running cannot be determined. (*Id.*)

Accordingly, a major technological problem resulted from the combination of (a) the use of third-party content delivery services (*i.e.,* a sender of the data that does not have the same URL as the original source of the data) with (b) content delivery services' use of encrypted data. More specifically, there was no way for a single network meter to determine what application the user's streaming device was running because the source of the data could not be determined ("**the Masked Source Problem**"). (*See* D.I. 1-1, Ex. 1 at 4:58-5:12, 10:63-11:8 ("The loss of functionality comes from the fact that the network traffic data that is captured by the network meter 106 is encrypted and, thus, the payloads of the network traffic cannot be examined ….").)

The prior art solution to the Masked Source Problem was to add to the network supplemental meters for each streaming device. (*Id.* at 4:58-5:12 ("Prior methods of identifying streaming media being presented on a media presentation device using a network meter required the use of multiple meters…."). ) But having an additional meter for every streaming device on a

network is an undesirable solution to the Masked Source Problem. This approach requires cooperation with device manufacturers to allow a device meter to obtain information from the device (*e.g.*, that the Netflix application is running). (D.I. 1 ¶ 26; D.I. 1-1, Ex. 2 ¶ 17.) Such cooperation may be difficult to obtain. (*Id.*) Moreover, it is undesirable to burden a computer network with numerous supplemental meters and the data they produce. (*See* D.I. 1-1, Ex. 1 at 4:58-5:12, 24:43-54.) Thus, the necessity of using separate meters for each streaming device was a problem in and of itself ("**the Multiple Meter Problem**"). This left the prior art with the need to simultaneously solve both the Masked Source Problem and the Multiple Meter Problem. (*See id.* at 3:63-4:28, 4:58-5:12, 10:63-11:8. 24:43-54; D.I. 1 ¶ 26; D.I. 1-1, Ex. 2 ¶ 17.)

Solving both the Masked Source Problem and the Multiple Meter Problem, as the asserted claims of the '642 Patent do, reflects a breakthrough by the inventor. In particular, the inventor was the first to (1) recognize that even when network data is encrypted, it is still possible to use a single network meter to determine which device on the network is streaming; and (2) take advantage of this by having the single network meter send that device a query that requests identification of its active processes (*e.g.*, Netflix). (*See* '642 Patent, 7:23-29, 10:25-30, 10:63-11:8, 16:19-21, 19:4-18, 24:43-54.) This is an innovative, network-based solution to both the Masked Source Problem and the Multiple Meter Problem.[1] (Complaint ¶ 22; Lee Decl. ¶ 13.)

## III.    APPLICABLE LAW

In the *Alice* Step One analysis, claims are ***not*** directed to an abstract idea when they (1) recite a solution to a prior art technological problem; and/or (2) recite an improvement to

---

[1] The ease with which the invention can be understood does not make the invention any less of a breakthrough. *See In re Kotzab*, 217 F.3d 1365, 1369 (Fed.Cir. 2000) ("[T]he very ease with which the invention can be understood may prompt one to fall victim to the insidious effect of a hindsight syndrome wherein that which only the invention taught is used against its teacher." (internal quotations omitted)).

computer or computer network technology. *See SRI Int'l, Inc. v. Cisco Sys.*, 930 F.3d 1295, 1303-04 (Fed. Cir. 2019); *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335-37 (Fed. Cir. 2016).

To successfully challenge a patent's eligibility under *Alice* Step One, a motion to dismiss must posit an abstract idea that accurately characterizes the challenged claims. Indeed, the role of a court in an *Alice* analysis is ***not*** to decide whether the challenged claims are directed to ***any*** abstract idea; rather, it is to decide whether the challenged claims are directed to the ***particular*** abstract idea proposed by the challenger. *3G Licensing*, *S.A. v. HTC Corp.*, C.A. No. 17-83-LPS, 2019 WL 2904670, at *2 (D. Del. July 5, 2019).

