IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THE NIELSEN COMPANY (US), LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 25-575-CJB |
| | ) | |
| TVISION INSIGHTS, INC., | ) | DEMAND FOR JURY TRIAL |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| TVISION INSIGHTS, INC., | ) | |
| | ) | |
| Counter-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE NIELSEN COMPANY (US), LLC, | ) | |
| | ) | |
| Counter-Defendant. | ) | |

**DEFENDANT TVISION INSIGHTS, INC.'S ANSWER TO COMPLAINT,
AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS**

**TABLE OF CONTENTS**

**Page**

**ANSWER**

ANSWER......................................................................................................................1

AFFIRMATIVE DEFENSES.......................................................................................8

**COUNTERCLAIM**

INTRODUCTION .......................................................................................................12

JURISDICTION AND VENUE ..................................................................................16

FACTUAL ALLEGATIONS ......................................................................................17

I.     TELEVISION AUDIENCE MEASUREMENT SERVICES ...........................17

II.    NIELSEN'S MONOPOLY POWER.................................................................25

III.   NIELSEN'S ANTICOMPETITIVE CONDUCT..............................................28

       A.     Nielsen's Anticompetitive Foreclosure Tactics......................................29

              i.     Nielsen Locks Its Customers Into *De Facto* Exclusive Contracts.............29

              ii.    Nielsen Conditions Customers' Access to Their Historical Data on
                     Continued Subscription to Nielsen's TV Audience Measurement
                     Services ........................................................................................37

              iii.   Nielsen Punishes Non-Subscribing Content Providers by
                     Arbitrarily Hiding Them From the Data It Provides to Advertisers..........39

       B.     Nielsen's Anticompetitive Litigation Tactics .......................................42

              i.     Nielsen's Anticompetitive Use of Serial Litigation..................................43

              ii.    Nielsen's Sham Litigation Against TVision...............................................47

                     a.     Sham Suit No. 1: the '189 and '120 patent suit ..........................48

                     b.     Sham Suit No. 2: the '889 patent suit ..........................................50

                     c.     Sham Suit No. 3: the '243 patent suit ..........................................51

                            (i)    Nielsen's assertion of a fraudulently obtained patent........52

                            (ii)   The '514 patent ...................................................................55

                            (iii)  The '372 publication ...........................................................58

                            (iv)   The Lu '577 publication......................................................58

                            (v)    The Lu '919 publication......................................................62

                            (vi)   The withheld prior art is material and demonstrates
                                   Nielsen's intent to deceive.................................................63

i

(vii)    Nielsen's attempt to use the fraudulently obtained '243 patent against TVision ...............................................66

d.    Sham Suit No. 4: the '030 patent suit ............................................67

e.    Sham Suit No. 5: the '642 patent suit ............................................68

ANTITRUST INJURY .......................................................................................69

INTERSTATE COMMERCE ............................................................................72

CONTINUING VIOLATIONS ..........................................................................72

CAUSES OF ACTION .......................................................................................73

COUNT I SHERMAN ACT SECTION 2: MONOPOLIZATION ..................................73

COUNT II SHERMAN ACT SECTION 2: ATTEMPTED MONOPOLIZATION.........74

COUNT III SHERMAN ACT SECTION 1: RESTRAINT OF TRADE.........................75

PRAYER FOR RELIEF ......................................................................................76

DEMAND FOR JURY TRIAL ...........................................................................77

ii

Defendant TVision Insights, Inc. ("TVision"), by and through counsel, demands a trial by jury on all issues so triable, answers the Complaint for Patent Infringement filed by Plaintiff The Nielsen Company (US), LLC ("Nielsen"), and submits its Counterclaims as follows:

## ANSWER

### NATURE OF THE ACTION

1.     TVision admits that this purports to be an action for patent infringement brought against TVision for alleged infringement of United States Patent No. 12,047,642 ("the '642 Patent"). To the extent that this paragraph alleges that TVision has infringed any valid and enforceable claims of the '642 patent, TVision denies those allegations.

### PARTIES

2.     TVision lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 1 and on that basis denies the allegations.

3.     TVision admits that TVision Insights, Inc. is organized and existing under the laws of the State of Delaware.

### JURISDICTION AND VENUE

4.     TVision admits that this purports to be an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq*. TVision further admits that this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) inasmuch as the Complaint purports to state claims for patent infringement arising under the patent laws of the United States.

5.     TVision admits that this Court has personal jurisdiction over it, and that TVision is a corporation organized and existing under the laws of the State of Delaware. TVision admits that it has a registered agent in Delaware—The Corporation Trust Company, 1209 Orange Street,

1

Wilmington, DE 19801. The remaining allegations of paragraph 5 set forth legal conclusions and questions of law regarding personal jurisdiction to which no response is required. To the extent a response is required, such allegations are denied.

6. TVision admits that venue is proper in this Judicial District. The remaining allegations of paragraph 6 are legal conclusions for which no response is required. To the extent a response is required, except as expressly admitted, such allegations are denied.

## FACTUAL BACKGROUND

7. TVision lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 7 concerning Nielsen's founding, whether it "fuels" the industry, and its self-description as "the media industry's leading data and analytics company" but, as set forth in the accompanying counterclaims, acknowledges that Nielsen is a monopolist in the market for TV measurement services.

8. TVision lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 8 and on that basis denies those allegations.

9. TVision lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 9 and on that basis denies those allegations.

10. TVision admits that Nielsen offers panel measurement technologies and that Nielsen analyzes data collected from panelists. TVision is without knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 10 and on that basis denies those allegations.

11. TVision admits that it maintains a media panel and uses data obtained from its panel to compete with Nielsen and enable other companies to compete with Nielsen. To the extent not specifically admitted, the remaining allegations are denied.

2

**THE ASSERTED PATENT**

12.    TVision admits that the '642 Patent on its face is entitled "Methods and Apparatus to Identify Media Presentations by Analyzing Network Traffic" was duly and legally issued on July 23, 2024, from Application 18/522,843. TVision admits that what appears to be a true and correct copy of the '642 Patent is attached as Exhibit 1 to the complaint.

13.    TVision admits that the '642 Patent on its face describes a series of continuations whose ultimate parent is U.S. Patent Application No. 16/209,897, filed on December 4, 2018, which issued as U.S. Patent No. 10,805,690. TVision is without knowledge sufficient to form a belief as to the remaining allegations of this paragraph and thus denies the same.

14.    TVision admits that the '642 patent on its face lists Nielsen as the assignee, but is without knowledge to form a belief as to the remainder of the allegations in this paragraph and thus denies the same.

15.    TVision denies that the '642 Patent is valid and enforceable.

16.    TVision admits that what appears to be the declaration of Virginia Lee ("Lee Decl.") is attached to the Complaint as Exhibit 2, but otherwise denies the allegations in this paragraph.

17.    TVision denies the characterization regarding what the '642 Patent allegedly relates to, and therefore denies the same to the extent that such characterization is not supported by the specification and/or claims of the '642 Patent.

18.    TVision admits that the '642 patent includes the quotation in paragraph 18 of the Complaint but otherwise denies the allegations in paragraph 18.

19.    TVision admits that the '642 patent includes the quotation in paragraph 19 of the Complaint, but otherwise denies the allegations in paragraph 19.

3

20.	TVision admits that the '642 patent includes the quotation in paragraph 20 of the Complaint, but otherwise denies the allegations in paragraph 20.

21.	TVision admits that the '642 patent includes the quotation in paragraph 21 of the Complaint, but otherwise denies the allegations in paragraph 21.

22.	TVision admits that the '642 patent includes the quotations in paragraph 22 of the Complaint, but otherwise denies the allegations in paragraph 22.

23.	As to paragraph 23, TVision admits that the face of the patent shows that the filing date of the ultimate parent application from which the '642 Patent is a continuation is December 4, 2018 but denies that the '642 patent is entitled to that date as its priority date.

24.	TVision denies the allegations of paragraph 24.

25.	TVision denies the characterizations in paragraph 25 of the prior art, and any remaining allegations are otherwise denied.

26.	TVision denies the characterizations in paragraph 26 of the prior art, and any remaining allegations are otherwise denied.

27.	TVision denies the characterizations in paragraph 27 of the prior art, and any remaining allegations are otherwise denied.

28.	TVision denies the allegations in paragraph 28 that the alleged invention "provides a technical improvement in the technology of media measurement by identifying a solution to these problems: monitoring the network for a streaming device accessing internet-based media, querying the streaming device for the executing application, and then recording that data for later analysis."

29.	TVision denies the characterization in paragraph 29.

4

30.     TVision admits the allegation in paragraph 30 that ways of determining the active, running application would have been known to one of skill in the art, including the ways allegedly covered by the claims. TVision denies that the claims do not preempt all ways of identifying an application active on a streaming device.

31.     TVision denies the allegations in paragraph 31.

32.     TVision denies the allegations of paragraph 32.

33.     TVision denies the allegations of paragraph 33.

34.     TVision denies the allegations of paragraph 34.

## THE INFRINGING APPARATUS AND METHOD

35.     TVision admits that it is a data and analytics company and that it that measures how people watch TV, and that it provides measurement data to Nielsen's competitors that enables such competitors to compete with Nielsen, but otherwise denies the allegations of paragraph 35.

36.     TVision admits the allegations of paragraph 36.

37.     TVision admits the allegations of paragraph 37 that TVision collects data from TV viewers and that TVision uses a panel methodology. TVision admits that it "gathers second-by-second data from a nationally representative panel of households who have signed on to help our industry understand how, what, and when they watch TV." TVision admits that TVision's panel includes 5,000 homes (approximately 15,000 persons) in the United States. TVision otherwise denies the remaining allegations of paragraph 37.

38.     TVision admits that the TVision system contains meters and webcams that are located at the panelists' homes and that TVision receives viewing data and attention data from the panelists' homes. TVision further admits that it provides reports based on such data to its customers.  TVision denies the remainder of the allegations of paragraph 38.

39. TVision admits that the meters that it places in its panelists' households collect and transmit viewing and attention data to TVision. TVision denies the remaining allegations of paragraph 39.

40. TVision admits that its meter within a panelist's household may be connected to the household's internet network using an Ethernet cable or WiFi, and that its meter transmits viewing data to TVision. TVision denies the remaining allegations of paragraph 40.

41. TVision admits that it believes that it has the industry's most comprehensive view of linear and CTV and that TVision's technology is capable of detecting which network, app, and/or streaming device is in use in on a panelist's television. TVision otherwise denies the remaining allegations of paragraph 41.

42. TVision admits that it has a computing system and that it gathers second-by-second data from a nationally representative panel of households who have signed on to help our industry understand how, what, and when they watch TV and reports on what program or ad is playing on the TV, which individuals are in the room, and if they are paying attention to the TV. TVision denies the remaining allegations in paragraph 42.

43. TVision admits that it licenses and offers to license data that it collects and analyzes, and that it licenses its data to VideoAmp and iSpot, among others. TVision denies the remaining allegations in paragraph 43.

44. TVision admits that TVision uses an apparatus and employs a method but denies the remainder of the allegations in paragraph 44.

45. TVision admits that TVision uses meters that have associated software and hardware, and that TVision has systems that permit it to collect and report data about its panelists' TV watching, but denies the remaining allegations of paragraph 45.

46.     TVision denies the allegations of paragraph 46.

47.     TVision denies any allegations of paragraph 47, and denies that Nielsen is entitled to any relief in this case.

## COUNT I
## INFRINGEMENT OF THE '642 PATENT

48.     TVision incorporates by reference its responses to paragraphs 1-47 as if fully set forth herein.

49.     TVision denies the allegations of paragraph 49.

50.     TVision denies that it requires a license or permission from Nielsen and thus denies all allegations in paragraph 50.

51.     TVision denies the allegations of paragraph 51.

52.     TVision admits that it acquired knowledge of the '642 patent as of the date that it was served but denies the allegations of paragraph 52 that TVision infringes the '642 patent or that any infringement is willful and deliberate.

53.     TVision denies the allegations of paragraph 53.

54.     TVision denies the allegations of paragraph 54.

55.     TVision denies the allegations of paragraph 55.

56.     TVision denies the allegations of paragraph 56.

57.     TVision denies the allegations of paragraph 57.

58.     TVision denies the allegations of paragraph 58.

59.     TVision denies the allegations of paragraph 59.

## PRAYER FOR RELIEF AS TO COMPLAINT

These paragraphs set forth the relief requested by Nielsen to which no response is required.

TVision denies any allegations contained in the Prayer for Relief to which response is required.

TVision denies that Nielsen is entitled to any relief requested in its Prayer for Relief in its Complaint, and further specifically denies that Nielsen is entitled to any relief whatsoever of any kind against TVision. TVision denies each and every allegation of Nielsen's Complaint not specifically admitted or otherwise responded to above. TVision specifically denies that it has infringed or is liable for infringement of any valid and enforceable patent claims by Nielsen.

WHEREFORE, TVision respectfully requests that the Court enter judgment in TVision's favor and against Nielsen on all of Nielsen's claims; that the Court declare that the '642 patent is invalid and not infringed by TVision; that the Court award TVision its costs and attorneys' fees pursuant to 35 U.S.C. § 285; and that the Court award TVision such other relief as the Court deems appropriate.

## EXCEPTIONAL CASE

On information and belief, this is an exceptional case entitling TVision to an award of its attorneys' fees incurred in connection with defending this action pursuant to 35 U.S.C. § 285, as a result of, inter alia, Nielsen's assertion of the '642 patent against TVision with the knowledge that TVision does not infringe any valid or enforceable claim of the '642 patent and/or that the '642 patent is invalid and/or unenforceable, and because this case is another instance of Nielsen's continued campaign of sham litigation against TVision.

## AFFIRMATIVE DEFENSES

Subject to the responses above, TVision alleges and asserts the following defenses in response to Nielsen's allegations, undertaking the burden of proof only as to those defenses deemed affirmative defenses by law, regardless of how such defenses are denominated herein. All defenses are pled in the alternative and do not constitute an admission of liability or that Nielsen is somehow entitled to any relief whatsoever. In addition to the defenses listed below, TVision

8

specifically reserves all rights under the Federal Rules of Civil Procedure to assert additional defenses and/or counterclaims that may become known through the course of discovery or otherwise during the course of these proceedings.

### FIRST DEFENSE
(NONINFRINGEMENT OF THE PATENT)

TVision has not infringed and does not infringe any valid, enforceable claim of the '642 patent, literally or under the doctrine of equivalents, indirectly, willfully, alone or jointly with third parties.

### SECOND DEFENSE
(INVALIDITY)

One or more of the claims of the '642 patent are invalid and unenforceable for failure to satisfy one or more of the conditions of patentability set forth in Title 35 of the United States Code, including without limitation, 35 U.S.C. §§ 102, 103, and/or 112, because the claims are directed to abstract ideas or other non-statutory subject matter, because the claims lack novelty and are taught or suggested by the prior art, and because the claims suffer from a failure of written description, lack of enablement, and claim indefiniteness.

