IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THE NIELSEN COMPANY (US), LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 25-575-CJB |
| | ) | |
| TVISION INSIGHTS, INC., | ) | |
| | ) | **Redacted - Public Version** |
| Defendant. | ) | |
| | ) | |
| | ) | |
| TVISION INSIGHTS, INC., | ) | |
| | ) | |
| Counter-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE NIELSEN COMPANY (US), LLC, | ) | |
| | ) | |
| Counter-Defendant. | ) | |

### TVISION INSIGHTS, INC.'S OPPOSITION TO THE NIELSEN COMPANY (US), LLC'S MOTION TO DISMISS TVISION INSIGHTS, INC.'S COUNTERCLAIMS

OF COUNSEL:
Jason Xu
RIMÔN LAW P.C.
1990 K. Street, NW, Suite 420
Washington, DC 20006
(202) 470-2141

Eric C. Cohen
RIMÔN LAW P.C.
4030 Wake Forest Road, Suite 300
Raleigh, NC 27609
(984) 960-2860

Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant/Counterclaimant
TVision Insights, Inc.*

Steig D. Olson
Sami H. Rashid
QUINN EMANUEL URQUHART
 & SULLIVAN LLP
295 Fifth Avenue
New York, NY 10016
(212) 849-7000

Patrick D. Curran
QUINN EMANUEL URQUHART
 & SULLIVAN LLP
11 Huntington Avenue, Suite 5200
Boston, MA 02199
(617) 712-7100

Adam B. Wolfson
QUINN EMANUEL URQUHART
 & SULLIVAN LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000

Benjamin D. Brown
Richard A. Koffman
Daniel McCuaig
COHEN MILSTEIN SELLERS
 & TOLL PLLC
1100 New York Ave NW, Suite 800
Washington, DC  20005
(202) 408-4600

Dated: February 24, 2026

**TABLE OF CONTENTS**

**Page**

NATURE AND STAGE OF THE PROCEEDINGS ...................................................................1

SUMMARY OF ARGUMENT ...........................................................................................3

STATEMENT OF FACTS .................................................................................................4

ARGUMENT ..................................................................................................................6

I.      There is No Claim Splitting ...............................................................................6

II.     TVision Plausibly Alleges a Relevant Market, Market Power, and Standing ....................8

        A.      TVision Alleges a Well-Recognized Relevant Market ............................................8

        B.      TVision Plausibly Alleges Nielsen's Market Power ...............................................11

        C.      TVision Has Antitrust Standing ......................................................................12

III.    TVision's Allegations about Nielsen's Use of Baseless Lawsuits to Stifle
        Competition Are Legally Sufficient ....................................................................15

        A.      TVision Plausibly Alleges That Nielsen Has a Practice of Serially Filing
                Patent Suits Without Regard to Merit ..............................................................16

        B.      Alternatively, TVision Plausibly Alleges Each Nielsen Suit is Objectively
                Baseless and Subjectively Motivated by Anticompetitive Intent ..........................20

CONCLUSION...............................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*10x Genomics, Inc. v. Curio Biosciences, Inc.*,
  2025 WL 326752 (D. Del. Jan. 29, 2025) (Burke, J.)............................................16, 17, 21, 25

*3Shape TRIOS A/S v. Align Tech., Inc.*,
  2020 WL 2559777 (D. Del. May 20, 2020).................................................................................9

*Abbott Lab'ys v. Teva Pharms. USA, Inc.*,
  432 F. Supp. 2d 408 (D. Del. 2006).........................................................................................23

*ADP, LLC v. Ultimate Software Grp., Inc.*,
  2018 WL 1151713 (D.N.J. Mar. 5, 2018).................................................................................19

*Akamai Techs., Inc. v. MediaPointe, Inc.*,
  2024 WL 1699352 (C.D. Cal. Apr. 10, 2024) ..........................................................................22

*Am. President Lines, LLC v. Matson, Inc.*,
  775 F. Supp. 3d 379 (D.D.C. 2025) .........................................................................................12

*Angelico v. Lehigh Valley Hosp., Inc.*,
  184 F.3d 268 (3d Cir. 1999)...........................................................................................4, 14, 15

*Applera Corp. v. MJ Research, Inc.*,
  303 F. Supp. 2d 130 (D. Conn. 2004).......................................................................................18

*Associated Gen. Contractors of Ca., Inc. v. Ca. State Council of Carpenters*,
  459 U.S. 519 (1983)..................................................................................................................15

*Azurity Pharms., Inc. v. Bionpharma Inc.*,
  650 F. Supp. 3d 269 (D. Del. 2023)..........................................................................................21

*Ballas v. Tedesco*,
  41 F. Supp. 2d 531 (D.N.J. 1999) .............................................................................................14

*Bayer Healthcare LLC v. Second Stone Enters. LLC*,
  2025 WL 1531237 (D.N.J. May 29, 2025) ...........................................................................19, 24

*Broadcom Corp. v. Qualcomm Inc.*,
  501 F.3d 297 (3d Cir. 2007)......................................................................................................12

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962)....................................................................................................................9

*C.R. Bard, Inc. v. M3 Sys., Inc.*,
  157 F.3d 1340 (Fed. Cir. 1998)..................................................................................23

*Cent. Garden & Pet Co. v. Scotts Co.*,
  2002 WL 1457691 (N.D. Cal. June 26, 2002) ...............................................................6

*Chabad of Prospect, Inc. v. Louisville Metro Bd. of Zoning Adjustment*,
  623 F. Supp. 3d 791 (W.D. Ky. 2022)..........................................................................7

*CoreStates Bank, N.A. v. Huls Am., Inc.*,
  176 F.3d 187 (3d Cir. 1999)........................................................................................6

*CSMN Invs., LLC v. Cordillera Metro. Dist.*,
  956 F.3d 1276 (10th Cir. 2020) .................................................................................17

*Curtis v. Citibank, N.A.*,
  226 F.3d 133 (2d Cir. 2000).........................................................................................6

*EmblemHealth, Inc. v. Alexion Pharms., Inc.*,
  2025 WL 3687761 (D. Mass. Dec. 19, 2025)...............................................................24

*ERBE Elektromedizin GmbH v. Canady Tech. LLC*,
  629 F.3d 1278 (Fed. Cir. 2010)..................................................................................17

*In re Flonase Antitrust Litig.*,
  795 F. Supp. 2d 300 (E.D. Pa. 2011) .........................................................................17

*FTC v. AbbVie Inc.*,
  329 F. Supp. 3d 98 (E.D. Pa. 2018) ...........................................................................24

*FTC v. AbbVie Inc*,
  976 F.3d 327 (3d Cir. 2020)..................................................................................24, 25

*In re Gabapentin Pat. Litig.*,
  649 F. Supp. 2d 340 (D.N.J. 2009) ............................................................................21

*Gedeon v. United States*,
  2025 WL 1490170 (E.D. Pa. May 22, 2025) .................................................................6

*Gregory v. Chehi*,
  843 F.2d 111 (3d Cir. 1988)..........................................................................................6

*Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*,
  806 F.3d 162 (3d Cir. 2015).......................................................4, 5, 16, 17, 18, 20

*Helicopter Helmet, LLC v. Gentex Corp.*,
  774 Fed. App'x 96 (3d Cir. 2019)...............................................................................14

*Hisey v. QualTek USA, LLC*,
    2019 WL 3936555 (E.D. Pa. Aug. 20, 2019) ..................................................................7

*Hoffman-La Roche Inc. v. Genpharm Inc.*,
    50 F. Supp. 2d 367 (D.N.J. 1999) ..................................................................................21

*Indivior Inc. v. Dr. Reddy's Lab'ys. S.A.*,
    2020 WL 4932547 (D.N.J. Aug. 24, 2020) ....................................................................18

*Intell. Ventures I LLC v. Cap. One Fin. Corp.*,
    280 F. Supp. 3d 691 (D. Md. 2017) ...............................................................................20

*Leonard v. Stemtech Int'l, Inc.*,
    2012 WL 3655512 (D. Del. Aug. 24, 2012) (Burke, J.) ..............................................6, 8

*Lifewatch Servs. Inc. v. Highmark Inc.*,
    902 F.3d 323 (3d Cir. 2018)..................................................................................3, 9, 10

