IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NIELSEN COMPANY (US), LLC, | ) | |
| Plaintiff, | ) | C.A. No. 25-575-CJB |
| v. | ) | |
| TVISION INSIGHTS, INC., | ) | |
| Defendant. | ) | |

Monday, May 4, 2026
1:00 p.m.
Video Conference

844 King Street
Wilmington, Delaware

BEFORE: THE HONORABLE CHRISTOPHER J. BURKE
United States Magistrate Judge

APPEARANCES:

POTTER ANDERSON & CORROON
BY: ANDREW MOSHOS, ESQ.

-and-

KELLEY DRYE & WARREN LLP
BY: MATTHEW KENNISON, ESQ.

Counsel for the Plaintiff

APPEARANCES CONTINUED:

SHAW KELLER
BY: ANDREW RUSSELL, ESQ.

-and-

QUINN EMANUEL URQUHART & SULLIVAN, LLP
BY: STEIG D. OLSON, ESQ.
BY: ANDREW FAISMAN, ESQ.
BY: SZYMON BARNAS, ESQ.

-and-

COHEN MILSTEIN SELLERS & TOLL
BY: RICHARD KOFFMAN, ESQ.
BY: ALEXANDER NORONHA, ESQ.
BY: GRACE CHOI, ESQ.

Counsel for the Defendant

\- - - - - - - - - -

P R O C E E D I N G S

(Proceedings commenced via video conference beginning at 1:00 p.m.)

**THE COURT:** Good afternoon, everybody. Let's go on the record, and as we do, let me say a few things for the record. The first is that we are here today by way of a video conference in the matter of Nielsen Company (US) LLC versus TVision Insights, Inc. It's Civil Action

Number 25-575-CJB here in our court.

We are here today for argument on some discovery disputes that have been raised by the defendant's side.

So before we go further, let's have counsel on our call identify themselves for the record. We'll start, first, with counsel for the plaintiff's side. We will begin with Delaware counsel. I'll ask Delaware counsel to introduce all their colleagues on the call.

**MR. MOSHOS:** Good afternoon, Your Honor. This is Andrew Moshos from Potter Anderson & Corroon on behalf of the plaintiff, the Nielsen Company (US) LLC, and I'm joined by cocounsel from Kelley Drye & Warren LLP, Mr. Matthew Kennison.

And with the court's permission Mr. Kennison will be arguing on behalf of Nielsen this afternoon.

**THE COURT:** Okay. Great.

And let me do the same for counsel for the defendant's side. Again, we'll begin with Delaware counsel, and I will ask Delaware counsel to identify each of the folks on the line for them.

**MR. RUSSELL:** Good afternoon, Your Honor. This is Andrew Russell from Shaw Keller for the defendant TVision. And with me on the line are my cocounsel, Steig Olson, Andrew Faisman and Szymon Barnas of Quinn Emanuel,

as well as Richard Koffman, Alexander Noronha and Grace Choi of Cohen Milstein. Ms. Choi and Mr. Barnas will be handling the argument today.

**THE COURT:** Okay. Got it. All right. Sounds good.

So, Counsel, just to set the table. As the parties know, there were kind of three separate issues that were raised by defendant in their letter.

The first is a custodian dispute with regard to Mr. Kenny and Mr. Rao. The second relates to a dispute about production of contractual-related documents. The third has to do with a dispute related to production of documents regarding alleged sham lawsuits.

So it will just be easiest for me if we take them one at a time. So we'll hear some argument on Issue 1 from the movant's side and then from the other side, the plaintiff, and then I will give brief chance or rebuttal and then we will move on to Issue 2 and then Issue 3.

That way, we don't have to kind of keep arguments in our head about all three issues before we get to counter arguments, et cetera. Okay.

So with that, let's start with Issue 1, and start, first, with defendant's counsel.

Who is going to take Issue 1 up for defendant's side?

**MS. CHOI:** Good afternoon, Your Honor. Grace Choi from Cohen Milstein Sellers & Toll for counter plaintiff TVision Insights, Inc.

I will be addressing the first discovery dispute related to the custodians.

**THE COURT:** Okay. Ms. Choi, maybe to just kind of help get us started and move us along, can you help me understand, you know, the default standard in our court kind of sets some presumptive guidelines for how many custodians a side to do ESI searching for, typically the default standard says it's ten.

From looking at the docs, I don't know if this is really like spelled out in the letters, but I think what's -- looking, it kind of seems like maybe the parties agreed that as it relates to the antitrust portion of the case, which our dispute relates to, it would be eight custodians identified by the plaintiff; is that right?

Because what I'm really trying to figure out is is the request that Mr. Rao and Mr. Kenny be added as custodians, is that a request that adds more custodians than the presumptive number that the default standard would set?

**MS. CHOI:** Your Honor, so no, we are not seeking to add more custodians beyond the ten permitted under the default standard.

As Your Honor will see, parties have agreed to eight custodians for the entire case in the 575 case. TVision here is seeking to add Karthik Rao and David Kenny as two custodians, in addition to the eight agreed-upon custodians, to round out the ten permitted under the default standard.

So if Your Honor looks at Exhibit D, our understanding is that Nielsen is taking a contrary position in their opposition brief by treating the replacement custodians as the dependent custodians. As you will see, Nielsen agreed to provide the documents for four replacement custodians for the very limited period of time that they assumed the responsibilities of three already agreed-upon custodians. And our --

**THE COURT:** So just let me jump in to make sure I'm following.

So the bottom line, when it comes to this litigation, meaning the 575 case, the one we are talking about, your view is, look, this is civil litigation matter, so the presumptive limit that the default limit would set is that there's ten plaintiff custodians that they are going to search ESI for, and it's not like the plaintiff picked ten, and now you are asking for numbers 11 and 12; i.e., you are asking for more than the ten presumptive. Your view is plaintiff picked eight and

you're fighting about the last two of the ten, which you want to be these two folks, Kenny and Rao. And then kind of like a footnote, with regard to the other eight, see what happened was some of those people left these jobs before the end of the relevant time period, and so since it wouldn't be fair for like a party to say, like, well, I'm going to designate Custodian Number 1, except they left the job shortly after all this stuff started happening, the parties kind of agreed that like the other four people that you are talking about are kind of the replacements for those first eight. They are not like nine, ten, 11, and 12.

Is that what you are saying?

**MS. CHOI:** That's correct, Your Honor.

**THE COURT:** Whether the plaintiff sees it that way or not, who knows, but that's the way you see it?

**MS. CHOI:** Yes, that's right.

**THE COURT:** But I guess like I ask this because I think in the letters, the parties -- there's some confusing backs and forths about like whose got the burden and what burden is it as to what, you know.

I think it can get a little confusing when it comes to these kinds of issues. But I think some of the reason why this might be relevant, tell me if you think this is right, is that as an initial matter, say it were

the case that it was like very straightforward and clear that plaintiff had identified ten custodians and among those ten was not Mr. Kenny or Mr. Rao. And then you guys said, well, we think you should add on 11 and 12, these two people, then because the default standard has kind of a presumptive ten, in that scenario, if that were the scenario -- I'm not saying it is -- if it were, wouldn't there kind of be a burden on you to demonstrate good cause for why there's more than the presumptive ten permitted?

**MS. CHOI:** That's correct, Your Honor. If we were in fact seeking to add on 11, 12, 13, 14, beyond the initial ten custodians, it would be our burden to show good cause that we met that standard to show that these additional custodians should be included, but as Your Honor mentioned, at this point, we've agreed upon eight, and Nielsen has not provided an extra -- they have not suggested two more custodians or five or six that might have more relevant documents than our proposed custodians, Mr. Kenny and Mr. Rao.

Because at this point, we are only looking to fill out the ten initial custodians, as provided under the default standard, we believe the burden is actually on Nielsen to show that, you know, if there's any sort of uniqueness issue or there's any other burden issue for them to be able to articulate that on their end.

**THE COURT:** Okay. So like in another world where it was like, look, it is clear you get ten under the default standard, and they only picked eight, and they said sorry, we only have eight, it's just eight, that's it. And if you were saying you should add Kenny and --

By the way, is the other gentleman's name pronounced Rao?

**MS. CHOI:** Yes, Your Honor, Rao.

**THE COURT:** -- Mr. Kenny and Mr. Rao. If you said they should add on the Kenny and Rao, that analysis as to whether they should, I think you would say, look, we are not trying to overcome a good cause barrier under the default standard because they haven't gotten to ten yet. That's out of the window. So all we'd really have to demonstrate with any other type of discovery is there was relevant discovery --

**MS. CHOI:** Yes.

**THE COURT:** -- to be expected. Is that your view?

**MS. CHOI:** Yes, Your Honor. That is our view.

**THE COURT:** Okay. And then, you know, they throw out, the plaintiff's side, throws out some other kind of standards, like maybe there's some very heavy burden that you have to meet or that you have to make some kind of manifestly unreasonable showing citing case law

outside of our district.

What's your view about if there's some other kind of standard, some very heavy burden standard, some manifest unreasonable standard? Where are they getting that? Why don't you think that's right, et cetera?

**MS. CHOI:** Sure, Your Honor.

So with respect to the cases that opposing counsel cites, they are from the District of New Jersey, the Northern District of Illinois. We believe that those cases are inapposite and do not apply here because those districts do not apply the default standard that is very specific to the District of Delaware.

I will note that there is the Northern District of Illinois are factually very different. For example, they are -- there had been an initial production; there had been an initial selection, and then the parties sought to add in four more custodians after the initial custodians had been sent, had been set. Based on the initial production, the Court noticed and saw that the CEO that was being requested in addition had, actually, you know, there were like 500, half the documents were just sort of rote documents that had very little involvement with the CEO. Because those were the types of documents that the initial production had shown, the Court found, you know, we really don't think this additional custodian,

you know, as a CEO, is really relevant to the claims in the case.

Here, party has cited one District of Delaware case. I believe it is a *Frontier Communications*. In that case, the party had requested an additional 28 custodians beyond the initial set of custodians. And so that, of course, triggered the good cause standard, which we do not believe apply here because we are only seeking to fill out the initial ten.

So I think our position is that many of the out-of-district cases that Nielsen's counsel cites are inapplicable because of the factual differences but also because they don't have the default standard the Court applies here.

**THE COURT:** Maybe what those cases are doing say look, you know, the rules of those courts provided for X, and if you want more you have to show, you know, a very heavy burden, manifest unreasonable. Maybe that's not all that different from the reality that could be in play here, if you had a default standard that has a presumptive ten, and you want more, you've got to show good cause, you know, maybe the good cause showing isn't that different from whatever those courts are applying there.

Your point is we are not even at that point yet, where we are looking at good cause because we haven't

filled out our first ten; is that right?

**MS. CHOI:** That's correct, Your Honor.

**THE COURT:** On that front, is it your view that what Nielsen did is they just said we are only do doing eight, like, you know, in other words, when I go to the Nielsen in a second, are they going to tell me, no, Judge, what are you talking about? We have the eight that we all agree on, and we wouldn't put Kenny and Rao as nine and ten; we would put Jones and Smith. We are happy to do ten and, frankly, forget about the other four people that are follow on, you know, like we get to pick ten, and we just don't think, you know, Kenny and Rao should be in it, you know, two other people. They haven't said that; that's not what's happening here; is that right?

**MS. CHOI:** No, Your Honor. And so I'd like to -- I think Exhibit D, Page 2, Nielsen's February 26 letter provides clarity and why we understood Nielsen's position to be we would be allowed to seek the ten under the default standard is because in the conversation with respect to the replacement custodians, they stated we agreed to replacement custodians on top of those that are agreed upon under the default standard.

Our interpretation of that statement was that we would be permitted to pursue the ten that is already allowed under the default standard, and that we would have

replacements as a separate conversation. The point is that it would not be that Nielsen would only propose eight and that would be the end. It was that we would propose ten.

**THE COURT:** Okay. This reminds me, by the way, just to say the defendant had a number of exhibits attached to their original letter, D.I. 75.

For whatever reason like maybe the first of those, they highlighted the relevant portion of the exhibit, like I ask parties to do in my guidelines, which I cite in our order setting the conference. The rest of docs, unless I'm missing something, I don't think any of them are highlighted at the relevant portions.

Again, reminding counsel that when we have discovery disputes, every time we set a dispute, I will point out my guidelines that apply. One of those guidelines is if you use a bunch of exhibits, please highlight the portions of the exhibit that you would like me to look to. It makes it easier for me to find the relevant arguments.

If you don't do it, and I can't easily figure out where you are directing me, I may not be able to find that at all. Just reminding both sides about those guidelines.

Ms. Choi, back on the substance then, whatever

the burden, whoever has whatever burden, just in terms of the merits, what you are trying to demonstrate in your letters is we think that these folks will have relevant information, and whether we have to show it or we have to rebut their showing about cumulativeness, we are going to try to demonstrate to you that these folks are likely to have unique information, so that the other side can't say any information is cumulative of any of the other eight agreed-upon custodians.

Now, in their response, they do a pretty good job in their letter of pointing out each of the docs you cite to and explain, for example, that as to a number of them, even if the two custodians at issue are on them, so two are other of the eight agreed-upon custodians, making the point that, look, these docs would probably have been in the document collection from those other custodians as well. And to the extent you cited some docs demonstrating a back and forth between the defendant and Mr. Kenny and Mr. Rao, some other examples how those individuals engaged in, you know, one-on-one or unique interactions, and I think they say, look, those docs shows the defendant trying to get like really trying to get their attention and maybe not really succeeding, but, frankly, that's it. They'd say, look, that's the docs they gave you, Judge, docs that either have our other custodians listed on them

or docs that are basically all about the defendant making a couple of efforts to try to meet with our folks maybe didn't really work out too well; that's it.

So in light of that, how do you demonstrate that no, nevertheless, we have made sufficient showing that there's unique material that's likely to be in Mr. Kenny's or Mr. Rao's docs.

**MS. CHOI:** Sure, Your Honor.

I would like to start by kind of categorizing the different types of evidence that TVision has put forward to show Mr. Rao and Mr. Kenny's relevance.

First, we have a set of public statements that Nielsen has not actually responded to. And so those include the fact that Mr. Rao led the audience measurement business unit, which is the core unit in which TVision alleges engaged in anticompetitive practices. He led that unit until 2023, when he was then promoted as CEO, and after his promotion, Mr. Rao's former portion was left unfilled, which we believe underscores his unique responsibilities, as well as continued participation in the TV audience measurement services.

We've shown in Exhibit S, for example, as Nielsen's CEO, Mr. Rao solicited direct communication from clients saying, quote, I encourage you to reach out to me directly with any questions and concerns, which was during

the contractual dispute with Paramount that TVision cites directly in Paragraphs 82 to 83 of its antitrust counterclaims.

Additionally, David Kenny was CEO of Nielsen until 2023, and Nielsen's own proxy statement describes him as having met with over 100 CEOs. He was in charge of key contractual extensions and renewals, and during his tenureship under his leadership, Nielsen renewed every national TV contract that was up for renewal in 2019 alone with multi-year agreements and price escalators, which are, again, directly relevant to Paragraph 62 and 72 of our counterclaims.

So we believe that there are ample public statements that Nielsen, themselves, have provided that show the relevance of Mr. Rao and Mr. Kenny as not a high level managerial role, but in fact really in the weeds with these contract negotiations that go to the core of our counterclaims.

**THE COURT:** Not just in the weeds, but you are suggesting that there may well be communications that are potentially relevant that involve only them from the --

**MS. CHOI:** Yes.

**THE COURT:** -- Nielsen side?

**MS. CHOI:** Correct. I think we see that from the direct solicitation to reach out to me directly.

**THE COURT:** Okay. I will let you continue.

**MS. CHOI:** On the second half is a set of internal Nielsen documents. I just want to point out here that we were able to obtain these documents under the unique circumstances that we're in right now, given that there is a related set of patent litigation.

And so these were documents that we were able to obtain, despite the fact that Mr. Rao and Mr. Kenny were not the custodians, and the searches were not targeted toward antitrust issues, and yet we still believe that the documents, exhibits that we presented show one-on-one correspondences with Nielsen and its potential partners.

And so I think I will start off with I believe that Exhibit M and N are the ones that Nielsen points out. You know, it looks like they are just forwarding these things. It looks like an FYI.

But I would like to direct Your Honor, first, to Exhibit M. In that exhibit you have a VP of client services, Jesse Weinstein and asking Mr. Kenny specifically, you know, we have a conversation with [redacted] they haven't been getting back to us. Can you a please do, quote, top top outreach with [redacted] to reignite a second conversation that had gone silent since March and to open the door to a license.

And so we believe that these are the sorts of -- these are the sorts of correspondences internally within Nielsen, whereby a lower level SVP will reach out to Mr. Kenny and ask him, hey, we really need to reconnect with this client to negotiate contract terms, you know, look at our [redacted] that came out, trying to sell our products specifically related to the measurement market and to reignite that conversation.

And so at the end of the day, [redacted]. It was then forwarded to Deirdra Thomas, another custodian. The fact that this conversation was happening indicates that there is direct outreach to Mr. Kenny alone that suggests to us that there is highly relevant similar materials.

**THE COURT:** Let me summarize. Tell me if I've got this right. You know, like with a lot of top executives, is it likely there might have been, you know, CEO to CEO or high-level executive to high-level executive outreach that these folks are going to be prepped, docs from other, you know, company employees, including being prepped by or getting docs from even some of our custodians? Sure, but we think that the import of the doc like this, in terms of the unique issue is that it's indicating at some level, there's going to be, you know, top top outreach; there's going to be one-on-one outreach.

That's the point.

**MS. CHOI:** Yes, Your Honor. We think that's the point.

Also, it's not just Exhibit M, but also Exhibit N, you will see Mr. Kenny reached out to another VP of client services being like, hey, I am -- can you set up this call with this [redacted], who is an executive at [redacted] who does advertising. He knows he also sends a personal note to [redacted], who is also a [redacted], while also noting that he plans to visit, personally visit, [redacted], truly a key top top person at [redacted].

So there are all of these indications that Mr. Kenny was personally reaching out and making these conversations, and these are the sorts of one-on-one correspondences that we think are highly relevant to our counterclaims because they deal with the contractual negotiations and many of our claims are centered around the types of contractual negotiations that Mr. Rao and Mr. Kenny were involved in.

**THE COURT:** Ms. Choi, anything further on this first issue before I turn to your colleague on the other side?

**MS. CHOI:** No, not from me.

**THE COURT:** All right. Let me turn, then, to

plaintiff's counsel.

Mr. Kennison, are you taking these up for plaintiff's side?

**MR. KENNISON:** Yes, Your Honor. Thank you very much.

**THE COURT:** Mr. Kennison, maybe we can start where I started with your colleague on the other side, which is to ask what exactly is your view about who has the burden and why with regard to this dispute?

**MR. KENNISON:** Sure. Yeah, we have a completely contrary view.

When we made our disclosures, we disclosed ten custodians, and we split them across the patent and antitrust portion of the case five, five or really six, four because there's one, the director of pricing, that we thought would have relevant information for both sides of the claim.

And after that, TVision reached out to us and asked to have discussion about our custodians because they had identified others that they said were relevant custodians.

And so what ended up transpiring after that, which is not in the exhibits before you and is sort of lost, is that we did identify ten custodians. We entered into negotiations and discussions with them in good faith,

and, in fact, ended up subbing in several custodians that they identified, current and former Nielsen employees, at their request, and we also agreed to the eight, two split of the antitrust to patent portion.

And so that's how we got here. And so, you know, this idea that we've only identified eight, and that we, you know, didn't get to the entire ten is really sort of kind of punishing Nielsen for engaging with TVision in good faith on this issue and talking to them about custodians and going back and forth with them.

And so --

**THE COURT:** Can I ask you, I'm trying to make sure I understand. So the -- when we talk about the antitrust and patent portions of the case, are we talking about -- by "the case," are we talking about, I'm focused on, you know, the 575 civil action.

So for that civil action is what you are saying we, plaintiff, identified ten people for that civil action, the 575 civil action?

**MR. KENNISON:** Correct. That's right, Your Honor.

**THE COURT:** Is there a place -- maybe it's Exhibit C to their letter or somewhere else -- where I could locate like where are these ten people, presumably are not going include Mr. Kenny and Mr. Rao, where are

they listed? Is there someplace in the record?

**MR. KENNISON:** Not in the record before you, Your Honor. It started before that. But we identified them in our amended Paragraph 3 disclosures when we made them.

**THE COURT:** Maybe can I direct you to Exhibit D, Page 2, which may not get us all the way there. It will get us a lot of the way there.