Even if a claim is directed to an abstract idea, it is still patent-eligible as long as it recites a combination of elements that was not well-understood, routine, or conventional in the industry at the time of the invention. *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 217-18 (2014); *Berkheimer,* 881 F.3d at 1367. If the specification of an asserted patent (or an expert witness declaration attached to the complaint) contains statements indicating the asserted claim passes muster under Step Two, courts accept those statements as true for the purposes of a Rule 12(b)(6) motion to dismiss. *See Sapphire Crossing LLC v. Quotient Tech. Inc.*, C.A. No. 18-1717-MN-CJB, 2020 WL 1550786, at *2-4 (D. Del. Apr. 1, 2020).

## IV.    ARGUMENT

### A.    The Asserted Claims Are Not Directed to an Abstract Idea under *Alice* Step One

#### 1.    The asserted claims improve the functioning of computer network technology by solving the Masked Source Problem and the Multiple Meter Problem

Asserted Claim 17 of the '642 Patent[2] is directed to an improvement in computer

---

[2] Nielsen agrees that Claim 17 is representative for purposes of TVision's Motion.

networking technology that solves the Masked Source Problem and the Multiple Meter Problem. Such improvements are not abstract ideas, and as such, they are patent-eligible under *Alice* Step One. *See SRI*, 930 F.3d at 1304; *Enfish*, 822 F.3d at 1335-36; *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016).

Claim 17 of the '642 Patent reads as follows:

A method for monitoring network traffic at a media exposure measurement location, wherein the method performed is by a network meter, wherein the network meter comprises a processor, and wherein the media exposure measurement location comprises a streaming device, the network meter, and a router separate from the network meter, wherein the streaming device, the network meter, and the router are connected to a local area network of the media exposure measurement location, the method comprising:

monitoring the local area network to identify the streaming device on the local area network, wherein the streaming device is accessing media from the Internet and providing the media to a television for presentation;

based on identifying the streaming device, querying the streaming device to determine an active streaming application that is associated with a streaming service and running on the streaming device; and

storing an identifier of the active streaming application.

As noted above, the Masked Source Problem and the Multiple Meter Problem were significant problems in the prior art. (*See* D.I. 1-1, Ex. 1 at 3:63-4:28, 4:58-5:12, 10:63-11:8, 24:43-54; D.I. 1 ¶ 26; D.I. 1-1, Ex. 2 ¶ 17.) The invention recited in Claim 17 solves those problems—thereby improving computer network technology—by allowing identification of the running applications on networked streaming devices with a single network meter, even when encrypted data is being sent by third-party content delivery services. (*See* D.I. 1-1, Ex. 1 at 7:23-29, 10:25-30, 10:63-11:8, 16:19-21, 19:4-18, 24:43-54.) More specifically, Claim 17 solves the Masked Source Problem and the Multiple Meter problem through the combination of identifying the streaming device and querying that device to determine the running streaming application. (*See* D.I. 1-1, Ex. 1 at Claim 17.)

TVision incorrectly asserts that Claim 17 fails the *Alice* Step One analysis because it does not recite a new way of identifying a streaming device on the network or a new way of querying the device. (*See* D.I. 12 at 8.) On the contrary, when assessing whether a claim is directed to an abstract idea under Step One, it is necessary to look at the claim as whole, and not just individual limitations in isolation. *Ancora Tech., Inc. v. HTC America, Inc.*, 908 F.3d 1343, 1347 (Fed. Cir. 2018). When Claim 17 is viewed as a whole, it is clear that the claim is directed to technological solutions to technological problems and a corresponding improvement in computer network technology.

The asserted claims' solution to the Masked Source Problem and the Multiple Meter Problem reflects the inventor's realization that even in an encrypted-data environment, it is still possible to determine which network device is actively streaming. (*See* D.I. 1-1, Ex. 1 at Claim 17, 7:23-29, 10:25-30, 16:20-21, 19:4-18.) Moreover, the claimed solution reflects the realization that once identified, the streaming device can be queried to identify the running streaming application. (*See id.*) Accordingly, the claimed improvement to computer network technology is the approach of (1) identifying the streaming device with a network meter; and then (2) using the network meter to query that device. (*See id.*) The improvement is the combination of these two steps; the improvement is ***not*** a new way to identify or query the device.