### THIRD DEFENSE
(LIMITATION ON DAMAGES)

Nielsen's damages are limited or unavailable pursuant to 35 U.S.C. §§ 286, 287, and/or 288.

### FOURTH DEFENSE
(NO INJUNCTIVE RELIEF)

Nielsen is not entitled to injunctive relief because it has an adequate remedy at law and, upon information and belief, otherwise cannot satisfy the requirements for injunctive relief.

9

**FIFTH DEFENSE**
(ACQUIESCENCE, ESTOPPEL, WAIVER, AND/OR LACHES)

The claims and relief sought by Nielsen in relation to the '642 patent are barred, in whole or in part, by the equitable doctrines of acquiescence, estoppel and/or prosecution history estoppel, waiver, and/or laches.

**SIXTH DEFENSE**
(UNCLEAN HANDS)

Nielsen's claims are barred, in whole or in part, by the equitable doctrine of unclean hands. Nielsen itself has contended in other, baseless patent litigation brought against TVision that TVision's customers VideoAmp and iSpot are Nielsen's only competitors in the national market for linear TV. Nielsen has further contended that without panel data obtained from TVision, VideoAmp and iSpot could not compete with Nielsen. Nielsen has further admitted that it was able to fix prices for Nielsen's ratings data until VideoAmp and iSpot began to compete with Nielsen using TVision's data. Nielsen has endeavored to limit TVision's growth or destroy TVision by serially filing baseless patent infringement lawsuits, of which this is one, by employing the practice of filing continuations of patent applications it has previously prosecuted and drafting claims to attempt to cover technology that TVision invented and began to use in the marketplace before Nielsen's patent applications were even filed. Further, on information and belief, Nielsen has adopted a practice of not searching its own files for relevant prior art and not disclosing prior art that it knows about to the United States Patent and Trademark Office ("USPTO" or "Patent Office") during the prosecution of its patents. During the prosecution of the patent-in-suit, Nielsen did not file a single invention disclosure statement. Nielsen has thus engaged in a pattern of conduct that includes willful blindness to its own prior art, and has flouted its obligation to provide the USPTO with prior art that is known to Nielsen. On information and belief, Nielsen has

10

withheld prior art material to the examination of the patent-in-suit that is in Nielsen's own files. Further, on information and belief, the patent-in-suit is invalid based on patents and patent publications in Nielsen's own files, of which Nielsen is charged with knowledge. Nielsen's pattern of conduct, including willful blindness to its own prior art, and its willful failure to disclose the same to the USPTO during examinations of patents that Nielsen is planning to assert against TVision render it inequitable to enforce the '642 patent against Nielsen, even if such patent were valid.

**SEVENTH DEFENSE**
(OBVIOUSNESS TYPE DOUBLE PATENTING)

Nielsen's asserted claims are invalid under the doctrine of obviousness-type double patenting over the claims of U.S. Patent Nos. 10,805,690, 11,463,770, and 11,877,028.

**EIGHTH DEFENSE**
(PATENT INELIGIBILITY UNDER 35 U.S.C. § 101)

Nielsen's asserted claims are patent-ineligible for the reasons stated in the memorandum of law filed in support of TVision's Motion to Dismiss (D.I. 11, D.I. 12).

## COUNTERCLAIMS OF TVISION INSIGHTS, INC. FOR VIOLATIONS OF THE ANTITRUST LAWS

### INTRODUCTION

1.      For years, Nielsen has used a number of anticompetitive tactics to unlawfully maintain its decades-long monopoly over TV audience measurement services in the United States. This latest patent-infringement lawsuit filed by Nielsen against TVision is just one more example, emblematic of a merciless approach by Nielsen to stamping out all potential competitors by any means at its disposal.

2.      As detailed throughout this counterclaim, Nielsen's stranglehold over TV audience measurement services harms every affected stakeholder other than Nielsen itself. Broadcasters, television networks, and streaming providers are forced to pay exorbitant prices for poor-quality data; advertisers are hampered by the inability to reach their desired audiences effectively and efficiently; the viewing public is deprived of the kind of diverse content that truly reflects its tastes and preferences; and innovative competitors like TVision are forced to compete on a vastly uneven playing field—one where it does not matter if your product is superior to Nielsen's (as TVision's is) or your prices are lower (as TVision's are), because Nielsen's anticompetitive tactics ensure it will remain dominant no matter what.

3.      Nielsen has used a two-pronged strategy to maintain its market dominance. *First*, Nielsen leverages its market power to lock its customers into using Nielsen's and **only** Nielsen's TV audience measurement services. *Second*, if and when a competitor emerges as a potential threat, Nielsen uses its vast resources to bury it under a mountain of baseless lawsuits, without any regard to the merits of those lawsuits. Each of these prongs independently harms competition and causes an array of market-wide injuries; together, they magnify those harms.

4.      Regarding the former, Nielsen imposes an array of exclusionary arrangements on its customers (including broadcasters, television networks, streaming providers, and advertisers) to lock those customers into its TV audience measurement services and ensure no competitor poses a meaningful threat to its monopoly. These arrangements, individually and collectively, unreasonably restrain competition and maintain Nielsen's dominance by ensuring that any customer who wishes to switch away from Nielsen's TV audience measurement services—or even just complement them with a competitor's—will face enormous difficulty, expense, and business risk.

5.      Nielsen's anticompetitive tactics include: (1) forcing customers into long-term *de facto* exclusive dealing contracts that effectively forbid them from using any other audience measurement data, (2) intentionally staggering the end dates of those contracts to ensure that only a trickle of potential customers becomes available to a competitor in any given year; (3) conditioning access to its customers' own critical historical data on their agreement to continue to purchase Nielsen's TV audience measurement services, making it nearly impossible for dissatisfied customers to switch suppliers; and (4) punishing any content provider who switches to a competitor by arbitrarily hiding that broadcaster from the data Nielsen provides to advertisers, crippling its business opportunities. These practices all contribute to a single result: they perpetuate Nielsen's monopoly and deprive innovators like TVision of the opportunity to compete on the merits.

6.      But, as this case itself demonstrates, Nielsen is not content just to utilize anticompetitive arrangements with its customers to maintain its dominance. To make its exclusionary tactics even more effective at blocking competition, Nielsen also maintains its monopoly through a playbook of anticompetitive, abusive litigation tactics, as exemplified by this

13

case and the series of other cases Nielsen has brought against TVision and other potential rivals. Nielsen's practice whenever a company like TVision begins to represent any sort of real competitive threat is consistent: Nielsen will drag the competitor into a protracted campaign of patent litigation without regards to the merits of that litigation, all with the end goal of draining the competitor's resources, scaring off its customers, and intimidating it into submission.

7.      In TVision's case, in the span of four years, Nielsen has filed *five* separate lawsuits against TVision, asserting six different patents, pertaining to one single product, TVision's in-home meter. Nielsen has succeeded on *none* of its claims to date.

8.      Nielsen has voluntarily dismissed claims concerning two of its patents, and has had a third patent invalidated by the United States Patent and Trademark Office ("USPTO" or "Patent Office"), which found Nielsen withheld critical information in the prosecution process, thus exposing Nielsen as having engaged in fraud. No reasonable litigant could realistically expect success on the merits in these suits, and Nielsen has known all along that each of its claims is objectively baseless. It knew before it even received its now-invalidated patent that it had no basis to seek that patent in the first place. But protecting legitimate intellectual property has never been Nielsen's intent; its goal was always to crush rivals before they could grow into major threats. Nielsen's baseless and anticompetitive series of lawsuits against TVision and others is abusive and illegal.

9.      TVision is a data and analytics company founded in 2014 that measures what was once unmeasurable—how viewers really watch TV. With its innovative in-home meter, TVision collects data from members of an opt-in panel of about 5,000 homes across the United States, aggregated and weighted to be nationally representative. Every time a person walks into a room and turns on the TV, TVision's in-home meter detects what is playing on the TV, who the viewer

14

is, where they are in the room, what their eyes are looking at, and if they are "co-viewing" with another viewer. The in-home meter collects this "eyes-on-screen attention" data for every second of programming and advertising, across both linear and connected TV. TVision goes beyond answering "is the TV on?" to understanding what TV content viewers actually engage with.

10.     TVision's innovative in-home meter—and its resulting data and service offerings—surpass Nielsen's technology and services. Among other features, TVision's in-home meter collects data far beyond what Nielsen is capable of collecting, while not requiring panellists to do anything beyond what they would ordinarily do. In contrast, panellists using Nielsen's in-home meter must actively click a remote on and off to indicate when they are watching TV.

11.     TVision's attention insights have revolutionized every segment of the TV audience measurement services market. Other market participants like VideoAmp calibrate their large datasets with TVision's panel data, allowing them to offer services to compete with Nielsen. TVision's insights allow a content provider like Netflix to determine whether viewers pay more attention to episodic shows that are "binge released" or released on a week-by-week schedule. Advertisers can use TVision's second-by-second data to determine precisely when viewers paid the most attention to a new ad campaign. These are just a few illustrative examples of the impact of TVision's innovations on the relevant market and how TVision's services allow market participants to make better-informed programming and advertising decisions.

12.     Nielsen's TV audience measurement services, in contrast, are built on woefully outdated technologies and methodologies. Yet Nielsen has had little need to innovate because it has shielded itself from competition. It is a frequently discussed fact of life in the entertainment industry that the quality of Nielsen's TV audience measurement services is poor—so poor, in fact, that they create massive distortions in what television programming is ultimately delivered to

15

consumers, as broadcasters and advertisers are forced to make business-critical decisions based on inaccurate data that does not reflect actual viewer preferences. Offering a subpar product, however, has not prevented Nielsen from charging U.S. broadcasters exorbitant fees that far exceed those charged in other developed countries where meaningful competition exists. Nielsen can get away with that only because it is a monopolist that abuses its monopoly power.

13.     Nielsen's conduct is antithetical to the free and fair competition protected by the federal antitrust laws. Judicial relief is necessary to remedy the harms Nielsen has caused TVision through its broader harms to competition. Such relief will lead to lower prices and real innovation for purchasers of TV audience measurement services, and will allow competitors like TVision to compete fairly and on the merits.

## JURISDICTION AND VENUE

14.     This is an action for violation of Sherman Act sections 1 and 2, 15 U.S.C. §§ 1, 2, brought under Clayton Act sections 4 and 16, 15 U.S.C. §§ 15, 26.

15.     Counterclaim Plaintiff TVision Insights, Inc. ("TVision") is a corporation organized and existing under the laws of the State of Delaware.

16.     Counterclaim Defendant The Nielsen Company (US), LLC ("Nielsen") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business at 85 Broad Street, New York, New York 10004.

17.     This Court has personal jurisdiction over Nielsen because it is the original Plaintiff in this case and has therefore submitted to this Court's jurisdiction. Additionally, this Court has personal jurisdiction over Nielsen because it is organized under the laws of the State of Delaware.

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337 because this action arises under the Sherman Act and Clayton Act, both federal laws.

16

19.    Venue in this District is proper pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22 because Nielsen resides in and does business in this District and a substantial portion of the affected interstate trade and commerce described herein was carried out in this District. Several of the acts complained of were committed in this District.

<b><u>FACTUAL ALLEGATIONS</u></b>

## I.    TELEVISION AUDIENCE MEASUREMENT SERVICES

20.    Nielsen's conduct has allowed it to dominate the market for TV audience measurement services. This is the relevant market for this antitrust lawsuit. As detailed herein, Nielsen's dominance has harmed this market, leading to higher prices, lower quality, and fewer options for its participants.

21.    The entertainment industry relies on data about who is watching which programs, when, and where. In order to decide which television shows to renew and which to cancel, understand viewer preferences to develop new programming, and to determine how much to charge for advertising time, content providers (including broadcasters, networks, cable distributors, and streaming providers) require extensive data about their audiences. Likewise, advertisers and advertising agencies need viewership data in order to decide where they will buy advertising and how much they are willing to pay. When a particular metric becomes accepted as a unit of value used by content providers and advertisers to negotiate prices for ad time, that metric is called a "currency" in the industry.

22.    TV audience measurement services are the means by which entertainment industry participants obtain this data. TV audience measurement services are a product whereby a customer pays a monthly subscription fee to receive periodic information about the entertainment landscape, including detailed data on the number of people who watched each show, the demographic and geographic breakdowns of the audiences, and similar information. In recent years, some more

17

sophisticated providers of TV audience measurement services, including TVision, have begun providing more advanced metrics, such as second-by-second measurements of viewers' eyes-on-screen attention level. Across these metrics and data types, the core utility provided by TV audience measurement services is the same: to provide an accurate snapshot of television consumption habits, in order to inform programming decisions and advertising transactions.

23.     Nielsen and other providers of TV audience measurement services sell these services to a variety of customers in the United States—including, but not limited to, broadcasters, television networks, cable television operators, streaming providers, advertisers, advertising agencies, and media sales representatives. As the dominant provider of TV audience measurement services, Nielsen charges extremely high prices for its services that are above competitive levels, because of the conduct detailed herein.

24.     TV audience measurement services include the provision of data on all types of television programming, including programs on both "linear TV" (*i.e.*, broadcast television, ad-supported cable television, and streaming services that use common, rather than targeted, advertisements) and "connected TV" (*i.e.*, programs made available through streaming services such as Netflix and Hulu that use targeted advertisements). TV audience measurement services do not include data on media forms other than television, such as film, video games, and online live-streaming from platforms like Twitch. Data on these non-television media forms is not reasonably substitutable with the data provided as part of television audience measurement services, as television studios cannot use such information to make decisions about their own programming and to sell the advertising space associated with their television programming.

25.     Data on other media forms is also not substitutable with TV audience measurement services from the perspective of advertisers, for whom advertising on television offers unique

18

benefits (such as the demographics reached and the means of presenting to them) that necessitate specific and separate measurement of the TV landscape. Accordingly, there is little to no cross-elasticity of demand between TV audience measurement services and data or measurement of other non-television media forms.

26.    More broadly, there are no reasonably interchangeable substitutes for TV audience measurement services. The core purpose of these services—to maintain a current view of the performance of different television programs across the entertainment industry in order to inform programming decisions and advertising buys—is a distinct use that only TV audience measurement services fulfill. While other services or products exist that relate generally and in various ways to entertainment data, they do not fulfill the entertainment industry's core and indispensable need for up-to-date data on the television viewing habits of the public, and are therefore not the types of product to which customers would turn to for the same essential purpose.

27.    For example, a license to access pre-existing and/or historical TV audience data, while important, cannot substitute for a subscription to live, continuously updated information on the current state of the television industry (*i.e.*, TV audience measurement services), as the state of play is constantly changing and industry participants need the most current information to inform timely decisions about programming and advertising.

28.    Nor, as another example, are TV audience measurement services substitutable with any kind of data analytics tools or software. Although the data provided by TV audience measurement services may be used within such tools or software, the key benefit provided by TV audience measurement services is the provision of the data itself. A content provider or advertiser receiving periodic deliveries of data through a subscription to TV audience measurement services could not swap out that subscription for a data analytics tool containing no actual information.