*Lum v. Bank of America*,
    361 F.3d 217 (3d Cir. 2004)...........................................................................................14

*McKenna v. City of Philadelphia*,
    304 F. App'x 89 (3d Cir. 2008) .......................................................................................6

*Mendoza v. Amalgamated Transit Union Int'l*,
    30 F.4th 879 (9th Cir. 2022) ............................................................................................6

*Miller Indus. Towing Equip. Inc. v. NRC Indus.*,
    659 F. Supp. 3d 451 (D.N.J. 2023) ................................................................................22

*Morton Grove Pharms., Inc. v. Par Pharm. Cos., Inc.*,
    2006 WL 850873 (N.D. Ill. Mar. 28, 2006)...................................................................23

*Multiple Energy Techs., LLC v. Under Armour, Inc.*,
    2021 WL 807722 (W.D. Pa. Mar. 3, 2021) .....................................................................9

*Nalco Co. v. Chen*,
    843 F.3d 670 (7th Cir. 2016) ...........................................................................................6

*Neifeld v. Steinberg*,
    438 F.2d 423 (3d Cir. 1971).............................................................................................8

*Nobelpharma AB v. Implant Innovations, Inc.*,
    141 F.3d 1059 (Fed. Cir. 1998).....................................................................................23

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
    2009 WL 2016436 (D. Del. July 9, 2009) .......................................................................6

iv

*Prescient Med. Holdings, LLC v. Lab'y Corp. of Am. Holdings*,
2019 WL 635405 (D. Del. Feb. 14, 2019)......................................................................9

*PrimeTime 24 Joint Venture v. NBC, Inc.*,
219 F.3d 92 (2d Cir. 2000)...........................................................................................17

*Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*,
508 U.S. 49 (1993).......................................................................................................20

*In re Revlimid & Thalomid Purchaser Antitrust Litig.*,
2024 WL 2861865 (D.N.J. June 6, 2024) ....................................................................23

*Sage Chem., Inc. v. Supernus Pharm., Inc.*,
2024 WL 2260331 (D. Del. May 9, 2024) (Burke, J.)..............................................9, 17

*Shionogi Pharma, Inc. v. Mylan, Inc.*,
2011 WL 3860680 (D. Del. Aug. 31, 2011) .................................................................13

*Spring Pharms., LLC v. Retrophin, Inc.*,
2019 WL 6769988 (E.D. Pa. Dec. 11, 2019)................................................................14

*Staley v. Gilead Scis., Inc.*,
2020 WL 5507555 (N.D. Cal. July 29, 2020)...............................................................11

*Steele v. United States*,
144 F.4th 316 (D.C. Cir. 2025)......................................................................................6

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
64 F. Supp. 3d 665 (E.D. Pa. 2014) ..............................................................................9

*Sunbeam Television Corp., v. Nielsen Media Rsch., Inc.*,
2010 WL 1504882 (S.D. Fla. Jan. 19, 2010) ...............................................................12

*Superama Corp., Inc. v. Tokyo Broad. Sys. Television, Inc.*,
2025 WL 2799807 (C.D. Cal. Sept. 30, 2025) ..............................................................7

*Takeda Pharm. Co. Ltd. v. Zydus Pharms. (USA) Inc.*,
358 F. Supp. 3d 389 (D.N.J. 2018) ..............................................................................16

*Torres v. Rebarchak*,
814 F.2d 1219 (7th Cir. 1987) .......................................................................................7

*Tripp v. Perdue Foods LLC*,
2024 WL 3904675 (D. Md. Aug. 22, 2024) ...................................................................7

*United States v. Dentsply Int'l, Inc.*,
399 F.3d 181 (3d Cir. 2005)..........................................................................................11

*USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council, AFL-CIO*,
   31 F.3d 800 (9th Cir. 1994) ..................................................................................17, 18

*Valassis Commc'ns, Inc. v. News Corp.*,
   2019 WL 802093 (S.D.N.Y. Feb. 21, 2019)..........................................................13

*Walton v. Eaton Corp.*,
   563 F.2d 66 (3d Cir. 1977) (en banc)..................................................................3, 6

*Waugh Chapel S., LLC v. United Food & Com. Workers Union Loc. 27*,
   728 F.3d 354 (4th Cir. 2013) ...................................................................................17

*In re Wellbutrin SR Antitrust Litig.*,
   2006 WL 616292 (E.D. Pa. Mar. 9, 2006)............................................................21

*In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*,
   868 F.3d 132 (3d Cir. 2017)..............................................................................16, 19

## Statutes and Rules

Fed. R. Civ. P. 13 .........................................................................................................8

Fed. R. Civ. P. 41(c) ....................................................................................................8

## Other Sources

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (5th ed., updated Sept. 2025). .....................................11, 14

## NATURE AND STAGE OF THE PROCEEDINGS

As TVision's counterclaims allege, "For years, Nielsen has used a number of anticompetitive tactics to unlawfully maintain its decades-long monopoly over TV audience measurement services in the United States," reflecting a "merciless approach by Nielsen to stamping out all potential competitors by any means at its disposal." (¶1.)[1] Nielsen uses a "two-pronged strategy" to maintain its monopoly. (¶3.) "*First*, Nielsen leverages its market power to lock its customers into using Nielsen's and *only* Nielsen's TV audience measurement services." (*Id.*) It does this by imposing "an array of exclusionary arrangements on its customers … to lock those customers into its TV audience measurement services and ensure no competitor poses a meaningful threat to its monopoly." (¶4.) "*Second*, if and when a competitor emerges as a potential threat, Nielsen uses its vast resources to bury it under a mountain of baseless lawsuits, without any regard to the merits of those lawsuits." (¶3.)

Nielsen's anticompetitive tactics to lock up customers have relegated TVision to the margins, forcing it to position its superior offerings as a mere supplement to Nielsen's to survive. (¶¶35, 182, 184–185.) At the same time, Nielsen's parade of lawsuits against TVision has crippled the company and left it struggling to stay afloat. (¶¶88, 184.)

TVision's counterclaims state antitrust claims under the applicable pleading standards. Nielsen now moves to dismiss on three meritless and legally flawed grounds.

*First*, Nielsen argues TVision's counterclaims are "textbook claim-splitting." (D.I. 50 ("Mot.") at 4.) But claim splitting occurs *only* when a party maintains two separate actions covering the same subject matter *at the same time*. That is plainly not occurring here. Rather,

---

[1]   Herein, TVision's Counterclaims, D.I. 30, are cited by paragraph numbers of the counterclaims, which start on page 12 of the Answer and Counterclaims, as follows: "(¶__.)."

TVision is proceeding *only* on the counterclaims in this action, having dismissed its prior counterclaims without prejudice after Nielsen refused to agree to consolidation. Since there is only one set of counterclaims pending, no claim is being "split." Multiple courts have rejected claim splitting arguments in this situation, and Nielsen fails to cite any case holding otherwise.

Nielsen's argument is not really about claim splitting. Rather, Nielsen is effectively arguing that TVision did not have the right to file a set of comprehensive, up-to-date antitrust counterclaims in this action, because it had previously filed antitrust counterclaims in an earlier action. But there is no authority for that proposition. If Nielsen did not want to face new counterclaims, it should not have filed yet another harassing lawsuit against TVision. Having chosen to do so, it cannot complain that TVision exercised its own legal rights by responding with counterclaims. Moreover, TVision's decisions about how to prosecute its counterclaims (while surviving Nielsen's litigation onslaught) do not implicate "claim splitting" or provide any ground for dismissal.

***Second***, Nielsen argues that the relevant market TVision has alleged is "intentionally vague and fatally flawed." (Mot. at 9.) But the alleged market for TV audience measurement services is neither vague nor flawed; it is a well-recognized market that Nielsen is known to dominate. Nielsen also argues that TVision does not have antitrust standing because it has not directly competed with Nielsen for customers. (*Id.* at 15.) But the counterclaims allege that, absent Nielsen's antitrust violations, TVision would be competing to replace Nielsen by selling its superior, lower-priced offerings to customers as a substitute for Nielsen's. Under black-letter law, these allegations establish TVision as a direct victim of Nielsen's exclusionary conduct, with antitrust standing.