So Exhibit D, on Page 2, I think that the eight people listed in Numbers 1 through 8 there are, at a minimum, what you would say are eight of the ten custodians, initial ten custodians.

Because we're not talking about, for now, the four people who you agreed to search for because they replaced people who were amongst the, you know, initial ten custodians.

But just for the record initial ten, tell me if I'm right, the eight listed are at least eight of them; is that right?

**MR. KENNISON:** Yes, Your Honor. That's right.

At this point, this is the letter dated February 26, 2026, these are through our discussions that had been happening in January and February that we had agreed to with -- that we had agreed to include in our initial ten.

**THE COURT:** Who are the other two people who were part of your initial ten custodians in the 525 case?

**MR. KENNISON:** There were several others that we included, including, I believe it was, Kim Miller and we also included Jamiee Foster, John Moulton, and Kevin Rini, which I don't think is in this. Yeah, Kevin Rini was also included in this initial ten that we proposed.

And at first when we talked about this with TVision, they agreed to include him as part of the ten, and then during our negotiations, they said we want to take Kevin Rini off, and we want to include David Kenny.

So Karthik Rao was one of the custodians they proposed that they wanted to discuss with us at first. David Kenny was not. And then after that, they said we'd like to take -- also discuss including Dave Kenny and take Kevin Rini off.

This was always a discussion back and forth with them about custodians, about the first ten custodians. So, now, what they are telling you is that, well, we didn't even get to ten. I mean, we were having discussions back and forth about this for January, February. And we agreed to several of what they asked for including not only, you know, multiple of -- most of the people that they asked for, but, also, the split, the eight-to-two split.

**THE COURT:** Okay. Again, if I'm trying to get my head around you guys on the plaintiff's side for this case, the 525 case, I think you are telling me we identified at least ten custodians that we believe had -- maybe you were suggesting you didn't have more than ten -- but at least ten that we thought these are the right ten. These are the people whose ESI should be searched. Is that what you are saying?

**MR. KENNISON:** Yes.

**THE COURT:** Of those ten, Kenny and Rao were not on them?

**MR. KENNISON:** That's correct. They were not on them.

Our view of that, Your Honor, is that the standard requires the ten custodians most likely to have discoverable information. Whatever TVision and Nielsen disagrees about, you know, the custodians that we, you know, discussed, I think what Nielsen's position is that these two just aren't among the most likely group. There are still others that we think are more likely to have discoverable information including at the more granular level. And --

**THE COURT:** If Ms. Choi is saying to me, no, no, they've only identified eight; they only identified eight, is your view of what she's saying that like she's

trying to dice this action, this 525 action, up into antitrust discovery or other discovery and calling it only eight or what is your view why we are having disconnect about whether these two people would be in addition to? It should be fairly straightforward. You know, are these in addition to ten people already disclosed, or are they not, less than ten been disclosed or in other words, be straightforward or apparently is not straightforward, what is your view about why we are having this disconnect?

**MR. KENNISON:** My view is that we are having this disconnect because we engaged in negotiations with them about the content of our first ten custodians; even though, we didn't have to. We could have given them the ten and said these are our ten. If you want more than that, then you to need to tell us good cause. We didn't do that. We engaged with them in good faith to try to streamline this and swapped in several custodians identified, and they said we want to include this person, this person, the person. We said, okay, we can include this person.

One of those people that they asked us to include in our ten was Karthik Rao at first. We said we don't think that is an appropriate custodians; we are not going to agree to that.

And then later on, they also said well, we want

to also include David Kenny. We said for similar reasons, we don't think that is an appropriate custodian.

So the eight that you see in front of you, Your Honor, are just eight that we've agreed to through our good faith negotiations. That's why there's a disconnect.

What we didn't do is just say here's ten; we are not negotiating with you about these ten. We tried to --

**THE COURT:** In addition to the eight that were agreed upon and in addition to the other four who are going to be like follow-on custodians relating to some of those eight, to the extent that some of those eight left the job before the end of our discovery period, you are also telling me, Judge, in this 525 action, we, plaintiff, are going to be serving for additional people's ESI, so you've got the four over here; you've got the eight, and there's more.

Do you know how many more there are that you are already going to be searching for?

**MR. KENNISON:** We have agreed to search these eight and those additional four, and TVision's request, while we were negotiating and while we were trying to work this dispute, we held off on identifying more or adding more custodians.

**THE COURT:** Maybe the extra -- to get you up to

ten, if we are not counting the other four, maybe because of the way this has gone, it's not like you are going to be affirmatively searching for even more people's stuff right now.

Your point is, look, it was just on us to name ten. We would have named ten already, and it wouldn't have included these two folks. So you can consider these two extra because they certainly wouldn't have been on our initial list of ten; is that right?

**MR. KENNISON:** That's correct. That's correct.

**THE COURT:** Okay. So say you're right that the right way to look at it is these folks you would be identifying ten people, these folks wouldn't be on them. So if they want more than ten, they should be demonstrating good cause, I guess; am I right so far?

**MR. KENNISON:** Yes, Your Honor.

**THE COURT:** All right. And on the merits, you know, I think it seems like whether or not they have a good cause burden to meet or whether we are going to typical discovery process, where the other side demonstrates relevance, and you have to come back and either explain why relevance showing is sufficient or whether there are other Rule 26 concerns like cumulativeness, that impact the analysis, one way or the other, the issue of cumulativeness is coming up because

you are asserting, I think, your main assertion is, look, to the extent that Mr. Kenny and Mr. Rao might have some relevant docs, they would be cumulative documents that are otherwise going to be likely in the production of some of the other eight custodians. Is that kind of the thrust of your key response?

**MR. KENNISON:** Yes, Your Honor. That's right.

I mean, the two internal documents or three internal documents, rather, that they have identified, internal Nielsen documents, all include one or more of our other custodians.

So we think, you know, on multiple occasions because of this issue, we proposed that what we think is a sensible compromise to sort of table this dispute until after Nielsen makes its production from the agreed custodians, and that was the approach that was taken in that Fort Worth employees case we mentioned, where the Court declined to add certain custodians, but said that after initial production at a later time, you know, we can see if that's warranted and the parties can discuss that.

At this point, what they've identified are kind of high-level involvement in public documents including, you know, add exchange or articles and proxy statements and then three internal Nielsen documents that show that they don't have documents that the other custodians aren't

going to have.

The Exhibit M that we were talking about, and Exhibit N shows that what's happening is that these discussions about contract negotiations, at least with these two documents, are going up and down the chain, and they are hitting our custodians.

Now, to the extent that that's not --

**THE COURT:** Well, let me jump in.

I certainly understand your point about, you know, tell me if this is what I think has happened. I want to get your take on what I think is Ms. Choi's real point though about the record, which is that say that I think you've done a good job about showing me the particular documents that the defendant has listed as exhibits in their discovery dispute motion. As to those documents, per se, you've done a good job in demonstrating why it is that those documents would likely be in the production of other custodians because we've done a good job on the plaintiff's side of showing why those e-mail chains, for example, were later involving one of our other eight custodians or why in the lead-up to the discussions of these e-mails that are like, for example, Exhibits M and N, it's clear that some of our other eight custodians are prepping Mr. Kenny or Mr. Rao or kind of like feeding them information, et cetera.

So say I think you've done a good job of that, but then Ms. Choi's larger point is really kind of as follows, look, in those documents and in some other documents we've shown, the key is that it's clear that these executives, at some point, at some level, are engaging in one-on-one discussions with the customers. They are touting it. They are talking about meetings that they are going to have at the executive for the other company's residence. They are putting in outreach or press releases that you can call me one on one, you know.

So the point she's making I think is separate and apart from these e-mail chains, it's a pretty clear from the record that Mr. Kenny and Mr. Rao were having one-on-one conversations with potential customers, and it's that uniqueness, uniqueness of those exchanges, for example, that demonstrate that they are not going to have just cumulative documents. Why is that line of argument wrong?

**MR. KENNISON:** Well, because even if -- so in the case of, you know, one-on-one meeting in person or on the phone, there's no indication there's going to be unique documents from those interactions.

Number 2, what these documents that they have provided are showing is that these contracting negotiations, Nielsen works as a team, and that there are

communications before and after and during, among this group, that evidences these contracting negotiations.

So I don't think it necessarily is the case that because there are these top top communications that there are just these secretive one on one, and they are only having these e-mail communications that don't then make it through these other custodians.

At this point, I think it's premature to conclude that. That's the point that, you know, going back to the compromise that we've proposed is that we should produce these documents from these custodians first.

And if there's something that is indicative that maybe there is a particular negotiation, I know counsel mentioned the Paramount negotiation, where there's Karthik Rao was having one on one, where there's no other custodians on it, we can do a targeted search and collection for those documents.

But, right now, what we're seeing is that these are team-based documents that the contracting negotiations occur with these other custodians included.

**THE COURT:** Lastly, on that Exhibit S of theirs, Mr. Rao encouraging clients, plural, to reach out to him directly with questions or concerns about plaintiff's approach to contracting.

That's not a pretty good doc for them to show that, yeah, it is pretty likely Mr. Rao is going to have communications, maybe not just verbal, with clients about issues that could be related to this case.

**MR. KENNISON:** Sure, Your Honor. I mean, it is essentially the same thing as that in this hypothetical where a client reaches out via e-mail, and there are documents between just the client and just Karthik Rao, you know, Mr. Rao needs to do something with that information, and the teams below him are the ones who are actually negotiating and doing the deals with the clients.

And so the chances that that document is not going to be forwarded or replied to or included with some others. I mean, you see it happening in these others documents. That's what's happening.

So, you know, again, we don't think that's enough that in and of itself is enough to justify making him a broad custodians.

**THE COURT:** Okay. Anything further, Mr. Kennison, on this first issue that you wanted to emphasize?

**MR. KENNISON:** No, Your Honor.

**THE COURT:** Okay. Ms. Choi, anything further on your end you want a brief rebuttal before Issue 2?

**MS. CHOI:** Yes, Your Honor.

First, I would just like to make a point that a default standard includes the ten most likely custodians to possess discoverable information. That is not just limited to documents. We believe that it's the information beyond just singular documents that Mr. Kenny and Mr. Rao have that would be relevant to our claims and --

**THE COURT:** Ms. Choi, on that front though, just to figure out the burden issue, I think what Mr. Kennison is saying is, like, listen, look, what we could have done here, we could have just given them a list of ten people for this case, but we didn't, you know. And if we did, frankly, you know, Mr. Kenny and Mr. Rao would not have been on that list. The defendant would be in the position in that world of saying, Judge, we need more than ten or, you know, and, you know, we maybe need to make a good cause showing, but we, the plaintiff, had tried to work things out. We tried to agree as best we could. We shouldn't be penalized for that, Judge. We did work out eight, but these last two, we could not.

Why wouldn't, if that's the true, why wouldn't that suggest that really asking for, quote, more than the default standard here?

**MS. CHOI:** Well, Your Honor, we believe that Mr. Kenny and Mr. Rao are our top two custodians. And so

because of their relevance in this case, this case is not just about lower level employees figuring intricacies of specific contract negotiations. These are really about contract policies and practices that are set at the top.

We believe as for the example shown through our exhibits, Mr. Kenny and Mr. Rao were the ones who are engaged in putting forth and applying the contractual policies that are set by the top top level.

And with respect to the various like forwarding, we believe that if -- to the extent that there are other custodians, again, Mr. Kenny and Mr. Rao were not custodians on the patent productions. And so of course there would be other custodians listed on those e-mails, and yet we still show that Mr. Kenny and Mr. Rao were the ones who were, themselves, negotiating these different contract issues and were the ones who were putting forth and applying the Nielsen policies.

And if there is any burden issue, Your Honor, we believe that, you know, this -- there is -- we use document review platform that will automatically de-dupe any duplicate documents. To the extent there is any burden, that will happen automatically.

We do not believe that there will be that much duplicate documents. There will be, in fact, a lot of different documents, and our exhibits are meant to show

exemplar examples of the types of correspondences and information Mr. Kenny and Mr. Rao will possess in their custodial files.

**THE COURT:** Okay. Anything further before we move on to Issue 2?

**MS. CHOI:** No, Your Honor.

**THE COURT:** Okay.

**MS. CHOI:** Thank you.

**THE COURT:** So Issue 2 is the defendant's request for certain contractual documents.

And who is going to be taking this one for the defendant's side?

**MR. BARNAS:** That's me, Your Honor.

Good afternoon. Szymon Barnas on behalf of TVision. I'm going to address the two RFPs in dispute.

**THE COURT:** Okay. Mr. Barnas, are you doing this one and the last one?

**MR. BARNAS:** Yes. I'm doing both RFPs.

**THE COURT:** Got it. Focusing on the Issue 2, so I think, first, let's try to figure out what is in dispute here or at issue.

And so in your opening letter, you know, on Pages 2 over to 3, you do talk about the types of docs you're looking for, and you have two categories. One is that you want the top 20 contracts by revenue in effect

over a nine-year period and then documents relating to negotiations of those contracts. But then you basically, when you start talking about like the dispute, and you should win, you really are focused on the contract issues, you know, how many contracts.

Like in the next paragraph -- there aren't that many paragraphs; there are only two, but you talk about how Nielsen has only offered to produce 20 contracts. And that doesn't seem right to you. It can't be unduly burdensome. They are contracts in this central repository. No real engagement in the other docs issue. It is about the contracts.

They respond, and of course, they are only talking contracts issue. 20 is fine, up to 180 is not fine. And then your reply; you come back and say, well, wait a second; don't forget about our second category of docs, which they didn't talk about, all these other documents relating to the contracts.

So are both sets of types of docs at issue in this dispute? And as to the second one, documents relating to negotiations of those contracts, back and forth would that help me decide the issue.

**MR. BARNAS:** Right, Your Honor. There's two categories of docs in dispute here, and the dispute is really how much of these two categories of documents

Nielsen should collect. Their offer has been to produce 20 contracts and the 20 renewal negotiations associated with those contracts.

So, yes, there's two discrete categories of documents in dispute here. And maybe I'll start with the final contracts.

**THE COURT:** Can I ask, though, about Category 2, I'm trying to understand in my mind what documents relating to negotiations of those contracts are. Because I think at one point, you said like, you know, those will show up in the custodial e-mails, you know, of plaintiff.

And I'm trying to like, for example, I am picturing in my mind say, for example, you lose and there's only 20 contracts that you get the right to.

Would documents relating to the negotiations of those 20 contracts be any documents like e-mails or backs and forths between anybody about Contract Number 1, you know, an e-mail from Nielsen to the other contracting party, vice versa or an e-mail between Nielsen people about that?

Is that what these other documents are about?

**MR. BARNAS:** Yes. The way we have constructed our compromise offer of the renewal negotiations are the back and forth between Nielsen and its customers. And we

have a targeted subset of that universe and precisely what we are asking for is the back and forth with customers.

**THE COURT:** I guess in terms of understanding the extent to which that kind of discovery would be larger or more than what you otherwise would be entitled to, like if the truth is there's only going to be so many ESI custodians, say there's only ten, and there's only so many search terms that are going to be used as to those custodian's documents, whatever it is, then, how would a grant to you of documents relating to the negotiations as to these contracts increase the amount of document discovery that you are getting?

Put differently, if you are only going to be getting ESI of ten custodians, using 20 search terms, I mean I wouldn't be adding to their burden, would I, by granting you this Tier 2 discovery or would I?

**MR. BARNAS:** Our position is that these back and forths with customers in renewal negotiations are so critical to our case, Your Honor, for a variety of reasons that we envision that this would be a targeted separate collection.

**THE COURT:** Okay. So like, you know, typically for ESI discovery -- again, say you weren't fighting about it and you could agree on ten custodians, and then, you know, say Nielsen comes forward and say okay, we have our

ten custodians and under the default standard, Judge, you know, we come forward to defend it, and we put forth, you know, our -- the amount of search terms that we are going to use on those custodians, those ten custodians, for the case, as the default standard says we should, and we also tell defendant that we are going to use these, you know, these ten search terms, and then the default standard, you know, says they get to put in ten of their own search terms. So now say we have 20 search terms we are going to use for these ten custodians. That's the way it would normally work.

Is what you are saying is like, yeah, we are going to do that, but if you grant us this discovery for Category 2 discovery, in addition to that, you are going to be able to get any communication regarding negotiations of the whatever number contracts you decide, Judge, that's additional discovery; is that right?

**MR. BARNAS:** That is our position, Your Honor, but we really are asking for just a reasonable search of a targeted subset of negotiations.

So it would be separate and apart from the designated custodians, but I will also add that a lot of documents in this targeted request would also be swept up in the designated custodians as well, and Nielsen has never articulated this burden argument. In fact, they

have offered to produce 20 renewal negotiations. It's just the fact that our view is that's just too few.

**THE COURT:** Okay. But I guess as to the second category, you know, like if I'm looking at this dispute, I might say to myself, well, look in Category 1, we're just talking about contracts, right. So, you know, in Nielsen's world, 20 contracts, or in TVision's world, you know, Nielsen says up to 180, but you say, look, it's going to be less than that. Say it's 100.

You know, by the way, do you have a number that you think is probably like around the number of contracts you are probably asking for here?

**MR. BARNAS:** We think it's going to be around 60 contracts, Your Honor, because the duration of Nielsen's contracts is typically five to seven years. So across a nine-year period, five to seven contracts is about 60 contracts.

**THE COURT:** Okay. Say we will take that as our guess. Say, you know, when I look at Category 1, I say well, we're talking about 20 docs or are we talking about 60 docs, you know. That seems pretty, you know, knowable.

But in Category 2, documents relating to negotiations of those contracts. Heck, this is for one contract, you know, how could I proceed? We could have lots and lots of documents relating to negotiations,

e-mails, backs and forths, drafts. You know, it doesn't take much thought to think could be getting pretty substantial here, in terms of burden.

If that's possible and if you really didn't discuss in your opening letter any of the specifics about that Category 2 request, how can I decide that one in your favor right now?

**MR. BARNAS:** Well, Nielsen's argument is that's disproportion to the case to search for these separate renewal documents.

Our position is they really do go to the core of the case. A lot of the contracting tactics that we allege in the counterclaim, they manifest themselves are on full display in these renewal negotiations, Your Honor.

And, again, what we mean by "renewal negotiations," it's a narrow targeted set. We are asking simply for Nielsen's back and forth with its customers. This is where a customer would say, for example, your data-use restrictions are too onerous, Nielsen. We can't use any other data provider in the market.

An e-mail like that is critical to our case, Your Honor. We are just asking for that customer back and forth and for a targeted subset of negotiations.

**THE COURT:** So like, for example, in 2017 say one of the top 20 contracts by rev who was with company

XYZ.

**MR. BARNAS:** Yes.

**THE COURT:** For Category 2 what you are saying is, look, if at some point in the discovery period, that contract with XYZ, that was one of the top 20 by revenue in 2017, came up for renewal, there must have been some back and forth with the customer about that. That --

**MR. BARNAS:** Yes.

**THE COURT:** -- would get that. That's what you are saying?

**MR. BARNAS:** The two categories should be kind of looked at separately, Your Honor.

On renewal negotiations, we are asking for Nielsen to go year by year and determine the top 20 contracts up for renewal each year, and we believe they can do that based on their internal documents and public filings. And then --

**THE COURT:** Oh, these are separate things?

**MR. BARNAS:** Right. Nielsen's compromised offer lumps them together, Your Honor. Nielsen is offering to produce 20 contracts, the top 20 contracts, and the negotiations underlying those top 20 contracts.

We think about it a little bit differently. We are asking for a little bit more. Twenty negotiations per year for a nine-year period.

That's our compromise offer. Your Honor, if you think that's too big of a set, we're willing to go down to the top ten renewal negotiations each year.

**THE COURT:** Have you told them that before or are you saying that for the first time right now?

**MR. BARNAS:** We are saying that for the first time right now to address your burden concerns, Your Honor.

**THE COURT:** Okay. I guess I just started to express it. Well, okay.

So just to make sure I understand, the Category 1 is the top 20 contracts by revenue for each year from 2017 to 2025.

Now if it turns out that some of those top 20 contracts by revenue in 2017 are also top 20 contracts by revenue in 2018, just, you know, that will reduce the total number. You think the total for that is going to be about 60 contracts.

But then separately, for each of the nine years, documents relating to negotiations of the top 20 contracts by revenue for each of those -- for renewal for each of those years. That Category 2 could be documents about maybe as many as 180 contracts, 20 per year for nine years that were the highest revenue contracts up for renewal.