Further confirmation that the asserted claims of the '642 Patent are directed to a technological improvement, and not an abstract idea, is that they recite specific steps to solve a problem—rather than merely a ***desired result***. *See McRO*, 837 F.3d at 1314. The ***desired result*** of the invention is a system or method that is capable of determining what application is running on a networked streaming device with a single network meter, even when encrypted data is being streamed from a third-party content delivery provider. (*See* D.I. 1-1, Ex. 1 at 2:29-37; 4:58-5:12,

10:63-11:8.) Accordingly, a claim that merely recites using a single network meter to determine which streaming applications are running on the network would be directed to an abstract idea. *See McRO*, 837 F.3d at 1314. But the asserted claims of the '642 Patent recite more than that result; instead, they recite *how to achieve* that result. In particular, they recite the steps of identifying the streaming device (which, as explained above, is still possible in an encrypted-data environment, even though no one had thought to do it for this purpose before) and then querying the identified device to ascertain the active streaming application. ('642 Patent, Claim 17.)

### 2. A recent case in this District found patent-eligible a claim similar to Claim 17 of the '642 Patent

In *The Nielsen Company (US), LLC v. Hyphametrics, Inc.*, C.A. No. 23-136-GBW, 2025 WL 2051443, at *4-5 (D. Del. July 22, 2025) ("*Hyphametrics*"), Judge Williams found that a claim similar to Claim 17 of the '642 Patent was *not* directed to an abstract idea.

The salient portion of *Hyphametrics* concerned Claim 1 of U.S. Patent No. 11,652,901.[3]

---

[3] Claim 1 of U.S. Patent No. 11,652,901 ("the '901 Patent") recited as follows:

1. A network communications monitor to log network traffic within a household that is monitored by an audience measurement entity, the network communications monitor comprising:

a network interface; a processor; and a non-transitory computer-readable medium having stored therein instructions that are executable to cause the network communications monitor to perform operations comprising:

detecting, via the network interface, multiple network communications transmitted on a wireless network within the household via a network gateway of the wireless network, wherein the network gateway is configured to route the multiple network communications within the wireless network;

accessing panelist data that associates a panelist of the household with a panelist device of the panelist;

determining, based on the panelist data, that a network communication of the multiple network communications is associated with the panelist device by determining that a media access control (MAC) address associated with the network communication matches a MAC address of the panelist device, and

causing storage of data identifying the network communication in association with the panelist, wherein: the network communications monitor is located within the household; and the network communications monitor is implemented by the network gateway.

That claim recited a network communications meter in an audience measurement system that monitored streaming media content or other data (*i.e.*, "network communications") flowing from the Internet to devices in a network. *Id.* at *2. In the claim, when the network meter/monitor determined that a particular network device (for example, an iPad) was receiving such streaming media content, it identified the media access control ("MAC") address of the device. *Id.* The claim then recited that the network meter/monitor determined, using panelist data, the name of the individual associated with the device's MAC address. *See id.* at *2-3. And finally, the claim provided that the network meter/monitor stored data associating the individual with the data being streamed to the device. *Id.*

The *Hyphametrics* court found that the claim at issue was directed to an improvement in the functioning of a computer network, and for that reason, it was not directed to an abstract idea. *Id.* at *5. The court reasoned that "[t]he '901 Patent Asserted Claims are about solving an issue in collecting data, not about data collection itself." *Id.* In particular, the court described the prior art problem being solved as follows:

> At the device-level [in the prior art], monitors had to install and maintain unique monitoring software for each kind of measured device, and some of the devices didn't allow installation of software, making monitoring impossible. Instead, the '901 patent inventors developed a system of monitoring data at the network gateway, where all the data to and from the devices travels through.

(*Id.* at *4 (citations omitted).)[4]

The similarity of Claim 1 of the '901 Patent to Claim 17 of the '642 Patent is evident. Just like Claim 17 of the '642 Patent, Claim 1 of the '901 Patent recites a network meter/monitor

---

*Id.* at *3.