19

29.     Because of the unique benefits they offer, and their low substitutability with other products, a hypothetical monopolist of television audience measurement services (or, an actual monopolist, like Nielsen) could profitably implement a small but substantial, non-transitory increase in price ("SSNIP"), because users of television audience measurement services would not switch to other types of products in sufficient numbers to make the increase unprofitable. This is borne out by the fact that, as discussed below, Nielsen—an actual monopolist over television audience measurement services—*has* been able to profitably charge supracompetitive prices for these services in the United States, and *has* profitably raised prices in the exact way contemplated by the SSNIP test.

30.     Nielsen charges far more on average for its TV audience measurement services domestically than it does abroad, where competition is more robust and the price is set closer to a competitive level. Specifically, in the United States, Nielsen charges as much as *four times* what it charges for TV audience measurement services in countries where meaningful competition exists. Nielsen's supracompetitive pricing in the United States, however, has not resulted in lower profitability due to domestic TV networks and advertisers switching to products other than TV audience measurement services. Just the opposite. The last time they were publicly reported, Nielsen's profit margins in the U.S. were approximately *five times higher* than its margins abroad. This is real-world demonstration of the fact that substantial numbers of TV audience measurement services customers have little choice but to pay monopoly prices for TV audience measurement services in the U.S.—so many, in fact, that a hypothetical monopolist could not only *maintain* profitability by imposing a SSNIP above the competitive price, but substantially *increase* profitability, as Nielsen itself has done.

31.    Further, there is longstanding and widespread industry recognition of TV audience measurement services as a distinct product. The concept of TV audience measurement services as a distinct service in which a supplier provides a subscriber with periodic measurement and reporting of the media landscape dates back at least to the 1950's.

32.    Nielsen and TVision each participate in the relevant market. As discussed, Nielsen's flagship product, and the product for which it is best known, is its TV audience measurement services, which dominates the relevant market. Nielsen markets its TV audience measurement services as a distinct product from its other data-related products and services.[1] Courts have also recognized "the television audience measurement market" as a cognizable antitrust market, including in previous cases brought against Nielsen.[2]

33.    TVision also sells TV audience measurement services to buyers in the relevant market. As explained on its website, TVision's offerings can present "the total TV landscape in one unified view," and "provide greater clarity and competitive insight into who is watching what content across the TV landscape." Nielsen has recognized TVision as a competitor in this market in its anticompetitive litigation campaign against TVision. For example, in its response to a motion to consolidate filed by TVision in one Nielsen's patent lawsuits, Nielsen acknowledged that "Nielsen and TVision are engaged in the business of providing audience measurement data," that "Nielsen and TVision are both direct[] and indirect[] competitors," and that "TVision boasts that

---

[1]    Nielsen, Measuring the Value of TV Advertising, https://www.nielsen.com/solutions/audience-measurement/us-national-and-local-tv-measurement/ (last visited Nov. 10, 2025).

[2]    *See, e.g.*, *Erinmedia, LLC v. Nielsen Media Rsch., Inc*, 2007 WL 9723532, at *2 (M.D. Fla. Dec. 28, 2007).

it is ready to 'take on Nielsen' and has raised many millions of dollars in capital towards those efforts."[3]

34.     TVision is a particular threat to Nielsen because it the only provider of TV audience measurement services other than Nielsen that can collect and analyze significant amounts of panel data—*i.e.*, data collected from individuals who opt in to have their viewing habits tracked with in-home meters. TVision's offerings that incorporate panel data are superior to Nielsen's, because Nielsen's inferior in-home meter cannot track an individual's actual attention level like TVision's in-home meter. TVision has developed significant relationships with major entertainment industry participants and would have been well-positioned to expand those relationships and convert those customers away from Nielsen entirely were those participants not locked up and deterred by Nielsen's anticompetitive conduct.

35.     TVision has also emphasized the ways its product can be used to supplement Nielsen's. TVision has positioned its product this way in part because of the insurmountable switching costs Nielsen imposes on its customers, which make it easier for a company like TVision to survive by emphasizing the ways its data can be used to supplement, rather than completely supplant, Nielsen's (although Nielsen's *de facto* exclusive dealing terms discussed below have made competing in this way extraordinarily difficult as well).

36.     Beyond Nielsen and TVision, other participants in the relevant market include Comscore, VideoAmp, and iSpot. In addition to its direct sales to customers, TVision also participates in the relevant market by selling certain of its services to certain of these competitors, including VideoAmp and iSpot. For example, TVision licenses its panel data to VideoAmp, which

---

[3]  *The Nielsen Company (US), LLC v. TVision Insights, Inc.*, C.A. No. 23-1345-CJB (D. Del.), D.I. 100 at 5-6.

VideoAmp uses to fine-tune and supplement its own TV audience measurement service offerings. TVision also provides unique metrics and analytics based on its panel data to other competitors, which they have commingled into their own offerings in the relevant market.

37.    As Nielsen has recognized, however, TVision's intention has always been to grow into a top-line competitor that would provide technologically-superior alternatives to Nielsen across its customer base and provide metrics that could serve as a "currency" in the industry for buyers and sellers of ad time. Were it not for the anticompetitive conduct described herein, TVision would have done so, and it would have been well-positioned to take significant market share from Nielsen.

38.    The TV audience measurement services market has very high barriers to entry. As noted, a principal method by which companies collect the data underlying TV audience measurement services involves the use of a "panel"—a carefully chosen, demographically representative group of many thousands of individuals who are paid to have devices installed on their televisions to monitor and record their viewing habits. Creating and maintaining a panel is extremely time- and capital-intensive, as it requires locating tens of thousands of participants using a meticulous sampling methodology, regularly paying each of them, and establishing an infrastructure to administer their continuous participation. Some providers of TV audience measurement services license panel data from other providers who collect it, rather than collecting it themselves, but even licensing panel data requires significant capital investments, given the difficulty and expense of collecting it. Moreover, entering the TV audience measurement services market requires the creation of software platforms and, in many cases, hardware devices that further escalate the difficulty of entry. It also requires breaking into a relatively small base of large,

23

established business customers. For these reasons, courts have recognized the "television audience measurement industry" as "capital intensive."[4]

39.    The TV audience measurement services market also has low market demand elasticity. In other words, customers are unlikely to respond to an increase in price by deciding to forgo purchasing any product whatsoever. Organizations that use TV audience measurement services typically require those services as an essential part of their business. Indeed, TV audience measurement services are so essential that certain metrics are referred to as the "currency" by which content providers and advertisers buy and sell advertising time. The TV audience measurement services market is therefore not the type of market that a customer is likely to enter and exit freely or lightly, and customers facing price increases typically have no choice but to bear those costs.

40.    The relevant geographic market is the United States. Because all of Nielsen's data is provided digitally, subscribers have no geographic preferences for the TV audience measurement services suppliers to whom they are willing to subscribe. Within the United States, all participants in the TV audience measurement services market compete with all other participants in the TV audience measurement services market. The services Nielsen offers outside the United States are neither offered for sale to U.S. customers nor useful to them, as they do not represent the activities of U.S. viewers.

---

[4] *Sunbeam Television Corp. v. Nielsen Media Rsch., Inc.*, 711 F.3d 1264, 1273 (11th Cir. 2013).

## II.    NIELSEN'S MONOPOLY POWER

41.    Nielsen is indisputably a monopolist in the market for TV audience measurement services, and has been since the 1950's. The industry consensus as to Nielsen's monopoly position and power is overwhelming. Commentators have recognized that Nielsen has "held a monopoly on TV viewership and ratings numbers for decades,"[5] and that "[w]hen it comes to national television audience measurement used for the buying and selling of commercial time, Nielsen has long been an industry-mandated monopoly."[6] Still other sources have recognized that "Nielsen Has Built a TV Ratings Monopoly Nearly as Old as TV,"[7] and that "Nielsen is a perfect example of a monopoly."[8]

42.    These assessments are accurate. Nielsen maintains market share in the market for TV audience measurement services at approximately 90%, and has done so for decades. According to a June 2025 article from *The Current*, "Industry sources estimate Nielsen controls around 80% to 90% of the national currency market today."[9] As mentioned above, "currency" is industry shorthand for the TV audience measurement information used by advertisers (buyers) and content providers (sellers) to negotiate prices for ad time.

---

[5]    Derek Baine, *Nielsen's New Owner Will Have Their Hands Full Measuring TV and Streaming Viewing Accurately*, Forbes (Jun. 21, 2022), https://www.forbes.com/sites/derekbaine/2022/06/21/nielsens-new-owner-will-have-their-hands-full-measuring-tv-and-streaming-viewing-accurately/?sh=443fc31366f6.

[6]    Steve Sternberg, *Here's What's Wrong with TV Audience Measurement and How to Fix It*, The Sternberg Report (Oct. 2021).

[7]    Tony Maglio, *How Nielsen Has Built a TV Ratings Monopoly Nearly as Old as TV*, The Wrap (Apr. 26, 2016), https://www.thewrap.com/nielsen-tv-ratings-new-threats-history/.

[8]    Josh Bernoff, *What will happen to Nielsen?* (Feb. 1, 2019), https://bernoff.com/blog/what-will-happen-to-nielsen.

[9]    Chris Brooklier, *The Messy World of TV Currency and How Competitors are Trying to Unseat Nielsen*, The Current (June 13, 2025), https://www.thecurrent.com/streaming-messy-world-how-competitors-trying-unseat-nielsen-comscore-tv-currency-data.

43.     Nielsen's market dominance extends to both TV audience measurement services sold to content providers (like broadcasters, networks, and streaming providers), and to TV audience measurement services sold to advertisers. It is common industry knowledge that advertisers and advertising agencies overwhelmingly use Nielsen's TV audience measurement services to plan their advertising buys, and no competitor has been able to establish more than a small position in supplying TV audience measurement services to these market participants. Likewise, the vast majority of TV audience measurement services sold to content providers come from Nielsen. As a result of Nielsen's dominant market share in all segments of this market—combined with TV audience measurement services' high barriers to entry and low market demand elasticity—Nielsen has the ability to control prices and output in the TV audience measurement services market in the United States.

44.     Nielsen itself has conceded its monopoly power over TV audience measurement services. In defending two previous monopolization lawsuits involving the same relevant market at issue in this case, Nielsen opted *not* to challenge the element of monopoly power. In 2005, Nielsen was sued by a upstart competitor called erinMedia in the Middle District of Florida for violations of the Sherman Act. When Nielsen moved for summary judgment in that action, it did not contest evidence of its monopoly power. The case settled before trial after the court denied Nielsen's motion.[10] In 2009, Nielsen was sued by its customer Sunbeam Television Corporation in the Southern District of Florida for similar violations of the Sherman Act. In that case as well,

---

[10]     During the pendency of the lawsuit, erinMedia ceased operations, noting in a press release that Nielsen had "chilled" its ability to close an investment round and find financing partners. *See* Linda Moss, *erinMedia Out of Ratings Business*, Multichannel News (Feb. 21, 2007), https://www.nexttv.com/news/erinmedia-out-ratings-business-294332.

"*[n]either party dispute[d]* that Nielsen exercises monopoly power over the TV audience measurement services industry[.]"[11]

45.    Nielsen's monopoly power is further shown by its ability to control prices and output in the TV audience measurement services market. Comparing the state of the TV audience measurement services market in the United States to the TV audience measurement services markets abroad provides a compelling demonstration of Nielsen's supracompetitive pricing. Because Nielsen competes abroad with substantial measurement rivals such as Kantar Media (which does not operate in the TV audience measurement services market in the United States), foreign markets for TV audience measurement services are substantially more competitive than the market in the U.S. In these competitive markets, content providers typically spend under 1% of their total advertising revenues on TV audience measurement services (including Nielsen's). By contrast, in the United States, where Nielsen holds monopoly power, content providers typically pay Nielsen between 2 and 4% of their total advertising revenues for TV audience measurement services—up to *quadruple* what they would pay abroad. Indeed, despite accounting for only "a little over a quarter of global TV ad revenue," the United States "accounts for about *two-thirds* of global spending on TV measurement."[12]

46.    Nielsen's profit margins further directly demonstrate the supracompetitive nature of its domestic pricing. In foreign markets where meaningful competition exists, Nielsen's operating margin the last time it was reported was 6%. In the United States, it was *29%*. The sole

---

[11]    *Sunbeam Television Corp.*, 711 F.3d at 1267 (emphasis added). The court in *Sunbeam* ultimately granted summary judgment to Nielsen on grounds not present in, or relevant to, this action. *Id.* at 1273-74.

[12]    Jack Neff, *Inside Nielsen's Pricey Hold on TV Networks and How They're Fighting Back*, AdAge (Oct. 20, 2022), https://adage.com/article/media/inside-nielsens-pricey-hold-tv-networks-and-how-theyre-fighting-back/2444386/ (emphasis added).

difference that could account for these dramatic mismatches in Nielsen's pricing and profit margins is the monopoly power it maintains in the United States but lacks abroad.

47.    Nielsen's ability to exclude competition in the U.S. is further evidence of its monopoly power. As discussed in the following sections, Nielsen has preempted competition by forbidding customers from simultaneously using competitors' data, forcing them into long-term contracts with staggered end dates, conditioning its customers' access to their historical data on continuing purchases of Nielsen's TV audience measurement services, and punishing any content provider who defects by hiding its programming from the data Nielsen supplies to advertisers. A participant in a competitive market could not successfully implement such practices, which are widely despised by customers, without jeopardizing its customer relationships and market share. That Nielsen has been able to maintain such high market share while treating its customers so poorly demonstrates it has the power to raise prices, restrict output, and exclude competition.

## III.    NIELSEN'S ANTICOMPETITIVE CONDUCT

48.    Nielsen maintains its monopoly through a broad array of anticompetitive practices. Each of these practices is anticompetitive, unlawful, and injurious to TVision, other competitors, and consumers standing alone, but they are even more pernicious in how they work in concert, reinforcing each other to create insurmountable anticompetitive effects. Through these practices, Nielsen locks down its customers while draining competitors of the resources and opportunities necessary to survive, grow to efficient scale, and eventually pose a meaningful threat to Nielsen's monopoly.

49.    Nielsen's anticompetitive tactics fall into two broad categories: (a) its exclusionary customer and contracting practices that starve prospective competitors of business by foreclosing major portions of the market; and (b) its litigation practices that intimidate, harass, deter, and drain

28

the resources of fledgling competitors without regard to the merits of the litigation (including, as particularly relevant here, its years-long litigation campaign against TVision). Each of these practices is discussed in more detail below.

### A. Nielsen's Anticompetitive Foreclosure Tactics

50. Nielsen engages in a variety of exclusionary practices intended to prevent its rivals from competing on the merits, including (i) *de facto* exclusive dealing; (ii) coercing existing customers into not switching to competitors' services by conditioning the customers' access to their historical data on their continued purchase of Nielsen's TV audience measurement services, essentially holding their critical business information hostage to keep customers on Nielsen's monthly TV audience measurement services subscription; and (iii) coercing customers into not switching to competitor services by arbitrarily hiding any content provider that stops subscribing to Nielsen from the data Nielsen sells to advertisers, thereby hamstringing the ad sales opportunities of any disloyal content providers.