***Third***, Nielsen argues TVision's allegations about its "litigation activity" are barred by *Noerr-Pennington* immunity. (*Id.* at 19.) Not so. TVision alleges that Nielsen, a monopolist, has filed a series of meritless lawsuits to bury TVision and other rivals, conduct that courts routinely

2

recognize as actionable under the antitrust laws. Nielsen claims that its favorable "win-loss percentage" against TVision somehow disproves TVision's allegations (*id.* at 25), but as the counterclaims allege, "since 2021, Nielsen has initiated a series of twelve total patent actions against rival companies and critical suppliers of rival companies," including five against TVision, and "***Nielsen has not been successful in a single case that has reached judgment***." (¶89.) In other words, Nielsen's "win percentage" is *zero*. Nielsen's motion to dismiss should be denied.

## SUMMARY OF ARGUMENT

1.      Nielsen argues that TVision's counterclaims constitute improper claim splitting, but the law is clear that claim splitting occurs only where a plaintiff seeks to maintain two actions simultaneously. *Walton v. Eaton Corp.*, 563 F.2d 66, 70 (3d Cir. 1977) (en banc). Because the counterclaims in this action are the only ones pending, there is no claim splitting.

2.      Nielsen argues that TVision fails to adequately define a relevant market, but TVision provides robust allegations about the defining features and reasonable interchangeability of the market for TV audience measurement services. (¶¶20–40.) Dismissal on this fact-intensive issue is appropriate only where the pleadings have "obvious oversights." *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 337 (3d Cir. 2018). None are present here.

3.      Nielsen argues that TVision fails to allege Nielsen's market power, but TVision alleges Nielsen maintains an overwhelming market share of "approximately 90%" in the market for TV audience measurement services. (¶¶41–42.) TVision further alleges direct evidence of Nielsen's market power, including its supracompetitive pricing. (¶¶45–46.) Either alone suffices.

4.      Nielsen argues that TVision lacks antitrust standing, but TVision plainly alleges it sells superior substitutable offerings in the relevant market but has been excluded from directly competing against Nielsen because of Nielsen's anticompetitive conduct that locks up customers.

3

(¶¶33–35, 37, 181–182.) That makes TVision a quintessential antitrust plaintiff. *See Angelico v. Lehigh Valley Hosp., Inc*., 184 F.3d 268, 274 (3d Cir. 1999).

5.      Nielsen argues it has not engaged in unlawful petitioning, but the series exception to *Noerr-Pennington* immunity applies here, given TVision's allegations that Nielsen has brought five meritless lawsuits against TVision as part of a broader campaign to stifle competition through litigation. *See Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 180–81 (3d Cir. 2015); (¶¶89–102). In addition, each lawsuit Nielsen has brought against TVision individually constitutes sham litigation, further negating *Noerr-Pennington* immunity. (¶¶103–179.)

## STATEMENT OF FACTS

As set forth in TVision's counterclaims, Nielsen's flagship product is its TV audience measurement services through which it sells information on television viewership to industry participants. (¶¶1, 32.) There is "longstanding and widespread industry recognition of TV audience measurement services as a distinct product," as well as recognition by courts. (¶¶31–32.) There is also widespread recognition that Nielsen dominates the market. (¶41.) Industry sources recognize, for example, that "[w]hen it comes to national television audience measurement used for the buying and selling of commercial time, Nielsen has long been an industry mandated monopoly." (*Id.*) Nielsen maintains a market share of approximately 90% of the United States market for TV audience measurement services. (¶42.) Nielsen's dominance allows it to charge customers in the U.S. up to *four times more* than it charges abroad, where markets are "substantially more competitive than the market in the U.S." (¶45.)

TVision also offers TV audience measurement services to buyers seeking data on who is watching what content across the TV landscape. (¶33.) Like Nielsen, TVision sells offerings derived from panel data, collected using in-home meters that track viewing habits in volunteer households, so buyers such as content providers and advertisers can better understand viewer

preferences. (¶21.) Although the services sold in this market can vary in features, they all serve the same "core utility" for customers, which is to "provide an accurate snapshot of television consumption habits, in order to inform programming decisions and advertising transactions." (¶22.) There are "no reasonably interchangeable substitutes for TV audience measurement services," because no other products or services "fulfill the entertainment industry's core and indispensable need for up-to-date data on the television viewing habits of the public." (¶26.)

Nielsen uses a "two-pronged strategy to maintain its market dominance." (¶3.) The first consists of exclusionary practices to lock up customers. Nielsen imposes long-term contracts with staggered end dates that prohibit the "commingling" of Nielsen data and information with non-Nielsen data and information, effectively forbidding its customers from using any competitor. (¶¶51–54.) Nielsen then conditions customers' access to their historical data on their continued subscription to Nielsen's TV audience measurement services. (¶¶73–79.) Finally, if a content provider terminates or non-renews its contract with Nielsen, Nielsen removes the provider's programming from its data, rendering disloyal content providers invisible to advertisers. (¶80.) Notably, Nielsen does not contest any of these exclusionary practices in its motion.

The second prong of Nielsen's strategy to maintain its monopoly involves using litigation as a weapon to prevent competition. Since 2021, Nielsen has brought twelve patent suits against competitors and suppliers to competitors, including not only TVision, but also HyphaMetrics, TVSquared, ACRCloud, and VideoAmp, without winning *any*. (¶89.) Against TVision alone, Nielsen has filed five patent infringement lawsuits. (*Id.*)

Having identified TVision as a competitive threat, Nielsen has used its anticompetitive practices to block TVision from effectively competing. (¶¶181–186.) Despite having superior offerings capable of replacing Nielsen's, at a lower price, TVision has been forced to survive by

positioning its offerings as a mere supplement to Nielsen's. (¶¶34–35, 185.) Absent Nielsen's anticompetitive conduct, "a substantial number" of "locked-up customers would have switched to TVision's TV audience measurement services," and TVision would "convert … customers away from Nielsen entirely." (¶¶34, 182.)

**ARGUMENT**

## I.  THERE IS NO CLAIM SPLITTING

Nielsen's argument that TVision's counterclaims should be dismissed for claim splitting fails under black-letter law. The rule against claim splitting applies only where a party seeks to "maintain two [or more] separate actions involving the same subject matter *at the same time*." *Walton*, 563 F.2d at 70 (emphasis added); *see also Leonard v. Stemtech Int'l, Inc.*, 2012 WL 3655512, at *5 (D. Del. Aug. 24, 2012) (Burke, J.) (rule applies only when "two suits are pending at the same time" (citation omitted)).[2]

Nielsen fails to cite any case applying the rule against claim splitting when only one set of claims is pending. Rather, the cases Nielsen cites all involved *multiple simultaneously pending claims*.[3] Previous litigants making this argument have suffered from the same absence of support.

---

[2] *See also Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 2009 WL 2016436, at *3 (D. Del. July 9, 2009) ("[T]he rule against claim splitting applies 'when, like here, two suits are pending at the same time.'" (citation omitted)); *Gedeon v. United States*, 2025 WL 1490170, at *3–4 (E.D. Pa. May 22, 2025) (similar); *Mendoza v. Amalgamated Transit Union Int'l*, 30 F.4th 879, 886 (9th Cir. 2022) (similar); *Curtis v. Citibank, N.A.*, 226 F.3d 133, 138–39 (2d Cir. 2000) (similar).

[3] *See Steele v. United States*, 144 F.4th 316, 320–21 (D.C. Cir. 2025) (plaintiffs filed second suit realleging claims they had abandoned in a still-pending class action); *McKenna v. City of Philadelphia*, 304 F. App'x 89, 90–91 (3d Cir. 2008) (second suit filed while first was on appeal); *Walton*, 563 F.2d at 70 (simultaneously pending cases); *Cent. Garden & Pet Co. v. Scotts Co.*, 2002 WL 1457691, at *5–6 (N.D. Cal. June 26, 2002) (same); *Leonard*, 2012 WL 3655512, at *10–11 (denying motion to dismiss second-filed complaint and consolidating simultaneously pending cases). Nielsen also cites other cases that are inapposite because they do not concern claim splitting at all. *See CoreStates Bank, N.A. v. Huls Am., Inc.*, 176 F.3d 187 (3d Cir. 1999); *Nalco Co. v. Chen*, 843 F.3d 670 (7th Cir. 2016); *Gregory v. Chehi*, 843 F.2d 111 (3d Cir. 1988).