**MR. BARNAS:** That's exactly right, Your Honor. That second category would encompass 180 unique negotiations. That's right.

**THE COURT:** Okay. All right. And then I guess the last question I had for you is about just, you know, the contracts issue, maybe the Category 1 issue, in general, relates to an argument they made, which is your own allegations seems to emphasize that their contracts have standard language in them.

You seem to make a point about that, make it clear that like the key language at issue in the case that is worrisome, don't assume, reader, that it's, you know, comes up once or twice. It is standard; it's there all the time.

So, you know, to their argument, if our contractual language is by and large standard, why do we need, you know, 60 or up to 180 contracts when the biggest 20 could do?

**MR. BARNAS:** This uniformity argument that misses the point. We don't -- we allege an array of contracting tactics.

For example, we allege that sometimes, in rare cases, Nielsen allows for a steep fee for customers to bypass that standard data use restriction.

So a contract, you know, that's amended and

shows those steep fees, that would not be the same across every single customer. And a lot of the other tactics, like blocking data, hiding data, those type of anticompetitive tactics also wouldn't be uniform across all the contracts; even though, nonetheless, they are anticompetitive practices.

**THE COURT:** In your pleading, when you say that customer contracts are essentially standardized, is that wrong?

**MR. BARNAS:** No, that's not wrong, Your Honor. What the data use restriction term is I think where Nielsen always starts its negotiations.

And some customers successfully push back by paying a steep fee. Some customers can't push back, and Nielsen dictates that term, and they are in the contracts.

But then stepping aside though, Your Honor, we do have to prove substantial foreclosure here of the market. And to prove that, out of 20 contracts is probably not enough. We are going to need more than 20 to prove up substantial foreclosure.

**THE COURT:** I guess maybe the question I'm asking, is the answer to the question I'm asking, Judge, look, yeah, I think like, in general, it's true from what we've seen or what we think, a lot of their contracts are pretty standardized. I bet it's going to be the case that

we get 20 contracts or 180, or whatever it is, very substantial portion of the language is going to be same. We said that. We didn't say because it's false. You know, we believe it. That's why we say things in our pleadings; we think they are true.

All that said, it's not as if they are entirely standardized. There are going to be some terms that differ. We have laid out in our pleading and otherwise in our allegation, a couple of key terms that aren't standardized like the upcharge that some clients have to engage in with the plaintiff if they want to be able to utilize, say, TVision's metrics along with plaintiffs.

So, yeah, mainly standardized, but not always and not always and not always in some important ways. Is that kind of what you are saying?

**MR. BARNAS:** That's exactly right. Anything from upcharge to the duration to the staggered end dates, all those things may differ in what otherwise may be a uniform contract. That's right.

**THE COURT:** And then if I were looking at the key proposals, I was like I don't know. I mean, look, essentially, the language is said to be the same. There may be certain differences. But do we need 180 or 60 or something in between? Why wouldn't we start with the 20 biggest revenue generators? They are also going to give

you some, according to them, information about their whole kind of contractual sphere, which presumably would allow you to be like we got 20, but 20 of what, 20 of what kind of sphere? Maybe there would be some allowance for you to come back and say, you know, well, 20, we've got 20, and now we'd like additional no more than blank, which we get to pick.

How many come something like that couldn't work?

**MR. BARNAS:** I think we would be amenable to that, Your Honor, if you are just talking about the contract piece. Because, again, the renewal negotiations, that's where the customers are identifying the onerous terms, and that critical back and forth wouldn't manifest itself in data or the contracts.

**THE COURT:** Okay. All right. Mr. Barnas, anything further about the second issue that you want to add?

**MR. BARNAS:** No, Your Honor.

**THE COURT:** Let me turn to plaintiff's counsel. Mr. Kennison, I think you are taking all these for the plaintiff.

So what say you about this second category of documents? You didn't address it in your letter, I don't think, at all. How and what do I do with it if that's the

case?

**MR. KENNISON:** I think the idea is that this is the proportionality argument here is that we have identified the 20 top clients for Nielsen in the television audience measurement segment, so not audio or any of the other segments that Nielsen deals with.

That accounts for 72 percent, according to what I understand from the client, of total revenue for that business segment. And we have agreed to produce negotiation documents about those contracts and those renewals over the relevant time period.

**THE COURT:** Let me pause you there to make sure I'm following you. Are you saying, look, Judge, on this Category 2 discovery, we are not fighting in total. We are going to allow, when we get to the right number of contracts at issue in Category 1, that is, you know, the right number in our view of contracts by revenue in effect for the entire time period, we are going to give top 20.

For Category 2, we are saying if there's any renewals of those in the time period, we'll give you documents relating to those renewals. I guess, documents relating to the renewals of no more than those 20; is that right?

**MR. KENNISON:** Of those 20 clients, that's right, Your Honor and --

**THE COURT:** Would they all have been renewed or is it possible that like some of the 20 contracts that you identify actually only 16 of them went under renewal in the period?

**MR. KENNISON:** No. My best representation about what I know right now, Your Honor, is that they all would have been renewed in this nine or ten year time period at least once, probably more.

**THE COURT:** I cut you off. Let me let you continue.

**MR. KENNISON:** That's position one. And, you know, on this first category, this first bucket of documents, or about this dispute, I'm sorry, is, you know, Your Honor identified that these are standardized contracts, at least use restriction language that's identified in the complaint is specific to a certain type of data that Nielsen makes available to its customers.

And on top of that, you know, as we said, these top 20 contracts that we agreed to pull and produce, which as we've put in our letter is not an easy task, not withstanding the fact that they live in a repository. It's an antiquated --

**THE COURT:** Can I ask about that, Mr. Kennison. Define -- because I think that the declaration and this repository issue is talking about the contracts

themselves, right? That repository is not housing document related to negotiations for renewal of those contracts, is it?

**MR. KENNISON:** Not in the main, Your Honor. There might be a cover e-mail that, you know, sends the signed contract with certain contracts, but, no, like it should not generally, as I understand it, have the actual negotiations. Those should be captured through the custodian e-mail.

**THE COURT:** So if that's true then, like if we're just talking about finding the contracts if your proposal is for 20, I mean that shouldn't take you any time at all, right, no matter how many?

**MR. KENNISON:** Well, yeah. You would think, except, Your Honor, that it was -- it's not a very easy task, and here's why. There's a few reasons.

First, the database itself is not easily searched. The contracts are also interspersed with different types of business unit contracts. And what happens is that there are, for example, the [redacted] contract. [redacted] has, you know, 15 subsidiary or other networks below it, including like [redacted], for example, and each one will have separate renewals and separate amendments all throughout the period.

And so identifying those different contracts is

not a straightforward task. You have to identify each contract number and then search by that contract number as I understand it and then look at them to verify this is what that contract is.

And so --

**THE COURT:** Would that mean what you are saying is that for Nielsen, right, the Nielsen company, as to like its audience measurement services business, talking about 20 contracts that amount to 72 percent of its revenue, so like, essentially, almost all of its revenue, it's going to have major trouble getting ahold of the contracts. Like it just seems hard to believe that for a major company when you are talking about contracts making up 72 percent of its revenue, I don't know where these contracts are. It doesn't make sense to a layperson. You know, that in a big company like this couldn't find contracts that make up 72 percent of its revenue. How come that's so?

**MR. KENNISON:** I understand, Your Honor.

It's not that we don't know where they are. We know where they are. It's just pulling them in their entirety is difficult.

This is something that, you know, frankly, as company initiative to try to modernize some of these systems, it's underway. It is what it is. It's something

that's happened over the course of Nielsen's existence, and this is where the contracts were kept and still are kept.

**THE COURT:** Maybe this is a good thing, spurring needed innovation to be able to find these 72 percent of your revenue contracts.

In any event, so on the one hand, for this first category, we're fighting about number of contracts at issue. The second category is a slightly different dispute.

And, you know, I think you pointed to the standardized language that even they say is in many of your contracts. The other side has put up some examples of things they talked about that they haven't standardized. Right? Truly, it's the case that there must be some provisions, including provisions that might have something to do with this case, that could be different in these contracts; isn't that fair?

**MR. KENNISON:** Yes, Your Honor. That's why, you know, for example, the example that Mr. Barnas used, which was the fee for the upcharge for commingling, for example, the use data restrictions. We've already proposed a search term that gets at that across our custodians that we think will capture those documents, and, you know, assuming they are not privileged and that

they hit on these terms and are relevant or responsive to a request, we produce them.

And so, you know, we're trying to find a path here like that, but, for example, proposing search terms that get at some of these noncontractual clause issues that deal with the negotiations that will produce responsive documents, but, also, do so in a way that's proportional.

Our view of it is that we are giving you contracts of our top three quarters of our business, and if I understand that their position is that this is a substantial foreclosure case -- we don't think it is, but assuming that's what they think that this is -- then that should be more than sufficient to, at least as a starting point, to produce.

And, again, if at the end of producing those documents, they think that there's something more, we're happy to have those negotiations with them and see if there's some more targeted searches that we have to do or need to do.

**THE COURT:** Mr. Kennison, is there anything you want to say about the concept of -- so I think for you guys, on Category 2, the renewal documents are going to be documents associated with the renewal of the contracts in Category 1; whereas, I understand now for the other side,

those are separate things. The other side says they are asking for documents associated with renewals of the top 20 contracts by revenue that were up for renewal that year; i.e., equaling about 180.

How come the type of renewal documents that you are proposing in a more limited set makes more sense than what they are proposing?

**MR. KENNISON:** If what they are getting at is substantial foreclosure of the market, you know, we've proposed a population of documents of contracts of relationships that are in place right now between Nielsen and their customers and that have been renewed through out the period that account for 72 percent of that revenue of that market for Nielsen. That should be sufficient. That should be proportional to the needs of the case.

What they are talking about, instead, is taking the top ten -- sorry, the top 20 that are up each year and then categorize them by, you know, by revenue.

And so that just adds a whole lot of searching and reviewing and documents for what we don't think is a proportional need.

**THE COURT:** Now, I think you told me that in addition to giving them the documents that you've proposed, you would also be giving them some other information about your kind of entire kind of client span.

Look, we are going to provide a listing of all of our audience measurement customers, so beyond just the 20 that make up 72 percent of the revenue.

So what about a world in which, you know, you give them the documents you are proposing and then we were to say -- I mean, maybe you guys could agree. If you couldn't, I would help you. Look, the plaintiff could pick out, you gave us the 20 you wanted to give us, plaintiff, but we're going to select an additional blank, you know, from this list of total customers because we think maybe the blah, blah, blah customer over here is not one of the top 20, might be relevant to our case.

Is that something that could happen if there were -- if I thought there might be some additional need or why would that kind of an idea...

**MR. KENNISON:** We would be happy to entertain that, Your Honor, if that's the case.

**THE COURT:** Mr. Kennison, anything further on Issue 2?

**MR. KENNISON:** No, Your Honor. Thank you.

**THE COURT:** Mr. Barnas, anything further you want to say about Issue 2 before we go to our last issue?

**MR. BARNAS:** Yes, Your Honor. I wanted to briefly respond to the burden point here, especially with the outdated database.

And just really, first of all, though just to step back. Nielsen is proposing 20 contracts and negotiations over a nine-year period. We just don't think that's enough, Your Honor. And --

**THE COURT:** Even if it does cover almost 75 percent of its total revenue in this space over that period?

**MR. BARNAS:** Yes. We just don't think that number is enough. And on the burden --

**THE COURT:** I mean, how much closer could they get? What if 20 contracts equals 89 percent of its revenue or 92? At a certain point, you would need to make an argument about: Judge, look, it's not all about revenue like, you know, although I don't know. I think probably a decent amount of it is about revenue, right. But you would want to have an argument like, listen, it could be the case as to what might seem like a smaller customer, not one of those top 20, nevertheless blank, you know, is important to the case to the allegations.

You know, so help me understand why wouldn't the top 20, including 72 percent of all revenue in the space, be sufficient?

**MR. BARNAS:** Because along those lines, Your Honor, the bargaining power of certain Nielsen customers is going to be different. ABC is going to have different

power to push back on onerous terms than a smaller network or smaller streaming service.

Those negotiation dynamics, that bargaining power, that matters in an antitrust case. So it's more -- it's less of the revenue than more of just the number of contracts and the bargaining power between Nielsen and the customers.

And actually the declaration submitted, that Nielsen submitted, kind of cuts against burden. If I understand the declaration correctly, they have already collected the 20 contracts from the database. That's Paragraph 9 of their declaration, and it took them about -- they say it would take a month, if not longer, to collect 11,000 contracts. We are asking for 60. It would take less than a day to extract 60 contracts from that database. So we think that that declaration cuts against any burden argument.

**THE COURT:** Saying your wrong that you requested 60. Say it 180 or something in between. Could you live with 60? If 60 was the right number, how would I figure out what 60 they were?

**MR. BARNAS:** I think in practice, at least the number of contracts will turn out to be less than 180. That's a certainty, Your Honor. Because the contracts, if they are longer than a year duration, there's going to be

fewer than 180. We are comfortable we will get approximately 60 contracts from this exercise.

**THE COURT:** Okay. Why don't we cover Issue 3. We're over an hour now. I want to try to wrap up, if we can, at about an hour and a half.

Issue 3 has to do with documents relating to the allegations that the plaintiffs filed a number of sham lawsuits in the category.

So here, Mr. Barnas, what do you want to say about this issue? Obviously, I saw what's in the briefing. I don't want to rehash it.

What new did you want to add that maybe wasn't covered or fully captured in your mind in the briefing?

**MR. BARNAS:** Yes, Your Honor. On this RFP, Nielsen is outright refusing to produce anything based on our relevance objection.

And just maybe, first, stepping back, this is a monopolization case. In every monopolization case, with or without a serial litigation theory, which was litigated in the briefing, we have to prove not only harm to TVision, but also harm to the competition. The documents we're asking for on this RFP go to both harms.

If you take TVision for a simple example, TVision -- sorry, VideoAmp. Nielsen sued VideoAmp twice and lost. VideoAmp licensed TV's panel data, it

incorporates it into its products and directly competes with Nielsen.

So a simple example, there is a Nielsen e-mail that says, let's sue VideoAmp to send a message to the market. Nielsen is refusing to produce them in a monopolization case, even in a case where we have to prove harm to TVision and harm to competition overall.

So even without getting into the series exception, which I am happy to, it's clear these documents are relevant in this monopolization case.

I will even add on that point too, we have an attempted monopolization claim. That requires showing Nielsen's specific intent to monopolize the market.

If Nielsen has documents about its plan, its intent or its motive to harm any market participant, even if those documents don't refer to TVision, they are still critically relevant in this case.

**THE COURT:** Mr. Barnas, what I was asking to make arguments that you may not have fully come out in the briefing. I didn't mean to make new arguments that weren't referenced at all in the briefing. I was talking about laborers of what is in there, you know what I mean.

Some of the stuff you are saying now, fair to say maybe that's not fully captured in the briefing?

**MR. BARNAS:** Well, we open the section of this

brief -- for this section, Your Honor, we open it by saying: Nielsen has a market-wide sham litigation campaign to stifle competition.

So I mean that's the argument I am expounding on today that these document go to TVision and competition overall.

**THE COURT:** Okay. I mean, that's the top sentence, whole bunch of other words after that. Get down to the bottom of the page, those other words I think are about specific things, and then, similarly, your reply brief. You know, but understood.

Okay. Anything further about this last issue?

**MR. BARNAS:** No, Your Honor.

You know, I will rest on the papers on the serial litigation theory. These documents are relevant to both aspects of a serial litigation theory.

We disagree with Nielsen on them. We think Nielsen is wrong, but, again, the Court doesn't have to decide that issue to decide this discovery dispute because the documents are relevant in other more broader ways.

**THE COURT:** By the way, anything you want to say about how, you know, your firm supposedly took a different view about what the right answer is as to this series issue?

**MR. BARNAS:** The argument that Quinn Emanuel

made here and in *RealTech* are actually entirely consistent. In its brief, Nielsen quotes the exact rule we advocated for in *RealTech* and now we are advocating for here.

And the rule is you don't look at who is a named defendant in the any given sham lawsuit. You look at who was the targeted rival, and those allegations were messing in *RealTech*. Here, we have those allegations --

**THE COURT:** Even if the other piece of the litigation wasn't against the party? To the extent it can be articulated how the harm from that litigation was directed at the party, that's the key principle?

**MR. BARNAS:** That's absolutely correct, and that's a principle we advocated to here and in *RealTech*.

**THE COURT:** Fair enough.

Let me turn to Mr. Kennison. On this last issue, Mr. Kennison, I guess the question is reading your answering brief, you know, it seems to read more like, you know, Judge, if we win our motion to dismiss, we wouldn't have to deal with this issue or if the case were stayed, we wouldn't to deal with this issue.

Where we are right now, though, we have a schedule for proceeding; there is no stay yet granted. No claims have been dispensed.

How come this isn't relevant discovery being

sought to be produced?

**MR. KENNISON:** Well, because I think that it is one of the things that came out of the *Twombly* case and then later on or actually earlier -- I'm sorry.

The *Professional Real Estate* case is that -- that's the case that established the two-part sham litigation exception case, objective baselessness and subjective motivation.

I think the teaching of that case is to allow these types of broad and -- allegations to go to the second subjective motivation prong to let that proceed to discovery before the plaintiff has established objective baselessness is not the way that this should go.

And so I don't think that we're saying that, you know, you need to decide the motion to dismiss first before, you know, you can decide this issue.

I think what we are saying is that they are related issues and that what TVision is seeking is documents related to patent litigations against other companies that aren't them, and there's a couple of problems with that.

I mean so Number 1 is that, and this was just a recent case of the D.C. circuit that was decided last month or two months ago about the *Helena World v. Google*. That case got dismissed. Part of the reason it did is

because a supplier who severs because of an antitrust violation curtails a business that would have otherwise purchased from a supplier doesn't have antitrust standing.

That is, essentially, what they are saying here is that we do business with VideoAmp, and this patent litigation that Nielsen lost against VideoAmp, both of them, you know, harmed that player in the market. That's not good enough for TVision to bring that claim.

A similar thing is when they call out in the reply brief, I think they call it HyphaMetrics, as one of their similarly situated competitors. There's lot of law there that says well, you know, if there's an anticompetitive scheme out there to harm your competitors, you don't have antitrust injury to bring that claim either.

So what they are ultimately pursuing here is irrelevant discovery. And if what they want to get at is this some type of scheme to harm them in the market, we've already agreed to produce documents related to our litigations against TVision that are not privileged, and that should be sufficient to get at this idea that these are sham litigations, these other litigations to get this other company, other companies we don't think are relevant.

**THE COURT:** All right. Well, we will have to

leave it there, and I appreciate counsels' arguments as to these issues. I appreciate the parties allowing counsel for both sides to make them.

I will take the matters under advisement. I will issue orders, likely this week, resolving these respective three disputes, so that the parties will have those and be on their way.

I know there are other motions pending in the case, try to get to them as soon as we can. As you might imagine, there are big lists, so we'll work as hard as we can to try to resolve them as soon as we can.

Is there anything further we need to take up procedurally before we conclude today? On the plaintiff's side, Mr. Kennison?

**MR. KENNISON:** Not for plaintiff, Your Honor. Thank you very much.

**THE COURT:** On defendant's side, Ms. Choi or Mr. Barnas?

**MR. BARNAS:** Nothing further, Your Honor. Thank you.

**THE COURT:** Good job by everyone. Appreciate your arguments.

With that said, we'll end our video conference today. We will go off the record. Take care.

(The proceedings concluded at 2:26 p.m.)

CERTIFICATE OF COURT REPORTER

I hereby certify that the foregoing is a true and accurate transcript from my stenographic notes in the proceeding.