[4] The *Hyphametrics* court also held that the asserted claims of the '901 Patent were similar to those at issue in *SRI International*, 930 F.3d at 1299. There, the Federal Circuit held that the claims at issue were directed to an improvement in computer network technology, and did not merely automate a conventional idea using a computer as a tool. *Hyphametrics*, 2025 WL

that identifies a network device that is receiving data from the Internet. *Id.* at *3 ("A network communications monitor…detecting…network communications…associate[d]…with the panelist device…"). Claim 1 of the '901 Patent then recites the retrieval of information (information about a panelist) based on the identity of the device (tracked by MAC address). *Id.* ("accessing panelist data that associates a panelist of the household with a panelist device of the panelist…"). This is similar to Claim 17 of the '642 Patent, which recites the retrieval of information (the identity of the active streaming application) based on the identity of the device. ('642 Patent, Claim 17.) And notably, the prior art problem solved by the patented invention in *Hyphametrics* was precisely the same as the problem the invention of the '642 Patent solves: the need to monitor every device on the network (*i.e.*, the Multiple Meter Problem). *Hyphametrics*, 2025 WL 2051443 at *4.

Instead of requiring the '901 Patent to recite how to detect network communications, how to retrieve panelist data, or how to identify the streaming device, the *Hyphametrics* court found that (like Claim 17 of the '642 Patent) it was the claim as a whole that made it patent-eligible.[5] In particular, the court found that "the … Asserted Claims do not merely generate and collect data but, instead, develop technical solutions in order to generate and collect data." *Id.* at *4.

---

2051443, at *5. This Court should find that Claim 17 of the '642 Patent is likewise not directed to an abstract idea.

[5] This finding demonstrates that TVision is incorrect when it argues that Claim 17 is directed to an abstract idea because it "does not disclose how to identify the streaming device [or] how to query [it]." (*See* D.I. 12 at 8.)

### 3.     Analogous Federal Circuit cases have found claims similar to the asserted claims patent-eligible

#### a.     *Packet Intelligence LLC v. NetScout Systems*

The asserted claims of the '642 Patent are analogous in relevant respects to the claims at issue in *Packet Intelligence LLC v. NetScout Systems, Inc.*, 965 F.3d 1299 (Fed Cir. 2020), in which the Federal Circuit upheld the asserted claims against a § 101 challenge. *Id.* The claims at issue there included Claim 19 of U.S. Patent No. 6,954,789 ("the '789 patent"), which the court characterized as "parsing packets to extract information that can be used to <u>associate packets</u> <u>with</u> single conversational flows, which correspond to <u>particular applications</u>…" *Id.* at 1307 (emphasis added). Holding that the claim must be considered as a whole, the court rejected the defendant's argument that the claims were "directed to the abstract idea of collecting, comparing, and classifying packet information" and used "standard, off-the-shelf components." *Id.* at 1308. Instead, the court found that the claims constituted an improvement in computer technology because associating data with underlying applications solved a problem "unique to computer networks"—identifying disjointed groups of packets in a network. *Id.* at 1309-10.

Viewed without its extraneous language, Claim 19 merely recited (a) checking to see whether an extracted portion of a packet matches an existing classification, and if not, (b) creating a new classification. *See id.* Notably, the claims contained no recitation of how to extract data from packets or how to check for a match between the extracted data and existing classifications. *See id.* But the claims were patent-eligible because their limitations as a whole functioned together to constitute an improvement to computer network technology. *See id.* at 1309-10.

Like the claim at issue in *Packet Intelligence*, Claim 17 of the '642 Patent consists of steps that allow network data to be correlated to a particular application. (*See* D.I. 1-1, Ex. 1 at Claim

17 ("monitoring the local area network to identify the streaming device on the local area network, wherein the streaming device is accessing media [data] from the Internet [and] determin[ing] an active streaming application").) Also like the *Packet Intelligence* claim, Claim 17 of the '642 Patent recites steps that function together to achieve this goal—identifying a streaming device using a single network meter and based on that identification, querying the streaming device to determine what application is actively running on the device. (*Id.* at Claim 17.) And finally, like the *Packet Intelligence* claims, Claim 17 of the '642 Patent solves the prior art problem of the inability to associate network data with a particular application. (*See id.* at 3:63-4:28, 4:58-5:12, 10:63-11:8; D.I. 1-1, Ex. 2 ¶ 17.) Thus, the Court should find that Claim 17 is patent-eligible.