### i. Nielsen Locks Its Customers Into *De Facto* Exclusive Contracts

51. One tactic Nielsen uses to foreclose competition in the TV audience measurement services market is to impose contract terms that effectively forbid its customers from using competing TV audience measurement services so long as they are under contract with Nielsen.

52. Nielsen achieves this outcome by requiring all customers to agree to refrain from what Nielsen calls "commingling" Nielsen data with other data, which Nielsen defines to mean that customers cannot use *any* competitor data while also using Nielsen data. This essentially means a Nielsen customer cannot use a competing service because the nature of TV audience measurement services is that they provide customers with data about TV programs. If a customer

29

cannot use such data while they are also a Nielsen customer, this is essentially a requirement that they ***only*** use Nielsen's services.

53.     All of Nielsen's customer contracts (which are essentially standardized) contain terms stating that customers may not, among other things:

> "combine, integrate, match, connect, fuse, validate or in any way use the Services or Nielsen Information with any other data or with software programs provided from any other source"

> "combine, cross tabulate, index, model or in any way use the Nielsen Information with any other data or software programs provided from any other source, or with any other data,"

> "cross-tabulate, index, or model the Services or Nielsen Information"

> "use the Services or Nielsen Information … for the creation of stand-alone analytics reports or products"[13]

In addition, at least up until the past year or two, Nielsen's contracts have also contained specific terms expressly forbidding customers from preparing documents that compare Nielsen's data side-by-side with other firms', even for solely internal purposes.

54.     It is effectively impossible to use both Nielsen's and a competitor's TV audience measurement services without violating these terms. Any simultaneous use of Nielsen's audience measurement data and a competitor's audience measurement data for the purposes to which such data is typically directed—*i.e.*, buying and selling ad time or making programming decisions—will inherently require the customer to in some sense, "use the Services or Nielsen Information with any other data," or to in some way perform a side-by-side comparison of the Nielsen data and other data.

---

[13]   Nielsen Marketplace Services Agreement, NIELSEN, https://www.nielsen.com/nielsen-marketplace-services-agreement/ (last accessed Nov. 10, 2025).

55.     Take, for example, a hypothetical advertiser that subscribes to both Nielsen's and TVision's TV audience measurement services. If an employee of that advertiser consults Nielsen's offerings to decide which timeslot to place an ad in as part of a new ad campaign, and then consults TVision's services to assess the attention paid to that ad, Nielsen could accuse that advertiser of "us[ing] the Services or Nielsen Information with any other data," in violation of its contract. If that same employee sends his boss an email detailing his recommendation with citations to both providers' data, Nielsen could accuse that advertiser of "us[ing] the Services or Nielsen Information with any other data," as well "us[ing] Services or Nielsen Information … for the creation of stand-alone analytics reports," and preparing a document containing a side-by-side comparison—all in violation of the advertiser's contract with Nielsen.

56.     Nielsen has also exploited the vagueness of its contract terms to strengthen their exclusionary effect. Nielsen's contracts do not explain what it means to "combine, integrate, match, connect, fuse, validate or in any way use the Services Nielsen Information with any other data," or what constitutes a "stand-alone analytics report[]" or a side-by-side comparison, and Nielsen does not provide clear guidance on these terms outside of its contracts. That is by design. The intentional vagueness of these terms causes customers, fearful of violating their contractual obligations to the infamously litigious Nielsen, to steer well clear of any conduct that might be construed to violate these terms. And Nielsen takes advantage of this uncertainty by frequently wielding these terms against customers who express interest in supplementing Nielsen's data with competitors' data, enforcing the *de facto* exclusivity of its contracts by telling such customers that use of competitor data would violate their contracts. Therefore, regardless of how broad these terms are properly construed to be, the anticompetitive shadow they cast is broader.

31

57.     TVision has experienced first-hand how Nielsen uses its agreements to block competition from rivals. Numerous customers and prospective customers of TVision have informed TVision that they understand that using TVision's data as a supplement to Nielsen's would violate their contracts with Nielsen, and that Nielsen has told the customer these terms prohibit such use. Multiple times, TVision has spent weeks trying to work with Nielsen and their joint customers to understand why Nielsen prohibits its customers from using TVision and other similarly situated competitors' data, and what information or assurances would be necessary to resolve this issue. These efforts have been unavailing, and Nielsen has maintained its position that its customers may not use TVision data because doing so would violate their contracts with Nielsen.

58.     Nielsen's use of these terms has materially impaired TVision's relationships with its customers and deterred others from even beginning relationships with TVision. As described more fully below, the only justification Nielsen has ever offered for these terms—to protect the integrity of its data and intellectual property—makes no sense and has no relationship to the terms themselves.

59.     As a fig leaf, Nielsen has in some cases provided its customers one theoretical way out of these "anti-commingling" restrictions, but it is non-meaningful and does not alleviate the *de facto* exclusivity the restrictions create or the broad anticompetitive harm they inflict. If a customer specifically insists on using supplemental data from a competitor like TVision, Nielsen has in some cases given it an option to pay a steep additional fee on top of Nielsen's already exorbitant fees in exchange for ***amending its contract*** to add a special "additional use case" that allows for such use. This practice effectively increases the price Nielsen's customers must pay to use Nielsen's competitors' products, with the fee paid to Nielsen acting as a tax on competition rather than

32

compensating the competitor for the competitive product itself. Nonetheless, at least some customers have still paid this anticompetitive tax because they recognize that TVision's offerings improve their ability to analyze and use TV audience measurement data to suit their business needs.

60.    As an initial matter, Nielsen's position that a customer must amend its contract with Nielsen to be able to use TVision's services shows that Nielsen itself believes the contracts give it *de facto* exclusivity. But, even if that were not so, Nielsen does not advertise amendment as a generally available option to its customers, and it is not part of the standard contract terms that apply to the vast majority of Nielsen's customers.

61.    Further, whether to allow amendment at all is, according to Nielsen, completely up to its discretion, and the price tag is enormous. Amendment is therefore not a meaningful economic choice for most Nielsen customers, particularly given that, due to high informational and cost barriers Nielsen itself imposes, only very few will ever even have an opportunity to consider this option. This theoretical possibility of amending the contracts therefore does not change the fact that Nielsen's contracts, as they work on the ground and in reality, effectively require exclusivity.

62.    Two additional aspects of Nielsen's contracts and contracting practices greatly amplify the already great anticompetitive effect of its *de facto* exclusive dealing terms: (1) the length of its contracts, and (2) its well-documented practice of staggering the end dates of its contracts, so that only a few are up for renewal each year.

63.    *First*, Nielsen uses the length of its contracts as a tactic to ensure its customers have as few opportunities as possible to switch to a competitor. Typically, Nielsen insists on contract lengths of at least five years. In many cases, the contracts extend as long as seven years. Nielsen's customer contracts are not terminable at-will by its customers—although they are terminable at-

will by Nielsen (thereby giving it enormous leverage over its customers, but very little return leverage).

64.    Despite the one-sidedness of these terms, Nielsen's customers, most of whom have no other options given Nielsen's market dominance and the other forms of coercive conduct discussed below, have no choice but to accept Nielsen's terms. In combination with the *de facto* exclusive dealing terms of these contracts, the contracts' long durations and one-sided terminability ensure that each time Nielsen signs a contract with a customer, that customer is effectively rendered out of reach to competitors for at least a half-decade.

65.    *Second*, Nielsen staggers the terms of its contracts as a strategy to ensure that few potential customers become available to a competitor in a given year. Specifically, Nielsen coordinates the end dates of its major customer contracts, spreading them out as much as possible and arranging them such that in any given year, the vast majority of content providers are and will remain locked up under Nielsen's long-term contracts.

66.    Through this staggering strategy, Nielsen ensures that its competitors will be able to pursue, at most, a slow drip of customers, preventing the tidal shift that should occur in a free and fair market when another company outcompetes Nielsen on the merits. As a result, many fledgling competitors are starved in their infancy, unable to survive long enough to win over the critical mass of customers needed to establish themselves as a true competitive threat and preferred alternative to Nielsen.

67.    Multiple courts have recognized the anticompetitive effects of Nielsen's long-term, staggered contracts, even independent of the "anti-commingling" terms that render Nielsen's contracts *de facto* exclusive. In *ErinMedia*, the court recognized "evidence that Nielsen employed a contract strategy to retain all customers by tying them up under long-term, high-priced contracts

34

with staggered end dates."[14] That antitrust claim did not involve Nielsen's "anti-commingling" terms. Nonetheless, the court found that the long-term, staggered nature of Nielsen's contracts was alone "sufficient to raise an issue of fact for trial" as to whether Nielsen engaged in anticompetitive conduct.[15] Likewise, in *Sunbeam*, the court recognized "evidence that Nielsen has a policy or practice of staggering the terms of certain of its national market contracts."[16] It cited, for example, "an internal Nielsen presentation … which lists '[s]taggered renewals' as a '[c]ontract strategy' for '[w]inning and retaining all potential clients.'"[17] As in *ErinMedia*, the plaintiff in *Sunbeam* did not base its claim on Nielsen's anti-commingling terms. Nonetheless, the *Sunbeam* court also recognized, based solely on the contracts' long duration and staggering, that "whether Nielsen's contracting practices are exclusionary is a disputed factual issue."[18]

68.    Nielsen's *de facto* exclusive, long-term, staggered contracts substantially foreclose the market to competitors. As discussed above, Nielsen has an approximately 90% market share in the market for television audience measurement services. Accordingly, at any given time, approximately 90% of all available customers of television audience measurement services are under contract with Nielsen. Therefore, the foreclosure rate from Nielsen's *de facto* exclusive dealing agreements, calculated as a snapshot of the market at any given point in time, is approximately 90%.

69.    Alternatively, if the foreclosure rate is calculated on a year-to-year basis—*i.e.*, as the percentage of selling opportunities that are and will remain foreclosed to rivals for the entirety

---

[14]    *ErinMedia*, 2007 WL 9723532, at *3.

[15]    *Id.*

[16]    *Sunbeam Television Corp. v. Nielsen Media Rsch., Inc.*, 763 F. Supp. 2d 1341, 1346 (S.D. Fla. 2011).

[17]    *Id.* at 1347.

[18]    *Id.*

of any given year—the rate is between 72% and 77%, given the duration and staggering of Nielsen's contracts.[19] This latter rate, however, likely substantially underestimates the true foreclosure effect of Nielsen's conduct, as it does not take into account how the additional forms of conduct discussed herein prevent customers from switching even when their contracts with Nielsen end. Regardless, however the foreclosure rate calculated, the selling opportunities foreclosed by Nielsen's contracts is substantial.

70.    There are no non-pretextual procompetitive benefits or other justifications for Nielsen to impose its anti-commingling terms, require long contract durations, or stagger its contracts' end dates. Nielsen's excuse for imposing its anti-commingling terms is a purported concern for the integrity of its intellectual property, but there is no rational relationship between those terms and protecting data integrity. Indeed, as discussed below, some of the intellectual property Nielsen professes to protect was, in fact, procured by fraud. Moreover, these terms do not and cannot affect the quality of the data Nielsen provides whatsoever, as they solely control what customers do with the data *after* they receive it.

71.    Although Nielsen may arguably have some interest in controlling how its customers publicly speak about the data it provides, it has no legitimate reason to restrict how its customers use the data they have already bought and paid for, for their own *internal* purposes. And it certainly has no legitimate reason to forbid its customers from even considering competitor data "in any way" alongside Nielsen's information. The true purpose of those terms is to ensure that Nielsen's customers continue to use Nielsen's and *only* Nielsen's TV audience measurement services.

---

[19]    Assuming evenly staggered 5-year contracts, 18% of the market would free up in any given year (90% / 5 = 18%). If these selling opportunities are excluded from the foreclosure rate, then the rate is 72%. Assuming evenly staggered 7-year contracts, approximately 13% of the market would free up in any given year (90% / 7 ≈ 13%). If these selling opportunities are excluded from the foreclosure rate, then the rate is 77%.

72.     Nor is there any procompetitive justification for Nielsen requiring long contract terms or staggering its contracts' end dates. By imposing these restrictions, Nielsen only limits the options available to its customers without any corresponding increase in quality or efficiency.

ii.     **Nielsen Conditions Customers' Access to Their Historical Data on Continued Subscription to Nielsen's TV Audience Measurement Services**

73.     Beyond the *de facto* exclusivity, long terms, and staggered nature of its contracts, Nielsen further coerces its existing customers into staying with it by conditioning access to their own historical data on continued subscription to Nielsen's forward-looking TV audience measurement services.

74.     When a content provider subscribes to TV audience measurement services, it accumulates vast historical data on its own performance via the periodic updates provided by the TV audience measurement services provider. This accumulated data is critical business information. Content providers need historical data for comparative and evaluative purposes, just as they need contemporaneous, periodic updates via TV audience measurement services to gauge their present audience and make short-term decisions about advertising sales.

75.     If a content provider loses access to its historical data, it faces challenges making informed programming decisions and participating effectively in the advertising market. Critically, historical data takes time to accumulate—a content provider switching to a new supplier of TV audience measurement services typically cannot immediately obtain from that new supplier the historical data it needs to most effectively run its business. A content provider switching suppliers of TV audience measurement services must therefore continue to rely on historical data obtained from its old supplier, at least until it has accumulated enough data from its new supplier's periodic audience measurement updates to serve its needs—a process that often takes years.

76.    Nielsen's contracts make explicit that Nielsen retains ownership of viewership data, and that its customers are granted only a limited, non-exclusive license to use the data. If a content provider stops subscribing to Nielsen's television audience measurement service—which are forward-looking, live, and continuous—Nielsen *revokes* access to that content provider's historical data. Nielsen ***does not allow*** content providers to simply pay for a license to retain access to its historical data, even though it would be extremely simple to allow such a purchase and would be a profitable product for Nielsen. Instead, the only way for a content provider to retain access to its historical data is to continue to subscribe to Nielsen's TV audience measurement services—to continue to pay full price for, and receive, continuous provision of *new* data.

77.    As a result, once a content provider subscribes to Nielsen for any meaningful amount of time (which, given Nielsen's long-term contracts, often means just a single contract term), switching to a competing supplier of TV audience measurement services becomes extremely onerous, and in many cases effectively impossible. Because content providers need their historical data, and because Nielsen retains total control over each customer's historical data, Nielsen's policy of conditioning access effectively forces content providers to continue subscribing to Nielsen's TV audience measurement services indefinitely, even if they would rather switch to a competitor's TV audience measurement services. This effect only worsens the longer a content provider subscribes to Nielsen, as the more historical data Nielsen accumulates on a content provider, the more power it wields over that customer.

78.    Nielsen's "all-or-nothing" policies and practices therefore leave customers with two bad choices: either (1) cut ties with Nielsen entirely, switch fully to a competitor, and lose access to all historical data, or (2) continue to bear the burden of Nielsen's monopoly prices and

inferior TV audience measurement services. Given the critical importance of historical data for content providers, this "choice" is no choice at all.