6

In *Superama Corp., Inc. v. Tokyo Broad. Sys. Television, Inc.*, the court noted, in denying the defendant's motion to dismiss, that "the Court is unable to identify *even one case* where a court applied claim-splitting to a scenario where the two actions were not pending at the same time." 2025 WL 2799807, at *3 (C.D. Cal. Sept. 30, 2025) (emphasis added); *see also Hisey v. QualTek USA, LLC*, 2019 WL 3936555, at *10 (E.D. Pa. Aug. 20, 2019) ("the cases cited by the defendants all involved dismissal for claim-splitting because two actions were both pending *at the same time*" (emphasis in original)).

Indeed, many courts have *specifically rejected* Nielsen's argument that the rule against claim splitting applies where, as here, the initial suit was dismissed without prejudice. *See, e.g.*, *Torres v. Rebarchak*, 814 F.2d 1219, 1224 (7th Cir. 1987) ("The defendants nevertheless claim … that the rule against claim splitting bars a subsequent suit even if the earlier claims were dismissed without prejudice. We do not agree."); *Hisey*, 2019 WL 3936555, at *10 ("claim-splitting only applies when two lawsuits are pending simultaneously, but not when one lawsuit is filed after the first suit is dismissed without prejudice"); *Tripp v. Perdue Foods LLC*, 2024 WL 3904675, at *4 (D. Md. Aug. 22, 2024) ("the dismissal of a prior lawsuit without prejudice does not bar the filing of a subsequent lawsuit based on the same facts and causes of action under the claim splitting doctrine"); *Chabad of Prospect, Inc. v. Louisville Metro Bd. of Zoning Adjustment*, 623 F. Supp. 3d 791, 799 (W.D. Ky. 2022) ("Nor would a subsequent suit [after dismissal without prejudice] be barred based on claim-splitting because only one suit is ongoing. Such subsequent lawsuits are normal and expected. *The whole point of dismissing without prejudice is to allow a subsequent suit.*" (emphasis added)). Nielsen does not cite a single court reaching a contrary conclusion.

In reality, Nielsen's unsupported argument is an effort to dispute TVision's exercise of its legal rights. If Nielsen wished to avoid facing new counterclaims, then it should not have filed yet

7

another lawsuit against TVision. Having done so, Nielsen cannot complain that TVision exercised its right to respond by filing comprehensive, up-to-date counterclaims. *See* Fed. R. Civ. P. 13; *see also Neifeld v. Steinberg*, 438 F.2d 423, 429 n.13 (3d Cir. 1971) ("Rule 13(b) does not place any restrictions on a defendant's right to assert a permissive counterclaim.").[4]

Moreover, after filing its new counterclaims, TVision sought Nielsen's consent to streamline the parties' litigation by consolidating this action with the prior action. Nielsen refused. TVision then voluntarily dismissed the prior counterclaims, so it could pursue its antitrust claims in one action. TVision had the right to do that too. *See* Fed. R. Civ. P. 41(c). No court has dismissed antitrust counterclaims under these circumstances.

## II. TVISION PLAUSIBLY ALLEGES A RELEVANT MARKET, MARKET POWER, AND STANDING

### A. TVision Alleges a Well-Recognized Relevant Market

Nielsen argues the relevant market alleged by TVision's counterclaims is "intentionally vague." (Mot. at 9.) Not so. TVision's counterclaims allege and detail a specific relevant market that Nielsen is known to dominate: the market for TV audience measurement services.

"Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Lifewatch*, 902 F.3d at 337 (citation omitted). Dismissal for failure to define a relevant market is typically appropriate only if the complaint contains "obvious oversights," such as "defin[ing] the relevant market without reference to interchangeability or cross-elasticity of demand." *Id*. Therefore, in assessing market

---

[4] Even if TVision had maintained its prior action, there would be no claim splitting. Claim splitting requires "substantially identical" complaints. *Leonard*, 2012 WL 3655512, at *6. Here, the up-to-date antitrust counterclaims substantively differ from the prior counterclaims. For example, Nielsen filed two more patent suits against TVision as part of its illegal use of litigation *after* the October 13, 2023 deadline for amending pleadings in Case No. 1345. (¶¶173–179.)

definition at the pleading stage, "courts should deny motions to dismiss unless the alleged market makes *no economic sense under any set of facts*." *3Shape TRIOS A/S v. Align Tech., Inc.*, 2020 WL 2559777, at *9 (D. Del. May 20, 2020) (citation modified) (emphasis added).[5] That is not the case here.

Here, TVision has exhaustively detailed the relevant market, including the defining features of the products (¶22), the purposes for which they are used (¶21), the customers to whom they are sold (¶23), the types of data they include (¶24), their lack of reasonable substitutability with other products (¶¶24–28), why a hypothetical monopolist could profitably implement a small but substantial, non-transitory increase in price ("SSNIP") (¶¶29–30), the commercial and judicial recognition of the relevant market (¶¶31–32), how the parties' offerings each fit within the relevant market (¶¶32–33), and the identities of other participants (¶36). These allegations fully satisfy the Supreme Court's "practical indicia" of a properly defined market, including "industry or public recognition" (¶¶31–32), "peculiar characteristics and uses" (¶¶21–22), and "distinct customers" (¶23). *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). Courts regularly find less detailed allegations sufficient at the pleading stage.[6]

Nielsen cites *Prescient Med. Holdings, LLC v. Lab'y Corp. of Am. Holdings*, where the plaintiff offered a "bare allegation of 'laboratory services'" as the relevant market. 2019 WL 635405, at *6 (D. Del. Feb. 14, 2019) (citation omitted). Nielsen also cites *Multiple Energy Techs.,*

---

[5]  Moreover, where, as here, a plaintiff alleges direct evidence of monopoly power, *see infra* Sec. II.B, only a "rough identification of the relevant market" is necessary. *Sage Chem., Inc. v. Supernus Pharm., Inc.*, 2024 WL 2260331, at *23 (D. Del. May 9, 2024) (Burke, J.).

[6]  *See, e.g.*, *Sage Chem.*, 2024 WL 2260331, at *24 (Burke, J.) (relevant market sufficiently alleged where plaintiff alleged there were "no other reasonably interchangeable substitutes," discussed "unique characteristics and distinct uses," and "reference[d] cross-elasticity of demand as to the market"); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665, 713 (E.D. Pa. 2014) (similar).

9

*LLC v. Under Armour, Inc.*, which also included barebones market allegations. 2021 WL 807722, at *2 (W.D. Pa. Mar. 3, 2021). This case is nothing like those. As noted, TVision has detailed the relevant market's contours and defining features, addressed interchangeability, and identified participants (Nielsen, TVision, Comscore, VideoAmp, and iSpot), explaining how each participates and how Nielsen forecloses the others. (¶¶21–28, 32–33, 36.) That is more than enough.

Nielsen contends that TVision has not adequately alleged its offerings are capable of being a reasonable substitute for Nielsen's. (Mot. at 11.) But the counterclaims allege the parties' offerings are reasonably interchangeable. TVision alleges that, just like Nielsen, "TVision also sells TV audience measurement services to buyers in the relevant market," and that the "core utility" offered by its services "is the same" as Nielsen's. (¶¶33, 22.) TVision alleges its offerings are "well-positioned" to "convert [Nielsen's] customers away from Nielsen entirely" (¶34), and "[g]iven the superiority of TVision's prices and product … a substantial number of [Nielsen's] locked-up customers would have switched to TVision's TV audience measurement services" absent Nielsen's exclusionary conduct (¶182). *Nielsen itself* recognized TVision as "a particular threat" because it is "the only provider of TV audience measurement services other than Nielsen that can collect and analyze significant amounts of panel data." (¶34.) It is only because Nielsen's unlawful conduct locks up customers that TVision has been forced "to survive by emphasizing the ways its data can be used to supplement, rather than completely supplant, Nielsen's." (¶35.)