/s/ Bonnie R. Archer
Bonnie R. Archer, RPR, FCRR
Official Court Reporter
U.S. District Court

[175]
**MR. BARNAS: [29]** 35/13 35/18 36/23 37/23 38/17 39/18 40/13 41/8 42/2 42/8 42/11 42/19 43/6 44/1 44/19 45/10 46/16 47/10 47/19 55/23 56/8 56/23 57/22 58/14 59/25 60/13 60/25 61/13 64/19
**MR. KENNISON: [29]** 20/4 20/10 21/20 22/2 22/20 23/3 24/9 24/12 25/10 26/20 27/10 27/16 28/7 30/19 32/5 32/22 48/2 48/24 49/5 49/11 50/4 50/14 51/19 52/19 54/8 55/16 55/20 62/2 64/15
**MR. MOSHOS: [1]** 3/10
**MR. RUSSELL: [1]** 3/22
**MS. CHOI: [21]** 5/1 5/23 7/14 7/17 8/10 9/8 9/17 9/20 10/6 12/2 12/15 15/8 16/22 16/24 17/2 19/2 19/24 32/25 33/24 35/6 35/8
**THE COURT: [82]**

**-**

**-and [3]** 1/21 2/5 2/8

**/**

**/s [1]** 65/8

**1**

**1 [13]** 4/16 4/22 4/24 7/7 22/10 37/18 40/5 40/19 43/12 44/6 48/16 53/25 62/22
**100 [2]** 16/6 40/9
**11 [4]** 6/24 7/12 8/4 8/11
**11,000 [1]** 57/14
**12 [4]** 6/24 7/12 8/4 8/11
**13 [1]** 8/11
**14 [1]** 8/11
**15 [1]** 50/21
**16 [1]** 49/3
**180 [11]** 36/14 40/8 43/23 44/2 44/17 46/1 46/23 54/4 57/19 57/23 58/1
**1:00 [2]** 1/10 2/20

**2**

**2 [22]** 4/18 12/16 22/7 22/9 30/23 32/24 35/5 35/9 35/19 35/23 37/8 38/16 39/14 40/22 41/6 42/3 43/22 48/14 48/19 53/23 55/19 55/22
**20 [51]** 35/25 36/8 36/14 37/2 37/2 37/15 37/17 38/14 39/9 40/1 40/7 40/20 41/25 42/5 42/14 42/21 42/21 42/22 43/12 43/14 43/15 43/20 43/23 44/18 45/18 45/19 46/1 46/24 47/3 47/3 47/3 47/5 47/5 48/4 48/18 48/22 48/24 49/2 49/19 50/12 51/9 54/3 54/17 55/2 55/8 55/12 56/2 56/11 56/18 56/21 57/11
**2017 [4]** 41/24 42/6 43/13 43/15
**2018 [1]** 43/16
**2019 [1]** 16/9
**2023 [2]** 15/17 16/5
**2025 [1]** 43/13
**2026 [2]** 1/10 22/22
**25 [2]** 1/4 3/1
**25-575-CJB [2]** 1/4 3/1
**26 [3]** 12/16 22/22 27/23
**28 [1]** 11/5
**2:26 [1]** 64/25

**3**

**3 [5]** 4/18 22/4 35/23 58/3 58/6

**4**

**4 [1]** 1/10

**5**

**500 [1]** 10/21
**525 [4]** 23/2 24/3 25/1 26/14
**575 [6]** 1/4 3/1 6/2 6/18 21/16 21/19

**6**

**60 [13]** 40/14 40/17 40/21 43/18 44/17 46/23 57/14 57/15 57/19 57/20 57/20 57/21 58/2
**62 [1]** 16/11

**7**

**72 [9]** 16/11 48/7 51/9 51/14 51/17 52/6 54/13 55/3 56/21
**72 percent [8]** 48/7 51/9 51/14 51/17 52/6 54/13 55/3 56/21
**75 [2]** 13/7 56/6
**75 percent [1]** 56/6

**8**

**8 [1]** 22/10
**82 [1]** 16/2
**83 [1]** 16/2
**844 [1]** 1/13
**89 [1]** 56/11

**9**

**9 [1]** 57/12
**92 [1]** 56/12

**A**

[redacted]
**able [7]** 8/25 13/22 17/4 17/7 39/15 46/11 52/5
**about [93]**
**absolutely [1]** 61/13
**according [2]** 47/1 48/7
**account [1]** 54/13
**accounts [1]** 48/7
**accurate [1]** 65/6
**across [5]** 20/13 40/16 45/1 45/4 52/23
**action [8]** 2/25 21/16 21/17 21/19 21/19 25/1 25/1 26/14
**actual [1]** 50/7
**actually [8]** 8/22 10/20 15/13 32/11 49/3 57/8 61/1 62/4
**add [13]** 5/24 6/3 8/4 8/11 9/5 9/10 10/17 28/18 28/23 39/22 47/18 58/12 59/11
**added [1]** 5/19
**adding [2]** 26/23 38/15
**addition [8]** 6/4 10/20 25/4 25/6 26/9 26/10 39/14 54/23
**additional [9]** 8/14 10/25 11/5 26/15 26/21 39/17 47/6 55/9 55/14
**Additionally [1]** 16/4
**address [3]** 35/15 43/7 47/24
**addressing [1]** 5/4
**adds [2]** 5/20 54/19
**advertising [1]** 19/8
**advisement [1]** 64/4
**advocated [2]** 61/3 61/14
**advocating [1]** 61/3
**affirmatively [1]** 27/3
**after [10]** 7/8 10/17 15/18 20/18 20/22 23/14 28/15 28/19 31/1 60/8
**afternoon [6]** 2/21 3/10 3/16 3/22 5/1 35/14
**again [11]** 3/19 13/14 16/11 24/1 32/16 34/11 38/23 41/15 47/12 53/16 60/18
**against [6]** 57/9 57/16 61/10 62/19 63/6 63/20
**ago [1]** 62/24
**agree [5]** 12/8 25/24 33/18 38/24 55/6
**agreed [24]** 5/15 6/1 6/4 6/11 6/14 7/9 8/15 12/21 12/22 14/9 14/14 21/3 22/14 22/24 22/24 23/9 23/22 26/4 26/10 26/20 28/15 48/9 49/19 63/19
**agreed-upon [4]** 6/4 6/14 14/9 14/14
**agreements [1]** 16/10
**ahold [1]** 51/11
**ALEXANDER [2]** 2/10 4/1
**all [34]** 3/9 4/4 4/20 7/8 9/14 11/18 12/7 13/23 15/1 19/13 19/25 22/7 27/17 28/10 36/17 44/4 44/13 45/5 46/6 46/18 47/16 47/21 47/25 49/1 49/6 50/13 50/23 51/10 55/1 56/1 56/13 56/21 59/21 63/25
**allegation [1]** 46/9
**allegations [6]** 44/8 56/19 58/7 61/7 61/8 62/10
**allege [3]** 41/13 44/20 44/22
**alleged [1]** 4/13
**alleges [1]** 15/16
**allow [3]** 47/2 48/15 62/9
**allowance [1]** 47/4
**allowed [2]** 12/18 12/25
**allowing [1]** 64/2
**allows [1]** 44/23
**almost [2]** 51/10 56/5
**alone [2]** 16/9 18/13
**along [3]** 5/7 46/12 56/23
**already [8]** 6/14 12/24 25/6 26/19 27/6 52/22 57/10 63/19
**also [24]** 11/12 19/4 19/4 19/8 19/9 19/10 21/3 23/5 23/7 23/15 23/24 25/25 26/1 26/14 39/5 39/22 39/23 43/15 45/4 46/25 50/18 53/7 54/24 58/21
**although [1]** 56/14
**always [5]** 23/17 45/12 46/13 46/14 46/14
**am [5]** 19/6 27/15 37/13 59/9 60/4
**amenable [1]** 47/10
**amended [2]** 22/4 44/25
**amendments [1]** 50/23
**among [3]** 8/2 24/19 31/1
**amongst [1]** 22/15
**amount [4]** 38/11 39/3 51/9 56/15
**ample [1]** 16/13
**analysis [2]** 9/10 27/24
**ANDERSON [2]** 1/19 3/11
**ANDREW [6]** 1/20 2/3 2/7 3/11 3/23 3/25
[redacted] **[1]** 19/9
**another [3]** 9/1 18/11 19/5
**answer [2]** 45/22 60/23
**answering [1]** 61/18
**anticompetitive [4]** 15/16 45/4 45/6 63/13
**antiquated [1]** 49/22
**antitrust [11]** 5/15 16/2 17/10 20/14 21/4 21/14 25/2 57/4 63/1 63/3 63/14
**any [21]** 8/23 8/24 9/15 13/12 14/8 14/8 15/25 34/18 34/21 34/21 37/17 39/15 41/5 41/20 48/6 48/19 50/12 52/7 57/17 59/15 61/6
**anybody [1]** 37/18
**anything [13]** 19/21 32/19 32/23 35/4 46/16 47/17 53/21 55/18 55/21 58/15 60/12 60/21 64/12
**apart [2]** 30/12 39/21
**apparently [1]** 25/8
**APPEARANCES [2]** 1/18 2/1
**applies [1]** 11/14
**apply [4]** 10/10 10/11 11/8 13/16
**applying [3]** 11/23 34/7 34/17
**appreciate [3]** 64/1 64/2 64/21
**approach [2]** 28/16 31/25
**appropriate [2]** 25/23 26/2
**approximately [1]** 58/2
**Archer [2]** 65/8 65/9
**are [215]**
**aren't [5]** 24/19 28/25 36/6 46/9 62/20
**arguing [1]** 3/16
**argument [15]** 3/2 4/3 4/15 30/17 39/25 41/8 44/7 44/15 44/19 48/3 56/13 56/16 57/17 60/4 60/25
**arguments [7]** 4/20 4/21 13/20 59/19 59/20

**A**

**arguments... [2]** 64/1 64/22
**around [4]** 19/18 24/2 40/11 40/13
**array [1]** 44/20
**articles [1]** 28/23
**articulate [1]** 8/25
**articulated [2]** 39/25 61/11
**as [62]** 2/22 4/1 4/1 4/6 5/15 5/19 6/1 6/4 6/10 6/10 7/21 7/25 8/14 8/21 9/11 11/1 12/8 13/1 14/12 14/16 15/17 15/20 15/20 15/22 16/6 16/15 23/9 29/14 29/15 30/2 30/25 32/6 33/18 34/5 36/20 38/8 38/10 39/5 39/24 40/3 40/18 43/23 43/23 46/6 49/18 49/20 50/7 51/2 51/7 51/23 53/14 56/17 60/23 63/10 64/1 64/9 64/9 64/9 64/10 64/10 64/11 64/11
**aside [1]** 45/16
**ask [9]** 3/8 3/20 7/18 13/10 18/4 20/8 21/12 37/7 49/23
**asked [4]** 20/19 23/22 23/24 25/21
**asking [17]** 6/23 6/24 17/20 33/22 38/2 39/19 40/12 41/16 41/22 42/13 42/24 45/22 45/22 54/2 57/14 58/22 59/18
**aspects [1]** 60/16
**asserting [1]** 28/1
**assertion [1]** 28/1
**associated [3]** 37/2 53/24 54/2
**assume [1]** 44/12
**assumed [1]** 6/13
**assuming [2]** 52/25 53/13
**attached [1]** 13/7
**attempted [1]** 59/12
**attention [1]** 14/22
**audience [5]** 15/14 15/21 48/5 51/8 55/2
**audio [1]** 48/5
**automatically [2]** 34/20 34/22
**available [1]** 49/17

**B**

**back [23]** 13/25 14/18 17/22 21/10 23/17 23/21 27/21 31/10 36/15 36/21 37/25 38/2 38/17 41/17 41/22 42/7 45/13 45/14 47/5 47/14 56/2 57/1 58/17
**backs [3]** 7/20 37/17 41/1
**bargaining [3]** 56/24 57/3 57/6
**BARNAS [11]** 2/7 3/25 4/2 35/14 35/16 47/16 52/20 55/21 58/9 59/18 64/18
**barrier [1]** 9/12
**based [4]** 10/18 31/20 42/16 58/15
**baselessness [2]** 62/7 62/13
**basically [2]** 15/1 36/2
**be [103]**
**because [38]** 5/18 7/18 8/5 8/20 9/13 10/10 10/23 11/8 11/12 11/13 11/25 12/19 19/17 20/15 20/19 22/13 22/14 25/11 27/1 27/8 27/25 28/13 29/18 30/19 31/4 34/1 37/10 40/14 46/3 47/12 49/24 55/10 56/23 57/24 60/19 62/2 63/1 63/1
**been [18]** 3/3 10/15 10/16 10/18 10/18 14/15 17/22 18/17 22/23 25/7 27/8 33/14 37/1 42/6 49/1 49/7 54/12 61/24
**before [17]** 1/15 3/5 4/20 7/5 19/22 20/23 22/2 22/3 26/13 31/1 32/24 35/4 43/4 55/22 62/12 62/16 64/13
**begin [2]** 3/8 3/19
**beginning [1]** 2/19
**behalf [3]** 3/11 3/16 35/14
**being [4]** 10/20 18/20 19/6 61/25
**believe [20]** 8/22 10/9 11/4 11/8 15/19 16/13 17/10 17/14 18/1 23/4 24/4 33/4 33/24 34/5 34/10 34/19 34/23 42/15 46/4 51/12
**below [2]** 32/10 50/21
**best [2]** 33/18 49/5
**bet [1]** 45/25
**between [9]** 14/18 32/8 37/18 37/20 37/25 46/24 54/11 57/6 57/19
**beyond [5]** 5/24 8/11 11/6 33/5 55/2
**big [3]** 43/2 51/16 64/10
**biggest [2]** 44/17 46/25
**bit [2]** 42/23 42/24
**blah [3]** 55/11 55/11 55/11
**blank [3]** 47/6 55/9 56/18
**blocking [1]** 45/3
**Bonnie [2]** 65/8 65/9
**both [8]** 13/23 20/16 35/18 36/19 58/22 60/16 63/6 64/3
**bottom [2]** 6/17 60/9
**brief [8]** 4/17 6/9 32/24 60/1 60/11 61/2 61/18 63/10
**briefing [6]** 58/11 58/13 58/20 59/20 59/21 59/24
**briefly [1]** 55/24
**bring [2]** 63/8 63/14
**broad [2]** 32/18 62/10
**broader [1]** 60/20
**bucket [1]** 49/12
**bunch [2]** 13/17 60/8
**burden [24]** 7/20 7/21 8/8 8/12 8/22 8/24 9/24 10/3 11/18 14/1 14/1 20/9 27/19 33/9 34/18 34/22 38/15 39/25 41/3 43/7 55/24 56/9 57/9 57/17
**burdensome [1]** 36/10
**BURKE [1]** 1/15
**business [7]** 15/15 48/9 50/19 51/8 53/10 63/2 63/5
**bypass [1]** 44/24

**C**

**C [2]** 2/17 21/23
**C.A [1]** 1/4
**call [6]** 3/6 3/9 19/7 30/10 63/9 63/10
**calling [1]** 25/2
**came [3]** 18/6 42/6 62/3
**campaign [1]** 60/3
**can [23]** 5/7 7/22 17/22 19/6 20/6 21/12 22/6 25/19 27/7 28/19 28/20 30/10 31/17 37/7 41/6 42/16 49/23 58/5 61/10 62/16 64/9 64/11 64/11
**can't [5]** 13/21 14/7 36/9 41/19 45/14
**capture [1]** 52/24
**captured [3]** 50/8 58/13 59/24
**care [1]** 64/24
**case [54]** 5/16 6/2 6/2 6/18 8/1 9/25 11/2 11/4 11/5 20/14 21/14 21/15 23/2 24/3 24/3 28/17 30/20 31/3 32/4 33/12 34/1 34/1 38/19 39/5 41/9 41/12 41/21 44/11 45/25 48/1 52/15 52/17 53/12 54/15 55/12 55/17 56/17 56/19 57/4 58/18 58/18 59/6 59/6 59/10 59/17 61/20 62/3 62/5 62/6 62/7 62/9 62/23 62/25 64/9
**cases [5]** 10/7 10/10 11/11 11/15 44/23
**categories [5]** 35/24 36/24 36/25 37/4 42/11
**categorize [1]** 54/18
**categorizing [1]** 15/9
**category [23]** 36/16 37/8 39/14 40/4 40/5 40/19 40/22 41/6 42/3 43/12 43/22 44/2 44/6 47/23 48/14 48/16 48/19 49/12 52/8 52/9 53/23 53/25 58/8
**Category 1 [6]** 40/5 40/19 43/12 44/6 48/16 53/25
**Category 2 [9]** 37/8 39/14 40/22 41/6 42/3 43/22 48/14 48/19 53/23
**cause [11]** 8/8 8/13 9/12 11/7 11/21 11/22 11/25 25/15 27/15 27/19 33/17
[redacted] **[1]** 19/12
**centered [1]** 19/18
**central [1]** 36/10
**CEO [8]** 10/19 10/23 11/1 15/17 15/23 16/4 18/18 18/18
**CEOs [1]** 16/6
**certain [7]** 28/18 35/10 46/23 49/16 50/6 56/12 56/24
**certainly [2]** 27/8 29/9
**certainty [1]** 57/24
**CERTIFICATE [1]** 65/3
**certify [1]** 65/5
**cetera [3]** 4/21 10/5 29/25
**chain [1]** 29/5
**chains [2]** 29/20 30/12
**chance [1]** 4/17
**chances [1]** 32/12
**charge [1]** 16/6
**CHOI [11]** 2/11 4/2 4/2 5/2 5/6 13/25 19/21 24/23 32/23 33/8 64/17
**Choi's [2]** 29/11 30/2
**CHRISTOPHER [1]** 1/15
**circuit [1]** 62/23
**circumstances [1]** 17/5
**cite [2]** 13/11 14/12
**cited [2]** 11/3 14/17
**cites [3]** 10/8 11/11 16/1
**citing [1]** 9/25
**civil [6]** 2/25 6/19 21/16 21/17 21/18 21/19
**CJB [2]** 1/4 3/1
**claim [4]** 20/17 59/12 63/8 63/14
**claims [4]** 11/1 19/18 33/6 61/24
**clarity [1]** 12/17
**clause [1]** 53/5
**clear [7]** 8/1 9/2 29/23 30/4 30/12 44/11 59/9
**client [7]** 17/19 18/5 19/6 32/7 32/8 48/8 54/25
**clients [7]** 15/24 31/23 32/3 32/11 46/10 48/4 48/24
**closer [1]** 56/10
**cocounsel [2]** 3/13 3/24
**COHEN [3]** 2/9 4/2 5/2
**colleague [2]** 19/22 20/7
**colleagues [1]** 3/9
**collect [2]** 37/1 57/14
**collected [1]** 57/11
**collection [3]** 14/16 31/18 38/21
**come [9]** 27/21 36/15 39/2 47/5 47/8 51/18 54/5 59/18 61/25
**comes [4]** 6/17 7/23 38/25 44/13
**comfortable [1]** 58/1
**coming [1]** 27/25
**commenced [1]** 2/19
**commingling [1]** 52/21
**communication [2]** 15/23 39/15
**communications [6]** 11/4 16/20 31/1 31/4 31/6 32/3
**companies [2]** 62/20 63/23
**company [10]** 1/3 2/24 3/12 18/20 41/25 51/7 51/13 51/16 51/24 63/23
**company's [1]** 30/9
**competes [1]** 59/1
**competition [4]** 58/21 59/7 60/3 60/5
**competitors [2]** 63/11 63/13
**complaint [1]** 49/16
**completely [1]** 20/11
**compromise [4]** 28/14 31/10 37/24 43/1
**compromised [1]** 42/19
**concept [1]** 53/22
**concerns [4]** 15/25 27/23 31/24 43/7
**conclude [2]** 31/9 64/13
**concluded [1]** 64/25
**conference [5]** 1/11 2/19 2/24 13/11 64/23
**confusing [2]** 7/20