### b.    *SRI Int'l, Inc. v. Cisco Sys.*

The asserted claims of the '642 Patent are also analogous in relevant respects to the claims at issue in *SRI*, in which the Federal Circuit upheld the asserted claims against a § 101 challenge. The claims at issue in *SRI* included Claim 1 of U.S. Patent No. 6,711,615 ("the '615 patent"):

> 1.    A computer-automated method of hierarchical event monitoring and analysis within an enterprise network comprising:
>
>     deploying a plurality of network monitors in the enterprise network;
>
>     detecting, by the network monitors, suspicious network activity based on analysis of network traffic data selected from one or more of the following categories: {network packet data transfer commands, network packet data transfer errors, network packet data volume, network connection requests, network connection denials, error codes included in a network packet, network connection acknowledgements, and network packets indicative of well-known network-service protocols};
>
>     generating, by the monitors, reports of said suspicious activity; and
>
>     automatically receiving and integrating the reports of suspicious activity, by one or more hierarchical monitors.

*SRI*, 930 F.3d at 1301. As shown, this claim recites using network meters/monitors to detect suspicious activity using various varieties of network data and then generate a report. *See id.* The claim does not recite any particular **way** to determine whether network activity is suspicious other than to "base it on" one of eight broad categories of network data. *See id.*

The *SRI* court found that Claim 1 of the '615 patent was not directed to an abstract idea, noting that the claim was "necessarily rooted in computer technology in order to solve a specific problem in the realm of computer networks." *Id.* at 1303. The court rejected the defendant's argument that the claim was directed to "just analyzing data from multiple sources to detect suspicious activity." *Id.* In particular, the court explained that the claim—even though it recites only "using a plurality of network monitors that each analyze specific types of data on the network and integrating reports from the monitors"—solved a technological problem arising in computer networks (identifying hackers) and was thus not directed to an abstract idea. *Id.* Instead, the claim was directed to an improvement in computer networks. *Id.*

The Court should likewise find that Claim 17 of the '642 Patent is not directed to an abstract idea. Like the *SRI* claim, Claim 17 of the '642 Patent solves problems rooted in computer network technology—the Masked Source Problem and the Multiple Meter Problem. And also like the *SRI* claim, Claim 17 recites steps that function together as an integrated whole to solve prior art challenges. The *SRI* court did not require that each step of the claim at issue recite a particular new way to perform that step (*i.e.*, it did not require recitation of a way to determine that network activity was suspicious), just as this Court should not require Claim 17 to recite a new way of identifying the streaming device or querying it.

In *SRI*, as here, the defendant relied on *Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016) in its argument that the claims at issue were directed to an abstract

idea. *Id.* at 1304. The *SRI* court rejected that argument, as this Court should in the present case. As the *SRI* court held, "[t]he *Electric Power* claims were drawn to using computers as tools to solve a power grid problem, rather than improving the functionality of computers and computer networks themselves." *Id.* In the present case, too, the asserted claims are directed to improving computer networks by solving the Masked Source Problem and the Multiple Meter Problem.

### 4.    TVision has failed to posit an appropriate abstract idea

Even assuming *arguendo* that the asserted claims of the '642 Patent are directed to **some** abstract idea (which they are not), the Court should still deny TVision's Motion because TVision has failed to satisfy its obligation to posit an abstract idea that accurately characterizes the claim. *See 3G Licensing*, 2019 WL 2904670 at *2; *Trident Holdings, Inc. v. HubSpot, Inc.*, C.A. No. 21-401-CFC, 2022 WL 823514, at *6, n. 15 (D. Del. Mar. 18, 2022) ("Courts in this district regularly deny motions to dismiss based on patent ineligibility under § 101 when the defendant's proffered abstract idea fails to satisfactorily capture the substance of the claims."). Specifically, TVision improperly characterizes the asserted claims as directed to "analyzing network data to locate and store the identity of an application on a device." (D.I. 12 at 7.)