79.    There is no legitimate reason for Nielsen to enforce this conditioning policy other than making it difficult for customers to switch and thereby foreclosing competition on a basis other than the merits. Nielsen could easily allow customers to purchase licenses to retain access to their historical data without requiring them to also purchase Nielsen's TV audience measurement services. Allowing such separate purchases would result in no or virtually no loss of efficiency or increase in cost for Nielsen. All it would do is loosen Nielsen's grip on the market by making it more feasible for customers to switch.

### iii.    Nielsen Punishes Non-Subscribing Content Providers by Arbitrarily Hiding Them From the Data It Provides to Advertisers

80.    In addition to its exclusionary contracting practices and conditioning of access to historical data, Nielsen leverages its control over the information ecosystem of advertisers to coerce content providers into purchasing its TV audience measurement services. Whenever a content provider stops using Nielsen, Nielsen hides that content provider and its programming from the data products and tools that advertisers use to plan their advertising buys. Given Nielsen's near-total dominance over the audience measurement information seen by TV advertisers, this removal effectively renders the disloyal content provider invisible to the advertising market. As a result, content providers know that if they stop using Nielsen, they will be stymied in their ability to make advertising sales and will risk devastating financial losses. This is a powerful coercive tool Nielsen employs to foreclose competition on the merits.

81.    To be clear, the removal of these content providers is not a necessary, inherent, or even logical consequence of them ending their relationship with Nielsen. Because Nielsen collects data by tracking the full viewing habits of its panel members, Nielsen inherently collects data on

39

every broadcast network and program, regardless of whether its content provider is a Nielsen customer. When a content provider subscribes to Nielsen, it is not paying Nielsen to gather data on its programs; it is paying for Nielsen to allow it to access the data Nielsen *already* collects on the full entertainment landscape, including that content provider's programs. When a content provider stops subscribing to Nielsen, Nielsen continues to collect data on that content provider. Nielsen's removal of non-subscribers' data from the offerings advertisers use is an intentional anticompetitive act. It degrades the products advertisers receive and has no purpose other than to coerce content providers into staying with Nielsen.

82.    An example of this practice and its consequences came when, in late 2024, Paramount made waves by becoming the first major television studio to allow its contract with Nielsen to expire after growing increasingly dissatisfied with Nielsen's pricing and performance. As Paramount noted, the fees Nielsen was attempting to impose in its contract renewal had become so exorbitant that "in certain instances, [they] already exceed[ed] the total advertising revenue of the network being measured."[20] Paramount's decision sparked speculation that other content providers might follow suit, but that speculation was quickly laid to rest as the full weight of Nielsen's anticompetitive power came into view.

83.    When Paramount's contract with Nielsen expired, and Paramount turned to VideoAmp as its interim primary currency provider, Nielsen immediately pulled all of Paramount's programming from the data sets and tools that advertisers use to plan their advertising

---

[20] *Daily News Roundup: Can Paramount Quit Nielsen?; The Smartest Algos Are Still So Dumb,* AdExchanger (Oct. 1, 2024), https://www.adexchanger.com/daily-news-roundup/tuesday-01102024/.

buys, known as "transactional files," thereby rendering it effectively invisible to the market.[21] As Paramount noted in a statement to its advertisers, "Nielsen will be in possession of the relevant data but will be suppressing your access to that data. This decision was made by Nielsen and will affect the value and utility of your Nielsen data and tool licenses."[22] Less than two months later, Paramount relented to Nielsen's coercion, signing a new "multi-year" contract for Nielsen's TV audience measurement services, and even licensing new Nielsen services as part of the agreement, further entrenching Nielsen's monopoly power in the relevant market.[23]

84.     Nielsen's practice of punishing non-subscribing content providers by hiding them from within the data it supplies to advertisers is well-known in the entertainment industry. During its periodic contract renewal negotiations with content providers, Nielsen regularly wields this policy as a threat to force customers to accept aggressive price increases. Through this policy and these threats, Nielsen is able to greatly increase the pain of failing to subscribe to Nielsen and deter customers who would otherwise switch to competitors, thereby stifling competition.

85.     There are no non-pretextual procompetitive benefits or other legitimate justifications for Nielsen's policy of hiding non-subscribing content providers from advertisers, nor does it have anything to do with competition on the merits. In a properly functioning market where Nielsen did not already have a monopoly, such a policy would be unsustainable, as it would drive advertisers to a competitor that actually provides a full view of the entertainment landscape, as TV audience measurement services are (supposedly) intended to represent.

---

[21] Lucas Manfredi, *Nielsen Pulls Paramount Data From Advertiser Analysis Tool as Contract Dispute Drags On*, The Wrap (Dec. 20, 2024), https://www.thewrap.com/nielsen-paramount-data-removal-product-update/.

[22] *Id.*

[23] *Paramount Global, Nielsen sign new partnership, ending dispute*, Reuters (Feb. 3, 2025), https://www.reuters.com/business/media-telecom/paramount-global-nielsen-sign-new-partnership-ending-dispute-2025-02-03/.

86.    Nor do Nielsen's customers today receive any benefit from this practice. Indeed, even with Nielsen's monopoly, removing non-subscribers from the data Nielsen provides only reduces the value of the product its customers receive. Paramount aptly noted this fact when it stated that its removal from Nielsen data would "affect the value and utility of [advertisers'] Nielsen data and tool licenses." The only reason Nielsen is able to get away with this conduct is the monopoly power it already enjoys.

**B.    Nielsen's Anticompetitive Litigation Tactics**

87.    In addition to the above-described conduct that systematically blocks actual and potential competition in the market, Nielsen also engages in anticompetitive litigation tactics designed specifically to target, harass, and overwhelm any potential rivals emerging in the TV audience measurement industry. TVision was (and remains) a victim of those practices, which have market-wide effects just like Nielsen's anticompetitive practices described in the preceding Sections.

88.    *First*, Nielsen engages in a pattern and practice of using the judicial process as an anticompetitive weapon rather than for its intended purpose of protecting legitimate legal rights. As applied to TVision specifically, Nielsen has serially filed five separate, baseless patent lawsuits against TVision between November 2021 and May 2025. The complete lack of success in these actions to date, coupled with Nielsen's decision to file one after another after another, demonstrates that Nielsen's motivation in filing them was not to vindicate valid patent rights, but to drain a competitor's resources and signal to the market that any company daring to compete with Nielsen will face a costly legal bombardment, regardless of merit.  Indeed, Nielsen did not just confine its serial lawsuits to TVision. It also pursued litigation against other companies critical to TVision's ability to compete, such as ACRCloud, which provides the automatic content recognition ("ACR")

technology in TVision's in-home meter that detects the content playing on the TV, VideoAmp, one of TVision's main partners/customers, as well as smaller competitors similarly situated to TVision, such as HyphaMetrics. This further underscores the anticompetitive intent and effect of Nielsen's series of anticompetitive lawsuits. *Second*, Nielsen's series of lawsuits against TVision is additionally anticompetitive because each lawsuit standing alone constitutes a sham litigation, rendering each individually illegal even if they were not all considered as a whole. *Third,* Nielsen has procured some patents—including the '243 patent—through fraud on the USPTO by intentionally withholding material prior art, and then knowingly asserted these fraudulently obtained patents against rivals, including TVision.

### i.    Nielsen's Anticompetitive Use of Serial Litigation

89.    Nielsen's pattern of filing five separate patent infringement lawsuits in series against TVision from November 2021 through May 2025—all involving different aspects of the same accused TVision product running the same software—demonstrates a deliberate strategy of using serial litigation as an anticompetitive weapon rather than a legitimate effort to protect intellectual property. This pattern, however, is not unique to TVision: since 2021, Nielsen has initiated a series of twelve total patent actions against rival companies and critical suppliers of rival companies, including not only TVision, but HyphaMetrics, TVSquared, ACRCloud, and VideoAmp. ***Yet Nielsen has not been successful in a single case that has reached judgment***.

90.    This pattern of serial, unsuccessful litigation reveals Nielsen's true motivation was (and is) ***not*** to vindicate legitimate legal rights, but to raise rivals' costs, drain their resources, and deter competitors' market entry or expansion by using legal costs and fear, uncertainty, and doubt on customers' parts as barriers to entry and continued competition.

91.    It is an open secret within the audience measurement industry that Nielsen uses baseless lawsuits to stifle its competition. As far back as 1963, the FTC found Nielsen guilty of

43

systematically abusing patent litigation to "harass and coerce and to discourage potential and actual competitors from developing and using electronic and mechanical devices for the purpose of measuring national radio and television audiences." *In the Matter of A. C. Nielsen Co.*, 63 F.T.C. 1082, 1963 WL 66818 (1963).

92.     Over sixty years later, Nielsen's anticompetitive tactics have not changed. In 2024, AdExchanger published an article titled "Why Does Nielsen Keep Suing Its Competition?", in which it chronicled Nielsen's aggressive litigation tactics and asked: "Who will be next on Nielsen's hit list?"[24] Likewise, Nielsen's own expert recently stated: "I reviewed several articles from Ad Age over the past few years which focused on Nielsen. One hundred percent of the articles I reviewed that mentioned Nielsen and litigation were negative toward Nielsen." *Nielsen v. TVision Insights, Inc.*, C.A. No. 22-57-CJB, D.I. 276, Ex. 2 ¶ 11 (D. Del. Apr. 24, 2025).

93.     An April 2025 AdExchanger news round-up, with the headline "Nielsen Wins By Losing," described Nielsen's aggressive litigation tactics and explains that "Nielsen doesn't need judges to decide in its favor for its legal bombardment tactic to succeed. … Nielsen may end up winning none of its suits, but who knows if bringing them prevented any important opportunities for the cottage industry of Nielsen challengers."[25]

94.     In another example, Josh Chasin, a well-respected researcher in the TV audience measurement industry, lamented: "You can always tell how well you are doing in the audience measurement space by how aggressively Nielsen is suing you."[26]

---

[24]   Alyssa Boyle, *Why Does Nielsen Keep Suing Its Competition?*, AdExchanger (Feb. 5, 2024), https://www.adexchanger.com/tv-2/why-does-nielsen-keep-suing-its-competition/.

[25]   *Daily News  Roundup: Google Antagonists Await Justice (Brinkema); Nielsen Wins by Losing*,   AdExchanger   (Apr.   2,   2025)   https://www.adexchanger.com/daily-news-roundup/wednesday-02042025/.

[26]   Josh Chasin, LinkedIn, https://www.linkedin.com/in/joshchasin/ (last visited Nov. 10, 2025).



95.     A review of patent litigation initiated by Nielsen shows that it has engaged in a pattern of litigation against its competitors with little to no success. In the four years from 2021 through 2025, Nielsen initiated twelve separate patent actions against competitors. And Nielsen has not been successful in a single case that has reached judgment. As shown by DocketNavigator, for Nielsen as a patentee, there have been five findings of non-infringement, two findings of invalidity, and a finding of unpatentability.[27]

96.     For example, in its litigation against HyphaMetrics, three of the asserted patents (from two actions) were tried to a jury, and for each patent, the jury entered a judgment of non-infringement. *See The Nielsen Company (US), LLC v. HyphaMetrics, Inc.*, C.A. No. 23-136-GBW-CJB (D. Del.).  Nielsen did not appeal the jury verdict.

_____

[27]     DocketNavigator,  https://search.docketnavigator.com/patent/party/53420/0  (last accessed Nov. 10, 2025).

97.    Nielsen also has brought a patent infringement action against ACRCloud, which provides critical ACR technology for TVision's in-home meter. *The Nielsen Company (US), LLC, et al. v. ACRCloud, Ltd.*, C.A. No. 22-1344-CJB (D. Del.). TVision had previously used software it had licensed from Gracenote for ACR, but after Nielsen acquired Gracenote, Gracenote refused to renew its license with TVision, which itself was an effort to block TVision from becoming a competitive threat.

98.    In the course of its action against ACRCloud, Nielsen issued costly subpoenas to other vendors that provide services to TVision. These vendors expressed concern to TVision that doing business with TVision meant they would be forced to bear exorbitant litigation costs as collateral damage in one of Nielsen's litigation campaigns. TVision found it difficult to maintain positive relationships with its vendors and was forced to pay higher fees for their services.

99.    In another example, Nielsen filed two baseless patent infringement suits against VideoAmp, a contractual partner of TVision. As noted, TVision licenses its panel data to VideoAmp, which VideoAmp uses to fine-tune and supplement its own TV audience measurement services offerings and compete with Nielsen. The timing of Nielsen's litigation campaign against VideoAmp was no accident: in June 2023, Allen Media Group replaced Nielsen with VideoAmp as its primary and preferred ratings currency, the first TV publisher to do so.[28]

100.    In Nielsen's first patent infringement suit against VideoAmp, the two asserted patents were found to be unpatentable as directed toward ineligible subject matter under 35 U.S.C. § 101. *Nielsen Co. (US), LLC v. VideoAmp, Inc.*, 2025 WL 961421 (D. Del. Mar. 31, 2025). With the ink on the court's dismissal order barely dry, Nielsen filed a second patent infringement suit

---

[28]    Press Release, VideoAmp, *Byron Allen's Allen Media Group Announces VideoAmp as Primary Currency with Ten-Year Agreement* (Jun. 20, 2023), https://videoamp.com/press/byron-allens-allen-media-group-announces-videoamp-as-primary-currency-with-ten-year-agreement/.

against VideoAmp in a matter of days. *The Nielsen Company (US), LLC v. VideoAmp, Inc.*, C.A. No. 25-408-RGA (D. Del.). VideoAmp asserts in its pending motion to dismiss that the asserted patent in the second suit is also directed toward ineligible subject matter under § 101 under the court's first dismissal order and well-established Federal Circuit caselaw. *Id.*, D.I. 11.

101. In addition, Nielsen has sued TVision itself in five serial patent infringement lawsuits, including this lawsuit. As set forth in detail below, Nielsen has not achieved any success to date in these suits, which are only meant to harass and intimidate TVision.

102. Viewed holistically, considering the five actions against TVision and the numerous actions against Nielsen's other competitors in the TV audience measurement services market, and considering the complete lack of success from Nielsen in its litigation campaigns, it is clear these actions were not brought to redress any actual grievances. Instead, they were used as a way to use Nielsen's formidable war chest (generated by its long-term market dominance) to bury smaller, potential rivals.

### ii.    Nielsen's Sham Litigation Against TVision

103. In addition to their anticompetitive nature as part of a scheme to bring serial litigation against TVision, Nielsen's five patent lawsuits also each independently constitute sham litigation, in that they were objectively baseless and subjectively motivated by anticompetitive intent rather than any genuine attempt to enforce valid intellectual property rights.

104. Nielsen's five sham patent infringement lawsuits against TVision all involve different aspects of TVision's in-home meter, the lifeblood of TVision's business. TVision's in-home meter and the panel data that it generates are superior in many ways to Nielsen's offerings, which is why Nielsen has relentlessly targeted TVision with a sham litigation campaign.