Nielsen also argues that, because Nielsen's and TVision's products have differences, they cannot be in the same market. (Mot. at 10–12.) But, as the Third Circuit has recognized, "differentiation is often present among competing products in the same market," and products in the same market often differ in "performance, physical appearance, size, capacity, cost, price, reliability, ease of use, service, customer support, and other features." *Lifewatch*, 902 F.3d at 339

(citation omitted). Similarly, the fact that TVision has had to position its services as a supplement to Nielsen's does not mean they are not substitutable or in the same market. *See* Areeda & Hovenkamp, *Antitrust Law* ¶565b (two products in same relevant market "may function as both complements and substitutes"); *Staley v. Gilead Scis., Inc.*, 2020 WL 5507555, at \*7 (N.D. Cal. July 29, 2020) (denying motion to dismiss where different products in market "sometimes may be complements for one another but other times may be substitutes").

## B.    TVision Plausibly Alleges Nielsen's Market Power

Nielsen next claims "there is no way for the Court to assess Nielsen's market power," yet simultaneously acknowledges TVision alleges a market share of approximately 90%. (Mot. at 13.) TVision also alleges "advertisers and advertising agencies overwhelmingly use Nielsen's TV audience measurement services," and "the vast majority of TV audience measurement services sold to content providers come from Nielsen." (¶43.) This is more than enough to plead market power, given that the Third Circuit has held a market share "significantly larger than 55%" is enough for a *prima facie* showing of monopoly power. *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005). Nielsen is well beyond that threshold.

Nielsen argues that the Court should ignore the counterclaims' express allegations of market power because the 90% figure supposedly does not account for "the sort of supplement[al] products that TVision and others sell." (Mot. at 13 (internal quotations omitted).) But this assertion contradicts TVision's counterclaims, which allege Nielsen's 90% share is in the market for "TV audience measurement services" (¶42)—a market that includes the products that TVision and others sell.[7] (¶¶33, 36.) Moreover, any sales by rivals like TVision are a drop in the bucket, as

---

[7] Nielsen's assertion that any outside source mentioning "ratings" refers to some separate market from the one TVision alleges is likewise unsupported. There is no basis for that assumption in TVision's allegations, and the old sources Nielsen cites show, at most, that "ratings" was occasionally used as a term to refer to TV audience measurement services. (*See* Mot. at 14 n.11

11

Nielsen has locked up virtually all customers. (¶¶35, 43.) That TVision and others have eked out a few sales hardly renders TVision's allegations of Nielsen's market power implausible.

Nielsen also ignores TVision's allegations of *direct* evidence of market power, which are independently sufficient. An antitrust plaintiff may allege monopoly power by alleging either the defendant's "dominant share in a relevant market" *or* "direct evidence of supracompetitive prices and restricted output." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007). Direct evidence includes evidence "that a firm has in fact profitably charged prices above the competitive level." *Am. President Lines, LLC v. Matson, Inc.*, 775 F. Supp. 3d 379, 394 (D.D.C. 2025) (citation modified). TVision alleges that Nielsen has done exactly that.

TVision alleges Nielsen has charged supracompetitive prices for TV audience measurement in the U.S. (¶¶45–46.) The prices Nielsen charges in the U.S. are between two and four times higher than those it charges in "foreign markets … [that] are substantially more competitive than the market in the U.S." (¶45.) Indeed, "[i]n foreign markets where meaningful competition exists, Nielsen's operating margin the last time it was reported was 6%. In the United States, it was *29%*." (¶46.) TVision has therefore alleged direct evidence that Nielsen "has in fact profitably charged prices above the competitive level." *Am. President Lines*, 775 F. Supp. 3d at 394 (citation modified). Nielsen offers no response to these allegations. Accordingly, TVision has plausibly alleged market power, through both direct and indirect evidence.

## C.    TVision Has Antitrust Standing

Nielsen next argues that TVision does not have standing to bring its antitrust counterclaims because TVision is not a "direct competitor" to Nielsen, invoking statements from other

---

(quoting *Sunbeam Television Corp., v. Nielsen Media Rsch., Inc.*, 2010 WL 1504882, at ¶23 (S.D. Fla. Jan. 19, 2010))).

proceedings. (Mot. at 16.) This is a circular argument that misses the point entirely. The counterclaims expressly allege that Nielsen's *unlawful conduct* explains TVision's inability to compete directly: Nielsen has locked up customers and crippled TVision, forcing it to survive by positioning its superior, substitutable offerings as a mere supplement to Nielsen's. (¶¶33–35, 37, 181–182.) The extra-pleading declaration that Nielsen cites in support of its argument makes this very point: There, TVision's CEO explains that, ██████████████████████████████ ██████████████████████████. (*See* C.A. No. 22-1345-CJB, D.I. 92 at 22.)

TVision's allegations establish antitrust standing. TVision has offerings with superior technology that it could sell to customers to replace Nielsen's, at a lower price. (¶¶33–35, 37.)[8] "Were it not for the anticompetitive conduct described herein," TVision would be "well-positioned to take significant market share from Nielsen." (¶37.) But it is blocked from doing so by Nielsen's exclusionary tactics, which have drained its resources and made it impossible for customers to switch. (¶¶34, 182.)

That Nielsen's unlawful conduct has been *successful* in preventing TVision from directly converting Nielsen's customers does not allow it to escape liability. It is black-letter law that a rival that has been "shut out of competition" by a monopolist's exclusionary conduct has standing to sue. *Angelico*, 184 F.3d at 274 ("the injury [a plaintiff] suffer[s], when shut out of competition for anticompetitive reasons, is indeed among those the antitrust laws were designed to prevent"); *Valassis Commc'ns, Inc. v. News Corp.*, 2019 WL 802093, at *11 (S.D.N.Y. Feb. 21, 2019) ("Exclusion from a market is a conventional form of antitrust injury because it is exactly the type

---

[8] Without support, Nielsen argues TVision is required to *specifically name* the customers it would sell to (Mot. at 17–18), but this is contradicted by caselaw. *See, e.g.*, *Shionogi Pharma, Inc. v. Mylan, Inc.*, 2011 WL 3860680, at *5 (D. Del. Aug. 31, 2011) (finding excluded competitor adequately alleged antitrust standing without specifying customer relationships).

of injury that antitrust laws were designed to prevent." (citation modified)); Areeda & Hovenkamp, *Antitrust Law* ¶348a ("[A] rival clearly has standing to challenge the conduct of rival(s) that is illegal precisely because it tends to exclude rivals from the market.").

Nor is there any merit to Nielsen's argument that TVision's allegations about its ability to compete but for Nielsen's conduct are "not entitled to a presumption of truth." (Mot. at 18.) Nielsen cites *Spring Pharms., LLC v. Retrophin, Inc.*, but that case involved a generic drug manufacturer that had not even begun the required testing for FDA approval. 2019 WL 6769988, at *13–14 (E.D. Pa. Dec. 11, 2019). Here, there is no regulatory bar to market entry—TVision is *already* in the market.[9] TVision alleges its offerings are superior to Nielsen's, and it could sell them today as a replacement to Nielsen's, absent Nielsen's unlawful conduct. No more is required.[10]

The only inconsistency here is that of Nielsen, which has repeatedly asserted throughout its patent litigation campaign against TVision that "*Nielsen and TVision are both direct and indirect competitors*," (C.A. No. 22-1345-CJB, D.I. 98 at 2 (emphasis added) (internal footnotes omitted)), that "████████████████████████████████" (*id.*, D.I. 88 at 3–4 (emphasis added)), and that "*the evidence of record demonstrates both direct and indirect competition between the*

---

[9]   Nielsen's citation to *Helicopter Helmet, LLC v. Gentex Corp.*, 774 Fed. App'x 96, 97 (3d Cir. 2019), is also inapt. (*See* Mot. at 18.) The portion Nielsen quotes had nothing to do with the level of detail needed to plausibly allege harm; it concerned the need to allege an effect on competition as a whole, which TVision plainly does. (¶¶180–187.)

[10]   In its reply letter in support of its motion to stay TVision's antitrust counterclaims (D.I. 59), Nielsen improperly cited deposition testimony from other proceedings to argue that Nielsen and TVision do not compete. To the extent Nielsen again improperly submits materials in another reply submission, the Court should disregard them. *See Lum v. Bank of America*, 361 F.3d 217, 222 n.3 (3d Cir. 2004) (deposition testimony from a prior proceeding is not judicially noticeable on a motion to dismiss); *Ballas v. Tedesco*, 41 F. Supp. 2d 531, 533 (D.N.J. 1999) ("A moving party may not raise new issues and present new factual materials in a reply brief that it should have raised in its initial brief."). TVision executives have consistently explained that TVision, as a small start-up under relentless attack from a monopolist, positioned its products as a supplement to Nielsen's *to survive*, and that it could do more absent Nielsen's misconduct.