**C**

**confusing... [1]** 7/22
**consider [1]** 27/7
**consistent [1]** 61/2
**constructed [1]** 37/23
**content [1]** 25/12
**continue [2]** 17/1 49/10
**continued [2]** 2/1 15/20
**contract [19]** 16/9 16/17 18/5 29/4 34/3 34/4 34/16 36/4 37/18 40/24 42/5 44/25 46/19 47/12 50/6 50/20 51/2 51/2 51/4
**contracting [7]** 30/24 31/2 31/20 31/25 37/19 41/12 44/21
**contracts [83]**
**contractual [9]** 4/11 16/1 16/7 19/17 19/19 34/7 35/10 44/16 47/2
**contractual-related [1]** 4/11
**contrary [2]** 6/8 20/11
**conversation [6]** 12/19 13/1 17/21 17/24 18/8 18/12
**conversations [2]** 19/15 30/14
**core [3]** 15/15 16/17 41/11
**correct [9]** 7/14 8/10 12/2 16/24 21/20 24/12 27/10 27/10 61/13
**correctly [1]** 57/10
**correspondences [4]** 17/12 18/2 19/16 35/1
**CORROON [2]** 1/19 3/11
**could [21]** 11/19 21/24 25/13 32/4 33/11 33/11 33/18 33/20 38/24 40/24 40/24 41/2 43/22 44/18 52/17 55/6 55/7 55/13 56/10 56/17 57/19
**couldn't [3]** 47/8 51/16 55/7
**counsel [18]** 1/25 2/13 3/5 3/7 3/8 3/8 3/18 3/20 3/20 4/6 4/23 10/8 11/11 13/14 20/1 31/15 47/20 64/2
**counsels' [1]** 64/1
**counter [2]** 4/21 5/2
**counterclaim [1]** 41/13
**counterclaims [4]** 16/3 16/12 16/18 19/17
**counting [1]** 27/1
**couple [3]** 15/2 46/9 62/20
**course [4]** 11/7 34/13 36/13 52/1
**court [11]** 1/1 3/1 5/8 10/19 10/24 11/13 28/18 60/18 65/3 65/9 65/10
**court's [1]** 3/15
**courts [2]** 11/16 11/23
**cover [3]** 50/5 56/5 58/3
**covered [1]** 58/13
**critical [3]** 38/19 41/21 47/14
**critically [1]** 59/17
**cumulative [3]** 14/8 28/3 30/17
**cumulativeness [3]** 14/5 27/24 27/25
**current [1]** 21/2
**curtails [1]** 63/2
**custodial [2]** 35/3 37/11
**custodian [6]** 4/9 7/7 10/25 18/11 26/2 50/9
**custodian's [1]** 38/9
**custodians [83]**
**customer [7]** 41/18 41/22 42/7 45/2 45/8 55/11 56/18
**customers [16]** 30/6 30/14 37/25 38/2 38/18 41/17 44/23 45/13 45/14 47/13 49/17 54/12 55/2 55/10 56/24 57/7
**cut [1]** 49/9
**cuts [2]** 57/9 57/16

**D**

**D [6]** 2/6 2/17 6/7 12/16 22/7 22/9
**D.C [1]** 62/23
**D.I. [1]** 13/7
**D.I. 75 [1]** 13/7
**data [10]** 41/19 41/20 44/24 45/3 45/3 45/11 47/15 49/17 52/22 58/25
**data-use [1]** 41/19
**database [4]** 50/17 55/25 57/11 57/16
**dated [1]** 22/21
**dates [1]** 46/17
**Dave [1]** 23/15
**David [5]** 6/3 16/4 23/11 23/14 26/1
**day [2]** 18/9 57/15
**de [1]** 34/20
**de-dupe [1]** 34/20
**deal [4]** 19/17 53/6 61/20 61/21
**deals [2]** 32/11 48/6
**decent [1]** 56/15
**decide [7]** 36/22 39/16 41/6 60/19 60/19 62/15 62/16
**decided [1]** 62/23
**declaration [5]** 49/24 57/8 57/10 57/12 57/16
**declined [1]** 28/18
**default [21]** 5/8 5/11 5/21 5/25 6/6 6/20 8/5 8/22 9/3 9/13 10/11 11/13 11/20 12/19 12/22 12/25 33/2 33/23 39/1 39/5 39/7
**defend [1]** 39/2
**defendant [12]** 1/7 2/13 3/23 4/8 13/6 14/18 14/21 15/1 29/14 33/14 39/6 61/6
**defendant's [7]** 3/4 3/19 4/23 4/24 35/9 35/12 64/17
**Define [1]** 49/24
**Deirdra [1]** 18/10
**DELAWARE [8]** 1/2 1/13 3/8 3/8 3/19 3/20 10/12 11/3
[redacted] **[1]** 18/10
**demonstrate [6]** 8/8 9/15 14/2 14/6 15/4 30/16
**demonstrates [1]** 27/21
**demonstrating [3]** 14/17 27/15 29/16
**dependent [1]** 6/10
**describes [1]** 16/5
**designate [1]** 7/7
**designated [2]** 39/22 39/24
**despite [1]** 17/8
**determine [1]** 42/14
**dice [1]** 25/1
**dictates [1]** 45/15
**did [6]** 12/4 20/24 33/13 33/19 58/12 62/25
**didn't [13]** 15/3 21/7 23/20 24/5 25/13 25/15 26/6 33/12 36/17 41/4 46/3 47/24 59/20
**differ [2]** 46/8 46/18
**differences [2]** 11/12 46/23
**different [13]** 10/14 11/19 11/22 15/10 34/16 34/25 50/19 50/25 52/9 52/18 56/25 56/25 60/23
**differently [2]** 38/13 42/23
**difficult [1]** 51/22
**direct [5]** 15/23 16/25 17/18 18/12 22/6
**directed [1]** 61/12
**directing [1]** 13/22
**directly [6]** 15/25 16/2 16/11 16/25 31/24 59/1
**director [1]** 20/15
**disagree [1]** 60/17
**disagrees [1]** 24/17
**disclosed [3]** 20/12 25/6 25/7
**disclosures [2]** 20/12 22/4
**disconnect [4]** 25/3 25/9 25/11 26/5
**discoverable [3]** 24/16 24/21 33/3
**discovery [23]** 3/3 5/4 9/15 9/16 13/15 25/2 25/2 26/13 27/20 29/15 38/4 38/12 38/16 38/23 39/13 39/14 39/17 42/4 48/14 60/19 61/25 62/12 63/17
**discrete [1]** 37/4
**discuss [4]** 23/13 23/15 28/20 41/5
**discussed [1]** 24/18
**discussion [2]** 20/19 23/17
**discussions [6]** 20/25 22/22 23/21 29/4 29/21 30/6
**dismiss [2]** 61/19 62/15
**dismissed [1]** 62/25
**dispensed [1]** 61/24
**display [1]** 41/14
**disproportion [1]** 41/9
**dispute [22]** 4/9 4/10 4/12 5/5 5/16 13/15 16/1 20/9 26/23 28/14 29/15 35/15 35/21 36/3 36/20 36/24 36/24 37/5 40/4 49/13 52/10 60/19
**disputes [3]** 3/3 13/15 64/6
**district [10]** 1/1 1/2 10/1 10/8 10/9 10/12 10/13 11/3 11/11 65/10
**districts [1]** 10/11
**do [38]** 2/22 3/18 4/12 5/10 10/10 10/11 11/7 12/4 12/9 13/10 13/21 14/10 15/4 17/23 25/16 26/6 26/18 31/17 32/9 34/23 35/23 39/13 40/10 41/11 42/16 44/16 44/18 45/17 46/23 47/25 47/25 52/17 53/7 53/19 53/20 58/6 58/9 63/5
**doc [2]** 18/22 32/1
**docs [20]** 5/12 13/12 14/11 14/15 14/17 14/21 14/24 14/25 15/1 15/7 18/19 18/21 28/3 35/23 36/11 36/17 36/19 36/24 40/20 40/21
**document [6]** 14/16 32/12 34/20 38/11 50/2 60/5
**documents [81]**
**does [2]** 19/8 56/5
**doesn't [5]** 36/9 41/1 51/15 60/18 63/3
**doing [5]** 11/15 12/4 32/11 35/16 35/18
**don't [34]** 4/19 5/12 10/5 10/25 11/13 12/12 13/12 13/21 23/6 25/23 26/2 28/25 31/3 31/6 32/16 36/16 44/12 44/20 46/21 47/24 51/14 51/20 53/12 54/20 56/3 56/8 56/14 58/3 58/11 59/16 61/5 62/14 63/14 63/23
**done [5]** 29/13 29/16 29/18 30/1 33/11
**door [1]** 17/25
**down [3]** 29/5 43/3 60/8
**drafts [1]** 41/1
**DRYE [2]** 1/22 3/13
**dupe [1]** 34/20
**duplicate [2]** 34/21 34/24
**duration [3]** 40/14 46/17 57/25
**during [4]** 15/25 16/7 23/10 31/1
**dynamics [1]** 57/3

**E**

**e [17]** 2/17 2/17 29/19 29/22 30/12 31/6 32/7 34/14 37/11 37/17 37/19 37/20 41/1 41/21 50/5 50/9 59/3
**e-mail [10]** 29/19 30/12 31/6 32/7 37/19 37/20 41/21 50/5 50/9 59/3
**e-mails [5]** 29/22 34/14 37/11 37/17 41/1
**each [11]** 3/20 14/11 42/15 43/3 43/12 43/19 43/21 43/22 50/22 51/1 54/17
**earlier [1]** 62/4
**easier [1]** 13/19
**easiest [1]** 4/14
**easily [2]** 13/21 50/17
**easy [2]** 49/20 50/15
**effect [2]** 35/25 48/17
**efforts [1]** 15/2
**eight [36]** 5/16 6/2 6/4 6/25 7/3 7/11 8/15 9/3 9/4 9/4 12/5 12/7 13/2 14/8 14/14 21/3 21/6 22/9 22/11 22/18 22/18 23/25 24/24 24/25 25/3 26/3 26/4 26/9 26/12 26/12 26/16 26/21 28/5 29/21 29/23 33/20
**either [3]** 14/25 27/22 63/15
**else [1]** 21/23

**E**

**EMANUEL [3]** 2/6 3/25 60/25
**emphasize [2]** 32/21 44/8
**employees [4]** 18/20 21/2 28/17 34/2
**encompass [1]** 44/2
**encourage [1]** 15/24
**encouraging [1]** 31/23
**end [9]** 7/5 8/25 13/3 18/9 26/13 32/24 46/17 53/16 64/23
**ended [2]** 20/22 21/1
**engage [1]** 46/11
**engaged [5]** 14/19 15/16 25/11 25/16 34/7
**engagement [1]** 36/11
**engaging [2]** 21/8 30/6
**enough [7]** 32/17 32/17 45/19 56/4 56/9 61/15 63/8
**entered [1]** 20/24
**entertain [1]** 55/16
**entire [4]** 6/2 21/7 48/18 54/25
**entirely [2]** 46/6 61/1
**entirety [1]** 51/22
**entitled [1]** 38/5
**envision [1]** 38/20
**equaling [1]** 54/4
**equals [1]** 56/11
**escalators [1]** 16/10
**ESI [7]** 5/10 6/22 24/7 26/15 38/6 38/14 38/23
**especially [1]** 55/24
[redacted] **[1]** 50/22
**ESQ [9]** 1/20 1/23 2/3 2/6 2/7 2/7 2/10 2/10 2/11
**essentially [5]** 32/6 45/8 46/22 51/10 63/4
**established [2]** 62/6 62/12
**Estate [1]** 62/5
**et [3]** 4/21 10/5 29/25
**even [15]** 11/24 14/13 18/21 23/20 25/12 27/3 30/19 45/5 52/12 56/5 59/6 59/8 59/11 59/15 61/9
**event [1]** 52/7
**every [4]** 13/15 16/8 45/2 58/18
**everybody [1]** 2/21
**everyone [1]** 64/21
**evidence [1]** 15/10
**evidences [1]** 31/2
**exact [1]** 61/2
**exactly [3]** 20/8 44/1 46/16
**example [20]** 10/14 14/12 15/22 29/20 29/22 30/16 34/5 37/13 37/14 41/18 41/24 44/22 50/20 50/22 52/20 52/20 52/22 53/4 58/23 59/3
**examples [3]** 14/19 35/1 52/13
**except [2]** 7/7 50/15
**exception [2]** 59/9 62/7
**exchange [1]** 28/23
**exchanges [1]** 30/15
**executive [5]** 18/18 18/18 19/7 19/10 30/8
**executives [2]** 18/17 30/5
**exemplar [1]** 35/1
**exercise [1]** 58/2
**exhibit [16]** 6/7 12/16 13/10 13/18 15/22 17/15 17/19 17/19 19/4 19/4 21/23 22/6 22/9 29/2 29/3 31/22
**exhibits [8]** 13/6 13/17 17/11 20/23 29/15 29/22 34/6 34/25
**existence [1]** 52/1
**expected [1]** 9/18
**explain [2]** 14/12 27/22
**expounding [1]** 60/4
**express [1]** 43/10
**extensions [1]** 16/7
**extent [8]** 14/17 26/12 28/2 29/7 34/10 34/21 38/4 61/10
**extra [3]** 8/16 26/25 27/8
**extract [1]** 57/15

**F**

**fact [10]** 8/11 15/14 16/16 17/8 18/11 21/1 34/24 39/25 40/2 49/21
**factual [1]** 11/12
**factually [1]** 10/14
**fair [4]** 7/6 52/18 59/23 61/15
**fairly [1]** 25/5
**FAISMAN [2]** 2/7 3/25
**faith [4]** 20/25 21/9 25/16 26/5
**false [1]** 46/3
**far [1]** 27/15
**favor [1]** 41/7
**FCRR [1]** 65/9
**February [4]** 12/16 22/22 22/23 23/22
**February 26 [2]** 12/16 22/22
**fee [3]** 44/23 45/14 52/21
**feeding [1]** 29/24
**fees [1]** 45/1
**few [3]** 2/22 40/2 50/16
**fewer [1]** 58/1
**fighting [4]** 7/1 38/23 48/14 52/8
**figure [5]** 5/18 13/21 33/9 35/20 57/21
**figuring [1]** 34/2
**filed [1]** 58/7
**files [1]** 35/3
**filings [1]** 42/17
**fill [2]** 8/21 11/8
**filled [1]** 12/1
**final [1]** 37/6
**find [5]** 13/19 13/22 51/16 52/5 53/3
**finding [1]** 50/11
**fine [2]** 36/14 36/15
**firm [1]** 60/22
**first [29]** 2/23 3/7 4/9 4/23 5/4 7/11 12/1 13/8 15/12 17/18 19/22 23/8 23/13 23/18 25/12 25/22 31/12 32/20 33/1 35/20 43/5 43/6 49/12 49/12 50/17 52/8 56/1 58/17 62/15
**five [5]** 8/17 20/14 20/14 40/15 40/16
**focused [2]** 21/15 36/4
**Focusing [1]** 35/19
**folks [9]** 3/21 7/2 14/3 14/6 15/2 18/19 27/7 27/12 27/13
**follow [2]** 12/11 26/11
**follow-on [1]** 26/11
**following [2]** 6/16 48/13
**follows [1]** 30/3
**footnote [1]** 7/3
**foreclosure [4]** 45/17 45/20 53/12 54/9
**foregoing [1]** 65/5
**forget [2]** 12/10 36/16
**former [2]** 15/18 21/2
**Fort [1]** 28/17
**forth [14]** 14/18 21/10 23/17 23/21 34/7 34/17 36/22 37/25 38/2 39/2 41/17 41/23 42/7 47/14
**forths [4]** 7/20 37/18 38/18 41/1
**forward [3]** 15/11 38/25 39/2
**forwarded [2]** 18/10 32/13
**forwarding [2]** 17/16 34/10
**Foster [1]** 23/5
**found [1]** 10/24
**four [10]** 6/12 7/10 10/17 12/10 20/15 22/14 26/10 26/16 26/21 27/1
**frankly [4]** 12/10 14/23 33/13 51/23
**front [3]** 12/3 26/3 33/8
**Frontier [1]** 11/4
**full [1]** 41/14
**fully [3]** 58/13 59/19 59/24
**further [11]** 3/5 19/21 32/19 32/23 35/4 47/17 55/18 55/21 60/12 64/12 64/19
**FYI [1]** 17/17

**G**

**G [1]** 2/17
**gave [2]** 14/24 55/8
**general [2]** 44/7 45/23
**generally [1]** 50/7
**generators [1]** 46/25
**gentleman's [1]** 9/6
**get [29]** 4/20 5/7 7/22 9/2 12/11 14/22 14/22 21/7 22/7 22/8 23/20 24/1 26/25 29/11 37/15 39/8 39/15 42/9 46/1 47/6 48/15 53/5 56/11 58/1 60/8 63/17 63/21 63/22 64/9
**gets [1]** 52/23
**getting [9]** 10/4 17/22 18/21 38/12 38/14 41/2 51/11 54/8 59/8
**give [6]** 4/17 46/25 48/18 48/20 55/5 55/8
**given [4]** 17/5 25/13 33/11 61/6
**giving [3]** 53/9 54/23 54/24
**go [13]** 2/22 3/5 12/5 16/17 41/11 42/14 43/2 55/22 58/22 60/5 62/10 62/13 64/24
**going [52]** 4/24 6/22 7/7 12/6 14/5 18/19 18/24 18/25 21/10 21/25 25/24 26/11 26/15 26/19 27/2 27/19 28/4 29/1 29/5 30/8 30/16 30/21 31/9 32/2 32/13 35/11 35/15 38/6 38/8 38/13 39/3 39/6 39/9 39/13 39/14 40/9 40/13 43/17 45/19 45/25 46/2 46/7 46/25 48/15 48/18 51/11 53/23 55/1 55/9 56/25 56/25 57/25
**gone [2]** 17/24 27/2
**good [30]** 2/21 3/10 3/22 4/5 5/1 8/8 8/13 9/12 11/7 11/21 11/22 11/25 14/10 20/25 21/9 25/15 25/16 26/5 27/15 27/19 29/13 29/16 29/18 30/1 32/1 33/17 35/14 52/4 63/8 64/21
**Google [1]** 62/24
**got [11]** 4/4 7/20 11/21 18/16 21/5 26/16 26/16 35/19 47/3 47/5 62/25
**gotten [1]** 9/13
**GRACE [3]** 2/11 4/1 5/1
**grant [2]** 38/10 39/13
**granted [1]** 61/23
**granting [1]** 38/16
**granular [1]** 24/21
**Great [1]** 3/17
**group [2]** 24/19 31/2
**guess [10]** 7/18 27/15 38/3 40/3 40/19 43/9 44/4 45/21 48/21 61/17
**guidelines [5]** 5/9 13/10 13/16 13/17 13/24
**guys [4]** 8/3 24/2 53/23 55/6

**H**

**had [19]** 8/2 10/15 10/16 10/18 10/18 10/20 10/22 10/24 11/5 11/20 13/6 17/24 20/20 22/23 22/23 22/24 24/4 33/17 44/5
**half [3]** 10/21 17/2 58/5
[redacted] **[1]** 19/7
**hand [1]** 52/7
**handling [1]** 4/3
**happen [2]** 34/22 55/13
**happened [3]** 7/4 29/10 52/1
**happening [7]** 7/9 12/14 18/12 22/23 29/3 32/14 32/15
**happens [1]** 50/20
**happy [4]** 12/9 53/18 55/16 59/9
**hard [2]** 51/12 64/10
**harm [8]** 58/20 58/21 59/7 59/7 59/15 61/11 63/13 63/18
**harmed [1]** 63/7
**harms [1]** 58/22
**has [21]** 4/12 8/5 8/16 11/3 11/20 14/1 15/10 15/13 20/8 27/2 29/10 29/14 36/8 37/1 39/24 50/21 52/13 58/6 59/14 60/2 62/12
**have [96]**
**haven't [5]** 9/13 11/25 12/13 17/22 52/14
**having [8]** 16/6 23/20 25/3 25/9 25/10 30/13 31/6 31/16
**he [6]** 15/16 15/17 16/6 19/8 19/8 19/10
**head [2]** 4/20 24/2
**hear [1]** 4/15
**heavy [3]** 9/23 10/3

**H**
**heavy... [1]** 11/18
**Heck [1]** 40/23
**held [1]** 26/23
**Helena [1]** 62/24
**help [5]** 5/7 5/7 36/22 55/7 56/20
**here [32]** 2/23 3/1 3/2 6/3 10/10 11/3 11/8 11/14 11/20 12/14 17/3 21/5 26/16 33/11 33/23 35/21 36/24 37/5 40/12 41/3 45/17 48/3 53/4 55/11 55/24 58/9 61/1 61/4 61/8 61/14 63/4 63/16
**here's [2]** 26/6 50/16
**hereby [1]** 65/5
**hey [2]** 18/4 19/6
**hiding [1]** 45/3
**high [4]** 16/15 18/18 18/18 28/22
**high-level [3]** 18/18 18/18 28/22
**highest [1]** 43/24
**highlight [1]** 13/18
**highlighted [2]** 13/9 13/13
**highly [2]** 18/14 19/16
**him [6]** 16/6 18/4 23/9 31/24 32/10 32/18
**his [4]** 15/18 15/19 16/7 16/8
**hit [1]** 53/1
**hitting [1]** 29/6
**home [1]** 19/11
**Honor [65]** 3/10 3/22 5/1 5/23 6/1 6/7 7/14 8/10 8/15 9/8 9/20 10/6 12/2 12/15 15/8 17/18 19/2 20/4 21/21 22/3 22/20 24/14 26/4 27/16 28/7 32/5 32/22 32/25 33/24 34/18 35/6 35/13 36/23 38/19 39/18 40/14 41/14 41/22 42/12 42/20 43/1 43/8 44/1 45/10 45/16 47/11 47/19 48/25 49/6 49/14 50/4 50/15 51/19 52/19 55/17 55/20 55/23 56/4 56/24 57/24 58/14 60/1 60/13 64/15 64/19
**HONORABLE [1]** 1/15
**hour [2]** 58/4 58/5
**housing [1]** 50/1
**how [21]** 5/9 14/19 15/4 21/5 26/18 36/5 36/8 36/25 38/9 40/24 41/6 47/8 47/25 50/13 51/17 54/5 56/10 57/20 60/22 61/11 61/25
**HyphaMetrics [1]** 63/10
**hypothetical [1]** 32/6