TVision's posited abstract idea is far too general, ignoring limitations that impart specificity to the claim, such as (1) the use of a network meter on a local area network, (2) the monitoring of network data to identify a streaming device that is accessing media from the Internet, and (3) based on the identification of the streaming device, sending a network query to determine the active streaming application running on the device. Accordingly, the Court should deny TVision's Motion. *See McRO*, 837 F.3d at 1313 ("[C]ourts must be careful to avoid oversimplifying the claims by looking at them generally and failing to account for the specific requirements of the claims.") (citations omitted); *3G Licensing*, 2019 WL 2904670 at *2.

TVision's posited abstract idea improperly captures many approaches that are not covered by the claim. Even worse, the posited abstract idea actually covers the prior art approach in which a separate meter monitored (and produced network data for) each streaming device on the network.[6] This unsatisfactory approach has the exact problem that Claim 17 of the '642 Patent solves (the Multiple Meter Problem). As this Court has made clear, when a posited abstract idea covers the approach that constitutes the prior art problem that the invention solves, that abstract idea is too broad. *Gracenote*, 2019 WL 6728450 at *3 (holding that "Defendant's characterization of the asserted claims is overbroad because it would encompass the precise disadvantageous concepts" that the claimed invention overcomes).

The table on page 7 of TVision's Brief demonstrates how TVision arrived at its overgeneralized characterization of Claim 17 of the '642 Patent. The table below incorporates TVision's table and adds a third column that contains an accurate characterization of each limitation (as opposed to TVision's oversimplification in the second column). Moreover, by pointing out how the elements work together, the entries in the third column of the table below demonstrate TVision's improper focus on individual claim limitations instead of considering how the limitations function together as an integrated whole:

---

[6] In other words, using a separate meter to produce network data for each streaming device to identify running applications is an example of "analyzing network data to locate and store the identity of an application on a device" (*i.e.*, TVision's posited abstract idea).

| '642 Patent, Claim 17 Claim Language | TVision's Characterization | Actual Contents of Limitation |
|---|---|---|
| A method for monitoring network traffic at a media exposure measurement location, wherein the method performed is by a network meter, wherein the network meter comprises a processor, and wherein the media exposure measurement location comprises a streaming device, the network meter, and a router separate from the network meter, wherein the streaming device, the network meter, and the router are connected to a local area network of the media exposure measurement location, the method comprising: | TVision ignores the preamble | A specific hardware configuration: a router, a network meter, a processor, and a streaming device connected in a local area network |
| monitoring the local area network to identify the streaming device on the local area network, wherein the streaming device is accessing media from the Internet and providing the media to a television for presentation; | Monitoring network data and identifying streaming device | Monitoring network conditions and basing identification of a streaming device on network conditions created when a streaming device is accessing media from the Internet and providing that media to a television for presentation (works in tandem with limitation below) |
| based on identifying the streaming device, querying the streaming device to determine an active streaming application that is associated with a streaming service and running on the streaming device; and | Locating and identifying streaming application | Determining the active streaming application through the use of a network query that is made possible through the network meter's identification of which device is streaming (works in tandem with limitation above) |
| storing an identifier of the active streaming application. | Storing identity of the streaming application | (TVision's characterization is correct) |

16

### 5.     TVision cites inapposite cases in its *Alice* Step One analysis

TVision relies on several inapposite cases that concern claims that, unlike Claim 17 of the

'642 Patent, are not directed to improvements in computer or computer network technology. For

example, TVision attempts to rely on *Sanderling Management Ltd. v. Snap Inc.*, 65 F.4th 698

(Fed. Cir. 2023). (D.I. 12 at 9.) There, the Federal Circuit explained that the *Sanderling* claim

simply instructs the reader to determine whether a condition is met and if so, send out

information. *Id.* In other words, in the *Sanderling* claims, computers were used as a ***tool to send

information***, and the claim recited no improvement to computers or computer networks

themselves. In contrast, Nielsen's asserted claims improve computer network technology by

solving the Masked Source Problem and the Multiple Meter Problem.