105. As detailed below, no reasonable litigant could realistically have expected success on the merits. For example, in the first suit alleging infringement of the '189 and '120 patents,

47

Nielsen failed to include infringement claim charts with its complaint and offered no analysis of publicly available components it alleged were infringed—ultimately voluntarily dismissing the '120 patent claims and stipulating to dismissal with prejudice. Next, in the '889 patent suit, "the heart of Nielsen's allegations of infringement" relied on a "significant error" that it refused to concede for over a year, even after TVision identified that error in April 2023 and made Nielsen aware that TVision now understood the baseless nature of the lawsuit.[29]

106.  Next, the '642 patent suit asserts a patent that a reasonable litigant would understand to be invalid as directed toward the ineligible subject matter of collecting and analyzing information, and displaying the results. And the '030 patent-in-suit involved claims so trivial, it was easier and less costly for TVision just to agree to a minor design-around than to seek its invalidation—which TVision obviously could have done, but for the time and expense it would take to do so. Any reasonable litigant would understand these suits were objectively baseless. And, by bringing them (individually and collectively), Nielsen's subjective anticompetitive intent is clear: these suits were designed to harm competition, not to win on the merits. Each was designed to deplete TVision's financial resources (which they have done), damage its reputation, and send a chilling message to the broader market.

### a.  Sham Suit No. 1: the '189 and '120 patent suit

107.  On November 10, 2021, Nielsen filed a Complaint for Patent Infringement against TVision in the United States District Court for the District of Delaware, alleging that TVision infringed U.S. Patent. Nos. 9,020,189 ("the '189 patent") and 8,302,120 ("the '120 patent"). *The Nielsen Company (US), LLC v. TVision Insights, Inc.*, C.A. No. 21-1592 (D. Del.).

---

[29]  *The Nielsen Company (US), LLC v. TVision Insights, Inc.*, C.A. No. 22-57-CJB, D.I. 272 at 2 (D. Del. Apr. 10, 2025).

108.    Nielsen did not have an objective basis to assert infringement of the '189 and '120 patents. It did not even file infringement claim charts with its complaint. Instead of analyzing TVision's hardware or publicly available components known to be used as part of TVision's system,  Nielsen based its infringement allegations on exemplary embodiments in the specification of a TVision patent application, with no credible allegations asserting this exemplary embodiment was practiced in the accused TVision products.

109.    The '120 patent is directed toward correlating presentation of media content on a media content presentation device with activity on a different computing device (for example, correlating the watching of a commercial and the purchasing of a product). The claims require the use of an "activity monitor" to log information, but Nielsen did not identify any "activity monitor" in its complaint. On June 7, 2022, Nielsen voluntarily dismissed claims regarding the '120 patent, because it was unable to articulate any infringement theory.

110.    The '189 patent is directed toward an audience measurement device that improves the accuracy of detection of individuals who are watching particular television content. The claims include a limitation requiring both two-dimensional and three-dimensional sensors and analysis. But Nielsen performed no analysis of the commercially-available Logitech® webcam it knew to be used by TVision to determine whether this requirement was met. On August 16, 2023, Nielsen again agreed to dismiss its own patent action, terminating its case on the '189 patent with prejudice.

111.    This pattern of "shoot first, aim later" on both asserted patents confirms two things: Nielsen was not advancing objectively reasonable claims, and was not motivated by advancing meritorious claims. Yet for two years, TVision was forced to bear the costs of defending against this meritless attack.

112.    Based on publicly available information regarding TVision's in-home meter, a reasonable litigant would not have realistically expected there to be a successful infringement claim. Nielsen was willfully delinquent in its pre-suit analysis, and brought the action solely as an attempt to damage TVision through the process of the litigation.

### b.    Sham Suit No. 2: the '889 patent suit

113.    On January 14, 2022, Nielsen filed another Complaint for Patent Infringement against TVision in the United States District Court for the District of Delaware, this time alleging that TVision infringed U.S. Patent. No. 7,783,889 ("the '889 patent"). *The Nielsen Company (US), LLC v. TVision Insights, Inc.*, C.A. No. 22-057-CJB (D. Del.).

114.    The '889 patent is directed toward generating signatures relating to audio content streams, which are used to identify content being consumed by an audience based on the audio of that content. As noted, this technology is generally referred to as automatic content recognition or "ACR."

115.    Nielsen also brought an action against ACRCloud, also asserting the '889 patent.[30] But in February 2023, it voluntarily dismissed its '889 patent claims against ACRCloud in order to avoid a motion to stay its case against TVision under the customer exception rule. For Nielsen, bringing a legal action against TVision was more important than actually prosecuting the source of the alleged infringement. The target for Nielsen was not ACRCloud's technology; the target was TVision, and Nielsen's goal was solely to have another suit with which to harass and impose significant costs on TVision.

---

[30]    *The Nielsen Company (US), LLC, et al. v. ACRCloud, Ltd.*, C.A. No. 22-1344-CJB (D. Del.).

116.     On or about June 21, 2024, Nielsen admitted to the Court that its technical expert had made a "significant error" that went "to the heart of [its] allegations of infringement." *The Nielsen Company (US), LLC v. TVision Insights, Inc.*, C.A. No. 22-57-CJB, D.I. 272 at 2 (D. Del. Apr. 10, 2025). Although TVision had identified that core issue in its April 2023 response to Nielsen's infringement contentions, and again identified the specific error in its November 2023 expert rebuttal report, Nielsen pressed this action with its infringement theory resting on a "significant error" that it apparently knew when it brought suit or willfully ignored. Although this action continues, Nielsen's new infringement theory is on no firmer ground than the theory it was forced to abandon.

117.     Nielsen's motivation for this action is shown by, *inter alia*, its attempt to hide the fundamentally baseless nature of its infringement allegations from the public. After the Court ruled on Nielsen's motion to reopen expert discovery, Nielsen sought to redact twelve related filings and to seal nearly half of the Court's Memorandum Order "in a way that would preclude the public from having a real understanding of the basis for the Court's decision as to an important and difficult matter." *Id.*, D.I. 312.

### c.     Sham Suit No. 3: the '243 patent suit

118.     On October 12, 2022, Nielsen again sued TVision in the United States District Court for the District of Delaware, this time for infringement of U.S. Patent No. 11,470,243 ("the '243 patent"). *The Nielsen Company (US), LLC v. TVision Insights, Inc.*, C.A. No. 22-1345-CJB (D. Del.).

119.     As discussed below, Nielsen knew at the time it filed the action that it had obtained the '243 patent fraudulently by concealing relevant and material prior art from the USPTO for the purpose of misleading the USPTO into granting the claims of the '243 patent. Nielsen's decision

51

to assert a patent that it had obtained by fraud was objectively baseless—there is no invention to speak of where an old idea becomes a new patent due to fraud on the USPTO. Nielsen knew the action was objectively baseless. Nielsen filed it anyway because, as with its prior suits, Nielsen's goal was not to win a suit—Nielsen's goal was to force TVision to spend time and money on defending lawsuits instead of on products, innovation, and competition against Nielsen.

### (i)    Nielsen's assertion of a fraudulently obtained patent

120.    Nielsen procured the '243 patent by intentionally deceiving the USPTO and then asserting the fraudulently obtained patent in order to drive up a rival's costs. Nielsen deliberately withheld four highly material prior art references during prosecution. Each of these references disclosed key aspects of the supposedly novel audience measurement platform claimed in the '243 patent. Nielsen knew the supposedly "new" technology described in the '243 patent was actually at least ten years old by the time Nielsen applied for the '243 patent. Nielsen charged ahead anyway, and hid what Nielsen knew from the USPTO.

121.    On May 23, 2022, Nielsen filed application no. 17/751,283 ("the '283 application") to attempt to obtain another patent that Nielsen could assert against TVision. The '283 application is the seventh in continuation patent application filed off of an application originally filed on December 15, 2011. The sole named inventor is Christen V. Nielsen.

122.    The '243 patent application was prosecuted by patent attorney James A. Flight and others of Hanley, Flight & Zimmerman, LLC, with oversight from Nielsen's Vice President & Intellectual Property Counsel, Thomas Strouse. Together, Christen Nielsen, James Flight and Thomas Strouse are referred collectively and individually herein as "Nielsen's Patent Prosecution Team."

123.    There was a high degree of coordination between the prosecution of the '243 patent and the filing of Nielsen's complaint in the '243 patent case, as reflected by the fact that the '243 patent issued just *one* day before Nielsen filed its 21-page complaint, which was accompanied by 240 pages of exhibits, including a 15-page expert report and nearly 50 pages of claim charts purporting to map the elements of claims 1, 4-6, 8-9, 11-14, 16, and 18-20 of the '243 patent to the accused TVision instrumentalities. Indeed, it was not possible for Nielsen's outside litigation counsel to have conducted a reasonable pre-filing investigation pursuant to their obligations under the Federal Rules of Civil Procedure in the less than 24 hours between issuance of the '243 patent and the filing of the complaint in that case.

124.    During prosecution of the '283 application, Nielsen's Prosecution Team knew that at least some of the purported inventions claimed in the '243 patent were part of a basic audience measurement platform that was at least ten years old at the time of the '243 patent's claimed priority date, as is reflected in Nielsen's own prior patents and patent applications. With specific intent to deceive, Nielsen's Prosecution Team withheld this information from the Patent Office during the prosecution of the '243 patent, including prior art showing the unpatentability of a claim to this basic audience measurement platform. Had the information and prior art been properly disclosed, and not withheld, the Patent Office would not have allowed one or more claims of the '243 patent, including at least the independent claims.

125.    Specifically, Nielsen's Prosecution Team knew at the time of application that the claimed subject matter—an audience measurement device or method that both (1) used an audio signature of the media content to identify that content, and (2) analyzed images of the viewers in a household to determine their identity and facial orientation—was a basic, well-known platform (and was particularly well-known within Nielsen) that was *at least 10 years older* than the

53

December 2011 priority date claimed by the '243 patent. Nielsen's own patents, patent applications, and public disclosures made clear that such technology existed well before 2011.

126. Nielsen's Prosecution Team knew not only that the basic audience measurement platform covered by the independent claims of the '243 patent was well-known and not patentable, they also specifically knew of at least four material prior art publications that reflected the basic, well-known audience measurement platform described above and that anticipated and/or rendered obvious at least all of the independent claims of the '243 patent. These material prior art references include at least: (1) Nielsen's own prior U.S. Patent No. 7,882,514 ("the '514 patent"), which names Christen Nielsen as an inventor and issued on February 1, 2011; (2) Nielsen's own prior U.S. Patent Application Publication No. 2010/0274372 ("the '372 publication"), which also names Christen Nielsen as an inventor and was published on October 28, 2010; and (3) Nielsen's own prior U.S. Patent Application Publication No. 2002/0059577 ("the Lu '577 publication"), which names Nielsen employees Daozheng Lu, Paul Kempter, and William Feininger as inventors and was published on May 16, 2002; and (4) and Nielsen's own prior U.S. Patent Application Publication No. 2002/0010919 ("the Lu '919 publication"), which also names Nielsen employees Daozheng Lu, Paul Kempter, and William Feininger as inventors and was published on January 24, 2002.

127. Because of its knowledge of the withheld prior art, when the USPTO issued the '243 patent, both Nielsen's litigation counsel and the Nielsen Prosecution Team were aware that the claims of the '243 patent were invalid.

128. Each member of Nielsen's Prosecution Team was involved in prosecuting the application leading to the '243 patent and had a duty to disclose to the Patent Office all information known to each of them to be material to patentability. That duty continued throughout the pendency

54

of all claims in the application leading to the '243 patent. In addition, Mr. Strouse was deeply involved in *both* the prosecution of Nielsen's patent portfolio related to audience measurement systems, including at least the '243 patent, *and* the litigation of the '243 patent against TVision. With the intent to deceive the USPTO, the Nielsen Prosecution Team decided to withhold the material information and prior art known to them and discussed above, and instead selectively disclosed only certain, potentially less relevant prior art information.

### (ii)    The '514 patent

129.    The '514 patent names Christen Nielsen as an inventor and issued on February 1, 2011. The '514 patent is therefore prior art to the '243 patent at least under 35 U.S.C. § 102(a). The '514 patent generally relates to audience measurements systems. In particular, the '514 patent discloses and describes systems for in-home measurement of a television viewing audience. For example, the '514 patent discloses and describes a people meter or metering unit that enables detecting the identities and number of people currently viewing a program displayed on a television. The metering unit is associated with a particular television or similar display device in a household, and may be equipped with or associated with sensors including a microphone that is placed in proximity to the display device and receives audio signals corresponding to the program being displayed on the television.

130.    In what the '514 patent describes as a well-known technique, the system can generate and process audio signatures corresponding to the audio component of a television program (*e.g.*, as captured by the microphone), which can uniquely identify the program being presented on the television by comparing the signature to reference signatures corresponding to known content. The '514 patent expressly incorporates by reference other patent applications, such

as U.S. patent application Serial No. 09/427,970, that disclose audio signature extraction and correlation techniques.

131.    The '514 patent is but-for material to the issuance of the '243 patent and non-cumulative of other prior art considered and/or cited during prosecution. For example, claim 1 of the '243 patent recites an "audience measurement system" comprising "memory," "machine readable instructions," and "processor circuitry to execute the machine-readable instructions to" carry out certain steps. Those steps include "generat[ing] an audio signature of media content presented by a television within the media exposure environment" and "obtain[ing] content identifying data corresponding to the presented media content, the content identifying data based on the audio signature of the media content presented by the television within the media exposure environment."

132.    The '514 patent discloses and/or renders obvious these limitations. For instance, the '514 patent discloses that exemplary embodiments of its system include an "audio signature processor" that "is configured to generate and process audio signatures corresponding to the input audio signal 230." The '514 patent further explains: "As is known, characteristics of the audio portion of presented program content may be used to generate a substantially unique proxy or signature (*e.g.*, a series of digital values, a waveform, *etc.*) for that content. The signature information for the content being presented may be compared to a set of reference signatures corresponding to a known set of content. When a substantial match is found, the currently presented program content can be identified with a relatively high probability."

133.    The steps in claim 1 of the '243 patent also include "analyz[ing] a sequence of images of the media exposure environment to detect a head appearing in one or more of the images, the sequence of images obtained by a camera while the media content corresponding to the content

56

identifying data is presented by the television," "determin[ing] an orientation of the head with respect to the camera," and "determin[ing] audience identification information based on a match of the head to a known person associated with the media exposure environment." And the '514 patent discloses and/or renders obvious these limitations.

134. For instance, the '514 patent discloses that known examples of audience measurement systems often include a "people meter" that "may be located in the viewing space of the television and in communication with the home unit, thereby enabling the home unit to detect the identities and/or number of the persons currently viewing programs displayed on the television." The '514 patent further discloses that exemplary embodiments of its system "include[] a people meter 162 to capture information about the audience" watching a program on a television.

135. Claim 1 of the '243 patent further recites that the claimed "audience measurement system" comprises "network interface circuitry to output a signal indicative of the content identifying data and the audience identification information to a data collection facility." The '514 patent discloses and/or renders obvious this limitation. For instance, the '514 patent discloses that, in exemplary embodiments of its system, a "metering unit 124 typically collects a set of viewing records and transmits the collected viewing records over a connection 140 to a central office or data processing facility (not shown)."