14

*parties*," (*id.* (emphasis added)), but now, faced with antitrust counterclaims, argues that the parties operate in entirely different markets. (Mot. at 16.) TVision's allegations are clear and consistent: TVision's offerings pose a direct competitive threat to Nielsen, which Nielsen quickly identified, but Nielsen's anticompetitive conduct has precluded TVision from positioning its offerings as the direct replacement they are. That establishes antitrust standing.

Finally, Nielsen claims that TVision cannot satisfy certain other standing factors recognized in *Associated Gen. Contractors of Ca., Inc. v. Ca. State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"). (Mot. at 18–19.) But where, as here, a plaintiff alleges the defendant's anticompetitive conduct has directly excluded it from the market, the *AGC* factors are satisfied. *See Angelico*, 184 F.3d at 275 (finding excluded competitor satisfied *AGC* factors). Nielsen argues that "TVision is not a direct victim of Nielsen's alleged anticompetitive conduct," (Mot. at 18), but that proposition contradicts numerous allegations in the counterclaims. (¶¶181–185.) Nielsen also states without explanation that "permitting TVision to go forward with these claims creates the risk of duplicative recovery." (Mot. at 18.) But TVision seeks damages for the financial harm TVision has suffered because of Nielsen blocking it from the market. (¶¶196–197, 205–206, 216–217.) No other entity could claim such damages.

### III.    TVISION'S ALLEGATIONS ABOUT NIELSEN'S USE OF BASELESS LAWSUITS TO STIFLE COMPETITION ARE LEGALLY SUFFICIENT

Nielsen does not address *any* of the exclusionary practices TVision alleges comprise the first prong of its monopolization scheme. (¶¶50–86.) Nielsen has thus conceded that, as alleged, those practices are plausibly anticompetitive and state a claim.

TVision's allegations about the second prong of Nielsen's monopolization scheme are equally damning. The counterclaims allege "[i]t is an open secret within the audience measurement industry that Nielsen uses baseless lawsuits to stifle its competition." (¶91.) This includes Nielsen

15

filing twelve patent actions since 2021 against rival companies and their critical suppliers, including TVision and others, without winning a single case that has reached judgment. (¶¶89–102.) These allegations are sufficient to plead unlawful conduct under the antitrust laws.

### A.      TVision Plausibly Alleges That Nielsen Has a Practice of Serially Filing Patent Suits Without Regard to Merit

TVision alleges that Nielsen has engaged in a pattern and practice of filing litigation for anticompetitive purposes. Nielsen argues its serial lawsuits are "legitimate petitioning activities" protected by *Noerr-Pennington* immunity (Mot. at 19), but this fact-specific defense is not susceptible to resolution at the pleading stage. *See 10x Genomics, Inc. v. Curio Biosciences, Inc.*, 2025 WL 326752, at *8 (D. Del. Jan. 29, 2025) (Burke, J.) ("Patent litigation often (as it does here) involves complex questions of fact that are just not suitable for resolution at the pleading stage."); *Takeda Pharm. Co. Ltd. v. Zydus Pharms. (USA) Inc.*, 358 F. Supp. 3d 389, 394 (D.N.J. 2018) ("[D]istrict courts within this Circuit have routinely prohibited parties from invoking the protections of *Noerr-Pennington* at the dismissal stage of a case in the context of patent suits.").

Moreover, courts assess serial petitioning claims under "a more flexible standard" because this tactic presents more complex facts while posing "a greater risk of antitrust harm" than a single suit. *Hanover*, 806 F.3d at 180; *see also In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 157 (3d Cir. 2017) (a plaintiff "could more easily overcome *Noerr-Pennington* immunity" with a serial litigation theory under *Hanover*). The series exception to *Noerr-Pennington* immunity is grounded in Supreme Court precedent and has been applied by the Third Circuit, as well as by the Second, Fourth, Ninth, and Tenth Circuits. *See Hanover*, 806 F.3d at 180 ("We agree with the approach to *California Motor* and *Professional Real Estate* that has

16

been adopted by the Second, Fourth, and Ninth Circuits.").[11]

The inquiry is "whether a series of petitions were filed with or without regard to merit and for the purpose of using the governmental process (as opposed to the outcome of that process) to harm a market rival and restrain trade." *Id*. The court "should perform a holistic review" that "may include looking at the defendant's filing success—i.e., win-loss percentage—as circumstantial evidence of the defendant's subjective motivations," as well as "other evidence of bad-faith" and "the magnitude and nature of the collateral harm imposed on plaintiffs by defendants' petitioning activity." *Id.* at 180–81. TVision's allegations satisfy this test. (¶¶89–179.)

Nielsen argues that Federal Circuit law applies, and the series exception "has no applicability" under Federal Circuit law. (Mot. at 20.) But the Federal Circuit recognized the series exception in *ERBE*, looking to regional circuit caselaw, but declined to apply it because the alleged three lawsuits were insufficiently "voluminous." *ERBE Elektromedizin GmbH v. Canady Tech. LLC*, 629 F.3d 1278, 1291–92 (Fed. Cir. 2010); *see In re Flonase Antitrust Litig.*, 795 F. Supp. 2d 300, 309 n.10 (E.D. Pa. 2011) (reading *ERBE* as adopting the series exception).

That the Federal Circuit has not yet found the series exception applies to the specific facts before it is irrelevant. It is overwhelmingly likely that the Federal Circuit's reading of precedent aligns with the consensus among regional circuits—including the Second, Third, and Ninth Circuits, which consider especially large volumes of antitrust cases. Indeed, this Court and others in the Third Circuit have regularly looked to *Hanover* and applied its two-tier *Noerr-Pennington* standard in patent cases. *See, e.g.*, *Sage Chem.*, 2024 WL 2260331, at \*24 (Burke, J.); *10x*

---

[11]  *See CSMN Invs., LLC v. Cordillera Metro. Dist.*, 956 F.3d 1276, 1286 (10th Cir. 2020); *Waugh Chapel S., LLC v. United Food & Com. Workers Union Loc. 27*, 728 F.3d 354, 363–64 (4th Cir. 2013); *PrimeTime 24 Joint Venture v. NBC, Inc.*, 219 F.3d 92, 100–01 (2d Cir. 2000); *USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council, AFL-CIO*, 31 F.3d 800, 810–11 (9th Cir. 1994).

*Genomics*, 2025 WL 326752, at *7 (Burke, J.); *Indivior Inc. v. Dr. Reddy's Lab'ys. S.A.*, 2020 WL 4932547, at *7–9 (D.N.J. Aug. 24, 2020).

Nielsen claims prior cases applying the more flexible serial petitioning standard are "nothing like this case." (Mot. at 20–21.) But the Third Circuit in *Hanover* applied the standard to four lawsuits. *Hanover*, 806 F.3d at 181. Here, Nielsen has brought five against TVision and twelve total. (¶¶89–179.) None of Nielsen's cited cases negate the sufficiency of those numbers. *See Applera Corp. v. MJ Research, Inc.*, 303 F. Supp. 2d 130, 133–34 (D. Conn. 2004) (finding series standard inapplicable with only "one lawsuit at issue"); *USS-POSCO*, 31 F.3d at 811 (analyzing serial litigator's success rate without setting a required minimum number of suits for a series).

Nielsen claims to have an undefeated "win-loss percentage." (Mot. at 25.) Far from running the table, Nielsen has yet to notch a single victory. As discussed below, for example, *see infra* Sec. III.B, Nielsen implausibly counts as a "win" the '189 and '120 case it *voluntarily dismissed* after a delinquent pre-suit investigation. (¶¶107–112.) And TVision alleges it settled the '030 case because a minor design-around cost less than invalidating the facially invalid patent. (¶¶173–175.) In any case, TVision's serial litigation theory does not rise or fall on the outcome of any one suit. *Hanover*, 806 F.3d at 180 ("[E]ven if a small number of the petitions turn out to have some objective merit, that should not automatically immunize defendants from liability.").