**I**
**I [152]**
**I'd [1]** 12/15
**I'll [2]** 3/8 37/5
**I'm [20]** 3/12 5/18 6/16 7/7 8/7 13/12 21/12 21/15 22/18 24/1 35/15 35/18 37/8 37/13 40/4 45/21 45/22 48/13 49/13 62/4
**I've [1]** 18/15
**i.e [2]** 6/24 54/4
**idea [4]** 21/6 48/2 55/15 63/21
**identified [16]** 5/17 8/2 20/20 21/2 21/6 21/18 22/3 24/4 24/24 24/24 25/18 28/9 28/21 48/4 49/14 49/16
**identify [5]** 3/6 3/20 20/24 49/3 51/1
**identifying [4]** 26/23 27/13 47/13 50/25
**Illinois [2]** 10/9 10/14
**imagine [1]** 64/10
**impact [1]** 27/24
**import [1]** 18/22
**important [2]** 46/14 56/19
**inapplicable [1]** 11/12
**inapposite [1]** 10/10
**INC [3]** 1/6 2/25 5/3
**include [10]** 15/14 21/25 22/24 23/9 23/11 25/18 25/19 25/22 26/1 28/10
**included [7]** 8/14 23/4 23/5 23/7 27/7 31/21 32/13
**includes [1]** 33/2
**including [9]** 18/20 23/4 23/15 23/23 24/21 28/22 50/22 52/16 56/21
**incorporates [1]** 59/1
**increase [1]** 38/11
**indicates [1]** 18/12
**indicating [1]** 18/24
**indication [1]** 30/21
**indications [1]** 19/13
**indicative [1]** 31/13
**individuals [1]** 14/19
**information [13]** 14/4 14/7 14/8 20/16 24/16 24/21 29/25 32/10 33/3 33/5 35/2 47/1 54/25
**initial [18]** 7/25 8/12 8/21 10/15 10/16 10/17 10/19 10/24 11/6 11/9 22/12 22/15 22/17 22/25 23/2 23/7 27/9 28/19
**initiative [1]** 51/24
**injury [1]** 63/14
**innovation [1]** 52/5
**INSIGHTS [3]** 1/6 2/25 5/3
**instead [1]** 54/16
**intent [2]** 59/13 59/15
**interactions [2]** 14/20 30/22
**internal [6]** 17/3 28/8 28/9 28/10 28/24 42/16
**internally [1]** 18/2
**interpretation [1]** 12/23
**interspersed [1]** 50/18
**intricacies [1]** 34/2
**introduce [1]** 3/9
**involve [1]** 16/21
**involved [1]** 19/20
**involvement [2]** 10/22 28/22
**involving [1]** 29/20
**irrelevant [1]** 63/17
**is [228]**
**isn't [3]** 11/22 52/18 61/25
**issue [46]** 4/15 4/18 4/18 4/22 4/24 8/24 8/24 14/13 18/23 19/22 21/9 27/25 28/13 32/20 32/24 33/9 34/18 35/5 35/9 35/19 35/21 36/11 36/14 36/19 36/22 44/6 44/6 44/11 47/17 48/16 49/25 52/9 55/19 55/22 55/22 58/3 58/6 58/10 60/12 60/19 60/24 61/17 61/20 61/21 62/16 64/5
**Issue 1 [1]** 4/24
**issues [10]** 4/7 4/20 7/23 17/10 32/4 34/16 36/4 53/5 62/18 64/2
**it [100]**
**it's [37]** 2/25 5/11 6/22 9/4 18/23 19/4 21/22 27/2 29/23 30/4 30/12 30/15 31/8 33/4 40/1 40/8 40/9 40/13 41/16 44/12 44/13 45/23 45/25 46/3 46/6 49/22 50/15 51/11 51/20 51/21 51/25 51/25 52/15 56/13 57/4 57/5 59/9
**its [19]** 16/2 17/12 28/15 37/25 41/17 45/12 49/17 51/8 51/9 51/10 51/14 51/17 56/6 56/11 59/1 59/14 59/14 59/15 61/2
**itself [3]** 32/17 47/15 50/17

**J**
**J [1]** 1/15
**Jamiee [1]** 23/5
**January [2]** 22/23 23/21
**Jersey [1]** 10/8
**Jesse [1]** 17/20
[redacted] **[1]** 19/9
**job [8]** 7/8 14/11 26/13 29/13 29/16 29/19 30/1 64/21
**jobs [1]** 7/4
[redacted]
**joined [1]** 3/13
**Jones [1]** 12/9
**Judge [12]** 1/15 12/6 14/24 26/14 33/15 33/19 39/1 39/16 45/22 48/13 56/13 61/19
**jump [2]** 6/15 29/8
**just [53]** 4/6 4/14 5/6 6/15 9/4 10/21 12/4 12/11 13/6 13/23 14/1 16/19 17/3 17/16 19/4 22/17 24/19 26/4 26/6 27/5 30/17 31/5 32/3 32/8 32/8 33/1 33/3 33/5 33/9 33/11 34/2 39/19 40/2 40/2 40/5 41/22 43/9 43/11 43/16 44/5 47/11 50/11 51/12 51/21 54/19 55/2 56/1 56/1 56/3 56/8 57/5 58/17 62/22
**justify [1]** 32/17

**K**
**Karthik [5]** 6/3 23/12 25/22 31/16 32/8
**keep [1]** 4/19
**KELLER [2]** 2/3 3/23
**KELLEY [2]** 1/22 3/13
**KENNISON [14]** 1/23 3/14 3/15 20/2 20/6 32/20 33/10 47/21 49/23 53/21 55/18 61/16 61/17 64/14
**Kenny [37]** 4/10 5/19 6/3 7/2 8/3 8/19 9/5 9/9 9/10 12/8 12/12 14/18 16/4 16/15 17/8 17/20 18/4 18/13 19/5 19/14 19/20 21/25 23/11 23/14 23/15 24/10 26/1 28/2 29/24 30/13 33/5 33/13 33/25 34/6 34/11 34/14 35/2
**Kenny's [2]** 15/7 15/11
**kept [2]** 52/2 52/3
**Kevin [4]** 23/5 23/6 23/11 23/16
**key [8]** 16/7 19/12 28/6 30/4 44/11 46/9 46/21 61/12
**Kim [1]** 23/4
**kind [28]** 4/7 4/19 5/6 5/9 5/14 7/2 7/9 7/10 8/5 8/8 9/23 9/25 10/3 15/9 21/8 28/5 28/21 29/24 30/2 38/4 42/11 46/15 47/2 47/3 54/25 54/25 55/15 57/9
**kinds [1]** 7/23
**King [1]** 1/13
**know [113]**
**knowable [1]** 40/21
**knows [2]** 7/16 19/8
**KOFFMAN [2]** 2/10 4/1

**L**
**laborers [1]** 59/22
**laid [1]** 46/8
**language [7]** 44/9 44/11 44/16 46/2 46/22 49/15 52/12
**large [1]** 44/16
**larger [2]** 30/2 38/4
**last [8]** 7/1 33/20 35/17 44/5 55/22 60/12 61/16 62/23
**Lastly [1]** 31/22
**later [4]** 25/25 28/19 29/20 62/4
**law [2]** 9/25 63/11
**lawsuit [1]** 61/6
**lawsuits [2]** 4/13 58/8
**layperson [1]** 51/15
**lead [1]** 29/21
**lead-up [1]** 29/21
**leadership [1]** 16/8
**least [8]** 22/18 24/4 24/6 29/4 49/8 49/15 53/14 57/22
**leave [1]** 64/1
**led [2]** 15/14 15/16
**left [4]** 7/4 7/8 15/18 26/12
**less [5]** 25/7 40/9 57/5 57/15 57/23
**let [13]** 2/22 3/18 6/15 17/1 18/15 19/25 29/8 47/20 48/12 49/9 49/9 61/16 62/11
**let's [5]** 2/21 3/5 4/22 35/20 59/4
**letter [10]** 4/8 12/17 13/7 14/11 21/23 22/21 35/22 41/5 47/24 49/20
**letters [3]** 5/13 7/19 14/3
**level [10]** 16/16 18/3 18/18 18/18 18/24 24/22 28/22 30/5 34/2 34/8
**license [1]** 17/25
**licensed [1]** 58/25
**light [1]** 15/4
**like [74]**
**likely [11]** 14/6 15/6 18/17 24/15 24/19 24/20 28/4 29/17 32/2 33/2 64/5
**limit [2]** 6/20 6/20
**limited [3]** 6/12 33/4 54/6

**L**

**line [4]** 3/21 3/24 6/17 30/17
**lines [1]** 56/23
**list [4]** 27/9 33/11 33/14 55/10
**listed [6]** 14/25 22/1 22/10 22/18 29/14 34/13
**listen [2]** 33/10 56/16
**listing [1]** 55/1
**lists [1]** 64/10
**litigated [1]** 58/19
**litigation [11]** 6/18 6/19 17/6 58/19 60/2 60/15 60/16 61/10 61/11 62/7 63/6
**litigations [4]** 62/19 63/20 63/22 63/22
**little [4]** 7/22 10/22 42/23 42/24
**live [2]** 49/21 57/20
**LLC [3]** 1/3 2/25 3/12
**LLP [3]** 1/22 2/6 3/13
**locate [1]** 21/24
**longer [2]** 57/13 57/25
**look [27]** 6/19 9/2 9/11 11/16 13/19 14/15 14/21 14/24 18/6 27/5 27/12 28/1 30/3 33/10 40/5 40/8 40/19 42/4 45/23 46/21 48/13 51/3 55/1 55/7 56/13 61/5 61/6
**looked [1]** 42/12
**looking [7]** 5/12 5/14 8/20 11/25 35/24 40/4 46/20
**looks [3]** 6/7 17/16 17/17
**lose [1]** 37/14
**lost [3]** 20/24 58/25 63/6
**lot [9]** 18/16 22/8 34/24 39/22 41/12 45/2 45/24 54/19 63/11
**lots [2]** 40/25 40/25
**lower [2]** 18/3 34/2
**lumps [1]** 42/20

**M**

**M [5]** 17/15 17/19 19/4 29/2 29/22
**made [5]** 15/5 20/12 22/4 44/7 61/1
**Magistrate [1]** 1/15
**mail [10]** 29/19 30/12 31/6 32/7 37/19 37/20 41/21 50/5 50/9 59/3
**mails [5]** 29/22 34/14 37/11 37/17 41/1
**main [2]** 28/1 50/4
**mainly [1]** 46/13
**major [2]** 51/11 51/13
**make [17]** 6/15 9/24 21/12 31/7 33/1 33/16 43/11 44/10 44/10 48/12 51/15 51/17 55/3 56/12 59/19 59/20 64/3
**makes [4]** 13/19 28/15 49/17 54/6
**making [6]** 14/14 15/1 19/14 30/11 32/17 51/13
**managerial [1]** 16/16
**manifest [4]** 10/4 11/18 41/13 47/14
**manifestly [1]** 9/25
**many [12]** 5/9 11/10 19/18 26/18 36/5 36/7 38/6 38/7 43/23 47/8 50/13 52/12
**March [1]** 17/25
**market [11]** 18/8 41/20 45/18 54/9 54/14 59/5 59/13 59/15 60/2 63/7 63/18
**market-wide [1]** 60/2
**material [1]** 15/6
**materials [1]** 18/14
**matter [4]** 2/24 6/20 7/25 50/13
**matters [2]** 57/4 64/4
**MATTHEW [2]** 1/23 3/14
**may [8]** 1/10 13/22 16/20 22/7 46/18 46/18 46/23 59/19
**maybe [29]** 5/6 5/14 9/23 11/15 11/18 11/22 13/8 14/23 15/2 20/6 21/22 22/6 24/5 26/25 27/1 31/14 32/3 33/16 37/5 43/23 44/6 45/21 47/4 52/4 55/6 55/11 58/12 58/17 59/24
**me [34]** 2/22 3/18 3/24 4/14 5/7 6/15 7/24 12/6 13/5 13/19 13/19 13/22 15/24 16/25 18/15 18/15 19/24 19/25 22/17 24/3 24/23 26/14 29/8 29/10 29/13 30/10 35/13 36/22 47/20 48/12 49/9 54/22 56/20 61/16
**mean [16]** 23/20 28/8 32/5 32/14 38/15 41/15 46/21 50/12 51/6 55/6 56/10 59/20 59/22 60/4 60/7 62/22
**meaning [1]** 6/18
**meant [1]** 34/25
**measurement [6]** 15/14 15/21 18/7 48/5 51/8 55/2
**meet [3]** 9/24 15/2 27/19
**meeting [1]** 30/20
**meetings [1]** 30/7
**mentioned [3]** 8/15 28/17 31/15
**merits [2]** 14/2 27/17
**message [1]** 59/4
**messing [1]** 61/8
**met [2]** 8/13 16/6
**meter [2]** 18/6 18/10
**metrics [1]** 46/12
**might [11]** 7/24 8/17 18/17 28/2 40/5 50/5 52/16 55/12 55/14 56/17 64/9
**Miller [1]** 23/4
**MILSTEIN [3]** 2/9 4/2 5/2
**mind [3]** 37/8 37/14 58/13
**minimum [1]** 22/11
**misses [1]** 44/20
**missing [1]** 13/12
**modernize [1]** 51/24
**Monday [1]** 1/10
**monopolization [5]** 58/18 58/18 59/6 59/10 59/12
**monopolize [1]** 59/13
**month [2]** 57/13 62/24
**months [1]** 62/24
**more [37]** 5/20 5/24 6/24 8/9 8/17 8/18 10/17 11/17 11/21 24/5 24/20 24/21 25/14 26/17 26/18 26/23 26/24 27/3 27/14 28/10 33/15 33/22 38/5 42/24 45/19 47/6 48/22 49/8 53/14 53/17 53/19 54/6 54/6 57/4 57/5 60/20 61/18
**MOSHOS [2]** 1/20 3/11
**most [4]** 23/23 24/15 24/19 33/2
**motion [3]** 29/15 61/19 62/15
**motions [1]** 64/8
**motivation [2]** 62/8 62/11
**motive [1]** 59/15
**Moulton [1]** 23/5
**movant's [1]** 4/16
**move [3]** 4/18 5/7 35/5
**Mr [45]** 3/15 4/10 4/10 5/19 5/19 8/3 8/19 9/9 14/19 15/7 15/11 15/14 15/18 15/23 16/15 17/8 18/4 19/19 20/6 21/25 28/2 29/24 30/13 31/23 32/2 32/9 32/20 33/6 33/13 33/25 34/6 34/11 34/14 35/2 35/16 47/21 52/20 53/21 55/18 55/21 58/9 59/18 61/16 61/17 64/18
**Mr. [31]** 3/14 4/2 8/3 8/19 9/9 14/18 15/7 15/11 16/15 17/8 17/20 18/13 19/5 19/14 19/20 20/2 21/25 28/2 29/24 30/13 33/5 33/10 33/13 33/25 34/6 34/11 34/14 35/2 47/16 49/23 64/14
**Mr. Barnas [2]** 4/2 47/16
**Mr. Kennison [4]** 20/2 33/10 49/23 64/14
**Mr. Kenny [22]** 8/3 8/19 9/9 14/18 16/15 17/8 17/20 18/13 19/5 19/14 19/20 21/25 28/2 29/24 30/13 33/5 33/13 33/25 34/6 34/11 34/14 35/2
**Mr. Kenny's [2]** 15/7 15/11
**Mr. Matthew [1]** 3/14
**Ms [6]** 5/6 19/21 24/23 29/11 33/8 64/17
**Ms. [4]** 4/2 13/25 30/2 32/23
**Ms. Choi [3]** 4/2 13/25 32/23
**Ms. Choi's [1]** 30/2
**much [6]** 20/5 34/23 36/25 41/2 56/10 64/16
**multi [1]** 16/10
**multi-year [1]** 16/10
**multiple [2]** 23/23 28/12
**must [2]** 42/6 52/16
**my [9]** 3/24 13/10 13/16 24/2 25/10 37/8 37/14 49/5 65/6
**myself [1]** 40/5

**N**

**N [5]** 2/17 17/15 19/5 29/3 29/23
**name [2]** 9/6 27/5
**named [2]** 27/6 61/6
**narrow [1]** 41/16
**national [1]** 16/9
**necessarily [1]** 31/3
**need [13]** 18/4 25/15 33/15 33/16 44/17 45/19 46/23 53/20 54/21 55/14 56/12 62/15 64/12
**needed [1]** 52/5
**needs [2]** 32/9 54/15
**negotiate [1]** 18/5
**negotiating [4]** 26/7 26/22 32/11 34/15
**negotiation [4]** 31/14 31/15 48/10 57/3
**negotiations [41]** 16/17 19/18 19/19 20/25 23/10 25/11 26/5 29/4 30/25 31/2 31/20 34/3 36/2 36/21 37/2 37/9 37/16 37/24 38/10 38/18 39/15 39/20 40/1 40/23 40/25 41/14 41/16 41/23 42/13 42/22 42/24 43/3 43/20 44/3 45/12 47/12 50/2 50/8 53/6 53/18 56/3
[redacted]
**network [1]** 57/1
**networks [1]** 50/21
**never [1]** 39/25
**nevertheless [2]** 15/5 56/18
**new [4]** 10/8 18/6 58/12 59/20
**next [1]** 36/6
**NIELSEN [64]** 1/3 2/24 3/12 3/16 6/8 6/11 8/16 8/23 12/4 12/6 13/2 15/13 16/4 16/8 16/14 16/23 17/3 17/12 17/15 18/3 21/2 21/8 24/16 28/10 28/15 28/24 30/25 34/17 36/8 37/1 37/19 37/20 37/25 38/25 39/24 40/8 41/19 42/14 42/20 44/23 45/12 45/15 48/4 48/6 49/17 51/7 51/7 54/11 54/14 56/2 56/24 57/6 57/9 58/15 58/24 59/2 59/3 59/5 59/14 60/2 60/17 60/18 61/2 63/6
**Nielsen's [13]** 11/11 12/16 12/17 15/23 16/5 24/18 40/7 40/15 41/8 41/17 42/19 52/1 59/13
**nine [9]** 7/12 12/8 36/1 40/16 42/25 43/19 43/23 49/7 56/3
**nine-year [4]** 36/1 40/16 42/25 56/3
**no [24]** 1/4 5/23 12/6 12/15 15/5 19/24 24/23 24/24 30/21 31/16 32/22 35/6 36/11 45/10 47/6 47/19 48/22 49/5 50/6 50/13 55/20 60/13 61/23 61/23
**noncontractual [1]** 53/5
**nonetheless [1]** 45/5
**normally [1]** 39/11
**NORONHA [2]** 2/10 4/1
**Northern [2]** 10/9 10/13
**not [83]**
**note [2]** 10/13 19/9
**notes [1]** 65/6
**Nothing [1]** 64/19
**noticed [1]** 10/19
**noting [1]** 19/10
**now [22]** 6/23 14/10 17/5 22/13 23/19 27/4 29/7 31/19 39/9 41/7 43/5 43/7 43/14 47/6 49/6 53/25 54/11 54/22

**N**

**now... [4]** 58/4 59/23 61/3 61/22
**number [22]** 3/1 5/21 7/7 13/6 14/12 30/23 37/18 39/16 40/10 40/11 43/17 48/15 48/17 51/2 51/2 52/8 56/9 57/5 57/20 57/23 58/7 62/22
**Number 1 [3]** 7/7 37/18 62/22
**Number 2 [1]** 30/23
**numbers [2]** 6/23 22/10