TVision also attempts to rely on *Mobile Acuity Ltd. v. Blippar Ltd.*, 110 F.4th 1280 (Fed.

Cir. 2024). The claims at issue in *Mobile Acuity* recited the steps of "receiving user-defined

information," "associating that information with an image in a database," and "providing access

to that information." *Id.* at 1292 (internal quotations omitted). Here again, computers were used

as a tool to deliver information, and the claims recited no improvement to computers or computer

networks.

In addition, TVision incorrectly cites *Two-Way Media Ltd v. Comcast Cable

Communications*, *LLC,* 874 F.3d 1329 (Fed. Cir. 2017). (D.I. 12 at 8.) There, the Federal Circuit

considered claims, unlike Claim 17 of the '642 Patent, that merely used computers as a tool to

send data to users. *Id.* at 1334-35. All of the claims at issue recited converting data from one

format into another and then sending that data to a user and keeping a record of what was sent to

whom. *Id.* The Federal Circuit found that these claims merely "manipulate[] data" and "invoke[]

generic processes and [computer] machinery" without more. *Id.* at 1337-38. In contrast, Claim

17 of the '642 Patent is directed to an improvement in computer network technology—it does

not merely use computers as a tool.

Finally, TVision relies on *The Nielsen Company (US), LLC v. VideoAmp, Inc.*, C.A. No. 24-123-RGA, 2025 WL 961421, at *5 (D. Del. Mar. 31, 2025) ("*VideoAmp*"). But the asserted claims of the '642 Patent differ materially from the claims asserted in *VideoAmp,* which the court found involved using computers for broad data modeling without any improvements to computers or computer networks. In contrast, Claim 17 of the '642 Patent recites improvements to computer networking technology and solves the specific prior art problems identified above (*i.e.*, the Masked Source Problem and Multiple Meter Problem).

### B.    The Asserted Claims Are Patent-Eligible under *Alice* Step Two

#### 1.    The Complaint and the Declaration of Virginia Lee establish an inventive concept

Even if the asserted claims of the '642 Patent were directed to an abstract idea (which they are not), they would still be patent-eligible under Step Two of *Alice.* In particular, the claims recite "more than performance of well understood, routine, and conventional activities previously known in the industry." *See Berkheimer*, 881 F.3d at 1367. As alleged in the Complaint and supported by the Declaration of Virginia Lee,[7] the asserted claims involve a combination of limitations not previously known in the audience measurement industry. *See id.*; *Buck v. Hampton Tp. School Dist.*, 442 F.3d 256, 260 (3d Cir. 2006) ("In evaluating a motion to dismiss, we may consider documents that are attached to or submitted with the complaint …."); *Peloton Interactive, Inc. v. Echelon Fitness, LLC*, C.A. No. 19-1903-RGA, 2020 WL 3640064, at

---

[7] Courts generally consider expert declarations attached to and incorporated by reference into patent infringement complaints. *See, e.g., Sapphire Crossing*, 2020 WL 1550786, at *3-4. However, everything asserted in the Lee Declaration is also asserted in the Complaint itself, and thus, the Lee Declaration can be viewed merely as additional support for the plausibility of the allegations in the Complaint (rather than separate and independent allegations).

*1 (D. Del. Jul. 6, 2020) ("When reviewing a motion to dismiss pursuant to Federal Rule of Civil

Procedure 12(b)(6), the Court must accept the complaint's factual allegations as true.). Thus, the

claims would still be patent-eligible under *Alice* Step Two even if they were directed to an

abstract idea. *See Alice*, 573 U.S. at 217-18 (2014); *Berkheimer*, 881 F.3d at 1367.