136. Claim 1 of the '243 patent further recites that the "audience measurement system" comprises "memory," "machine readable instructions," and "processor circuitry to execute the machine readable instructions." The '514 patent discloses and/or renders obvious these limitations as well. For instance, the '514 patent discloses that an example embodiment of its system "includes a processor 2912 such as a general purpose programmable processor," which "includes a local memory 2914, and executes coded instructions 2916 present in the local memory 2914 and/or in

57

another memory device." The entire disclosure of the '514 patent is incorporated herein by reference.

137.    The Patent Office would not have allowed at least one claim of the '243 patent—*e.g.*, at least independent claims 1, 9, 16, and/or 22—had it been aware of the '514 patent.

### (iii)    The '372 publication

138.    The '372 publication names Christen Nielsen as an inventor and was published on October 28, 2010. The '372 publication is therefore prior art to the '243 patent at least under 35 U.S.C. §§ 102(a) and 102(b).

139.    The '372 publication is but-for material to the issuance of the '243 patent and non-cumulative of other prior art considered and/or cited during prosecution. The '372 publication is the publication of non-provisional U.S. patent Appl. No. 12/831,870, which is a continuation of U.S. patent Appl. No. 11/576,328, which is the application that matured into the '514 patent. Because the '372 publication is the publication of a continuation of the application resulting in the '514 patent, it has a substantially identical disclosure as the '514 patent. Thus, the description and allegations set forth above of the '514 patent's disclosure is incorporated by reference as equally applicable to the '372 publication. The entire disclosure of the '372 publication is incorporated herein by reference.

140.    The Patent Office would not have allowed at least one claim of the '243 patent—*e.g.*, at least independent claims 1, 9, 16, and/or 22—had it been aware of the '372 publication.

### (iv)    The Lu '577 publication

141.    The Lu '577 publication names Nielsen employees Daozheng Lu, Paul Kempter, and William Feininger as inventors and was published on May 16, 2002. The Lu '577 publication

58

is therefore prior art to the '243 patent —by nearly a decade—at least under 35 U.S.C. §§ 102(a) and 102(b).

142.    The Lu '577 publication is the publication of non-provisional U.S. patent Appl. No. 09/909,224, Filed on July 19, 2001. The Lu '577 publication generally relates to a television audience measurement system that measures viewing of a television program on a digital television. More specifically, the Lu '577 publication relates to measuring audiences of digitally broadcast television programming. Among other things, the Lu '577 publication discloses extracting an audio signature from the television program being watched in order to identify the television program.

143.    For example, the Lu '577 publication describes how an in-home audience measurement system can extract an audio signature (*e.g.*, captured via a microphone) from the programming being displayed on a television and, either locally or at a remote data collection facility, compare the signature to a set of reference signatures to identify the programming being displayed on the television. After the identification of the programming being displayed on the television (referred to as "tuning" information or data in the Lu '577 publication) is determined the tuning information can be transmitted to a remote data collection central office.

144.    The Lu '577 publication also discloses how it is well-known within the field of audience measurement systems to identify the members of a television viewing audience, such as an in-home audience viewing a digital television program. For example, the Lu '577 publication describes using a "person identifier," which may be a video camera, IR camera, or the like, that identifies the persons watching television programming on a digital television set. The Lu '577 publication further describes how the person identifier may use head location and facial recognition software and techniques to identify the viewing persons and collect other demographic

59

data. This television audience data can then be transmitted (*e.g.*, via the Internet) to a remotely located data collection central office.

145. The Lu '577 publication is but-for material to the issuance of the '243 patent and non-cumulative of other prior art considered and/or cited during prosecution. For example, claim 1 of the '243 patent recites an "audience measurement system" comprising "memory," "machine readable instructions," and "processor circuitry to execute the machine readable instructions to" carry out certain steps. Those steps include "generat[ing] an audio signature of media content presented by a television within the media exposure environment" and "obtain[ing] content identifying data corresponding to the presented media content, the content identifying data based on the audio signature of the media content presented by the television within the media exposure environment." The Lu '577 publication discloses and/or renders obvious these limitations.

146. For example, the Lu '577 publication discloses a "television audience measurement system" that "measures viewing of a television program viewed on digital television located in a statistically selected site." The Lu '577 publication further discloses that exemplary embodiments of its system may include a "detector" that "may detect the audio portion of a program to which the digital television set 66 is tuned by non-intrusively detecting the sound provided by a speaker 72 of the digital television set 66 (in which case the detector 64 may be a microphone)."

147. The Lu '577 publication further discloses "extracting signatures from the audio portion of the television signal to which a receiver is tuned." The Lu '577 publication further discloses that the extracted signatures can be used "for subsequent comparison, either in the statistically selected monitoring site 62 or in the central office 90, with previously collected reference signatures in order to identify the television programs to which the digital television set 66 . . . [is] tuned."

148. The steps in claim 1 of the '243 patent also include "analyz[ing] a sequence of images of the media exposure environment to detect a head appearing in one or more of the images, the sequence of images obtained by a camera while the media content corresponding to the content identifying data is presented by the television," "determin[ing] an orientation of the head with respect to the camera," and "determin[ing] audience identification information based on a match of the head to a known person associated with the media exposure environment." The Lu '577 publication discloses and/or renders obvious these limitations.

149. For example, the Lu '577 publication discloses that, in exemplary embodiments of its system, "a person identifier 98 may be provided in order to identify the persons watching television programming on the digital television set 66." The Lu '577 publication further discloses: "The person identifier 98 may be video camera, an IR camera, or the like. When such equipment is available in the statistically selected monitoring site 62, the site unit 86 may employ known head location and face recognition software (*e.g.*, as taught by Lu in U.S. Pat. No. 4,858,000) for the identification of the viewing persons and for the collection of other demographic data."

150. The Lu '577 publication further discloses that "it is well known in the audience measurement arts to use computer-based image recognition in order to identify members of a viewing audience. Notable among teachings in this area is that by Lu in U.S. Pat. No. 4,858,000. The teaching of this patent is herein incorporated by reference."

151. Claim 1 of the '243 patent further recites that the claimed "audience measurement system" comprises "network interface circuitry to output a signal indicative of the content identifying data and the audience identification information to a data collection facility." The Lu '577 publication discloses and/or renders obvious this limitation.

61

152. For example, the Lu '577 publication discloses that, in exemplary embodiments of its system, "television audience data from all the viewing sites in the statistically selected monitoring site 102 can be communicated, via the Internet, a public telephone system, or the like, to a locally located or remotely located intermediate data collector 128 and then to a remotely located central office 130 through a communication channel 170." Claim 1 of the '243 patent further recites that the "audience measurement system" comprises "memory," "machine readable instructions," and "processor circuitry to execute the machine readable instructions." The Lu '577 publication discloses and/or renders obvious these limitations as well. For instance, the Lu '577 publication discloses that its system includes one or more processors, memories, and "software agent[s]," and software is understood to comprise machine readable instructions. The entire disclosure of the Lu '577 publication is incorporated herein by reference.

153. The Patent Office would not have allowed at least one claim of the '243 patent—*e.g.*, at least independent claims 1, 9, 16, and/or 22—had it been aware of the Lu '577 publication.

### (v) The Lu '919 publication

154. As noted above, the Lu '919 publication names Nielsen employees Daozheng Lu, Paul Kempter, and William Feininger as inventors and was published on January 24, 2002. The Lu '919 publication is therefore prior art to the '243 patent at least under 35 U.S.C. §§ 102(a) and 102(b).

155. The Lu '919 publication is but-for material to the issuance of the '243 patent and non- cumulative of other prior art considered and/or cited during prosecution. As noted above, the Lu '919 publication is a divisional of the same application leading to the Lu '577 publication (*i.e.*, non-provisional U.S. patent application No. 09/076,517) and thus contains substantially the same disclosure as the Lu '577 publication. Thus, the description and allegations set forth above of the

Lu '557 publication's disclosure is incorporated by reference as equally applicable to the Lu '919 publication. The entire disclosure of the Lu '919 publication is incorporated herein by reference.

156.    The Patent Office would not have allowed at least one claim of the '243 patent— *e.g.*, at least independent claims 1, 9, 16, and/or 22—had it been aware of the Lu '919 publication.

**(vi)    The withheld prior art is material and demonstrates Nielsen's intent to deceive**

157.    The material information and prior art discussed herein are non-cumulative of the prior art references submitted to or considered by the Examiner, because none of the references or information actually identified during prosecution disclosed the basic Nielsen audience measurement platform described above. To the extent a prior art Nielsen audience-measurement platform was disclosed, it lacked basic, critical features relevant to the '243 patent.

158.    For example, U.S. Pub. Patent App. No. 2008/0271065 to Buonasera et al., which was one of the references identified during prosecution, discloses a TV-audience measurement systems but fails to disclose the features of audio-based content recognition, user identification and facial orientation determination. As described above, Christen Nielsen, Nielsen's in-house IP counsel, and Nielsen's outside prosecution counsel at Hanley, Flight & Zimmerman, LLP, knew of prior art more relevant than the Buonasera reference. Moreover, practically none of the prior art references of record disclose generating an audio signature of media content presented by a television within the media exposure environment in connection with the basic audience measurement platform, which was a feature known to and patented by Nielsen since at least the late 1980's, and literally none involve combined use of audio-based content recognition with use of cameras for user identification and head-orientation determination.

159.    Had any of the material but withheld information or prior art references discussed above been disclosed, their relevance would have been immediately obvious to the Examiner

63

because the withheld prior art references discussed above used some of the exact same language recited in the claims of the '243 patent, such as "audio signature" and "audience measurement," which would have provided a strong basis for the Examiner to reject at least the independent claims of the '243 patent as unpatentable, especially because these references were Nielsen's own prior patents and patent application publications.

160.    The inventor Christen Nielsen was well aware at the time of filing of the application leading to the '243 patent that the technology claimed in at least the independent claims—namely, claims 1, 9, 16, and 22—was a basic, well-known audience measurement platform that was at least 10 years older than the December 2011 priority date claimed by the '243 patent.

161.    The Nielsen Prosecution Team were aware of the existence of the '514 patent during the prosecution of the '243 patent and were further aware of all aspects of the disclosure of the '514 patent relevant to patentability of the '243 patent. For example, as noted above, Christen Nielsen is a named inventor on the '514 patent. Accordingly, Christen Nielsen was aware of the entire disclosure of the '514 patent at all relevant times, including during prosecution of the '243 patent, because, as a named inventor, she would have reviewed the entire application leading to the '514 patent before it was filed, including the specification, figures, and claims.

162.    For further example, James A. Flight was responsible for prosecution of the '243 patent. Mr. Flight also participated in prosecution of the '514 patent before the Patent Office. For instance, Mr. Flight signed and filed a July 2, 2007, Information Disclosure Statement (IDS) during prosecution of the '514 patent. For further instance, Mr. Flight also signed and filed multiple IDS's during prosecution of the '514 patent, including on March 27, 2008, and April 9, 2008. Based on his involvement in and responsibility for prosecution of the '514 patent, Mr. Flight was aware of the entire disclosure of the '514 patent at all relevant times, including during prosecution of the

64

'243 patent, because Mr. Flight could not have competently prosecuted the application leading to the '514 patent without being familiar with its entire disclosure, including the specification, figures, and claims.

163. The Nielsen Prosecution Team were also aware of the existence of the '372 publication during the prosecution of the '243 patent and were further aware of all aspects of the disclosure of the '372 publication relevant to patentability of the '243 patent. For example, as noted above, Christen Nielsen is a named inventor on the '372 publication. Accordingly, Christen Nielsen was aware of the entire disclosure of the '372 publication patent at all relevant times, including during prosecution of the '243 patent, because, as a named inventor, she would have reviewed the entire application that was published as the '372 publication (non-provisional U.S. patent Appl. No. 12/831,870) before it was filed, including the specification, figures, and claims.

164. The Nielsen Prosecution Team were also aware of the existence of the Lu '577 publication during the prosecution of the '243 patent and were further aware of all aspects of the disclosure of the Lu '577 publication relevant to patentability of the '243 patent. For example, as noted above, Christen Nielsen is a named inventor on the '514 patent and Mr. Flight participated in prosecution of the '514 patent before the Patent Office. The Lu '577 publication was identified and disclosed as prior art to the Patent Office during prosecution of the '514 patent before the Patent Office. Accordingly, at least Christen Nielsen and Mr. Flight were aware of the Lu '577 publication at all relevant times, including during prosecution of the '243 patent.

165. Nielsen's intent to deceive the Patent Office is shown by the fact that the Nielsen Prosecution Team decided to take the unusual step of requesting "Track One" prioritized examination of the application for the '243 patent. Indeed, the request for "Track One" prioritized examination was intended by the Nielsen Prosecution Team to minimize the Examiner's

opportunity to locate and thoroughly evaluate the withheld references and information, which further shows an intent to deceive.

166.    The step of requesting prioritized examination of the application for the '243 patent was particularly unusual because Nielsen had not previously requested "Track One" prioritized examination for any of the applications in the priority chain of the '243 patent. Specifically, based on the records available at the Patent Office, Nielsen did not request "Track One" prioritized examination for any of the following applications to or through which the '243 patent claims priority: application No. 17/666,322, filed on Feb. 7, 2022; application No. 16/878,935, filed on May 20, 2020; application No. 16/196,810, filed on Nov. 20, 2018; application No. 15/793,108, filed on Oct. 25, 2017; application No. 15/419,120, filed on Jan. 30, 2017; application No. 14/732,175, filed on Jun. 5, 2015; application No. 13/327,227, filed on Dec. 15, 2011.

167.    For more than ten years, Nielsen never considered it necessary to request "Track One" prioritized examination for any invention claimed in this series of applications, even though all of the purported inventions were based on the same exact disclosure. The Nielsen Prosecution Team decided to seek "Track One" prioritized examination for the first time with the application for the '243 patent because their intent was to quickly obtain a set of claims that were as broad as possible to read on TVision's accused instrumentalities while limiting the USPTO's time to appropriately consider the claim scope in light of the prior art.

**(vii)    Nielsen's attempt to use the fraudulently obtained '243 patent against TVision**

168.    As discussed above, the day after the '243 patent was granted, on October 12, 2022, Nielsen filed an action against TVision alleging infringement of the '243 patent.

169.     On June 16, 2023, TVision petitioned the Patent Trial and Appeal Board ("PTAB") for *inter partes* review, with Lu '577 and the '372 publication as primary references. *TVision Insights, Inc. v. The Nielsen Company (US)*, LLC PTAB-IPR2023-01014.

170.     In response to the PTAB petition, Nielsen filed a statutory disclaimer of claims 1, 9, and 16 of the '243 patent. This statutory disclaimer further shows that Nielsen understood that the claims of the '243 patent were anticipated or otherwise rendered obvious by the prior art.