As noted, on top of the five cases filed against TVision, Nielsen has serially filed suits "against other companies critical to TVision's ability to compete." (¶¶87–102.) Nielsen sued TVision and HyphaMetrics on the same day, targeting its two rivals that collect and analyze panel data. (¶¶88, 107.) [12] Nielsen then sued ACRCloud, the provider of the automatic content

---

[12] *See The Nielsen Co. (US), LLC v. HyphaMetrics, Inc.*, C.A. No. 21-1591-CJB (D. Del. filed Nov. 10, 2021). Nielsen voluntarily dismissed its first case against HyphaMetrics and filed a

recognition technology in TVision's in-home meter, and twice sued VideoAmp, which licenses TVision's panel data to compete with Nielsen. (¶¶97–102.) But "***Nielsen has not been successful in a single case that has reached judgment.***" (¶89.) Nielsen has been dealt "five findings of non-infringement, two findings of invalidity, and a finding of unpatentability," including a jury finding of non-infringement in favor of HyphaMetrics. (¶¶95–96.)

Under *Hanover*'s holistic review, these suits provide additional evidence of Nielsen's efforts to weaponize litigation against rivals. And the losses continue. On February 12, 2026, Magistrate Judge Tennyson recommended dismissal of Nielsen's second patent suit against VideoAmp, finding the patent was directed toward ineligible subject matter under 35 U.S.C. § 101. *The Nielsen Company (US), LLC v. VideoAmp, Inc.*, C.A. No. 25-408-RGA (D. Del.), D.I. 20.

Nielsen incorrectly argues that *Wellbutrin* held TVision cannot "rely on litigations against other parties." (Mot. at 21 n.16.) In *Wellbutrin*, the Third Circuit held only that the series exception does not apply in the heavily regulated Hatch-Waxman context. *Wellbutrin*, 868 F.3d at 157–58. In fact, courts have expressly held that "sham litigation need not name the targeted competitor as a part[y]; the focus is not on the parties but on whether the actions were 'brought for the purpose of injuring a market rival.'" *ADP, LLC v. Ultimate Software Grp., Inc.*, 2018 WL 1151713, at *3 (D.N.J. Mar. 5, 2018) (citation omitted) (collecting cases); s*ee also Bayer Healthcare LLC v. Second Stone Enters. LLC*, 2025 WL 1531237, at *3–5 (D.N.J. May 29, 2025) (crediting five lawsuits, including four suits against third-party sellers, as a well-pleaded serial litigation theory).[13] Here, TVision alleges Nielsen's suits against ACRCloud and VideoAmp were brought

---

redacted notice of dismissal. (*Id.* at D.I. 174.) Nielsen later subjected HyphaMetrics to additional patent litigation, which concluded in a jury verdict of non-infringement. (¶96.)

[13] *Intell. Ventures*, from outside the Third Circuit, cited at Mot. at 21 n.16, is distinguishable because there were only two suits filed against the counterclaimant Capital One, and the

19

for the purpose of disrupting TVision's business relationships and injuring TVision. (¶88.)

TVision easily satisfies *Hanover's* "holistic review" for stating a claim based on Nielsen's serial litigation. As the counterclaims allege, the "magnitude and nature of the collateral harm" from Nielsen's serial litigation campaign is severe. *Hanover*, 806 F.3d at 181. Nielsen's campaign has disrupted TVision's business relationships with existing customers and suppliers while deterring prospective ones "who fear associating with a company that has become a target of Nielsen." (¶184.) Nielsen's bad faith is further manifested by its knowing assertion of the fraudulently obtained '243 patent against TVision. (¶119.) The suits have drained TVision's resources and interfered with TVision's ability to attract investment. (¶¶106, 111, 115, 184–185.) As a result, TVision has had to delay plans to expand its panel and improve its offerings that pose a competitive threat to Nielsen. (¶¶37, 184–185.)

### B.    Alternatively, TVision Plausibly Alleges Each Nielsen Suit is Objectively Baseless and Subjectively Motivated by Anticompetitive Intent

Even if Nielsen's five patent suits against TVision were not considered as a series, TVision has plausibly alleged each suit standing alone is a sham, as each was objectively baseless and subjectively motivated by anticompetitive intent. (¶¶103–179.) Nielsen does not contest the adequacy of TVision's allegations on the subjective motivation prong of the sham litigation exception. (*See* Mot. at 21.) A suit is objectively baseless when "no reasonable litigant could realistically expect success on the merits" at the time of filing suit. *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 50 (1993). Whether a patent suit is objectively baseless "often … involves complex questions of fact that are just not suitable for resolution at the pleading stage." *10x Genomics*, 2025 WL 326752, at *8 (Burke, J.). Nielsen's

---

disregarded lawsuits against its competitor banks had "no bearing" on Capital One. *Intell. Ventures I LLC v. Cap. One Fin. Corp.*, 280 F. Supp. 3d 691, 712–13 (D. Md. 2017).

self-serving factual characterizations of the proceedings in the underlying suits prove as much and should not be credited. *See Azurity Pharms., Inc. v. Bionpharma Inc.*, 650 F. Supp. 3d 269, 279 (D. Del. 2023) ("Whether these [litigation] events show that [the] lawsuits were not objectively baseless is a factual question that cannot be resolved on a motion to dismiss."); *In re Wellbutrin SR Antitrust Litig.*, 2006 WL 616292, at *7 (E.D. Pa. Mar. 9, 2006) (Defendant "cannot invoke the record in the underlying infringement actions to challenge factual allegations in the Complaints.").

1.  Sham Suit No. 1: the '189 and '120 patent suit (C.A. No. 21-1592-CJB)

In the first suit against TVision, "Nielsen was willfully delinquent in its pre-suit analysis" and knew it was "unable to articulate any infringement theory" at the time it filed the suit, which culminated in voluntary dismissal. (¶¶105, 107–112.) Nielsen did not analyze the hardware or publicly available components in TVision's in-home meter. (¶¶108, 110.) Instead, it based its allegations on "exemplary embodiments in the specification of a TVision patent application, with no credible allegations asserting this exemplary embodiment was practiced in the accused TVision product[]." (¶108.) This is sufficient to plausibly allege the suit was objectively baseless. *See In re Gabapentin Pat. Litig.*, 649 F. Supp. 2d 340, 364 (D.N.J. 2009) (finding allegations of failure to examine accused products before filing suit stated sham claim); *Hoffman-La Roche Inc. v. Genpharm Inc.*, 50 F. Supp. 2d 367, 380 (D.N.J. 1999) (suit is objectively baseless where plaintiffs did not undertake "a reasonable investigation before filing suit").

Nielsen voluntarily dismissed its claims on the '120 patent before this Court ruled on TVision's motion to dismiss under Section 101. (¶109.) Nielsen later dismissed its claims on the '189 patent as well, but not before TVision bore the burden of litigating against Nielsen for two

years. (¶¶110–112.)[14] That Nielsen's claims on the '189 patent survived a motion to dismiss does not establish their merit. This Court denied TVision's motion to dismiss because it failed to carry its "burden to articulate an abstract idea that correctly characteriz[ed] the claim at issue," not because Nielsen's claims were meritorious. (C.A. No. 21-1592-CJB, D.I. 47 at 8–9.); *see also Miller Indus. Towing Equip. Inc. v. NRC Indus.*, 659 F. Supp. 3d 451, 464 (D.N.J. 2023) (finding counterclaims stated sham claim despite infringement claims surviving motion to dismiss).

2.   Sham Suit No. 2: the '889 patent suit (C.A. No. 22-57-CJB)

Nielsen's second suit has "survived for more than three years," (Mot. at 22), only because Nielsen abandoned its original infringement theory after admitting "the heart of [its] allegations of infringement" relied on a "significant error." (¶¶105, 113–117.) Nielsen petitioned the Court to reopen expert discovery and allow it to assert a new infringement theory, a concession that its original theory had no chance of success. (¶¶116–117.) Its replacement theory is "on no firmer ground," and the fact that Nielsen withdrew an identical claim against ACRCloud, the supplier of the software at issue, shows that "the target was TVision, and Nielsen's goal was solely to have another suit with which to harass and impose significant costs on TVision." (¶¶115–116.)