**O**

**O [1]** 2/17
**objection [1]** 58/16
**objective [2]** 62/7 62/12
**obtain [2]** 17/4 17/8
**Obviously [1]** 58/10
**occasions [1]** 28/12
**occur [1]** 31/21
**off [6]** 17/14 23/11 23/16 26/23 49/9 64/24
**offer [4]** 37/1 37/24 42/20 43/1
**offered [2]** 36/8 40/1
**offering [1]** 42/21
**Official [1]** 65/9
**Oh [1]** 42/18
**okay [27]** 3/17 4/4 4/21 5/6 9/1 9/21 13/5 17/1 24/1 25/19 27/11 32/19 32/23 35/4 35/7 35/16 38/22 38/25 40/3 40/18 43/9 43/10 44/4 47/16 58/3 60/7 60/12
**OLSON [2]** 2/6 3/25
**once [2]** 44/13 49/8
**one [47]** 4/15 6/18 11/3 13/16 14/20 14/20 17/12 17/12 18/25 18/25 19/15 19/15 20/15 23/12 25/21 27/24 28/10 29/20 30/6 30/6 30/10 30/10 30/14 30/14 30/20 30/20 31/5 31/5 31/16 31/16 35/11 35/17 35/17 35/24 36/20 37/10 40/23 41/6 41/25 42/5 49/11 50/22 52/7 55/12 56/18 62/3 63/10
**onerous [3]** 41/19 47/13 57/1
**ones [5]** 17/15 32/10 34/6 34/15 34/16
**only [23]** 8/20 9/3 9/4 11/8 12/4 13/2 16/21 21/6 23/23 24/24 24/24 25/2 31/6 36/7 36/8 36/13 37/15 38/6 38/7 38/7 38/13 49/3 58/20
**open [3]** 17/25 59/25 60/1
**opening [2]** 35/22 41/5
**opposing [1]** 10/7
**opposition [1]** 6/9
**order [1]** 13/11
**orders [1]** 64/5
**original [1]** 13/7
**other [62]** 4/16 7/3 7/9 8/24 9/6 9/15 9/22 10/2 12/5 12/10 12/13 14/7 14/8 14/14 14/16 14/19 14/25 18/20 19/22 20/7 23/1 25/2 25/7 26/10 27/1 27/20 27/23 27/25 28/5 28/11 28/25 29/18 29/20 29/23 30/3 30/8 31/7 31/16 31/21 34/11 34/13 36/11 36/17 37/19 37/22 41/20 45/2 48/6 50/21 52/13 53/25 54/1 54/24 60/8 60/9 60/20 61/9 62/19 63/22 63/23 63/23 64/8
**others [5]** 20/20 23/3 24/20 32/14 32/14
**otherwise [5]** 28/4 38/5 46/8 46/18 63/2
**our [74]**
**out [40]** 5/13 5/18 6/5 8/21 9/14 9/22 9/22 11/8 11/11 12/1 13/16 13/22 14/11 15/3 15/24 16/25 17/3 17/15 18/3 18/6 19/5 19/14 20/18 31/23 32/7 33/9 33/18 33/19 35/20 43/14 45/18 46/8 54/12 55/8 57/21 57/23 59/19 62/3 63/9 63/13
**outdated [1]** 55/25
**outreach [6]** 17/23 18/13 18/19 18/25 18/25 30/9
**outright [1]** 58/15
**outside [1]** 10/1
**over [10]** 16/6 26/16 35/23 36/1 48/11 52/1 55/11 56/3 56/6 58/4
**overall [2]** 59/7 60/6
**overcome [1]** 9/12
**own [3]** 16/5 39/8 44/8

**P**

**P [1]** 2/17
**p.m [3]** 1/10 2/20 64/25
**page [4]** 12/16 22/7 22/9 60/9
**Page 2 [3]** 12/16 22/7 22/9
**Pages [1]** 35/23
**Pages 2 [1]** 35/23
**panel [1]** 58/25
**papers [1]** 60/14
**paragraph [4]** 16/11 22/4 36/6 57/12
**Paragraph 3 [1]** 22/4
**Paragraph 62 [1]** 16/11
**Paragraph 9 [1]** 57/12
**paragraphs [2]** 16/2 36/7
**Paragraphs 82 [1]** 16/2
[redacted]
**part [4]** 23/2 23/9 62/6 62/25
**participant [1]** 59/15
**participation [1]** 15/20
**particular [2]** 29/14 31/14
**parties [10]** 4/7 5/14 6/1 7/9 7/19 10/16 13/10 28/20 64/2 64/6
**partners [1]** 17/13
**party [6]** 7/6 11/3 11/5 37/20 61/10 61/12
**patent [7]** 17/6 20/13 21/4 21/14 34/12 62/19 63/5
**path [1]** 53/3
**pause [1]** 48/12
**paying [1]** 45/14
**penalized [1]** 33/19
**pending [1]** 64/8
**people [19]** 7/4 7/10 8/5 12/10 12/13 21/18 21/24 22/10 22/14 22/15 23/1 23/24 24/7 25/4 25/6 25/21 27/13 33/12 37/20
**people's [2]** 26/15 27/3
**per [3]** 29/16 42/24 43/23
**percent [10]** 48/7 51/9 51/14 51/17 52/6 54/13 55/3 56/6 56/11 56/21
**period [16]** 6/12 7/5 26/13 36/1 40/16 42/4 42/25 48/11 48/18 48/20 49/4 49/8 50/24 54/13 56/3 56/7
**permission [1]** 3/15
**permitted [4]** 5/24 6/5 8/9 12/24
**person [6]** 19/12 25/18 25/19 25/19 25/20 30/20
**personal [1]** 19/9
**personally [2]** 19/11 19/14
**phone [1]** 30/21
**pick [3]** 12/11 47/7 55/8
**picked [3]** 6/23 6/25 9/3
**picturing [1]** 37/14
**piece [2]** 47/12 61/9
**place [2]** 21/22 54/11
**plaintiff [21]** 1/4 1/25 3/12 4/17 5/3 5/17 6/21 6/23 6/25 7/15 8/2 21/18 26/14 33/17 37/12 46/11 47/22 55/7 55/9 62/12 64/15
**plaintiff's [9]** 3/7 9/22 20/1 20/3 24/2 29/19 31/25 47/20 64/13
**plaintiffs [2]** 46/12 58/7
**plan [1]** 59/14
**plans [1]** 19/10
**platform [1]** 34/20
**play [1]** 11/19
**player [1]** 63/7
**pleading [2]** 45/7 46/8
**pleadings [1]** 46/5
**please [2]** 13/17 17/23
**plural [1]** 31/23
**point [29]** 8/15 8/20 11/24 11/24 13/1 13/16 14/15 17/3 19/1 19/3 22/21 27/5 28/21 29/9 29/12 30/2 30/5 30/11 31/8 31/9 33/1 37/10 42/4 44/10 44/20 53/15 55/24 56/12 59/11
**pointed [1]** 52/11
**pointing [1]** 14/11
**points [1]** 17/15
**policies [3]** 34/4 34/8 34/17
**population [1]** 54/10
**portion [6]** 5/15 13/9 15/18 20/14 21/4 46/2
**portions [3]** 13/13 13/18 21/14
**position [10]** 6/9 11/10 12/18 24/18 33/15 38/17 39/18 41/11 49/11 53/11
**possess [2]** 33/3 35/2
**possible [2]** 41/4 49/2
**potential [2]** 17/12 30/14
**potentially [1]** 16/21
**POTTER [2]** 1/19 3/11
**power [4]** 56/24 57/1 57/4 57/6
**practice [1]** 57/22
**practices [3]** 15/16 34/4 45/6
**precisely [1]** 38/1
**premature [1]** 31/8
**prepped [2]** 18/19 18/21
**prepping [1]** 29/24
**presented [1]** 17/11
**press [1]** 30/10
**presumably [2]** 21/24 47/2
**presumptive [7]** 5/9 5/21 6/20 6/25 8/6 8/9 11/20
**pretty [7]** 14/10 30/12 32/1 32/2 40/21 41/2 45/25
**price [1]** 16/10
**pricing [1]** 20/15
**principle [2]** 61/12 61/14
**privileged [2]** 52/25 63/20
**probably [6]** 14/15 40/11 40/12 45/19 49/8 56/15
**problems [1]** 62/21
**procedurally [1]** 64/13
**proceed [2]** 40/24 62/11
**proceeding [2]** 61/23 65/7
**proceedings [2]** 2/19 64/25
**process [1]** 27/20
**produce [13]** 31/11 36/8 37/1 40/1 42/21 48/9 49/19 53/2 53/6 53/15 58/15 59/5 63/19
**produced [1]** 62/1
**producing [1]** 53/16
**production [9]** 4/11 4/12 10/15 10/19 10/24 28/4 28/15 28/19 29/18
**productions [1]** 34/12
**products [2]** 18/7 59/1
**Professional [1]** 62/5
**promoted [1]** 15/17
**promotion [1]** 15/18
**prong [1]** 62/11
**pronounced [1]** 9/7
**proportional [3]** 53/8 54/15 54/21
**proportionality [1]** 48/3
**proposal [1]** 50/12
**proposals [1]** 46/21
**propose [2]** 13/2 13/3
**proposed [8]** 8/18 23/7 23/13 28/13 31/10 52/23 54/10 54/24
**proposing [5]** 53/4 54/6 54/7 55/5 56/2
**prove [5]** 45/17 45/18 45/20 58/20 59/6
**provide [2]** 6/11 55/1
**provided [5]** 8/16 8/21 11/16 16/14 30/24
**provider [1]** 41/20
**provides [1]** 12/17
**provisions [2]** 52/16 52/16
**proxy [2]** 16/5 28/23
**public [4]** 15/12 16/13 28/22 42/16

**P**

pull [1] 49/19
pulling [1] 51/21
punishing [1] 21/8
purchased [1] 63/3
pursue [1] 12/24
pursuing [1] 63/16
push [3] 45/13 45/14 57/1
put [8] 12/8 12/9 15/10 38/13 39/2 39/8 49/20 52/13
putting [3] 30/9 34/7 34/17

**Q**

quarters [1] 53/10
question [4] 44/5 45/21 45/22 61/17
questions [2] 15/25 31/24
QUINN [3] 2/6 3/25 60/25
quote [3] 15/24 17/23 33/22
quotes [1] 61/2

**R**

R [3] 2/17 65/8 65/9
raised [2] 3/3 4/8
Rao [38] 4/10 5/19 6/3 7/2 8/3 8/19 9/7 9/8 9/9 9/10 12/8 12/12 14/19 15/11 15/14 15/23 16/15 17/8 19/19 21/25 23/12 24/10 25/22 28/2 29/24 30/13 31/16 31/23 32/2 32/8 32/9 33/6 33/13 33/25 34/6 34/11 34/14 35/2
Rao's [2] 15/7 15/18
rare [1] 44/22
rather [1] 28/9
reach [4] 15/24 16/25 18/3 31/23
reached [2] 19/5 20/18
reaches [1] 32/7
reaching [1] 19/14
read [1] 61/18
reader [1] 44/12
reading [1] 61/17
real [3] 29/11 36/11 62/5
reality [1] 11/19
really [21] 5/13 5/18 9/14 10/25 11/1 14/22 14/23 15/3 16/16 18/4 20/14 21/7 30/2 33/22 34/3 36/4 36/25 39/19 41/4 41/11 56/1
RealTech [4] 61/1 61/3 61/8 61/14
reason [3] 7/24 13/8 62/25
reasonable [1] 39/19
reasons [3] 26/1 38/19 50/16
rebut [1] 14/5
rebuttal [2] 4/17 32/24
recent [1] 62/23
reconnect [1] 18/4
record [9] 2/22 2/23 3/6 22/1 22/2 22/17 29/12 30/13 64/24
[redacted] [1] 19/11
reduce [1] 43/16
refer [1] 59/16
referenced [1] 59/21
refusing [2] 58/15 59/5
regard [3] 4/9 7/3 20/9
regarding [2] 4/13 39/15
rehash [1] 58/11
reignite [2] 17/24 18/8
related [10] 4/11 4/12 5/5 17/6 18/7 32/4 50/2 62/18 62/19 63/19
relates [4] 4/10 5/15 5/16 44/7
relating [13] 26/11 36/1 36/18 36/21 37/9 37/16 38/10 40/22 40/25 43/20 48/21 48/22 58/6
relationships [1] 54/11
releases [1] 30/10
relevance [6] 15/11 16/15 27/21 27/22 34/1 58/16
relevant [26] 7/5 7/24 8/18 9/16 11/1 13/9 13/13 13/20 14/3 16/11 16/21 18/14 19/16 20/16 20/20 28/3 33/6 48/11 53/1 55/12 59/10 59/17 60/15 60/20 61/25 63/24
reminding [2] 13/14 13/23
reminds [1] 13/5
renewal [21] 16/9 37/2 37/24 38/18 40/1 41/10 41/14 41/15 42/6 42/13 42/15 43/3 43/21 43/25 47/12 49/3 50/2 53/23 53/24 54/3 54/5
renewals [7] 16/7 48/11 48/20 48/21 48/22 50/23 54/2
renewed [4] 16/8 49/1 49/7 54/12
replaced [1] 22/15
replacement [4] 6/10 6/12 12/20 12/21
replacements [2] 7/11 13/1
replied [1] 32/13
reply [3] 36/15 60/10 63/10
REPORTER [2] 65/3 65/9
repository [4] 36/11 49/21 49/25 50/1
representation [1] 49/5
request [8] 5/19 5/20 21/3 26/21 35/10 39/23 41/6 53/2
requested [3] 10/20 11/5 57/19
requires [2] 24/15 59/12
residence [1] 30/9
resolve [1] 64/11
resolving [1] 64/5
respect [3] 10/7 12/20 34/9
respective [1] 64/6
respond [2] 36/13 55/24
responded [1] 15/13
response [2] 14/10 28/6
responsibilities [2] 6/13 15/20
responsive [2] 53/1 53/7
rest [2] 13/11 60/14
restriction [3] 44/24 45/11 49/15
restrictions [2] 41/19 52/22
rev [1] 41/25
revenue [25] 35/25 42/5 43/12 43/15 43/16 43/21 43/24 46/25 48/8 48/17 51/10 51/10 51/14 51/17 52/6 54/3 54/13 54/18 55/3 56/6 56/12 56/14 56/15 56/21 57/5
review [1] 34/20
reviewing [1] 54/20
RFP [2] 58/14 58/22
RFPs [2] 35/15 35/18
RICHARD [2] 2/10 4/1
right [53] 4/4 5/17 7/17 7/25 10/5 12/1 12/14 17/5 18/16 19/25 21/20 22/18 22/19 22/20 24/6 27/4 27/9 27/11 27/12 27/15 27/17 28/7 31/19 36/9 36/23 37/15 39/17 40/6 41/7 42/19 43/5 43/7 44/1 44/3 44/4 46/16 46/19 47/16 48/15 48/17 48/23 48/25 49/6 50/1 50/13 51/7 52/15 54/11 56/15 57/20 60/23 61/22 63/25
Rini [4] 23/6 23/6 23/11 23/16
rival [1] 61/7
role [1] 16/16
[redacted] [1] 19/9
rote [1] 10/22
round [1] 6/5
RPR [1] 65/9
rule [3] 27/23 61/2 61/5
Rule 26 [1] 27/23
rules [1] 11/16
RUSSELL [2] 2/3 3/23

**S**

s [4] 2/17 15/22 31/22 65/8
said [21] 8/4 9/4 9/10 12/4 12/13 20/20 23/10 23/14 25/14 25/18 25/19 25/22 25/25 26/1 28/18 37/10 46/3 46/6 46/22 49/18 64/23
same [5] 3/18 32/6 45/1 46/2 46/22
saw [2] 10/19 58/10
say [44] 2/22 7/6 7/25 9/11 11/16 13/6 14/7 14/21 14/24 22/11 26/6 27/11 29/12 30/1 36/15 37/14 38/7 38/23 38/25 38/25 39/9 40/5 40/8 40/9 40/18 40/19 40/19 41/18 41/24 45/7 46/3 46/4 46/12 47/5 47/23 52/12 53/22 55/6 55/22 57/13 57/19 58/9 59/24 60/22
saying [25] 7/13 8/7 9/5 15/24 21/17 24/8 24/23 24/25 33/10 33/15 39/12 42/3 42/10 43/5 43/6 46/15 48/13 48/19 51/6 57/18 59/23 60/2 62/14 62/17 63/4
says [7] 5/11 39/5 39/8 40/8 54/1 59/4 63/12
scenario [2] 8/6 8/7
schedule [1] 61/23
scheme [2] 63/13 63/18
se [1] 29/16
search [15] 6/22 22/14 26/20 31/17 38/8 38/14 39/3 39/7 39/8 39/9 39/19 41/9 51/2 52/23 53/4
searched [2] 24/7 50/18
searches [2] 17/9 53/19
searching [4] 5/10 26/19 27/3 54/19
second [13] 4/10 12/6 17/2 17/24 36/16 36/16 36/20 40/3 44/2 47/17 47/23 52/9 62/11
secretive [1] 31/5
section [2] 59/25 60/1
see [10] 6/1 6/11 7/3 7/16 16/24 19/5 26/3 28/20 32/14 53/18
seeing [1] 31/19
seek [1] 12/18
seeking [5] 5/24 6/3 8/11 11/8 62/18
seem [3] 36/9 44/10 56/17
seems [6] 5/14 27/18 40/21 44/8 51/12 61/18
seen [1] 45/24
sees [1] 7/15
segment [2] 48/5 48/9
segments [1] 48/6
select [1] 55/9
selection [1] 10/16
sell [1] 18/7
SELLERS [2] 2/9 5/2
send [1] 59/4
sends [2] 19/8 50/5
senior [1] 19/9
sense [2] 51/15 54/6
sensible [1] 28/14
sent [1] 10/18
sentence [1] 60/8
separate [10] 4/7 13/1 30/11 38/20 39/21 41/9 42/18 50/23 50/23 54/1
separately [2] 42/12 43/19
serial [3] 58/19 60/15 60/16
series [2] 59/8 60/24
service [1] 57/2
services [4] 15/21 17/20 19/6 51/8
serving [1] 26/15
set [15] 4/6 5/22 6/21 10/18 11/6 13/15 15/12 17/2 17/6 19/6 34/4 34/8 41/16 43/2 54/6
sets [2] 5/9 36/19
setting [1] 13/11
seven [2] 40/15 40/16
several [4] 21/1 23/3 23/22 25/17
severs [1] 63/1
sham [6] 4/13 58/7 60/2 61/6 62/6 63/22
[redacted] [1] 19/11
SHAW [2] 2/3 3/23
she's [3] 24/25 24/25 30/11
shortly [1] 7/8
should [21] 8/4 8/14 9/5 9/10 9/11 12/12 24/7 25/5 27/14 31/11 36/4 37/1 39/5 42/11 50/7 50/8 53/14 54/14 54/15 62/13 63/21
shouldn't [2] 33/19