 Both the Complaint and Ms. Lee's declaration assert that as of the priority date of the

'642 Patent, it was not well-understood, routine, or conventional in the audience measurement

industry to monitor streaming media and active applications on a streaming device by identifying

and querying the streaming device. (D.I. 1 ¶ 24; D.I. 1-1, Ex. 2 ¶ 15.) In addition, both the

Complaint and Ms. Lee's declaration describe the disadvantages of the prior art as compared to

the invention. In particular, the Complaint and the declaration note that in the modern streaming

environment, with data encryption and third-party content delivery services, network meters

cannot identify streaming media or applications without the use of multiple meters. (D.I. 1 ¶¶ 20-

21, 25, 28; D.I. 1-1, Ex. 2 ¶¶ 11-12, 16, 19.) The invention recited in the asserted claims solves

this problem. (*See id.*) Accordingly, the Court should find that the asserted claims are patent-

eligible under *Alice* Step Two. *See Sapphire Crossing LLC*, 2020 WL 1550786, at *3-4.

 TVision misses the mark when it argues that the asserted claims contain no inventive

concept because the individual components are conventional. (D.I. 12 at 10-12.) The use of

conventional components does not render a claim patent-ineligible. *See, e.g., Enfish*, 822 F.3d at

1338. The correct question to consider is whether those components are used in a way that is

unconventional. *See Gracenote*, 2019 WL 6728450 at * 3; *Thales Visionix Inc. v. US*, 850 F.3d

1343, 1345, 1348-49 (Fed. Cir. 2017). In other words, "[t]he court must consider the claims as a

whole to determine whether they are directed to a functional improvement." *Gracenote, Inc. v.*

*Free Stream Media Corp.*, C.A. No. 18-1608-RGA, 2019 WL 5684491 at *6 (D. Del. Nov. 1,

2019), *adopted* 2019 WL 6728450. As explained above, the asserted claims make use of the invention's components in an unconventional way.

TVision argues that whatever is not well-known, routine, and conventional in Claim 17 of the '642 Patent is merely part of the alleged abstract idea or is a new abstract idea. (D.I. 12 at 10-12.) But using a meter to monitor network data and determine which device is streaming from the Internet, and then sending a network query to that device to determine which application is actively running, are not steps that constitute an abstract idea. Rather, they are concrete steps that result from the inventor's realization that even in an encrypted-data environment, it is still possible to determine which network device is actively streaming. (*See, e.g.,* D.I. 1-1, Ex. 1 at Claim 17, 7:23-29, 10:25-30, 16:20-21, 19:4-18.)

### 2.    The asserted claims do not preempt the field

The asserted claims of the '642 Patent do not preempt the field. In particular, there are other ways of determining the active streaming applications in networked devices. For example, as explained above, it is possible to determine active streaming applications by having separate meters for each device on the network (even though there are many disadvantages to doing so). (D.I. 1-1, Ex. 1 at 4:58-5:12.) It would also be possible to require streaming devices to operate only in a non-encrypted environment (even though this would result in the disadvantage of decreased security). (D.I. 1 ¶¶ 30-31, D.I. 1-1, Ex. 2 at ¶¶ 21-22.) Accordingly, the claims pass muster at *Alice* Step Two. *See Alice*, 573 U.S. at 223 ("[T]he pre-emption concern…undergirds our § 101 jurisprudence."); *McRO*, 837 F.3d at 1314.

## V.    CONCLUSION

For the reasons explained above, Nielsen respectfully requests that the Court deny TVision's Motion to Dismiss and find that the asserted claims of the '642 Patent are patent-eligible under 35 U.S.C. § 101.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Steven Yovits
Douglas Lewis
Jason Greenhut
KELLEY DRYE & WARREN LLP
333 West Wacker Drive
Chicago, IL 60606
Tel: (312) 857-7070

Dated: August 15, 2025
124201304 / 14944.00011

By:  */s/ David E. Moore*
       David E. Moore (#3983)
       Bindu A. Palapura (#5370)
       Andrew M. Moshos (#6685)
       Malisa C. Dang (#7187)
       Hercules Plaza, 6th Floor
       1313 N. Market Street
       Wilmington, DE 19801
       Tel:  (302) 984-6000
       dmoore@potteranderson.com
       bpalapura@potteranderson.com
       amoshos@potteranderson.com
       mdang@potteranderson.com

*Attorneys for Plaintiff The Nielsen Company
(US), LLC*

21