171.     On January 6, 2025, the PTAB found the asserted claims of the '243 patent unpatentable over Lu '577 in combination with Tian (Ying-li Tian, Evaluation of Face Resolution for Expression Analysis, 2004 Conference on Computer Vision and Pattern Recognition Workshop), and the '372 publication in combination with U.S. Patent Application Publication No. 2010/0066822 to Steinberg and Tian. This indicates that had Nielsen properly disclosed the relevant prior art it was aware of, the Patent Office would not have allowed at least one claim of the '243 patent.

172.     Nielsen committed fraud upon the Patent Office with respect to the '243 patent, and then attempted to use the fraudulently obtained patent as an anticompetitive weapon against TVision in a baseless lawsuit.

### d.     Sham Suit No. 4: the '030 patent suit

173.     On November 22, 2023, Nielsen sued TVision yet again in the United States District Court for the District of Delaware, this time for infringement of U.S. Patent No. 11,798,030 ("the '030 patent"). *The Nielsen Company (US), LLC v. TVision Insights, Inc.*, C.A. No. 23-1346-RGA-CJB (D. Del.).

174.     The '030 patent is directed toward the combination of an audience measurement device and the connecting of a device to a mobile phone with Bluetooth in order to set up the WiFi

67

on the device. The '030 patent has a priority date of June 24, 2016, and a reasonable litigant would understand that each of these components was already well-known in the art as of June 2016. A reasonable litigant would also know that the combination of these components would have been obvious as of June 2016.

175.    Although the '030 patent was facially invalid under 35 U.S.C. § 103, TVision agreed to make a minor change to its configuration procedure in exchange for dismissal of this action because making the minor change was less expensive than commencing and then pursuing an *inter partes* review ("IPR") action to invalidate the '030 patent, as well as the expense in seeking discovery on Nielsen's likely knowledge that such an obviously invalid patent never should have been issued in the first place (and potentially that Nielsen committed yet more fraud on the Patent Office in obtaining the '030 patent).

### e.    Sham Suit No. 5: the '642 patent suit

176.    On May 9, 2025, Nielsen again sued TVision in the United States District Court for the District of Delaware, this time for infringement of U.S. Patent No. 12,047,642 ("the '642 patent"). *The Nielsen Company (US), LLC v. TVision Insights, Inc.*, C.A. No. 25-575-CJB (D. Del.).

177.    The '642 patent is directed toward a method of identifying an active streaming application being used by a television or a streaming device. For example, it claims a method (or a device) which monitors a local network, identifies what occurs on that network, and stores the result of that observation. A reasonable litigant would understand that this patent is directed toward the ineligible subject matter of "collecting information, analyzing it, and displaying certain results of the collection and analysis" and is invalid for the same reason that Nielsen's United States Patent

Nos. 11,871,058 and 11,856,250 were invalidated in *Nielsen Co. (US), LLC v. VideoAmp, Inc.*, C.A. No. 24-123-RGA, 2025 WL 961421, at *3 (D. Del. Mar. 31, 2025).

178.    TVision has moved to dismiss this action on the basis that the '642 patent is directed toward ineligible subject matter under 35 U.S.C. § 101. *See The Nielsen Company (US), LLC v. TVision Insights, Inc.*, C.A. No. 25-575-CJB, D.I. 11 (D. Del.).  And Nielsen knows, or should know, that the claims of the '642 patent are not patent eligible, and that the action is objectively baseless.

179.    Each of the suits discussed above individually meets the requirement for a sham litigation. Each suit is objectively baseless; no reasonable litigant could realistically expect success on the merits; and each of these objectively baseless actions is an anticompetitive weapon used interfere directly with the business of TVision through the use of the governmental process. Nielsen is not shooting for a win in the outcome of the litigation process—Nielsen is simply making sure the process, and the cost, fees, uncertainty, and business disruption associated with it, are present and distracting TVision from spending resources on competition, innovation, and product development.

**ANTITRUST INJURY**

180.    The purpose and effect of Nielsen's conduct has been to foreclose or severely limit competition over TV audience measurement services, which has not only harmed TVision as a competing provider of TV audience measurement services, but also content providers, broadcasters, and advertisers, as customers for those services.

181.    As a result of Nielsen's anticompetitive foreclosure tactics—including (1) its use of *de facto* exclusive, long-term, staggered contracts, (2) its practice of conditioning customers' access to their own historical data on continuing to purchase new data from Nielsen, and (3) its practice of hiding non-subscribing content providers from the data and analytics tools it provides

69

to advertisers—TVision has suffered significant economic harm, including lost profits, lost business valuation, and lost customers and market share. The content providers and advertisers which Nielsen locks up through these contracts and practices are the precise customers to whom TVision seeks to provide its own TV audience measurement services. Though it has managed to win over some, a far greater number of potential customers have been foreclosed to TVision by Nielsen's exclusionary contracting and other practices.

182.    Given the superiority of TVision's prices and product (including its ability to offer measurements of audience attention that Nielsen simply cannot), a substantial number of these locked-up customers would have switched to TVision's TV audience measurement services, or at least supplemented Nielsen's data with TVision's data, absent Nielsen's exclusionary contracting practices.

183.    TVision's losses stemming from Nielsen's anticompetitive foreclosure tactics are the type of injury the antitrust laws are intended to prevent. Nielsen's foreclosure tactics substantially harm competition as a whole, and the injuries TVision has suffered from them flow directly from that which makes them unlawful—namely, their tendency to foreclose the market by preventing customers from using competitor products and services regardless of price and/or quality.

184.    As a result of Nielsen's anticompetitive litigation tactics—including its assertion of a series of objectively baseless patent lawsuits for the purpose of stifling competition, and its assertion of fraudulently procured patents against TVision—TVision has suffered harm, including in the form of lost profits, lost valuation, artificially suppressed market share, and attorney's fees and litigation expenses. Nielsen's relentless patent lawsuits against TVision have subjected TVision to enormous legal expense, drained away resources that would otherwise be invested in

its growth, and scared away numerous prospective customers and investors who fear associating with a company that has become a target of Nielsen. Given the superiority of TVision's prices and product (including its ability to offer measurements of audience attention that Nielsen simply cannot), a substantial number of additional customers would have switched to TVision's TV audience measurement services, or at least supplemented Nielsen's data with TVision's data, absent the fear, uncertainty, and doubt caused by Nielsen's litigation tactics, including the fear of themselves becoming the target of a Nielsen lawsuit.

185.    TVision has long had plans to build out the size of its panel to increase the integrity and quality of its data and become an even stronger competitor against Nielsen, but it has been prevented from making the investments required to do so by Nielsen's anticompetitive litigation campaign. In addition, given the superiority of TVision's prices and product (including its ability to offer measurements of audience attention that Nielsen simply cannot), a substantial number of additional customers would have switched to TVision's TV audience measurement services, or at least supplemented Nielsen's data with TVision's data, absent the fear, uncertainty, and doubt caused by Nielsen's litigation tactics, including the fear of themselves becoming the target of a Nielsen litigation campaign.

186.    By excluding competition for TV audience measurement services broadly through the foreclosure tactics described above, Nielsen has also harmed TVision by reducing the opportunities of other competitors in the TV audience measurement services market that (like VideoAmp) would purchase offerings from TVision. These losses are also of the type the antitrust laws were intended to prevent because they stem from a competition-reducing aspect of Nielsen's conduct—namely, its tendency to foreclose the sales opportunities of other competitors in the TV audience measurement services market.

71

187.    TVision's losses stemming from Nielsen's anticompetitive litigation tactics are precisely the type of injury the antitrust laws are intended to prevent. Nielsen's well-documented practice of using sham patent litigation as a competitive weapon substantially harms competition as a whole, and the injuries TVision has suffered from it flow directly from that which makes it unlawful—namely, its exclusion of competitors through means other than competitive merit or valid intellectual property rights.

## INTERSTATE COMMERCE

188.    Nielsen's conduct has taken place in and affected the continuous flow of interstate trade and commerce in the United States, in that, *inter alia*:

    a.  Nielsen's conduct has substantially affected the provision of TV audience measurement services—a product sold in interstate commerce—by excluding competitors in the market for such services;

    b.  Nielsen has used instrumentalities of interstate commerce to provide TV audience measurement services throughout the United States; and

    c.  In furtherance of the anticompetitive conduct alleged herein, Nielsen employees have travelled between states and exchanged communications through interstate wire communications and via U.S. mail.

## CONTINUING VIOLATIONS

189.    Nielsen has engaged in, and continues to engage in, a course of wrongful conduct, including substantial overt conduct within the applicable limitations periods in connection with all of the practices complained of herein. All of the practices complained of herein have inflicted continuing and accumulating harm within the applicable statutes of limitations.

72

## CAUSES OF ACTION

### COUNT I
### SHERMAN ACT SECTION 2: MONOPOLIZATION

190.    TVision repeats and realleges all paragraphs above as though fully set forth herein.

191.    Nielsen has a market share of approximately 90% in the market for TV audience measurement services, as described herein.

192.    Nielsen has monopoly power, *i.e.* the ability to control prices and output and exclude competition, in the market for TV audience measurement services, which is a relevant market in which the parties compete.

193.    Nielsen has willfully acquired and maintained monopoly power in the market for TV audience measurement services by means of predatory, exclusionary, and anticompetitive conduct, as alleged herein.

194.    Nielsen's conduct has no legitimate business purpose of procompetitive effect. Any non-pretextual business rationale for its conduct that Nielsen attempts to claim could have been achieved through less restrictive means.

195.    Nielsen's conduct has had a substantial effect on interstate commerce.

196.    TVision has suffered antitrust injury as a result of Nielsen's anticompetitive conduct in the form of current and future lost profits, lost valuation, and artificially suppressed market share. Nielsen's conduct has harmed competition overall in the market for TV audience measurement services.

197.    TVision has suffered substantial and calculable damages stemming from Nielsen's anticompetitive conduct.

## COUNT II
### SHERMAN ACT SECTION 2: ATTEMPTED MONOPOLIZATION

198. TVision repeats and realleges all paragraphs above as though fully set forth herein.

199. Nielsen has a market share of approximately 90% in the market for TV audience measurement services, as described herein.

200. Nielsen has attempted to monopolize the market for TV audience measurement services by means of the predatory, exclusionary, and anticompetitive conduct alleged herein.

201. Nielsen has specifically intended to monopolize the market for TV audience measurement services by means of the predatory, exclusionary, and anticompetitive conduct alleged herein.

202. There is a dangerous probability that Nielsen will achieve monopoly power in the market for TV audience measurement services due to its anticompetitive conduct. Specifically, Nielsen's high market share, in combination with its practices making it extremely difficult for customers to switch away from its services or to use any competing service, and its practice of harassing competitors through sham patent litigation, create a likelihood that Nielsen will obtain the ability to control prices and output in the market for TV audience measurement services.

203. Nielsen's conduct has no legitimate business purpose or procompetitive effect. Any non-pretextual business rationale for its conduct that Nielsen attempts to claim could have been achieved through less restrictive means.

204. Nielsen's conduct has had a substantial effect on interstate commerce.

205. TVision has suffered antitrust injury as a result of Nielsen's anticompetitive conduct in the form of current and future lost profits, lost valuation, and artificially suppressed market share. Nielsen's conduct has harmed competition overall in the market for TV audience measurement services.

206.    TVision has suffered substantial and calculable damages stemming from Nielsen's anticompetitive conduct.

## COUNT III
### SHERMAN ACT SECTION 1: RESTRAINT OF TRADE

207.    TVision repeats and realleges all paragraphs above as though fully set forth herein.

208.    As alleged above, Nielsen has entered into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain monopoly power in the relevant market for TV audience measurement services.

209.    Specifically, Nielsen has entered into contracts with its TV audience measurement services customers containing terms that operate as *de facto* exclusive dealing provisions, as described herein.

210.    Nielsen's *de facto* exclusive dealing contracts have a substantial foreclosure effect in the market for TV audience measurement services on competition by foreclosing approximately 90% of potential customers in the market for television audience measurement services.

211.    Nielsen's *de facto* exclusive dealing contracts are long in duration, typically lasting for between five and seven years, and are not easily terminable by its customers.

212.    Nielsen intentionally staggers the end dates of its *de facto* exclusive dealing contracts, further amplifying their anticompetitive effect, as described herein.

213.    Nielsen's customer contracts have had an anticompetitive effect in the relevant market for TV audience measurement services.

214.    Nielsen's conduct has no legitimate business purpose or procompetitive effect. Any non-pretextual business rationale for its conduct that Nielsen attempts to claim could have been achieved through less restrictive means.

215.    Nielsen's conduct has had a substantial effect on interstate commerce.

216.    TVision has suffered antitrust injury as a result of Nielsen's anticompetitive conduct in the form of current and future lost profits, lost valuation, and artificially suppressed market share. Nielsen's conduct has harmed competition overall in the market for TV audience measurement services.

217.    TVision has suffered substantial and calculable damages stemming from Nielsen's anticompetitive conduct.

## PRAYER FOR RELIEF

218.    WHEREFORE, Counterclaim Plaintiff TVision prays for judgment against Counterclaim Defendant Nielsen as follows:

A.    Adjudication that the acts alleged herein constitute monopolization in violation of the Sherman Act, 15 U.S.C. § 2;

B.    Adjudication that the acts alleged herein constitute attempted monopolization in violation of the Sherman Act, 15 U.S.C. § 2;

C.    Adjudication that the acts alleged herein constitute unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. § 1;

D.    Actual damages, statutory damages, punitive or treble damages, and such other relief as provided by the statutes cited herein;

E.    Equitable relief in the form of enjoining Nielsen from engaging in the anticompetitive conduct alleged herein;

F.    Equitable relief as may be required to restore competition and to prevent the recurrence of future antitrust violations alleged herein;

G.    The costs of bringing this suit, including reasonable attorneys' fees; and

H.    All other relief as the Court deems just and proper.

76

## DEMAND FOR JURY TRIAL

219.    Defendant and Counterclaim Plaintiff TVision hereby demands a trial by jury of all the claims and counterclaims asserted in this action.

OF COUNSEL:
Jason Xu
RIMÔN LAW P.C.
1990 K. Street, NW, Suite 420
Washington, DC 20006
(202) 470-2141

Eric C. Cohen
RIMÔN LAW P.C.
4030 Wake Forest Road, Suite 300
Raleigh, NC 27609
(984) 960-2860

Steig D. Olson
Sami H. Rashid
QUINN EMANUEL URQUHART
 & SULLIVAN LLP
295 Fifth Avenue
New York, NY 10016
(212) 849-7000

Patrick D. Curran
QUINN EMANUEL URQUHART
 & SULLIVAN LLP
11 Huntington Avenue, Suite 5200
Boston, MA 02199
(617) 712-7100

Adam B. Wolfson
QUINN EMANUEL URQUHART
 & SULLIVAN LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000

Benjamin D. Brown
Richard A. Koffman
Daniel McCuaig
COHEN MILSTEIN SELLERS
 & TOLL PLLC
1100 New York Ave NW, Suite 800
Washington, DC  20005
(202) 408-4600

Dated: November 10, 2025

_/s/ Andrew E. Russell_
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
arussell@shawkeller.com
nhoeschen@shawkeller.com
_Attorneys for Defendant_

78