*Akamai Technologies* involved only a factual determination that the mistaken infringement theory asserted in discovery, which the patentee itself identified "with the help of its expert witness," did not support an exceptional case finding under 35 U.S.C. § 285. *Akamai Techs., Inc. v. MediaPointe, Inc.*, 2024 WL 1699352, at *2 (C.D. Cal. Apr. 10, 2024). *Akamai* does not hold that a mistaken infringement theory cannot plausibly support a sham litigation allegation at the pleading stage. Here, TVision alleges that Nielsen pressed its baseless infringement theory for

---

[14]   Nielsen asserts "the more plausible reason for a voluntary dismissal is simply that the parties reached an agreement." (Mot. at 22 n.18.) But the notice of voluntary dismissal and accompanying letter to the court make no mention of any settlement. (*See* C.A. No. 21-1592-CJB, D.I. 142, 143.)

months, despite TVision identifying the error early on, and TVision alleges Nielsen's new infringement theory is equally baseless. (¶116.)

        3.   <u>Sham Suit No. 3: the '243 patent suit (C.A. No. 22-1345-CJB)</u>

The day after the USPTO granted the '243 patent, Nielsen filed its third suit against TVision. (¶168.) TVision alleges "Nielsen knew at the time it filed the action that it had obtained the '243 patent fraudulently by concealing relevant and material prior art from the USPTO for the purpose of misleading the USPTO into granting the claims of the '243 patent." (¶119; *see also* ¶¶120–175); *see also C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1368 (Fed. Cir. 1998) ("Conduct prohibited under antitrust law includes bringing suit to enforce a patent with knowledge that the patent is invalid or not infringed, and the litigation is conducted for anti-competitive purposes."); *Abbott Lab'ys v. Teva Pharms. USA, Inc.*, 432 F. Supp. 2d 408, 427 (D. Del. 2006) (similar allegations sufficient to state a claim).

*Revlimid* is inapposite, as Nielsen relies on the portion dismissing a *Walker Process* fraud claim for insufficient allegations of specific intent to deceive the USPTO. (Mot. at 23–24 (citing *In re Revlimid & Thalomid Purchaser Antitrust Litig.*, 2024 WL 2861865, at *79 (D.N.J. June 6, 2024)).) But such allegations are not necessary to state a sham litigation claim. *See Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1072 (Fed. Cir. 1998) ("In contrast with a *Walker Process* claim, a patentee's activities in procuring the patent are not necessarily at issue. It is the bringing of the lawsuit that is subjectively and objectively baseless that must be proved."). Even so, TVision plausibly alleges Nielsen's specific intent to deceive the USPTO. (¶¶157–167.)

This Court's denial of Nielsen's motion to strike TVision's affirmative defense of inequitable conduct refutes Nielsen's claim that TVision's allegations are conclusory.[15] (Mot. at

---

[15]  (*See* C.A. No. 22-1345-CJB, D.I. 49.)

23.) Nielsen fares no better invoking the patent's purported presumption of validity. (*Id*.) That presumption does not apply in the sham context. *See Morton Grove Pharms., Inc. v. Par Pharm. Cos., Inc.*, 2006 WL 850873, at * 11 (N.D. Ill. Mar. 28, 2006). Regardless, *the '243 patent carries no presumption of validity at all*, because the PTAB determined the challenged claims are unpatentable based on prior art Nielsen intentionally withheld. (¶¶169–172.)

4. Sham Suit No. 4: the '030 patent suit (C.A. No. 23-1346-CJB)

Far from a "resounding Nielsen victory" (Mot. at 24), TVision's settlement of the '030 case is not dispositive of the suit's objective baselessness. *See FTC v. AbbVie Inc*, 976 F.3d 327, 367–68 (3d Cir. 2020) (affirming a settled suit was objectively baseless because "the record [was] clear that [antitrust plaintiff] did not settle because it doubted its litigation position"). "Parties often settle litigation for a variety of reasons independent of the merits of the claims," including to "limit their litigation costs." *FTC v. AbbVie Inc.*, 329 F. Supp. 3d 98, 123 (E.D. Pa. 2018). Even "frivolous lawsuits can be very costly to defend and to take to trial," especially where, as here, the serial litigator has "extensive resources." *Id.*[16]

TVision alleges that, although the patent was facially invalid under 35 U.S.C. § 103, TVision agreed to make a "minor design-around" in exchange for dismissal, which was "less expensive" than seeking invalidation through an IPR action and "seeking discovery on Nielsen's likely knowledge that such an obviously invalid patent never should have been issued in the first place." (¶¶106, 173–175.) TVision never "doubted its litigation position" and instead settled to

---

[16] *See also Bayer*, 2025 WL 1531237, at *3–5 (denying motion to dismiss serial petitioning counterclaim where the series included four settled suits); *EmblemHealth, Inc. v. Alexion Pharms., Inc.*, 2025 WL 3687761, at *10 (D. Mass. Dec. 19, 2025) ("[A] settlement alone is not dispositive on the issue of sham litigation at the motion to dismiss stage.").

24

stem the mounting costs of defending against Nielsen's serial patent suits. *AbbVie*, 976 F.3d at 367–68. These plausible allegations are sufficient to plead a sham lawsuit.

>5.  Sham Suit No. 5: the '642 patent suit (C.A. No. 25-575-CJB)

The '642 patent is directed toward a method of identifying an active streaming application on a TV or streaming device. (¶177.) TVision alleges "a reasonable litigant would understand that this patent is directed toward the ineligible subject matter of 'collecting information, analyzing it, and displaying certain results of the collection and analysis.'" (¶¶176–179.) The '642 patent suffers from the same Section 101 defect that Judge Andrews found fatal last year in Nielsen's first sham suit against VideoAmp. (¶¶177–178.) Nielsen's assertion of a patent with such an obvious legal defect after the *VideoAmp* decision shows TVision's sham allegations are plausible.

Finally, TVision's decision to pursue its Section 101 motion after the pleading stage does not render its sham litigation allegation implausible. TVision's withdrawal of its motion to dismiss had nothing to do with the merits of Nielsen's claims. Contrary to Nielsen's argument, TVision withdrew its motion to dismiss so it could timely file its antitrust counterclaims, and TVision will continue to assert the ineligibility of the '642 patent.

## CONCLUSION

For these reasons, TVision requests that the Court deny Nielsen's motion to dismiss. If the Court grants the motion in any capacity, TVision requests that the Court do so without prejudice and permit TVision to amend its counterclaims. *See, e.g.*, *10x Genomics*, 2025 WL 326752, at \*6 (Burke, J.) (permitting amendment).

OF COUNSEL:
Jason Xu
RIMÔN LAW P.C.
1990 K. Street, NW, Suite 420
Washington, DC 20006
(202) 470-2141

Eric C. Cohen
RIMÔN LAW P.C.
4030 Wake Forest Road, Suite 300
Raleigh, NC 27609
(984) 960-2860

Steig D. Olson
Sami H. Rashid
QUINN EMANUEL URQUHART
 & SULLIVAN LLP
295 Fifth Avenue
New York, NY 10016
(212) 849-7000

Patrick D. Curran
QUINN EMANUEL URQUHART
 & SULLIVAN LLP
11 Huntington Avenue, Suite 5200
Boston, MA 02199
(617) 712-7100

Adam B. Wolfson
QUINN EMANUEL URQUHART
 & SULLIVAN LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000

Benjamin D. Brown
Richard A. Koffman
Daniel McCuaig
COHEN MILSTEIN SELLERS
 & TOLL PLLC
1100 New York Ave NW, Suite 800
Washington, DC  20005
(202) 408-4600

Dated: February 24, 2026

/s/ Andrew E. Russell
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant/Counterclaimant
TVision Insights, Inc.*

26

## CERTIFICATE OF SERVICE

I hereby certify that on February 24, 2026, this document was served on the persons

listed below in the manner indicated:

**BY EMAIL:**

David E. Moore
Bindu A. Palapura
Andrew M. Moshos
Malisa C. Dang
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
(302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
amoshos@potteranderson.com
mdang@potteranderson.com

Steven Yovits
Jason P. Greenhut
Douglas Lewis
Matthew Kennison
KELLEY DRYE & WARREN LLP
333 West Wacker Drive
Chicago, IL 60606
(312) 857-7070
syovits@kelleydrye.com
jgreenhut@kelleydrye.com
dlewis@kelleydrye.com
mkennison@kelleydrye.com

*/s/ Andrew E. Russell*
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant/Counterclaim*
*Plaintiff TVision Insights, Inc.*