**S**

**shouldn't... [1]** 50/12
**show [14]** 8/12 8/13 8/23 11/17 11/21 14/4 15/11 16/15 17/11 28/24 32/1 34/14 34/25 37/11
**showing [10]** 9/25 11/22 14/5 15/5 27/22 29/13 29/19 30/24 33/17 59/12
**shown [4]** 10/24 15/22 30/4 34/5
**shows [3]** 14/21 29/3 45/1
**side [22]** 3/4 3/7 3/19 4/16 4/16 4/25 5/10 9/22 14/7 16/23 19/23 20/3 20/7 24/2 27/20 29/19 35/12 52/13 53/25 54/1 64/14 64/17
**sides [3]** 13/23 20/16 64/3
**signed [1]** 50/6
**silent [1]** 17/24
**similar [3]** 18/14 26/1 63/9
**similarly [2]** 60/10 63/11
**simple [2]** 58/23 59/3
**simply [1]** 41/17
**since [2]** 7/5 17/24
**single [1]** 45/2
**singular [1]** 33/5
**situated [1]** 63/11
**six [2]** 8/17 20/14
**slightly [1]** 52/9
**smaller [3]** 56/17 57/1 57/2
**Smith [1]** 12/9
**so [95]**
**solicitation [1]** 16/25
**solicited [1]** 15/23
**some [45]** 3/2 4/15 5/9 7/4 7/19 7/23 9/22 9/23 9/24 10/2 10/3 10/3 14/17 14/19 18/21 18/24 26/11 26/12 28/2 28/4 29/23 30/3 30/5 30/5 32/13 42/4 42/6 43/14 45/13 45/14 46/7 46/10 46/14 47/1 47/4 49/2 51/24 52/13 52/16 53/5 53/19 54/24 55/14 59/23 63/18
**someplace [1]** 22/1
**something [11]** 13/12 31/13 32/9 46/24 47/8 51/23 51/25 52/17 53/17 55/13 57/19
**sometimes [1]** 44/22
**somewhere [1]** 21/23
**soon [2]** 64/9 64/11
**sorry [5]** 9/4 49/13 54/17 58/24 62/4
**sort [5]** 8/23 10/22 20/23 21/7 28/14
**sorts [3]** 18/1 18/2 19/15
**sought [2]** 10/16 62/1
**Sounds [1]** 4/4
**space [2]** 56/6 56/22
**span [1]** 54/25
**specific [5]** 10/12 34/3 49/16 59/13 60/10
**specifically [2]** 17/21 18/7
**specifics [1]** 41/5
**spelled [1]** 5/13
**sphere [2]** 47/2 47/4
**split [4]** 20/13 21/3 23/24 23/25
**spurring [1]** 52/5
**staggered [1]** 46/17
**standard [30]** 5/8 5/11 5/21 5/25 6/6 8/5 8/13 8/22 9/3 9/13 10/3 10/3 10/4 10/11 11/7 11/13 11/20 12/19 12/22 12/25 24/15 33/2 33/23 39/1 39/5 39/7 44/9 44/13 44/16 44/24
**standardized [8]** 45/8 45/25 46/7 46/10 46/13 49/14 52/12 52/15
**standards [1]** 9/23
**standing [1]** 63/3
**start [9]** 3/6 4/22 4/23 15/9 17/14 20/6 36/3 37/5 46/24
**started [5]** 5/7 7/8 20/7 22/3 43/9
**starting [1]** 53/14
**starts [1]** 45/12
**stated [1]** 12/20
**statement [2]** 12/23 16/5
**statements [3]** 15/12 16/14 28/23
**STATES [2]** 1/1 1/15
**stay [1]** 61/23
**stayed [1]** 61/20
**steep [3]** 44/23 45/1 45/14
**STEIG [2]** 2/6 3/24
**stenographic [1]** 65/6
**step [1]** 56/2
**stepping [2]** 45/16 58/17
**stifle [1]** 60/3
**still [5]** 17/10 24/20 34/14 52/2 59/16
**straightforward [5]** 8/1 25/5 25/8 25/8 51/1
**streaming [3]** 18/6 18/9 57/2
**streamline [1]** 25/17
**Street [1]** 1/13
**stuff [3]** 7/8 27/3 59/23
**subbing [1]** 21/1
**subjective [2]** 62/8 62/11
**submitted [2]** 57/8 57/9
**subset [3]** 38/1 39/20 41/23
**subsidiary [1]** 50/21
**substance [1]** 13/25
**substantial [6]** 41/3 45/17 45/20 46/2 53/12 54/9
**succeeding [1]** 14/23
**successfully [1]** 45/13
**sue [1]** 59/4
**sued [1]** 58/24
**sufficient [6]** 15/5 27/22 53/14 54/14 56/22 63/21
**suggest [1]** 33/22
**suggested [1]** 8/17
**suggesting [2]** 16/20 24/5
**suggests [1]** 18/13
**SULLIVAN [1]** 2/6
**summarize [1]** 18/15
**supplier [2]** 63/1 63/3
**supposedly [1]** 60/22
**sure [9]** 6/15 10/6 15/8 18/22 20/10 21/13 32/5 43/11 48/12
**SVP [1]** 18/3
**swapped [1]** 25/17
**swept [1]** 39/23
**systems [1]** 51/25
**SZYMON [3]** 2/7 3/25 35/14

**T**

**table [2]** 4/6 28/14
**tactics [4]** 41/12 44/21 45/2 45/4
**take [15]** 4/14 4/24 23/11 23/15 23/15 29/11 40/18 41/2 50/12 57/13 57/15 58/23 64/4 64/12 64/24
**taken [1]** 28/16
**taking [5]** 6/8 20/2 35/11 47/21 54/16
**talk [4]** 21/13 35/23 36/7 36/17
**talked [2]** 23/8 52/14
**talking [21]** 6/18 7/10 12/7 21/9 21/14 21/15 22/13 29/2 30/7 36/3 36/14 40/6 40/20 40/20 47/11 49/25 50/11 51/8 51/13 54/16 59/21
**targeted [10]** 17/10 31/17 38/1 38/20 39/20 39/23 41/16 41/23 53/19 61/7
**task [3]** 49/20 50/16 51/1
**teaching [1]** 62/9
**team [2]** 30/25 31/20
**team-based [1]** 31/20
**teams [1]** 32/10
**television [1]** 48/5
**tell [7]** 7/24 12/6 18/15 22/17 25/15 29/10 39/6
**telling [3]** 23/19 24/3 26/14
**ten [74]**
**tenureship [1]** 16/8
**term [3]** 45/11 45/15 52/23
**terms [17]** 14/1 18/5 18/23 38/3 38/8 38/14 39/3 39/7 39/9 39/9 41/3 46/7 46/9 47/14 53/1 53/4 57/1
**than [23]** 5/21 6/24 8/9 8/18 24/5 25/7 25/14 27/14 33/15 33/22 38/5 40/9 45/19 47/6 48/22 53/14 54/6 57/1 57/5 57/15 57/23 57/25 58/1
**Thank [5]** 20/4 35/8 55/20 64/16 64/20
**that [442]**
**that's [70]**
**their [28]** 3/9 4/8 6/9 8/25 13/7 14/5 14/10 14/11 14/22 21/3 21/23 29/15 34/1 35/2 37/1 38/15 39/8 42/16 44/8 44/15 45/24 47/1 51/21 53/11 54/12 57/12 63/11 64/7
**theirs [1]** 31/23
**them [47]** 3/21 4/15 8/25 13/13 14/13 14/13 14/25 16/21 20/13 20/25 21/9 21/10 22/4 22/5 22/18 23/18 24/11 24/13 25/12 25/13 25/16 27/13 29/25 32/1 33/11 42/20 43/4 44/9 47/1 49/3 51/3 51/21 53/2 53/18 54/18 54/23 54/24 55/5 57/12 59/5 60/17 62/20 63/7 63/18 64/3 64/9 64/11
**themselves [5]** 3/6 16/14 34/15 41/13 50/1
**then [39]** 4/16 4/17 4/18 4/18 7/2 8/3 8/5 9/21 10/16 13/25 15/17 18/10 19/25 23/10 23/14 25/15 25/25 28/24 30/2 31/6 36/1 36/2 36/15 38/9 38/24 39/7 42/17 43/19 44/4 45/16 46/20 50/10 51/2 51/3 53/13 54/18 55/5 60/10 62/4
**theory [3]** 58/19 60/15 60/16
**there [59]** 4/7 8/8 9/15 10/13 10/15 10/15 10/21 11/23 16/13 16/20 17/6 18/12 18/13 18/17 19/13 21/22 22/1 22/7 22/8 22/10 23/3 24/19 26/18 27/23 30/25 31/4 31/5 31/14 32/7 34/10 34/13 34/18 34/19 34/21 34/23 34/24 36/6 36/7 42/6 44/13 46/7 46/22 47/4 48/12 50/5 50/20 52/15 53/21 55/13 55/14 59/3 59/22 61/23 63/12 63/13 64/1 64/8 64/10 64/12
**there's [32]** 6/21 7/19 8/9 8/23 8/24 9/23 10/2 15/6 18/24 18/25 20/15 26/5 26/17 30/21 30/21 31/13 31/15 31/16 36/23 37/4 37/15 38/6 38/7 38/7 48/19 50/16 53/17 53/19 57/25 62/20 63/11 63/12
**these [81]**
**they [104]**
**They'd [1]** 14/24
**they've [2]** 24/24 28/21
**thing [3]** 32/6 52/4 63/9
**things [10]** 2/22 17/17 33/18 42/18 46/4 46/18 52/14 54/1 60/10 62/3
**think [80]**
**third [1]** 4/12
**this [112]**
**Thomas [1]** 18/11
**those [68]**
**though [8]** 25/13 29/12 33/8 37/7 45/5 45/16 56/1 61/22
**thought [4]** 20/16 24/6 41/2 55/14
**three [7]** 4/7 4/20 6/13 28/8 28/24 53/10 64/6
**through [7]** 22/10 22/22 26/4 31/7 34/5 50/8 54/12
**throughout [1]** 50/24
**throw [1]** 9/22
**throws [1]** 9/22
**thrust [1]** 28/5
**Tier [1]** 38/16
**time [13]** 4/15 6/13 7/5 13/15 28/19 43/5 43/7 44/14 48/11 48/18 48/20 49/7 50/13
**today [6]** 2/23 3/2 4/3 60/5 64/13 64/24
**together [1]** 42/20
**told [2]** 43/4 54/22
**TOLL [2]** 2/9 5/2
**too [5]** 15/3 40/2 41/19 43/2 59/11

**T**

**took [2]** 57/12 60/22
**top [37]** 12/21 17/23 17/23 18/16 18/25 18/25 19/12 19/12 31/4 31/4 33/25 34/4 34/8 34/8 35/25 41/25 42/5 42/14 42/21 42/22 43/3 43/12 43/14 43/15 43/20 48/4 48/18 49/18 49/19 53/10 54/2 54/17 54/17 55/12 56/18 56/21 60/7
**total [6]** 43/17 43/17 48/8 48/14 55/10 56/6
**touting [1]** 30/7
**toward [1]** 17/10
**transcript [1]** 65/6
**transpiring [1]** 20/22
**treating [1]** 6/9
**tried [3]** 26/7 33/17 33/18
**triggered [1]** 11/7
**trouble [1]** 51/11
**true [5]** 33/21 45/23 46/5 50/10 65/5
**truly [2]** 19/11 52/15
**truth [1]** 38/6
**try [8]** 14/6 15/2 25/16 35/20 51/24 58/4 64/9 64/11
**trying [13]** 5/18 9/12 14/2 14/22 14/22 18/6 21/12 24/1 25/1 26/22 37/8 37/13 53/3
**turn [5]** 19/22 19/25 47/20 57/23 61/16
**turns [1]** 43/14
**TV [2]** 15/21 16/9
**TV's [1]** 58/25
**TVISION [22]** 1/6 2/25 3/24 5/3 6/3 15/10 15/15 16/1 20/18 21/8 23/9 24/16 35/15 58/21 58/23 58/24 59/7 59/16 60/5 62/18 63/8 63/20
**TVision's [3]** 26/21 40/7 46/12
**Twenty [1]** 42/24
**twice [2]** 44/13 58/24
**two [28]** 6/4 7/1 7/2 8/5 8/17 12/13 14/13 14/14 21/3 23/1 23/25 24/19 25/4 27/7 27/8 28/8 29/5 33/20 33/25 35/15 35/24 36/7 36/23 36/25 37/4 42/11 62/6 62/24
**two-part [1]** 62/6
**Twombly [1]** 62/3
**type [5]** 9/15 45/3 49/16 54/5 63/18
**types [8]** 10/23 15/10 19/19 35/1 35/23 36/19 50/19 62/10
**typical [1]** 27/20
**typically [3]** 5/10 38/22 40/15

**U**

**U.S [1]** 65/10
**ultimately [1]** 63/16
**under [13]** 5/25 6/5 8/21 9/2 9/12 12/18 12/22 12/25 16/8 17/4 39/1 49/3 64/4
**underlying [1]** 42/22
**underscores [1]** 15/19
**understand [13]** 5/8 21/13 29/9 37/8 43/11 48/8 50/7 51/3 51/19 53/11 53/25 56/20 57/10
**understanding [2]** 6/8 38/3
**understood [2]** 12/17 60/11
**underway [1]** 51/25
**unduly [1]** 36/9
**unfilled [1]** 15/19
**uniform [2]** 45/4 46/19
**uniformity [1]** 44/19
**unique [8]** 14/7 14/20 15/6 15/19 17/5 18/23 30/22 44/2
**uniqueness [3]** 8/24 30/15 30/15
**unit [4]** 15/15 15/15 15/17 50/19
**UNITED [2]** 1/1 1/15
**universe [1]** 38/1
**unless [1]** 13/12
**unreasonable [3]** 9/25 10/4 11/18
**until [3]** 15/17 16/5 28/14
**up [29]** 4/24 16/9 19/6 20/2 20/22 21/1 25/1 26/25 27/25 29/5 29/21 36/14 37/11 39/23 40/8 42/6 42/15 43/24 44/13 44/17 45/20 51/14 51/17 52/13 54/3 54/17 55/3 58/4 64/12
**upcharge [3]** 46/10 46/17 52/21
**upon [7]** 6/4 6/14 8/15 12/22 14/9 14/14 26/10
**URQUHART [1]** 2/6
**us [17]** 1/3 2/25 3/12 5/7 5/7 17/22 18/13 20/18 22/7 22/8 23/13 25/15 25/21 27/5 39/13 55/8 55/8
**use [11]** 13/17 34/19 39/4 39/6 39/10 41/19 41/20 44/24 45/11 49/15 52/22
**used [2]** 38/8 52/20
**using [1]** 38/14
**utilize [1]** 46/12

**V**

**v [2]** 1/5 62/24
**variety [1]** 38/19
**various [1]** 34/9
**verbal [1]** 32/3
**verify [1]** 51/3
**versa [1]** 37/20
**versus [1]** 2/25
**very [12]** 6/12 8/1 9/23 10/3 10/11 10/14 10/22 11/17 20/4 46/1 50/15 64/16
**via [2]** 2/19 32/7
[redacted] **[1]** 19/12
**vice [1]** 37/20
**video [4]** 1/11 2/19 2/24 64/23
**VideoAmp [6]** 58/24 58/24 58/25 59/4 63/5 63/6
**view [17]** 6/19 6/25 9/19 9/20 10/2 12/3 20/8 20/11 24/14 24/25 25/3 25/9 25/10 40/2 48/17 53/9 60/23
**violation [1]** 63/2
**visit [2]** 19/11 19/11
**VP [2]** 17/19 19/5

**W**

**wait [1]** 36/16
**want [24]** 7/2 11/17 11/21 17/3 23/10 23/11 25/14 25/18 25/25 27/14 29/11 32/24 35/25 46/11 47/17 53/22 55/22 56/16 58/4 58/9 58/11 58/12 60/21 63/17
**wanted [4]** 23/13 32/20 55/8 55/23
**warranted [1]** 28/20
**WARREN [2]** 1/22 3/13
**was [41]** 7/4 8/1 8/3 9/2 9/15 10/20 12/23 13/3 15/17 15/18 15/25 16/4 16/6 16/9 18/10 18/10 18/12 19/14 23/4 23/7 23/12 23/14 23/17 25/22 27/5 28/16 28/16 31/16 41/25 42/5 46/21 50/15 52/21 57/20 58/19 59/18 59/21 61/7 61/11 62/22 62/23
**wasn't [2]** 58/12 61/10
**way [18]** 2/24 4/19 7/16 7/16 9/6 13/5 22/7 22/8 27/2 27/12 27/24 37/23 39/10 40/10 53/7 60/21 62/13 64/7
**ways [2]** 46/14 60/20
**we [255]**
**we'd [3]** 9/14 23/14 47/6
**we'll [6]** 3/6 3/19 4/15 48/20 64/10 64/23
**we're [14]** 17/5 22/13 31/19 40/5 40/20 43/2 50/11 52/8 53/3 53/17 55/9 58/4 58/22 62/14
**we've [13]** 8/15 15/22 21/6 26/4 29/18 30/4 31/10 45/24 47/5 49/20 52/22 54/9 63/18
**weeds [2]** 16/16 16/19
**week [1]** 64/5
**Weinstein [1]** 17/20
**well [24]** 4/1 7/6 8/4 14/17 15/3 15/20 16/20 23/20 25/25 29/8 30/19 33/24 36/15 39/24 40/5 40/20 41/8 43/10 47/5 50/14 59/25 62/2 63/12 63/25
**went [1]** 49/3
**were [45]** 4/7 4/8 7/25 8/6 8/7 8/11 9/5 10/21 10/21 10/23 17/4 17/7 17/7 17/9 17/9 19/20 20/20 22/15 23/2 23/3 23/20 24/5 24/10 24/12 26/9 26/22 26/22 29/2 29/20 30/13 34/6 34/11 34/15 34/15 34/16 34/16 43/24 46/20 52/2 54/3 55/5 55/14 57/21 61/7 61/20
**weren't [2]** 38/23 59/21
**what [73]**
**what's [6]** 5/14 10/2 12/14 29/3 32/15 58/10
**whatever [8]** 11/23 13/8 13/25 14/1 24/16 38/9 39/16 46/1
**when [16]** 6/17 7/22 12/5 13/14 15/17 20/12 21/13 22/4 23/8 36/3 40/19 44/17 45/7 48/15 51/13 63/9
**where [22]** 9/2 10/4 11/25 13/22 20/7 21/23 21/24 21/25 27/20 28/17 31/15 31/16 32/7 41/18 45/11 47/13 51/14 51/20 51/21 52/2 59/6 61/22
**whereas [1]** 53/25
**whereby [1]** 18/3
**whether [7]** 7/15 9/11 14/4 25/4 27/18 27/19 27/23
**which [24]** 5/16 7/1 11/7 13/10 15/15 15/15 15/19 15/25 16/10 20/8 20/23 22/7 23/6 29/12 36/17 38/4 44/7 47/2 47/6 49/19 52/21 55/4 58/19 59/9
**while [3]** 19/10 26/22 26/22
**who [20]** 4/24 7/16 19/7 19/8 19/9 20/8 22/14 22/15 23/1 23/1 26/10 32/10 34/6 34/15 34/16 35/11 41/25 61/5 61/7 63/1
**whoever [1]** 14/1
**whole [3]** 47/1 54/19 60/8
**whose [2]** 7/20 24/7
**why [23]** 7/24 8/9 10/5 12/17 20/9 25/3 25/9 26/5 27/22 29/17 29/19 29/21 30/17 33/21 33/21 44/16 46/4 46/24 50/16 52/19 55/15 56/20 58/3
**wide [1]** 60/2
**will [39]** 3/7 3/16 3/20 4/2 4/14 4/17 4/18 5/4 6/1 6/11 10/13 13/15 14/3 17/1 17/14 18/3 19/5 22/8 34/20 34/22 34/23 34/24 35/2 37/11 39/22 40/18 43/16 50/22 52/24 53/6 57/23 58/1 59/11 60/14 63/25 64/4 64/5 64/6 64/24
**willing [1]** 43/2
**Wilmington [1]** 1/13
**win [2]** 36/4 61/19
**window [1]** 9/14
**within [1]** 18/3
**without [2]** 58/19 59/8
**withstanding [1]** 49/21
**words [4]** 12/5 25/7 60/8 60/9
**work [7]** 15/3 26/22 33/18 33/19 39/11 47/9 64/10
**works [1]** 30/25
**world [6]** 9/1 33/15 40/7 40/7 55/4 62/24
**worrisome [1]** 44/12
**Worth [1]** 28/17
**would [61]** 5/16 5/22 6/21 8/12 9/11 12/9 12/18 12/24 12/25 13/2 13/2 13/3 13/3 13/18 14/15 15/9 17/18 20/16 22/11 25/4 27/6 27/12 28/3 29/17 33/1 33/6 33/13 33/14 34/13 36/22 37/16 38/4 38/5 38/9 38/15 38/16 38/20 39/10 39/21 39/23 41/18 42/9 44/2 45/1 47/2 47/4 47/10 49/1 49/7 50/14 51/6 54/24 55/7 55/15 55/16 56/12 56/16 57/13 57/14 57/20 63/2
**wouldn't [15]** 7/6 8/7

**W**

**wouldn't... [13]** 12/8 27/6 27/8 27/13 33/21 33/21 38/15 45/4 46/24 47/14 56/20 61/19 61/21
**wrap [1]** 58/4
**wrong [5]** 30/18 45/9 45/10 57/18 60/18

**X**

**X [1]** 11/17
**XYZ [2]** 42/1 42/5

**Y**

**yeah [7]** 20/10 23/6 32/2 39/12 45/23 46/13 50/14
**year [16]** 16/10 36/1 40/16 42/14 42/14 42/15 42/25 42/25 43/3 43/13 43/23 49/7 54/4 54/17 56/3 57/25
**years [4]** 40/15 43/20 43/22 43/24
**yes [21]** 7/17 9/8 9/17 9/20 16/22 19/2 20/4 22/20 24/9 27/16 28/7 32/25 35/18 37/4 37/23 42/2 42/8 52/19 55/23 56/8 58/14
**yet [5]** 9/13 11/25 17/10 34/14 61/23
**you [272]**
**you're [3]** 7/1 27/11 35/24
**you've [7]** 11/21 26/16 26/16 29/13 29/16 30/1 54/23
**your [105]**